UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CENTRAL LABORERS' PENSION FUND, Derivatively on Behalf of UNIVERSAL HEALTH SERVICES, INC., | ) ) ) | Civ. Action No. |
| | ) | VERIFIED SHAREHOLDER DERIVATIVE |
| Plaintiff, | ) ) | COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS FOR BREACH OF |
| vs. | ) ) | FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT, |
| ALAN B. MILLER, MARC D. MILLER, STEVE G. FILTON, DEBRA K. OSTEEN, MARVIN G. PEMBER, ANTHONY PANTALEONI, LAWRENCE S. GIBBS, JOHN H. HERRELL, ROBERT H. HOTZ and EILEEN C. MCDONNELL, | ) ) ) ) ) ) ) | CONSTRUCTIVE FRAUD, CORPORATE WASTE AND UNJUST ENRICHMENT |
| Defendants, | ) ) | |
| – and – | ) ) | |
| UNIVERSAL HEALTH SERVICES, INC., a Delaware corporation, | ) ) ) | |
| Nominal Party. | ) ) | |
| | ) | DEMAND FOR JURY TRIAL |

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought by the Central Laborers' Pension Fund ("Central Laborers"), a shareholder of Universal Health Services, Inc. ("UHS" or the "Company"), on behalf of the Company against all of the members of its current Board of Directors (the "Board") and certain of its senior executives (collectively, "defendants").  This action seeks to remedy defendants' violations of federal and state law, including violations of the federal securities laws, breaches of fiduciary duty, abuse of control, gross mismanagement, constructive fraud, corporate waste and unjust enrichment, arising out of a scheme and wrongful course of business whereby defendants, between April 2014 and the present (the "Relevant Period"), caused UHS to, among other things, illicitly over-admit patients to its inpatient mental health facilities, improperly bill government agencies for these illicit fees in violation of the False Claims Act, operate without effective internal controls, and file misleading financial reports with the Securities and Exchange Commission ("SEC"), thus artificially inflating the price of UHS common stock by concealing the illicit source of a growing portion of UHS's reported revenues.  Meanwhile, with the price of UHS common stock artificially inflated as a result of their misconduct, defendants caused UHS to repurchase tens of millions of dollars' worth of UHS common stock on the open market at fraud-inflated prices, further buttressing the market price of UHS common stock, while simultaneously unloading millions of dollars' worth of their own personally held shares into that same public market, reaping tens of millions of dollars in profits.  Central Laborers, a long-time shareholder of UHS, brings this action on behalf of the Company to recover damages it has suffered because none of the faithless fiduciaries on its Board are independent or disinterested enough to do so.

## INTRODUCTION AND SUMMARY OF THE ACTION

2.      UHS is the nation's largest operator of mental health facilities.  Since its founding in 1978, the Company has grown through acquisitions and currently owns and/or operates 319

inpatient facilities and 33 outpatient and other facilities located in 37 states, Washington D.C., the United Kingdom, Puerto Rico and the U.S. Virgin Islands.

3.      Since at least 2010, the Company has engaged in a pattern and practice of illicitly over-admitting inpatient behavioral health services patients, admitting them and keeping them admitted for financial rather than medical reasons, providing sub-standard care by untrained medical technicians at its facilities, and repeatedly and illegally billing Medicare and Medicaid for those "services." This misconduct, along with UHS's potential extensive legal liability, has been brought to the attention of UHS's current Board repeatedly over the past seven years and yet the Board has steadfastly refused to address the misconduct. As a result, the Company is presently subject to at least 25 civil investigations for potential violations of the False Claims Act, a Civil War era law that makes it illegal to submit false claims to the U.S. government and subjects violators to substantial criminal and civil liability. Indeed, UHS has already settled two actions alleging False Claims Act violations, paying millions of dollars to settle each. The Company currently faces another so-called *qui tam* action under the False Claims Act, and a 24-page *BuzzFeed* report published in December 2016 describes, in excruciating detail, the misconduct of UHS's senior executives, all overseen by its Board.

4.      Meanwhile, with UHS common stock trading at fraud-inflated prices due to their own misconduct, the same defendants further damaged UHS by causing it to spend tens of millions of dollars repurchasing shares of common stock at fraud-inflated prices. The Board, as currently composed, was unwilling and/or unable to stop the stock repurchases, because each member of the Board was either personally complicit in the misconduct as a result of selling stock into the market at inflated prices at the time of the stock repurchases or was under the control of the Chairman of UHS's Board, who along with other family members controls the election of 80% of the Board

members, and who personally directed the misconduct alleged herein and was also selling stock into the market at fraud-inflated prices during the Relevant Period.

5.       Defendants' malfeasance, mismanagement and self-dealing during the Relevant Period has wreaked, or threatens to wreak, hundreds of millions of dollars' worth of damages on UHS.  The Company's senior executives were incentivized to cause UHS to engage in and conceal a pattern and practice of illicit over-admissions engineered to increase reported revenues and allow the executives to profit from their misconduct by paying themselves tens of millions of dollars in incentive compensation.  In addition, as a result of their issuing false and misleading financial reports and statements, which ran up the market price of UHS common stock, all but one of the defendants, while in possession of material non-public information, was able to abuse their fiduciary relationship with the Company by selling *$26.7 million* worth of their personally held UHS shares at artificially inflated prices during the Relevant Period.  Meanwhile, in a further effort to buttress the market price of UHS common stock to facilitate those profitable stock sales, defendants were also damaging UHS by causing the Company to repurchase more than $514 million worth of its own shares at artificially inflated prices, causing UHS to overpay an estimated $29.7 million for the shares it repurchased.  As a result of defendants' misconduct, the Company has been sued in this Court by purchasers of its common stock seeking hundreds of millions of dollars in damages on a class-wide basis for violations of the federal securities laws.  The Company has also been named as a defendant in a *qui tam* action seeking tens of millions of dollars for violations of the False Claims Act and is the subject of one criminal and at least 25 civil investigations for violations of the False Claims Act.

6.       Defendants' gross mismanagement, malfeasance, misrepresentations, self-dealing and wrongful course of conduct violated the Securities Exchange Act of 1934 (the "Exchange Act"), as well as Pennsylvania and Delaware state law, exposing UHS to criminal and civil liability

for False Claims Act violations and violations of the federal securities laws.  By authorizing and/or acquiescing in the pattern and practice of illicit over-admissions, the improper billing of the U.S. government, the misstatement of the Company's financial results, and by forcing UHS to become a victim of the same fraud, defendants: (i) caused UHS to defraud the U.S. government in violation of the False Claims Act; (ii) caused UHS to issue materially false and misleading financial reports to it investors and to file materially false and misleading financial statements with the SEC in violation of the federal securities laws; (iii) caused UHS common stock to trade at artificially inflated prices; (iv) facilitated the sale of $26.7 million worth of UHS's senior executives' and directors' personally held UHS common stock at artificially inflated prices; (v) facilitated the payment of more than $74 million in executive compensation based on illicit revenue reports; (vi) caused UHS to overpay an estimated $29.7 million to repurchase its own shares at artificially inflated prices; (vii) exposed UHS to hundreds of millions of dollars in potential liability to regulators and investors; and (viii) permitted UHS's senior executives and directors to unjustly enrich themselves to the detriment of the Company.  This action seeks to recover for UHS against these faithless fiduciaries, which UHS's Board is simply unable or unwilling to do.

## JURISDICTION AND VENUE

7.     The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder, and under state law for breach of fiduciary duty, abuse of control, gross mismanagement, constructive fraud, corporate waste and unjust enrichment.  In connection with the acts, conduct and other wrongs complained of herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the U.S. mail and the facilities of the national securities markets.

8.     This Court has subject matter jurisdiction pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1331.  This Court also has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367.

9.     This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

10.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1391(b).  Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because: (i) UHS maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to UHS, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

12.     Plaintiff Central Laborers is a UHS shareholder and has continuously held UHS stock since at least 2008.  Plaintiff will fairly and adequately represent UHS's interests in this action.

13.    Nominal party UHS is a Delaware corporation founded in 1978.  UHS's corporate headquarters are located at 367 South Gulph Road, King of Prussia, Pennsylvania 19406.

14.    Defendant Alan B. Miller ("Alan Miller") founded UHS in 1978.  Defendant Alan Miller has served as UHS's Chairman of the Board and Chief Executive Officer ("CEO") since its founding and served as its President until May 2009.  UHS's 2016 Annual Proxy Statement concedes that defendant Alan Miller lacks independence from the other Board members due to his positions at the Company and relationships with its management.  Because of defendant Alan Miller's positions, he knew the adverse non-public information about the business of UHS, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, defendant Alan Miller directed the illicit over-admission of patients at UHS facilities, the submission of illicit claims for services to the U.S. government, and participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings.  Defendant Alan Miller also caused UHS to repurchase its own stock at fraud-inflated prices.  With knowledge of material non-public information regarding the Company, defendant Alan Miller sold approximately $4.6 million worth of his personally held UHS stock during the Relevant Period at fraud-inflated prices.

15.    Defendant Marc D. Miller ("Marc Miller") is defendant Alan Miller's son and has served as a member of the UHS Board since 2006 and as its President since May 2009.  UHS's 2016 Annual Proxy Statement concedes that defendant Marc Miller lacks independence from the other Board members due to his positions at the Company and relationships with its management. Because of defendant Marc Miller's positions, he knew the adverse non-public information about

the business of UHS, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof and via reports and other information provided to him in connection therewith.   During the Relevant Period, defendant Marc Miller directed the illicit over-admission of patients at UHS facilities, the submission of illicit claims for services to the U.S. government, and participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings.  Defendant Marc Miller also caused UHS to repurchase its own stock at fraud-inflated prices.   With knowledge of material non-public information regarding the Company, defendant Marc Miller sold approximately $1.4 million worth of his personally held UHS stock during the Relevant Period at fraud-inflated prices.

16.     Defendant Anthony Pantaleoni has served as a member of the UHS Board since 1982.  Defendant Pantaleoni also serves as Of Counsel to the law firm of Norton Rose Fulbright US LLP, New York, New York ("Norton Rose"), UHS's long-term outside counsel.  Norton Rose also provides personal legal services to defendant Alan Miller and is also the trustee of certain trusts for the benefit of defendant Alan Miller and his family.   Defendant Pantaleoni's compensation at Norton Rose is largely dependent upon the continued engagement by and payments for legal services to UHS and defendant Alan Miller.  UHS's 2016 Annual Proxy Statement expressly concedes that defendant Pantaleoni lacks independence from the other Board members due to his positions at the Company and Norton Rose and his relationships with UHS management.  Because of defendant Pantaleoni's positions, he knew the adverse non-public information about the business of UHS, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and

committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, defendant Pantaleoni directed the illicit over-admission of patients at UHS facilities, the submission of illicit claims for services to the U.S. government, and participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings. Defendant Pantaleoni also caused UHS to repurchase its own stock at fraud-inflated prices. With knowledge of material non-public information regarding the Company, defendant Pantaleoni sold approximately $2 million worth of his personally held UHS stock during the Relevant Period at fraud-inflated prices.

17.     Defendant Lawrence S. Gibbs has served as a director of UHS since 2011. Because of Gibbs's position, he knew the adverse non-public information about the business of UHS, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, defendant Gibbs directed the illicit over-admission of patients at UHS facilities, the submission of illicit claims for services to the U.S. government, and participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings. Defendant Gibbs also caused UHS to repurchase its own stock at fraud-inflated prices. With knowledge of material non-public information regarding the Company, defendant Gibbs sold approximately $1.5 million worth of his personally held UHS stock during the Relevant Period at fraud-inflated prices.

18.     Defendant John H. Herrell has served as a director of UHS since 1993. Because of Herrell's position, he knew the adverse non-public information about the business of UHS, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees,

attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, defendant Herrell directed the illicit over-admission of patients at UHS facilities, the submission of illicit claims for services to the U.S. government, and participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings. Defendant Herrell also caused UHS to repurchase its own stock at fraud-inflated prices. With knowledge of material non-public information regarding the Company, defendant Herrell sold approximately $1.6 million worth of his personally held UHS stock during the Relevant Period at fraud-inflated prices.

19.     Defendant Robert H. Hotz has served as a director of UHS since 1991. Because of Hotz's position, he knew the adverse non-public information about the business of UHS, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, defendant Hotz directed the illicit over-admission of patients at UHS facilities, the submission of illicit claims for services to the U.S. government, and participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings. Defendant Hotz also caused UHS to repurchase its own stock at fraud-inflated prices. With knowledge of material non-public information regarding the Company, defendant Hotz sold approximately $3.5 million worth of his personally held UHS stock during the Relevant Period at fraud-inflated prices.

20.     Defendant Eileen C. McDonnell has served as a director of UHS since April 2013. Because of McDonnell's position, she knew the adverse non-public information about the business of UHS, as well as its finances, markets and present and future business prospects, via access to

internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to her in connection therewith. During the Relevant Period, defendant McDonnell directed the illicit over-admission of patients at UHS facilities, the submission of illicit claims for services to the U.S. government, and participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings.

21.     Defendant Steve G. Filton has served as UHS's Executive Vice President and Chief Financial Officer ("CFO") at all relevant times. Because of defendant Filton's positions, he knew the adverse non-public information about the business of UHS, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, defendant Filton directed the illicit over-admission of patients at UHS facilities, the submission of illicit claims for services to the U.S. government, and participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings. Defendant Filton also caused UHS to repurchase its own stock at fraud-inflated prices. With knowledge of material non-public information regarding the Company, defendant Filton sold approximately $3.3 million worth of his personally held UHS stock during the Relevant Period at fraud-inflated prices.

22.     Defendant Debra K. Osteen has served as UHS's Executive Vice President and President-Behavioral Health Division at all relevant times. Because of defendant Osteen's positions, she knew the adverse non-public information about the business of UHS, as well as its finances, markets and present and future business prospects, via access to internal corporate

documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof and via reports and other information provided to her in connection therewith. During the Relevant Period, defendant Osteen directed the illicit over-admission of patients at UHS facilities, the submission of illicit claims for services to the U.S. government, and participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings. Defendant Osteen also caused UHS to repurchase its own stock at fraud-inflated prices. With knowledge of material non-public information regarding the Company, defendant Osteen sold approximately $6.7 million worth of her personally held UHS stock during the Relevant Period at fraud-inflated prices.

23.      Defendant Marvin G. Pember has served as UHS's Executive Vice President and President-Acute Care Division at all relevant times. Because of defendant Pember's positions, he knew the adverse non-public information about the business of UHS, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, defendant Pember directed the illicit over-admission of patients at UHS facilities, the submission of illicit claims for services to the U.S. government, and participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings. Defendant Pember also caused UHS to repurchase its own stock at fraud-inflated prices. With knowledge of material non-public information regarding the Company, defendant Pember sold approximately $2.2 million worth of his personally held UHS stock during the Relevant Period at fraud-inflated prices.

24.     The defendants identified in ¶¶14-20 comprise the current Board as of the filing of this complaint and are sometimes referred to herein as the "Director Defendants." The defendants identified in ¶¶14-15 and 21-23 are UHS executives and are sometimes referred to herein as the "Officer Defendants." The defendants identified in ¶¶14-19 and 21-23 sold stock during the Relevant Period and are sometimes referred to herein as the "Insider Selling Defendants."

## DEFENDANTS' FIDUCIARY DUTIES

25.     Each officer and director of UHS named herein owed the Company and UHS shareholders the duty to exercise a high degree of care, loyalty and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets, and to cause the Company to comply with all applicable law. The conduct of UHS's directors and officers complained of herein involves knowing, intentional and culpable violations of their obligations as officers and/or directors of UHS and violations of the federal securities law, resulting in UHS both being a victim of the securities fraud and being accused of being a perpetrator. Further, the misconduct of UHS's officers has been ratified by UHS's Board, which has failed to take any legal action on behalf of the Company against them.

26.     By reason of their positions as officers, directors and fiduciaries of UHS and because of their ability to control the business and corporate affairs of the Company, defendants owed UHS and its shareholders fiduciary obligations of candor, trust, loyalty and care, and were required to use their ability to control and manage UHS in a fair, just, honest and equitable manner, and to act in furtherance of the best interests of UHS and its shareholders so as to benefit all shareholders equally and not in furtherance of their own personal interest or benefit. Defendants also had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, earnings and compensation practices. In addition, as officers and/or directors of a publicly held company, the defendants had a duty to refrain from utilizing their

control over UHS to cause UHS to spend millions of dollars repurchasing its own stock at fraud-inflated prices that were the result of their own improper and/or unlawful practices.

27.     Because of their positions of control and authority as directors and/or officers of UHS, each of the defendants was able to and did, directly and indirectly, control the wrongful acts complained of herein.  As to the Director Defendants, these acts include: (i) directing UHS to engage in a pattern and practice of illicit over-admission of UHS patients and billing the U.S. government for those services, exposing the Company to liability for defrauding government agencies in violation of the False Claims Act; (ii) agreeing to and/or acquiescing in defendants' false financial reporting; (iii) permitting UHS to operate with inadequate internal controls; and (iv) causing UHS to repurchase tens of millions of dollars' worth of UHS common stock on the market at fraud-inflated prices, while the defendants were busy selling their own personally held UHS shares back into that same market.  Because of their positions with UHS, each of the defendants was aware of these wrongful acts, had access to adverse non-public information, and was required to disclose these facts promptly and accurately to UHS shareholders and the financial markets but failed to do so.  The same defendants were charged with protecting and preserving UHS's assets by not forcing it to repurchase its shares at fraud-inflated prices at the same time they were selling their own shares at fraud-inflated prices.

28.     To discharge their duties, the directors of UHS were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the business and financial affairs of UHS.  By virtue of such duties, the officers and directors of UHS were required, among other things, to:

(a)     manage, conduct, supervise and direct the business affairs of UHS in accordance with all applicable law (including federal and state laws, government rules and regulations, and the charter and bylaws of UHS);

- 13 -

(b)      neither engage in self-dealing nor knowingly permit any officer, director or employee of UHS to engage in self-dealing;

(c)      neither violate nor knowingly permit any officer, director or employee of UHS to violate applicable laws, rules and regulations;

(d)      remain informed as to the status of UHS's operations, including its admissions, billing and accounting practices, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with the False Claims Act, the federal securities laws and their duty of candor to the Company's shareholders;

(e)      prudently protect the Company's assets, including not causing UHS to repurchase its own shares on the open market at fraud-inflated prices and taking all necessary steps to recover corporate assets (including cash bonuses and stock options) improperly paid to Company executives and directors, together with the related costs (professional fees) proximately caused by the illegal conduct described herein;

(f)      establish and maintain systematic and accurate records and reports of the business and affairs of UHS and procedures for reporting the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(g)      maintain and implement an adequate, functioning system of internal legal, financial and accounting controls, such that UHS's operations and financial reporting – including its admitting and billing practices and accounting and other financial information – would be accurate and the actions of its directors would be in accordance with all applicable laws;

(h)     exercise control and supervision over public statements to the securities markets and trading in UHS stock by officers and employees of UHS; and

(i)     supervise the preparation and filing of any financial reports or other information required by law from UHS and to examine and evaluate any reports of examinations, audits or other financial information concerning the financial affairs of UHS and to make full and accurate disclosure of all material facts concerning, *inter alia,* each of the subjects and duties set forth above.

29.     Each defendant, by virtue of his or her position as a director and/or officer, owes the Company and its shareholders the fiduciary duties of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of UHS, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders, which defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the defendants who were also officers of the Company during the Relevant Period has been ratified by the Director Defendants who comprised UHS's Board during the Relevant Period.

30.     Defendants breached their duties of loyalty and good faith by allowing or by themselves causing the Company to defraud the U.S. government in connection with an illicit over-admissions scheme and misrepresenting UHS's financial results and prospects, as detailed herein *infra,* or by failing to prevent the defendants from taking such illegal actions, and by permitting UHS to become an unwitting victim of defendants' fraud when they forced UHS to repurchase tens of millions of dollars of UHS common stock on the open market at fraud-inflated prices.  As

a result, UHS has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

      (a)      the $29.7 million UHS already overpaid to repurchase its shares on the open market at fraud-inflated prices during the Relevant Period;

      (b)      the tens of millions of dollars in costs being incurred to carry out expensive internal investigations, including legal fees paid to outside counsel and outside auditors;

      (c)      the tens of millions of dollars UHS might be forced to pay to resolve False Claims Act violations;

      (d)      the tens of millions of dollars UHS might be forced to pay to resolve federal securities laws violations;

      (e)      the millions of dollars in improvidently paid executive compensation;

      (f)      the millions of dollars in damages resulting from UHS's senior officers and directors selling tens of millions of dollars' worth of UHS common stock on the open-market at inflated prices; and

      (g)      the increased capital costs the Company will incur as a result of the loss of market capitalization and the Company's damaged reputation in the investment community.

      31.      These actions have irreparably damaged UHS's corporate image and goodwill.  For at least the foreseeable future, UHS will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that UHS's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DEFENDANTS' OTHER DUTIES

32.     UHS's Code of Business Conduct and Corporate Standards ("Code of Business Conduct") expressly forbids, in pertinent part, "[a]ll employees, officers and directors of the company and its subsidiaries" from:

- engaging in "any illegal conduct";

- "obtain[ing] any improper personal benefit by virtue of his or her employment with UHS [or] misus[ing] company assets or us[ing] corporate information or opportunities for personal gain";

- "engag[ing] in any business practice intended to unlawfully obtain favorable treatment or business from any government entity, physician, potion, vendor, or any other party in a position to provide such treatment or business";

- "us[ing] confidential or proprietary information of UHS, its facilities, patients, vendors, or customers for his or her own personal benefit or for the benefit of any other person or entity, while employed at UHS or any of its subsidiaries, or at any time thereafter";

- "buy[ing] or sell[ing] UHS or any other stock based upon 'insider' information about or involving UHS, . . . pass[ing] on any such information to others, including, but not limited to, friends and family members";

- "participat[ing] in any conduct, agreement or understanding (including agreements based upon a course of conduct) with a competitor of UHS or anyone else to . . . inappropriately manipulate or conceal information, misrepresent material facts, abuse privileged information or engage in any other unfair practice"; or

- "participat[ing] in any false billing of patients, government entities, or any other party."

33.     UHS's Code of Business Conduct also expressly mandates that "[a]ll employees, officers and directors of the company and its subsidiaries" "promptly report all suspected violations of this Code of Business Conduct and Corporate Standards by other employees, officers or directors to (1) the UHS compliance hotline . . . or (2) the compliance post office box. . . , or (3) his or her immediate supervisor or the facility's compliance officer."

34.     UHS's Code of Conduct and Ethics (the "Code of Ethics") expressly mandates the compliance of all of the Company's officers, directors and employees with the following pertinent provisions:

- "Compliance with Laws, Rules and Regulations":

    You must respect and abide by all applicable laws, rules and regulations.  Although you are not expected to know the details of all applicable laws, rules and regulations, you are expected to seek advice in accordance with guidelines described in Section 13 of this Code.

- "Insider Trading":

    Federal law and the policies of the Company prohibit you, either directly or indirectly through your family members or others, from purchasing or selling Universal Health Services, Inc. Shares while in the possession of material, non-public information concerning the Company.  This same prohibition applies to trading in the stock of other publicly-held companies on the basis of material, non-public information.

    Material, non-public information is any information which could reasonably be expected to affect either the price of, or a decision to buy or sell, the stock of any company.  If you are considering buying or selling Universal Health Services, Inc. shares because of inside information you possess, you should assume that such information is material.

- "Integrity of Financial Statements and Disclosures":

    The integrity of the Company's financial statements and the disclosures contained in the filings with government agencies and in its press releases and other public statements is essential.  All financial books, records and accounts must timely and accurately reflect transactions and events.  You must comply with the Company's policies and practices that comprise its system of internal controls and disclosure controls and procedures and must provide full, fair, accurate, timely and understandable responses to all requests from any of the Company's senior management, independent or internal auditors or legal counsel for information in accordance therewith.

- "Reporting of Illegal or Unethical Behavior":

    You should report all actual or potential violations of laws, rules, regulations or of this Code in accordance with the guidelines described in Section 13 of this Code.  You may submit your report confidentially and, if you wish, anonymously in accordance with the guidelines described in Section 13 of this Code.

35.     UHS's Code of Ethics for Senior Financial Officers (the "SFO Code of Ethics") further requires that UHS's CEO, CFO, Treasurer, Controller, Vice Presidents of Finance-Acute Care/Behavioral Health, and any other employees of the Company performing similar functions (the "Senior Financial Officers" or "SFOs") comply with the following pertinent provisions:

- "Honest and Ethical Conduct and Ethical Handling of Conflicts of Interest":

   The Senior Financial Officers should conduct themselves and their activities on behalf of the Company, its subsidiaries and affiliated entities in an honest and ethical manner and in a manner which complies well [sic] this Code and in all material respects with the Company's Business Policies and Code of Conduct.  To this end, the Senior Financial Officers should endeavor to promote a culture of honesty, integrity, ethical behavior and accountability within the Company, its subsidiaries and affiliated entities whereby all employees are encouraged to conduct themselves and their activities on behalf of the Company, its subsidiaries and affiliated entities in an honest and ethical manner and in a manner which complies in all material respects with the Business Policies and Code of Conduct or any other applicable code of conduct of the Company.

   The Senior Financial Officers should endeavor to avoid any actual or potential conflict of interest between their personal and professional relationships.  The Senior Financial Officers should promptly report, and disclose all material facts relating to their relationships or financial interests which give rise, directly or indirectly, to an actual or potential conflict of interest to the Audit Committee of the Board. No Senior Financial Officer should knowingly become involved in any actual or potential conflict of interest without the relationship or financial interest having been approved by the Board or the Audit Committee thereof.

- "Disclosure in SEC Filings and Other Public Communications":

   The Senior Financial Officers should conduct themselves and their activities on behalf of the Company, its Subsidiaries and affiliated entries in a manner which promotes the full, fair, accurate, timely and understandable disclosure, in accordance with applicable law, rules or regulations, of all material information required to be included in (i) each report or other document required to be filed or submitted by the Company with the SEC and (ii) in all other public communications made by the Company.  To this end, the Senior Financial Officers should oversee the establishment and management of the Company's internal controls and disclosure controls and procedures to enable:

   ▪ The Company's consolidated financial statements and the notes thereto to present fairly, in all material respects, the financial position, the results of operations and the cash flows of the Company

- 19 -

as of and for the period(s) indicated in conformity with accounting principles generally accepted in the United States; and

- The Senior Financial Officers to bring to the attention of the Audit Committee any information, of which they are aware, concerning (i) significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial data or (ii) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls.

- "Compliance with Applicable Governmental Laws, Rules and Regulations":

   The Senior Financial Officers are expected to comply, and should encourage and promote compliance by all employees of the Company, its subsidiaries and affiliated entities, with the governmental laws, rules and regulations applicable to their business and operations, including the retention and disposal of business documents and records.

- "Reporting Code Violations":

   Senior Financial Officers should report any known or suspected violation of this Code by any Senior Financial Officer to the Company's chief executive officer, chief compliance officer and the Audit Committee (and any other appropriate committee) of the Board.

36.     UHS's Inside Information and Trading of Company Stock policy (the "Insider Trading Policy") prohibits all UHS officers, directors and employees from transacting in UHS common stock while in possession of material non-public information, stating in pertinent part as follows:

   Under the Federal Securities Law, a person is prohibited from exercising stock options and/or purchasing or selling securities on the basis of "material (inside) information", which includes any information that would influence a reasonable investor to buy or sell stock of the Company. Non-public information is material if it is reasonably certain to have a substantial effect on the market price of the security, if publicly disclosed. ***The news of such activity must be widely disseminated in the press before stock options can be exercised and/or purchases or sales of stock can be made. Communications on behalf of the Company with the media, security analysts and investors must be made only by specifically designated representatives of the Company.***

\*          \*          \*

*No individual, regardless of position within the Company, should exercise stock options and/or purchase or sell the Company's stock while in the possession of material (inside) information which is not yet publicly disseminated.  At such times, such individuals (referred to as "Insiders") may not exercise stock options and/or purchase or sell Company stock.*

37.     In violation of UHS's Code of Business Conduct, Code of Ethics, SFO Code of Ethics and Insider Trading Policy, each of the Director Defendants: (a) failed to cause UHS to comply with all applicable laws and regulations, including the False Claims Act and the federal securities laws; (b) failed to cause UHS to appropriately maintain the Company's books, records, accounts and financial statements; to accurately report its financial performance; or to make accurate filings with the SEC, specifically as to UHS's reliance on illicit revenues derived from a pattern and practice of over-admissions; (c) engaged in and/or allowed others to engage in insider trading, including improperly using UHS's confidential information for their own personal gain; (d) wasted UHS's assets by paying the Officer Defendants outsized incentive compensation that rewarded them for causing the Company to defraud the U.S. government in violation of the False Claims Act; and (e) failed to report and/or address violations of the Code of Business Conduct, Code of Ethics, SFO Code of Ethics and/or Insider Trading Policy.

## CONSPIRACY, AIDING AND ABETTING AND CONCERTED ACTION IN BREACH OF FIDUCIARY DUTY

38.     In committing the wrongful acts alleged herein, defendants pursued or joined in the pursuit of a common course of conduct and acted in concert with and conspired with one another in furtherance of a common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability for breach of fiduciary duty, defendants further aided and abetted and/or assisted each other in breaching their respective duties.

39.     The purpose and effect of defendants' conspiracy, common enterprise and/or common course of conduct was, among other things, to disguise their breaches of fiduciary duty,

abuse of control, constructive fraud, gross mismanagement, corporate waste and unjust enrichment, and to conceal adverse information concerning the Company's operations.

40.     Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully pursue a business strategy designed to improperly admit, keep and/or treat patients at UHS facilities in order to fraudulently maximize the amount of Medicare and/or private insurance payments the Company would receive for such unnecessary and/or improper treatment and making false and misleading statements regarding the Company's performance so that defendants could reap over $26.7 million in illegal insider trading proceeds.  Because the actions described herein occurred under the authority of the UHS Board, each of the defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct that breached defendants' fiduciary duties as complained of herein.

41.     Each of the defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the defendants acted with knowledge of the breach of their fiduciary duties, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

**BACKGROUND**

42.     UHS was founded in 1978 by defendant Alan Miller.  UHS's principal business is owning and operating, through subsidiaries, acute care hospitals, outpatient facilities and behavioral health care facilities.

43.     As of February 28, 2017, UHS owned and/or operated 319 inpatient facilities and 33 outpatient and other facilities in 37 states, Washington, D.C., the United Kingdom, Puerto Rico and the U.S. Virgin Islands.

44.     UHS operates and reports its financial results through two segments.  The Acute Care segment operates 26 inpatient acute care hospitals, four free-standing emergency departments, four outpatient surgery/cancer care centers, and one surgical hospital, all of which are located in the United States.  The Behavioral Health Care segment operates 293 inpatient facilities and 24 outpatient facilities.  Approximately 51% of UHS's consolidated revenue comes from its acute care hospitals, outpatient facilities and commercial health insurers, with the remainder of its consolidated revenue derived from its behavioral health care facilities.  Each of the two operating segments further breaks down its reported revenue based on inpatient and outpatient services.

## DEFENDANTS' PATTERN AND PRACTICE OF ILLICIT OVER-ADMISSIONS AT UHS IN-PATIENT BEHAVIORAL HEALTH FACILITIES TO DRIVE REVENUES

45.     UHS inpatient behavioral health facilities have a long history of employing improper admissions practices based on driving revenues and profits for UHS rather than on the medical necessity of the patients.

46.     UHS derives more than one-third of its revenues directly from government programs and an additional 50% from sources that include government programs, and the improper admission practices place it in jeopardy of being prohibited from participating in these government programs for violating the False Claims Act.  Any such result would put the vast majority of UHS's revenues at risk.

47.     The False Claims Act imposes significant penalties on anyone who "knowingly presents . . . a false or fraudulent claim for payment or approval" to the federal government.  31 U.S.C. §3729(a)(1)(A).  A "claim" includes direct requests to the U.S. government for payment as well as reimbursement requests made to the recipients of federal funds under federal benefits programs.  *See* 31 U.S.C. §3729(b)(2)(A).  The Act's scienter requirement defines "knowing" and "knowingly" to mean that a person has "actual knowledge of the information," "acts in deliberate

ignorance of the truth or falsity of the information," or "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. §3729(b)(1)(A). And the Act defines "material" to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. §3729(b)(4). Pursuant to a 1986 amendment to the Act, liability need only be demonstrated by a preponderance of the evidence. Pub.L. 99-562, 100 Stat. 3153, enacted October 27, 1986.

48.     Congress has increased the False Claims Act's civil penalties so that liability is "essentially punitive in nature." *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 784 (2000). Defendants are subject to treble damages plus civil penalties of up to $10,000 per false claim. 31 U.S.C. §3729(a); 28 C.F.R. §85.3(a)(9) (2015) (adjusting penalties for inflation).

49.     The False Claims Act includes a *qui tam* provision that allows people who are not affiliated with the government, called "relators" under the law, to file actions on behalf of the government. Persons filing under the Act stand to receive a portion (15%-30%) of any recovered damages. The government recovered $38.9 billion under the Act between 1987 and 2013, and of this amount, $27.2 billion, or 70%, was from *qui tam* cases brought by relators.

50.     Medicare and Medicaid revenues directly represented 32% of UHS's net patient revenues during 2016, 34% during 2015, and 38% during 2014. Revenues from managed care entities, including health maintenance organizations and managed Medicare and Medicaid programs, accounted for another 56% of UHS's net patient revenues during 2016, 54% during 2015, and 52% during 2014.

51.     The current UHS Board has long known that the Company has repeatedly been under investigation for False Claims Act violations and for failing to bring the Company into compliance. In fact, the Board incentivizes – if not directs – UHS's officers and employees to

violate the False Claims Act by rewarding them through outsized incentive compensation for increasing revenues, without concomitantly ensuring that the Company is not violating any laws in order to increase UHS's revenues.

52.     In 2011, a relator filed a *qui tam* action in the U.S. District Court for the District of Massachusetts alleging that UHS had violated the False Claims Act under an implied false certification theory of liability.  The operative complaint asserted that UHS, acting through one of its subsidiaries, submitted reimbursement claims that made representations about the specific services provided by specific types of professionals, but failed to disclose serious violations of regulations pertaining to staff qualifications and licensing requirements for those services. Specifically, the Massachusetts Medicaid program required satellite facilities to have specific types of clinicians on staff, delineates licensing requirements for particular positions (like psychiatrists, social workers and nurses), and details supervision requirements for other staff.  *See* 130 Code Mass. Regs. §§429.422–424, 429, 439 (2014).  UHS allegedly flouted these regulations because its subsidiary employed unqualified, unlicensed and unsupervised staff, resulting in the injury and death of at least one inpatient behavioral health patient.  The Massachusetts Medicaid program, unaware of these deficiencies, paid the claims.  UHS thus allegedly defrauded the program, which would not have reimbursed the claims had it known that it was billed for mental health services that were performed by unlicensed and unsupervised staff.  In February 2012, the United States declined to intervene in the action and in March of 2014 the district court dismissed the action, finding that the relator failed to allege that any of the regulations UHS violated was a condition of payment.[1]  In 2015, the U.S. Court of Appeals for the First Circuit reversed and remanded, finding in pertinent part that each time a billing party submits a claim it "implicitly

---

[1]     *See United States ex rel. Escobar v. Universal Health Servs.*, No. 11-11170, 2014 WL 1271757, at *1, *6-*12 (D. Mass. Mar. 26, 2014).

communicate[s] that it conformed to the relevant program requirements, such that it was entitled

to payment." *United States ex rel. Escobar v. Universal Health Servs.*, 780 F.3d 504, 514 n.14,

517 (1st Cir. 2015).  In June of 2016, the U.S. Supreme Court largely affirmed the First Circuit

Court of Appeals' ruling, holding in pertinent part as follows:

> We first hold that the implied false certification theory can, at least in some
> circumstances, provide a basis for liability.  By punishing defendants who submit
> "false or fraudulent claims," the False Claims Act encompasses claims that make
> fraudulent misrepresentations, which include certain misleading omissions. ***When,***
> ***as here, a defendant makes representations in submitting a claim but omits its***
> ***violations of statutory, regulatory, or contractual requirements, those omissions***
> ***can be a basis for liability if they render the defendant's representations***
> ***misleading with respect to the goods or services provided.[2]***

In January 2017, the U.S. Attorney's Office and Massachusetts Attorney General's Office advised

UHS of their potential intent to intervene in the case, and in April 2017, the Commonwealth of

Massachusetts formally intervened.[3]

53.     The 2011 action is not the only potential False Claims Act violations this Board has

been made aware of.  The Office of the Inspector General ("OIG") of the Department of Health

and Human Services issued subpoenas to UHS and 10 of its facilities in February 2013, and the

OIG and the Justice Department have steadily expanded the probe since then.  In March of 2015,

defendants revealed that UHS is under investigation as "a corporate entity" by the U.S. Department

of Justice Criminal Fraud Section.  According to the publication *Modern Healthcare*, the Justice

Department investigation is a "criminal investigation into whether [UHS] fraudulently billed

Medicare and Medicaid for behavioral health treatments."  At least three of UHS's behavioral

facilities were then already under criminal investigation.  One of those facilities – River Point

---

[2]      *See Universal Health Servs. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016).

[3]      *See* Docket No. 157, *United States ex rel. Escobar v. Universal Health Servs.*, No. 11-cv-11170-DPW (D. Mass. Apr. 10, 2017).

Behavioral Health in Jacksonville, Fla. – had its payments suspended by Medicare and Medicaid beginning in April 2014.

54.     UHS and 25 of its behavioral health facilities are also the subject of a coordinated civil investigation by federal authorities related to billings submitted to the government, including but not limited to:

- Central Florida Behavioral Hospital (Fla.);
- National Deaf Academy (Fla.);
- River Point Behavioral Health (Fla.);
- University Behavioral Center (Fla.);
- Wekiva Springs (Fla.);
- Coastal Harbor Treatment Center (Ga.);
- St. Simons by the Sea (Ga.);
- Turning Point Care Center (Ga.);
- Hartgrove Hospital (Ill.);
- Riveredge Hospital (Ill.);
- Rock River Academy and Residential Treatment Center (Ill.);
- Streamwood Behavioral Health (Ill.);
- Arbour Hospital (Mass.);
- Arbour-Fuller Hospital (Mass.);
- Arbour-HRI Hospital (Mass.);
- Pembroke Hospital (Mass.);
- Westwood Lodge (Mass.);
- Keys of Carolina (N.C.);
- Old Vineyard Behavioral Health (N.C.);

- Friends Hospital (Pa.);

- Roxbury Treatment Center (Pa.);

- The Meadows Psychiatric Center (Pa.);

- Behavioral Hospital of Bellaire (Texas);

- Salt Lake Behavioral Health (Utah); and

- Harbor Point Behavioral Health Center (Va.) (formerly known as The Pines Residential Treatment Center, including the Crawford, Brighton and Kempsville campuses).

55.     The probe involves more than one in ten UHS psychiatric hospitals.  Federal and

state officials have intervened in a number of cases/investigations of UHS and reached substantial

settlements with UHS, including:

- In March 2012, UHS reached a $6.85 million settlement with the Department of Justice to settle charges by whistleblowers at the Keystone Marion Youth Center in Virginia alleging that the facility provided substandard care and submitted false claims to Medicaid.

- In August 2012, UHS reached a $4.25 million settlement with the California Attorney General to settle a lawsuit filed by parents of a student and staff at several UHS day schools.  They alleged UHS "warehouse[d] the students and falsely billed local districts for offering instruction."

**DESPITE RECEIVING REPEATED NOTICE OF THE MISCONDUCT, THE UHS BOARD REFUSES TO TAKE CORRECTIVE ACTION**

56.     In addition to having actively participated in defending False Claims Act

allegations brought against UHS in courts across the country since 2011, the UHS Board was put

on notice of the Company's illicit over-billing practices and likely liability for violations of the

False Claims Act in April of 2014.  That month, an organization called Change to Win ("CtW")

wrote the Board detailing the Company's potential violations, likely liability and the reforms

required to permit the UHS Board to effectively exercise its fiduciary duties to the Company's

shareholder owners.   The CtW letter, addressed to defendant Herrell, the Lead Independent

Director of the UHS Board, stated in pertinent part as follows:

> In light of the ongoing investigations of UHS and its facilities by the Department of Health and Human Services Office of the Inspector General ("OIG") and by the Department of Justice ("DoJ") we urge you and the UHS board to take immediate steps to improve the board's oversight of regulatory compliance.

> As we will describe below, we believe shareholders face considerable risk that regulatory enforcement actions and/or settlements with federal regulators will result from the OIG and DoJ investigations, given the divergence in billing practices between UHS-owned and other facilities evinced by an independent analysis of Medicare data.   Furthermore, our review of UHS's corporate governance, and in particular of the board's committee structure and membership, strongly suggests that improvements are overdue: unlike most publicly traded hospital companies, UHS's board does not have a separate Compliance Committee – instead housing compliance oversight in the Audit Committee.  However, the members of the Audit Committee do not have the depth or range of health care and regulatory experience evident among the members of the Compliance Committees at other publicly traded hospital and health care firms.  We are concerned that inadequate board oversight of regulatory compliance has generated significant risks for shareholders, and believe that without changes in the board's structure and membership, such oversight will not improve sufficiently to mitigate such risks going forward.

> Absent a commitment by the board to create a new Compliance Committee comprised of independent directors with extensive relevant medical and regulatory experience, we will be unable to support Lawrence Gibbs, the Audit Committee member who is slated to stand for election at this year's annual meeting.

> The CtW Investment Group works with pension funds sponsored by affiliates of Change to Win – a federation of unions representing over six million members – to enhance long-term shareholder value through active ownership. These funds invest over $200 billion in the global capital markets and are substantial investors in UHS.

**UHS's Billing Practices**

> As you are aware, our affiliate union SEIU has conducted an analysis of Medicare data comparing UHS's billing practices to those of other behavioral health facility operators.  While SEIU described its findings to you in a letter dated March 7, 2014, we will briefly review their findings here, both because they are directly relevant to our concern over the effectiveness of the board's oversight of compliance risks, and because you have yet to respond to SEIU's communication. We note that last November, UHS disclosed an investigation by the DoJ, and that Massachusetts regulators halted admissions at one of the company's facilities citing "deteriorating conditions and an immediate risk to patient safety."   These

disclosures followed the issuance of a series of subpoenas by the OIG beginning in February 2013 and continuing at least until July 2013.

SEIU's analysis of Medicare data indicates both that UHS free-standing inpatient psychiatric facilities ("IPFs") utilize the suicidal ideation code much more frequently than other free-standing IPFs. Moreover, as Figure 1 demonstrates, following UHS's acquisition of Psychiatric Solutions ("PSI") in 2010, the former PSI facilities experienced a dramatic increase in their utilization of the suicidal ideation code. Prior to acquisition by UHS, these PSI facilities had been either in line with or below other IPFs in terms of their frequency in coding patients.



This sharp increase in the suicidal ideation rate following acquisition by UHS prompted SEIU to compare individual PSI facilities to the broader industry before and after the 2010 merger. Their findings are shown in Figures 2 and 3 below: in federal fiscal year 2010, only seven of PSI's facilities had suicidal ideation rates above the 80th percentile nationally (which in FFY 2010 was approximately 5.7%), the level identified by the OIG as indicating a significant outlier at risk of billing errors. But by federal fiscal year 2012, 71% of former PSI facilities (37 out of 52) had suicidal ideation rates above the national 80th percentile level (which rose to 36.7% in FFY 2012, with UHS/PSI facilities comprising 20% of sampled facilities).





Beyond the generic concern with a large number of facilities above the risk threshold identified by the OIG, this pattern of extremely high suicidal ideation rates is particularly troubling because it seems consistent with allegations made by a former UHS doctor in 2010.  In a qui tam lawsuit, Dr. Steven G. Klotz, formerly of the Roxbury Treatment Center (a UHS facility), alleged that UHS "falsely and fraudulently coded patients as suicidal, when the chart did not reflect a likelihood of patient suicide."  Dr. Klotz further alleged the UHS's internal audit employees advised caregivers on how to maximize reimbursement.  While the DoJ declined to intervene in Dr. Klotz's suit, and the suit itself was withdrawn voluntarily in October 2013, we are concerned that the Medicare data seems to point to an unusually high level of suicidal ideation coding at UHS facilities, particularly following the PSI acquisition, consistent with Dr. Klotz's allegations.  We note that the Roxbury treatment center was one of 14 UHS facilities subpoenaed by the OIG in February 2013.

Additionally, SEIU compared UHS and former PSI facilities to other inpatient psychiatric facilities with respect to their rates of comorbidities requiring treatment during an inpatient stay that have been identified by the Program for

Evaluating Payment Patterns Electronic Report ("PEPPER") as target areas that increase costs incurred by hospitals caring for affected patients. Figure 4 shows that comorbidity rates at UHS facilities have consistently been higher than those at non-UHS/non-PSI facilities from 2006 to 2012. Furthermore, this figure shows that PSI facilities exhibited a lower rate of these targeted comorbidities up through 2010 (when these facilities were acquired by UHS), but exhibit a sharp increase thereafter. Indeed, by FFY 2012 12 of UHS's 43 qualifying "legacy" facilities (ie not including those acquired by PSI), ranked at the 80th percentile nationally. Of the former PSI facilities, 19 ranked at or above the 80th percentile nationally in FFY 2012, compared to only 9 in FFY 2010.



SEIU also analyzed readmission rates, since Medicare administrators have also identified this as an area for attention in order to contain costs. SEIU found that in FFY 2012, nearly 30% of UHS's free standing IPFs have 30-day readmission rates at or above the 80th percentile nationally. Three of these facilities rank in the top 10 in the country for this fiscal year, and two of the facilities that have been subject to the federal subpoenas mentioned above (Hartgrove Hospital and Riveredge Hospital) have the highest readmission rates among free-standing IPFs in their state in FFY 2012.

Despite having a substantial share of its facilities above the "red flag" 80th percentile for suicidal ideation diagnoses, as well in areas targeted by Medicare administrators for cost-containment such as comorbidities and readmission rates, and despite a steadily intensifying investigation by federal authorities, UHS's board has not disclosed any efforts by itself or the Audit Committee to determine if UHS's unusually high level of suicidal ideation diagnoses, comorbidity rates, or other billing practices, may be generating excessive regulatory and compliance risks for the company and its long-term shareholders.

**Audit Committee Lacks Medical and Regulatory Experience**

In contrast to many other publicly-traded hospital and healthcare firms, UHS assigns responsibility for overseeing regulatory compliance to its Audit Committee, rather than to a separate committee focused on that area of

responsibility. Moreover, UHS's Audit Committee members do not appear to have medical and regulatory experience comparable to that of directors serving on the Compliance Committees of other hospital firms. For instance, your fellow Audit Committee members include a portfolio manager, an investment banker, and an insurance executive. While you yourself worked for over 30 years for the Mayo Foundation, it does not appear from your biographical description that your work there involved matters directly pertaining to regulatory compliance or the review of clinical practices. Additionally, as the only financial expert on the Audit Committee, as well as the Lead Independent Director for the board, we are skeptical that you alone can provide the experience and expertise to effectively oversee UHS's compliance practices, especially given all the other duties of the Audit Committee.

In contrast, Tenet Healthcare's board has a Quality, Compliance, and Ethics Committee which includes Richard Pettingill, a former executive at Alliana Hospitals, Kaiser Foundation Health Plans and Hospitals, and Camino Healthcare, and has also been senior fellow on public health policy in the Advanced Leadership Initiative at Harvard University. Lifepoint Hospitals, HCA, and Community Health Systems each combine compliance and audit oversight functions in a single committee, but Lifepoint's Audit and Compliance Committee includes John Maupin, Jr., the president of Morehouse School of Medicine, and a former Deputy Commissioner for Medical Services at the Baltimore City Health Department, as well as Marguerite Kondracke, former president and CEO of The Brown Schools, a behavioral health provider to adolescents, and the former Commissioner of Human Services for the State of Tennessee. HCA's Audit and Compliance Committee includes Dr. Wayne Riley, who in addition to being a physician is the President of Meharry Medical College, and Geoffrey Meyers, a former executive with ManorCare, a long-term care provider. Of the major publicly traded hospital companies, only Community Health System's Audit and Compliance Committee lacks any individual with direct healthcare experience.

Moreover, the other major hospital firms make much more clear the relevant committee's responsibility to oversee regulatory compliance and that committee's role in the reporting relationships among senior compliance executives. At UHS, up until October 2013 the Audit Committee's charter did not state explicitly that the Committee was responsible for regulatory oversight. Subsequently the charter has been amended to state that the Committee is responsible for overseeing "the Company's compliance with legal and regulatory requirements and quality of care standards." The charter was also amended to include among the Committee's responsibilities reviewing and discussing with management and independent auditors "any correspondence with regulators or governmental agencies and any published reports which raise material issues regarding the Company's financial statements or accounting policies which has been brought to the Committee's attention." While the Committee has access to the Chief Compliance Officer, he is not described as reporting to the Committee.

Several of the other publicly-traded hospital companies have much more explicit language in charging their relevant committee with responsibility for compliance oversight, and establish a direct reporting relationship between the

relevant committee and the company's Chief Compliance Officer.  For instance, at Tenet the Chief Compliance Officer reports directly to the Quality, Compliance, and Ethics Committee, and the Committee also receives regular reports from the Ethics, Compliance, and Quality Management Departments.  Similarly, at HCA the Chief Compliance Officer reports directly to the Audit and Compliance Committee, and the Committee's Charter clearly spells out that one of the Committees two purposes is to "assist the Board in fulfilling its duties and oversight responsibilities relating to the Company's compliance with applicable laws and regulations, the Company Code of Conduct, and related Company policies and procedures, including the Corporate Ethics and Compliance Program."  Both Community Health Systems and Lifepoint also explicitly spell out the Committee's responsibility to oversee compliance practices, though the reporting relationship between the Committee and the senior executive responsible for compliance is not made explicit.

**Improved Compliance Oversight Will Protect Shareholders**

In light of the ongoing federal investigations of UHS's billing practices, the unusually high levels of suicidal ideation diagnoses at UHS facilities – and the very sharp increase in such diagnoses at formerly PSI facilities following their 2010 acquisition by UHS – and the UHS Audit Committee's lack of members with direct medical and regulatory experience, we believe that an overhaul of the board's compliance oversight function is necessary.  In particular, we urge you and your fellow directors to separate the compliance and audit oversight roles, and create a new committee comprised of independent directors with direct medical and regulatory experience to oversee legal and regulatory compliance.  Absent a commitment to make such changes to the board's structure and membership, we will be unwilling to support the reelection of Lawrence Gibbs at this year's annual meeting.  We look forward to hearing your response to our concerns at your earliest convenience.

Sincerely,

Dieter Waizenegger
Executive Director

(Footnotes omitted.)

### THE FULL EXTENT OF DEFENDANTS' MISCONDUCT IS REVEALED

57.    In December 2016, *BuzzFeed* published a 24-page report, entitled "Intake: Locked on the Psych Ward – Lock them in. Bill their insurer. Kick them out. How scores of employees and patients say America's largest psychiatric chain turns patients into profits," detailing

*BuzzFeed*'s findings from its own year-long investigation into UHS's illicit over-admissions practices in violation of the False Claims Act.

58.    In the *BuzzFeed* report, journalist Rosalind Adams detailed her interviews with 175 current and former UHS staff, including 18 executives who ran UHS hospitals, and more than 120 additional interviews with patients and government investigators. These interviews, in addition to providing a "cache of internal documents," raised "grave questions about the extent to which those profits were achieved at the expense of patients."

59.    *BuzzFeed*'s investigation detailed how current and former employees from at least ten UHS hospitals in nine states said they were under pressure to fill beds by almost any method – which sometimes meant exaggerating people's symptoms or twisting their words to make them seem suicidal – and to hold them until their insurance payments ran out.  Internal UHS documents exposed by *BuzzFeed* show that one UHS psychiatric hospital's strategic plan described extending patient stays as a means to meet financial goals.  Other executives said this strategy was one they also used to meet their budgets.  The *BuzzFeed* report also detailed how in the first full year after UHS acquired approximately 100 hospitals from a competitor, Psychiatric Solutions Inc. ("PSI"), those hospitals' use of the billing code for suicidal ideation in Medicare claims spiraled up exponentially – more than sixfold overall:



60.     In response to the *BuzzFeed* report, the price of UHS's common stock plunged $15.01 per share, or 12%, on December 7, 2016, erasing $1.5 billion in market capitalization. UHS has been named as a defendant in a class action lawsuit filed pursuant to the federal securities laws in this District and now faces tens of millions of dollars in potential liability.  Yet due to defendants' misconduct, and as alleged herein, UHS is itself a victim of that same fraud.

61.     Nonetheless, defendants immediately caused UHS to issue a press release denouncing the *BuzzFeed* report, further demonstrating the Board's inability to exercise its fiduciary duties and effectively investigate and prosecute the allegations in this complaint, stating in pertinent part as follows: "We dispute and deny the conclusions drawn by the reporter in relation to UHS and believe that the story misses the mark in several important ways leading to an inaccurate portrayal of UHS's behavioral health operations."

**DEFENDANTS INFLATE THE MARKET PRICE OF UHS COMMON STOCK BY FALSIFYING UHS'S FINANCIAL REPORTS THROUGHOUT THE RELEVANT PERIOD**

62.     Meanwhile, during the Relevant Period, defendants caused UHS shares to trade at artificially inflated levels by issuing a series of materially false and misleading statements regarding the Company's financial results, business and prospects. Specifically, defendants caused

- 36 -

UHS to issue materially false and misleading financial statements that failed to disclose or misstated the following: (i) that defendants were causing UHS to improperly recognize millions of dollars of revenues derived through a pattern and practice of illicitly over-admitting patients and billing the U.S. government for their purported "care," potentially in violation of the False Claims Act; and (ii) that the Company's internal controls were defective, rendering quarter after quarter of steadily increasing revenues from behavioral health inpatient "services" derived from Medicare and Medicaid, and the profits reported on those revenues, materially false and misleading.

63.     Each of the false and misleading quarterly financial reports issued during the Relevant Period was signed by defendants Alan Miller and Filton and included certifications pursuant to the Sarbanes Oxley Act of 2002 stating that management had reviewed the Company's internal controls and that they were effective to ensure that material information was being recorded, processed, summarized and reported by management on a timely basis in order to comply with UHS's disclosure obligations under the Exchange Act, as amended, and the SEC rules thereunder. Each of the false and misleading annual financial reports issued during the Relevant Period (for fiscal years 2014 and 2015) was signed by defendants Alan Miller, Marc Miller, Gibbs, Herrell, Hotz, McDonnell, Pantaleoni and Filton, and defendants Alan Miller and Filton certified each of them pursuant to the Sarbanes Oxley Act of 2002 as described above.

64.     Concerning UHS's compliance with Medicare and Medicaid billing laws and guidelines, the Company's 2013 to 2016 annual reports to shareholders stated both that "[a]ll of [UHS's] acute care hospitals and most of [its] behavioral health centers [were] certified as providers of Medicare and Medicaid services by the appropriate governmental authorities," and that UHS "believe[d] [that its] facilities [were] in substantial compliance with current applicable federal, state, local and independent review body regulations and standards." Each of the

Company's quarterly financial reports filed with the SEC on Forms 10-Q during the Relevant Period incorporated these statements by reference.

65.    Defendants also caused UHS to issue press releases announcing these same financial results and to conduct investor conferences during which they recited these financial results and made other positive statements about the Company's then-present business metrics and financial prospects.

66.    Defendants' efforts to artificially inflate the market price of UHS common stock through a pattern and practice of illicit over-admissions and the billing of the U.S. government in violation of the False Claims Act and their false and misleading financial reporting had its intended effect, with UHS shares ultimately reaching a Relevant Period high of more than $148 per share during August 2015:



**DEFENDANTS CAUSE UHS TO REPURCHASE STOCK AT FRAUD-INFLATED PRICES WHILE THEY CASH IN ON THE SAME FRAUD-INFLATED PRICES**

67.    Concomitantly, seeking to further artificially inflate the trading price of UHS common stock, in July 2014 and again in February 2016, the UHS Board twice authorized the

- 38 -

repurchase of up to $400 million worth of publicly traded UHS common stock on the open market, for a total of up to $800 million worth of shares.  Then the Insider Selling Defendants dumped tens of millions of dollars' worth of their own shares *into* the open market at fraud-inflated prices, while the UHS Board caused the Company to repurchase *more than 4.3 million* UHS shares *on the same open market* at fraud-inflated prices, causing UHS to overpay *more than an estimated $29.7 million* for those shares as follows:

| Reporting Period Ended | Shares Repurchased | Aggregate Paid | Average Price Paid Per Share | Estimated Overpayment[4] |
|---|---|---|---|---|
| 09/30/2014 | 226,692 | $25,211,000 | $111.21 | N/A |
| 12/31/2014 | 321,500 | $32,739,000 | $101.83 | N/A |
| 03/31/2015 | 48,269 | $5,607,000 | $116.16 | $231,691 |
| 06/30/2015 | 256,440 | $30,829,000 | $120.22 | $2,272,058 |
| 09/30/2015 | 543,380 | $71,976,000 | $132.46 | $11,465,318 |
| 12/31/2015 | 478,118 | $57,811,000 | $120.91 | $4,566,026 |
| 03/31/2016 | 1,343,830 | $152,440,000 | $113.44 | $2,795,166 |
| 06/30/2016 | 235,352 | $29,054,000 | $123.45 | $2,845,405 |
| 09/30/2016 | 458,410 | $56,644,000 | $123.57 | $5,597,186 |
| 12/31/2016 | 475,000 | $51,799,000 | $109.05 | N/A |
| Total: | *4,386,991* | *$514,110,000* | | *$29,772,850* |

68.     Meanwhile, many of the Company's senior executives and directors cashed in, including the Insider Selling Defendants, who, as detailed below, collectively sold 224,348 shares of their personally held shares during the Relevant Period, reaping approximately *$26.7 million* in gross proceeds as follows:

| DEFENDANT | DATE | SHARES | PRICE | PROCEEDS |
|---|---|---|---|---|
| FILTON | 06/02/16 | 15,000 | $136.01 | $2,040,150 |
| | 03/08/17 | 10,000 | $123.80 | $1,238,000 |
| | | 25,000 | | *$3,278,150* |
| GIBBS | 07/31/14 | 1,000 | $107.12 | $107,120 |
| | 03/04/15 | 4,541 | $115.32 | $523,668 |
| | 05/28/15 | 1,393 | $129.62 | $180,561 |
| | 03/08/16 | 6,000 | $112.14 | $672,840 |

---

[4]     Based on the December 7, 2016 closing price of UHS common stock of $111.36.

|  |  | 12,934 |  | *$1,484,189* |
|---|---|---|---|---|
| **HERRELL** | 03/04/15 | 6,000 | $115.17 | $691,020 |
|  | 12/14/15 | 1,200 | $117.38 | $140,856 |
|  | 05/11/16 | 6,000 | $136.09 | $816,540 |
|  |  | 13,200 |  | *$1,648,416* |
| **HOTZ** | 06/06/14 | 4,000 | $94.75 | $379,000 |
|  | 07/31/14 | 6,000 | $106.98 | $641,880 |
|  | 07/31/14 | 700 | $106.97 | $74,879 |
|  | 07/31/14 | 200 | $106.99 | $21,398 |
|  | 07/31/14 | 5,000 | $106.85 | $534,250 |
|  | 07/31/14 | 100 | $106.97 | $10,697 |
|  | 08/01/14 | 6,804 | $107.00 | $728,028 |
|  | 05/28/15 | 100 | $129.54 | $12,954 |
|  | 05/28/15 | 1,454 | $129.47 | $188,249 |
|  | 05/28/15 | 904 | $129.51 | $117,077 |
|  | 03/08/16 | 7,077 | $113.06 | $800,126 |
|  |  | 32,339 |  | *$3,508,538* |
| **ALAN MILLER** | 09/12/14 | 2,000 | $113.45 | $226,900 |
|  | 12/05/14 | 33,228 | $107.51 | $3,572,342 |
|  | 12/11/14 | 7,000 | $108.40 | $758,800 |
|  |  | 42,228 |  | *$4,558,042* |
| **MARC MILLER** | 05/14/14 | 8,477 | $85.88 | $728,005 |
|  | 09/12/14 | 2,000 | $111.65 | $223,300 |
|  | 09/12/14 | 2,000 | $111.66 | $223,320 |
|  | 09/12/14 | 2,000 | $111.65 | $223,300 |
|  |  | 14,477 |  | *$1,397,925* |
| **OSTEEN** | 05/21/14 | 1,500 | $88.36 | $132,540 |
|  | 05/21/14 | 1,500 | $88.31 | $132,465 |
|  | 05/21/14 | 1,500 | $88.35 | $132,525 |
|  | 05/21/14 | 1,500 | $88.42 | $132,630 |
|  | 05/21/14 | 1,121 | $88.40 | $99,096 |
|  | 05/27/15 | 700 | $130.59 | $91,413 |
|  | 05/27/15 | 100 | $130.63 | $13,063 |
|  | 05/27/15 | 461 | $130.59 | $60,202 |
|  | 05/27/15 | 4,016 | $130.71 | $524,931 |
|  | 05/27/15 | 3,300 | $130.59 | $430,947 |
|  | 06/10/15 | 3,641 | $131.34 | $478,209 |
|  | 06/10/15 | 199 | $131.35 | $26,139 |
|  | 06/10/15 | 200 | $131.21 | $26,242 |

|  |  |  |  |  |
|---|---|---:|---:|---:|
|  | 06/10/15 | 4,000 | $131.20 | $524,800 |
|  | 06/10/15 | 800 | $131.20 | $104,960 |
|  | 06/10/15 | 360 | $131.38 | $47,297 |
|  | 06/10/15 | 300 | $131.32 | $39,396 |
|  | 06/10/15 | 300 | $131.35 | $39,405 |
|  | 06/10/15 | 200 | $131.36 | $26,272 |
|  | 06/10/15 | 1,305 | $131.38 | $171,451 |
|  | 06/01/16 | 18,749 | $135.81 | $2,546,302 |
|  | 06/09/16 | 6,756 | $138.27 | $934,152 |
|  |  | 52,508 |  | *$6,714,437* |
| **PANTALEONI** | 05/06/15 | 862 | $116.18 | $100,147 |
|  | 05/08/15 | 7,700 | $120.08 | $924,616 |
|  | 05/05/16 | 6,995 | $133.51 | $933,902 |
|  |  | 15,557 |  | *$1,958,666* |
| **PEMBER** | 06/03/16 | 16,105 | $135.70 | $2,185,449 |
|  |  | 16,105 |  | *$2,185,449* |

## THE UHS BOARD REWARDS THE OFFICER DEFENDANTS THROUGH OUTSIZED INCENTIVE COMPENSATION DESPITE THEIR MISCONDUCT

69.     The Officer Defendants were unjustly enriched as a result of being paid outsized executive compensation, predicated, in large part, on their having exposed UHS to massive liability for violations of both the False Claims Act, through a pattern and practice of illicitly over-admitting patients and then billing government agencies for those patients' care, and the federal securities laws, for failing to disclose the illicit source of those revenues to investors and regulators.

70.     For example, in justifying the payment of incentive compensation for fiscal 2016, the Company's 2016 Annual Proxy Statement emphasized the following "***highlights of . . . 2016 financial and operating performance***":

- During 2016, our adjusted ***net income attributable to UHS . . . increased*** to $720.2 million, or $7.32 per diluted share, as compared to $692.0 million, or $6.87 per diluted share, during 2015.

- Our ***net revenues increased 8.0%*** to $9.77 billion during 2016 as compared to $9.04 billion during 2015.

- Net revenues at our acute care hospitals owned during both years increased 9.4% during 2016 as compared to 2015. During 2016 at these facilities,

adjusted admissions (adjusted for outpatient activity) increased 5.2% and adjusted patient days increased 3.3% as compared to 2015.

- ***Net revenues at our behavioral health care facilities owned during both years increased 2.6%*** during 2016 as compared to 2015.  During 2016 at these facilities, adjusted admissions increased 1.0% and adjusted patient days increased 0.9% as compared to 2015.

71.     Discussing the Company's "Compensation Philosophy and Objectives," the 2016 Annual Proxy Statement further stated in pertinent part that the UHS Compensation Committee "[d]iscuss[ed] financial and operational performance rigorously in determining any base salary and incentive decisions."  Likewise, the 2016 Annual Proxy Statement also stated that "[i]n designing [UHS's] compensation programs for [its] named executive officers," the Board's Compensation Committee included as an important "objective[]" that "[c]ompensation programs should support [UHS's] ***short-term . . . strategic business goals and objectives***."

72.     While the UHS Board has a Compensation Committee made up of non-executive directors charged with designing and approving the compensation arrangements with UHS's named executive officers, in practice the UHS Compensation Committee has largely rubber-stamped defendant Alan Miller's executive pay decisions as to all officers other than himself. According to the 2016 Annual Proxy Statement, the same Compensation Committee also purported to regulate defendant Alan Miller's "base salary, minimum annual bonus and certain perquisites" in his employment agreement.  The Compensation Committee who largely rubber-stamped the compensation of the Company's executive officers, acted no differently with defendant Alan Miller's requested bonuses, stock grants, and his salary increases during the purported contract negotiations.  Defendant Alan Miller's salary is currently $1.635 million, an increase of 2.2% over his 2016 salary, and defendant Alan Miller is eligible for an annual bonus targeted at 100% of his salary.  Defendant Alan Miller was also granted restricted stock awards valued at $1.5 million each in March 2015 and 2016.

73.    In order to meet the Compensation Committee's preordained revenue and profit targets, defendants caused and/or permitted UHS to illicitly over-admit patients and to bill the federal government billions of dollars for inpatient behavioral health "care" during fiscal years 2014, 2015 and 2016 alone.

74.    Meanwhile, based on UHS's having purportedly achieved the operational and financial "objectives" set by the UHS Board's Compensation Committee, in addition to the Officer Defendants being paid millions of dollars in salaries, health benefits, deferred compensation, retirement contributions and other perquisites, the UHS Board's Compensation Committee also approved payment of the following ***more than $74 million in incentive-based cash bonuses and long-term incentive awards*** to the Officer Defendants for fiscal years 2014, 2015 and 2016:

| DEFENDANT | YEAR | STOCK AWARDS | OPTION AWARDS | CASH BONUS[5] | TOTAL INCENTIVE COMPENSATION |
|---|---|---|---|---|---|
| Alan Miller | 2014 | $1,500,069 | $14,024,359 | $1,360,053 | |
| | 2015 | $1,500,022 | $12,553,430 | $3,434,599 | ***$49,814,876*** |
| | 2016 | $1,500,004 | $10,098,440 | $3,843,900 | |
| Marc Miller | 2014 | | $2,377,010 | $398,276 | |
| | 2015 | N/A | $1,914,930 | $989,371 | ***$8,303,402*** |
| | 2016 | | $1,540,440 | $1,083,375 | |
| Filton | 2014 | | $1,663,907 | $248,458 | |
| | 2015 | N/A | $1,489,390 | $619,794 | ***$5,902,570*** |
| | 2016 | | $1,198,120 | $682,901 | |
| Osteen | 2014 | | $1,663,907 | $67,790 | |
| | 2015 | N/A | $1,489,390 | $518,495 | ***$5,350,905*** |
| | 2016 | | $1,198,120 | $413,203 | |
| Pember | 2014 | | $1,307,357 | $529,592 | |
| | 2015 | N/A | $1,063,850 | $613,441 | ***$4,988,227*** |
| | 2016 | | $855,800 | $618,187 | |

---

[5]    UHS refers to its cash bonus payments as "Non-Equity Incentive Plan Compensation" paid pursuant to its "Executive Incentive Plan as approved by [the] Compensation Committee on March 29, 2017 (for 2016), March 23, 2016 (for 2015) and March 18, 2015 (for 2014)."

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

75.     Plaintiff incorporates ¶¶1-74 by reference and realleges each and every allegation set forth above, as though fully set forth herein.

76.     Plaintiff brings this action derivatively in the right and for the benefit of UHS to redress injuries suffered and to be suffered by UHS as a direct result of defendants' violations of state and federal law, breaches of fiduciary duty, abuse of control, gross mismanagement, constructive fraud, corporate waste and unjust enrichment, as well as the aiding and abetting thereof by defendants.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

77.     Plaintiff will adequately and fairly represent the interests of UHS and its shareholders in enforcing and prosecuting its rights.

78.     Central Laborers has continuously held UHS stock during the period in which defendants' conducted their illegal and wrongful course of conduct as alleged herein.

79.     Based upon the facts set forth throughout this complaint, applicable law and the longstanding rule that equity does not compel a useless and futile act, a pre-filing demand upon the UHS Board to institute this action against the officers and members of the UHS Board is excused as futile.  A pre-filing demand would be a useless and futile act because:

(a)     By virtue of Alan Miller and his family's stock ownership, defendants have consistently conceded that the UHS Board is "controlled" by Alan Miller, who has the voting power to elect five of the seven directors on the Board – or 80%.  As detailed most recently in the 2016 Annual Proxy Statement, UHS is "eligible to be treated as a controlled company under New York Stock Exchange Rule 303A due to the fact that the family of Alan B. Miller holds more than 95% of the shares of Class A and Class C Common Stock, which is entitled to elect 80% of the entire Board of Directors and constitutes more than 50% of [UHS's] aggregate voting power."

Moreover, stating that the "New York Stock Exchange Rule 303A" does not require "that a controlled company . . . have [its] nominating/corporate governance . . . committees composed entirely of independent directors," UHS has "determin[ed] that [its] Nominating & Governance Committee is not responsible for identifying and recommending qualified candidates for Board positions that, in accordance with [its] Restated Certificate of Incorporation, are to be elected by the holders of Class A and Class C Common Stock of the Company." Likewise, UHS's 2016 Form 10-K expressly concedes:

> Since a substantial majority of the Class A shares and Class C shares are controlled by Mr. Alan B. Miller and members of his family, one of whom (Marc D. Miller) is also a director and officer of our company, and they can elect a majority of our company's directors and effect or reject most actions requiring approval by stockholders without the vote of any other stockholders, there are potential conflicts of interest in overseeing the management of our company.

Because all UHS Board members serve at the discretion and favor of defendant Alan Miller, and Alan Miller directed the misconduct alleged herein, none of the members of the UHS Board are independent from Alan Miller.

(b)    UHS's 2016 Annual Proxy Statement expressly concedes that defendants Alan Miller, Marc Miller and Pantaleoni are not independent due to the Millers' stock ownership and roles with the Company and Pantaleoni's role as outside counsel to the Company, and their relationships with and dependence upon the other members of the Board for their livelihoods.

(c)    By virtue of the fact the entire Board caused UHS to repurchase its own shares at fraud-inflated prices, each member of the UHS Board is complicit in making the Company both a victim of defendants' securities fraud scheme and ultimately threatened with potential liability for that same scheme. Because none of the Director Defendants was sufficiently disinterested and independent, UHS could not have perpetrated this fraud against itself.

(d)     By virtue of having directed the Company to continue the illicit over-admissions scheme in order to report outsized revenues, which would artificially inflate the price of UHS common stock and facilitate the insider trading by the Insider Selling Defendants, and to justify the payment of excessive incentive compensation to the Officer Defendants, each of the Director Defendants personally participated in the misconduct alleged herein and is therefore complicit in the misconduct.

(e)     By virtue of having been unjustly enriched by millions of dollars through the receipt of executive incentive compensation that was augmented as a result of their having caused the Company to illicitly over-admit patients in violation of the False Claims Act, each of the Officer Defendants, including Director Defendants Alan Miller and Marc Miller, unjustly enriched themselves, rendering them complicit in the misconduct.

(f)     By virtue of having been unjustly enriched to the tune of $26.7 million as a result of artificially pumping up the price of UHS common stock (by causing the Company to illicitly over-admit patients and falsify its financial reporting and then causing the Company to repurchase UHS shares on the open-market at fraud-inflated prices, thus reducing the float and further increasing the price) and then dumping their personally held shares at fraud-inflated prices, each of the Insider Selling Defendants, including all of the Director Defendants except McDonnell, unjustly enriched themselves, rendering them complicit in the misconduct.

(g)     By virtue of the fact that defendant Herrell was Chairman and defendants McDonnell, Gibbs and Hotz were members of the Board's Audit Committee, and each was charged with exercising his or her fiduciary duties in

> assist[ing] the Board of Directors in fulfilling its oversight responsibility to the stockholders, potential stockholders, the investment community and others relating to: the integrity of [UHS's] financial statements, the financial reporting process, the systems of internal accounting and financial controls, the performance of [UHS's] internal audit function and independent auditors, the independent auditors'

qualifications and independence and [UHS's] compliance with legal and regulatory requirements,

defendants Herrell, McDonnell, Gibbs and Hotz are directly complicit in the misconduct alleged herein and would not be disinterested in the outcome of an investigation into these claims.

(h)     By virtue of the fact that defendant Hotz was the Chairman and defendants Gibbs and Herrell were members of the Board's Compensation Committee, each of which was charged with exercising their fiduciary duties in "review[ing] and approv[ing] [all] goals and objectives relevant to the compensation of [UHS's] Chief Executive Officer and other executive officers, evaluat[ing] their performance, determin[ing] and approv[ing] their compensation level" and "administer[ing] incentive-compensation plans and equity-based plans and approv[ing] compensation awards," the Compensation Committee improperly rewarded the Officer Defendants for defrauding the U.S. government through the illicit over-admissions scheme and by misleading the Company's investors as to the true source of its illicit revenues, to the detriment of UHS and its shareholder owners.   Defendants Hotz, Gibbs and Herrell are therefore directly complicit in the misconduct alleged herein and would not be disinterested in the outcome of an investigation into these claims.

(i)     In violation of UHS's Code of Business Conduct, Code of Ethics, SFO Code of Ethics and Insider Trading Policy, each of the Director Defendants: (a) failed to cause UHS to comply with all applicable laws and regulations, including the False Claims Act and the federal securities laws; (b) failed to cause UHS to appropriately maintain the Company's books, records, accounts and financial statements; to accurately report its financial performance; or to make accurate filings with the SEC, specifically as to UHS's reliance on illicit revenues derived from a pattern and practice of over-admissions; (c) engaged in and/or allowed others to engage in insider trading, including improperly using UHS's confidential information for their own personal gain; (d) wasted UHS's assets by paying the Officer Defendants outsized incentive compensation that

rewarded them for causing the Company to defraud the U.S. government in violation of the False Claims Act; and (e) failed to report and/or address violations of the Code of Business Conduct, Code of Ethics, SFO Code of Ethics and/or Insider Trading Policy.

(j)     The members of UHS's Board have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the corporation for the violations of law complained of herein.  These are people they have developed professional relationships with, who are their friends and with whom they have entangling financial alliances, interests and dependencies, and therefore, they are not able to and will not vigorously prosecute any such action.

(k)     The UHS Board and senior management participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from UHS's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties.  As a result of their access to and review of internal corporate documents, or conversations and connections with other corporate officers, employees and directors, and attendance at management and/or Board meetings, each of the defendants knew the adverse non-public information regarding the potential False Claims Act violations, false financial reporting, the wasteful stock buy-backs, and the payment of outsized incentive compensation to the Officer Defendants as a reward for their having caused the Company to violate the law.  Pursuant to their specific duties as Board members, the Director Defendants are charged with the management of the Company and to conduct its business affairs.  Defendants breached the fiduciary duties they owed to UHS and its shareholders in that they failed to prevent and correct the False Claims Act violations, the false financial reporting, and the wasteful stock buy-backs, and were complicit in financially rewarding the Officer Defendants for causing UHS to violate the False Claims Act.  Certain directors are also dominated and

controlled by other directors and cannot act independently of them.  Thus, the UHS Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because each of its members participated personally in the wrongdoing or are dependent upon other defendants who did.

(l)     The acts complained of constitute violations of the fiduciary duties owed by UHS's officers and directors and these acts are incapable of ratification.

(m)     The members of the UHS Board have benefited, and will continue to benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of control and the perquisites derived thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.

(n)     Any suit by the current directors of UHS to remedy these wrongs would likely further expose the liability of defendants under the federal securities laws, which could result in additional civil and/or criminal actions being filed against one or more of the defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

(o)     UHS has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the current Board has not filed any lawsuits against itself or others who were responsible for that wrongful conduct to attempt to recover for UHS any part of the damages UHS suffered and will suffer thereby.

(p)     In order to properly prosecute this lawsuit, it would be necessary for the directors to sue themselves and the other defendants, requiring them to expose themselves and their comrades to millions of dollars in potential civil liability and criminal or SEC sanctions.  This they will not do.  Specifically, in addition to UHS, defendants Alan Miller and Filton are already defending claims they violated the federal securities laws in a securities fraud class action entitled

*Heed v. Universal Health Services, Inc., et al*[6]*.*, with UHS and defendants Alan Miller and Filton

being charged with violations of §§10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 in

connection with UHS's issuance of materially false and misleading statements and financial

reports between February 26, 2015 and December 7, 2016.  The participation of defendants Alan

Miller and Filton in the alleged fraud is detailed in the Class Action Complaint for Violations of

the Federal Securities Laws filed in that matter on December 23, 2016, at ECF No. 1, and because

all of the other Board members are beholden to defendant Alan Miller, they cannot effectively

investigate and prosecute the claims detailed herein.

       (q)     UHS's current and past officers and directors are protected against personal

liability for their acts of mismanagement, waste and breach of fiduciary duty alleged in this

complaint by directors' and officers' liability insurance which they caused the Company to

purchase for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of

UHS.  However, due to certain changes in the language of directors' and officers' liability

insurance policies in the past few years, the directors' and officers' liability insurance policies

covering the defendants in this case contain provisions which eliminate coverage for any action

brought directly by UHS against these defendants, known as, *inter alia*, the "insured versus insured

exclusion."  As a result, if these directors were to sue themselves or certain of the officers of UHS,

there would be no directors' and officers' insurance protection and thus, this is a further reason

why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this

action is brought, such insurance coverage exists and will provide a basis for the Company to

effectuate a recovery.

---

[6] This litigation is in the United States District Court for the Central District of California, Civil
Action No.16-09499 but is in the process of being transferred to the Eastern District of
Pennsylvania.

(r)     In order to bring this action for breaching their fiduciary duties, the members of the UHS Board would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, who are their personal friends and with whom they have entangling financial alliances, interests and dependencies, which they would not do.

80.     Plaintiff has not made any demand on shareholders of UHS to institute this action since such demand would be a futile and useless act for the following reasons:

(a)     UHS is a publicly traded company with approximately 96.6 million shares of Class A, Class B, Class C and Class D common stock outstanding, and thousands of shareholders;[7]

(b)     making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)     making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

### Violations of §10(b) and Rule 10b-5 of the Exchange Act
### Against the Officer Defendants

81.     Plaintiff incorporates ¶¶1-80 by reference and realleges each and every allegation set forth above, as though fully set forth herein.

82.     Throughout the Relevant Period, the Officer Defendants individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to cause UHS to falsify its financial reporting, causing its stock to trade at fraud-inflated prices. Meanwhile,

---

[7]     The UHS Class A, Class C, and Class D common stock are not publicly traded but are convertible share-for-share into Class B common stock, which is publicly traded.

the Officer Defendants caused UHS to repurchase its own shares on the open market at fraud-inflated prices, rendering UHS a victim of the fraud of its faithless fiduciaries.

83.     The Officer Defendants employed devices, schemes and artifices to defraud while in possession of material, adverse non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about UHS not misleading.

84.     The Officer Defendants, as top executive officers of the Company, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as officers of the Company, each of the Officer Defendants was able to and did control the conduct complained of herein and the content of the public statements disseminated by UHS.

85.     The Officer Defendants acted with scienter throughout the Relevant Period, in that they either had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.  The Officer Defendants were among the senior management of the Company, and were therefore directly responsible for the false and misleading statements and/or omissions disseminated to the public through press releases, news reports and filings with the SEC.  The Officer Defendants also each sold millions of dollars of their personally held UHS common stock while in possession of material non-public information as alleged herein.

86.     Each of the Officer Defendants participated in a scheme to defraud with the purpose and effect of defrauding UHS by causing UHS to purchase shares at fraud-inflated prices.

87.     By virtue of the foregoing, the Officer Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## COUNT II

### Violations of §20(a) of the Exchange Act Against
### the Officer Defendants

88.     Plaintiff incorporates ¶¶1-87 by reference and realleges each and every allegation set forth above, as though fully set forth herein.

89.     The Officer Defendants, by virtue of their stock ownership and positions with UHS and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of UHS within the meaning of §20(a) of the Exchange Act.   They had the power and influence and exercised the same to cause UHS to engage in the illegal conduct and practices complained of herein.

## COUNT III

### Breach of Fiduciary Duty and/or Aiding and Abetting
### Against All Defendants

90.     Plaintiff incorporate ¶¶1-89 by reference and realleges each and every allegation set forth above, as though fully set forth herein.

91.     Each of the defendants agreed to and did participate with the other defendants and/or aided and abetted one another in a deliberate course of action designed to cause UHS to violate the False Claims Act, to falsify its financial reports and to divert corporate assets in breach of fiduciary duties the defendants owed to the Company.

92.     The defendants have violated fiduciary duties of care, loyalty, candor and independence owed to UHS and its public shareholders by causing the Company to violate the False Claims Act and the federal securities laws and have engaged in unlawful self-dealing and have acted to put their personal interests and/or their colleagues' interests ahead of the interests of UHS and its shareholders.

93.     As demonstrated by the allegations above, defendants failed to exercise the care required and breached their fiduciary duties of loyalty, good faith, candor and independence owed

- 53 -

to UHS and its public shareholders by causing UHS to violate the False Claims Act and failing to disclose material information and/or making material misrepresentations to shareholders regarding UHS's misleading financial reporting.

94.     By reason of the foregoing acts, practices and course of conduct, the defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward UHS and its public shareholders.

95.     As a proximate result of defendants' conduct, UHS has been injured and is entitled to damages.

## COUNT IV

### Abuse of Control Against All Defendants

96.     Plaintiff incorporates ¶¶1-95 by reference and realleges each and every allegation set forth above, as though fully set forth herein.

97.     The defendants employed the alleged scheme detailed above for the purpose of maintaining and entrenching themselves in their positions of power, prestige and profit at UHS and maintaining their control over UHS, and to continue to receive the substantial benefits, salaries, incentive compensation and emoluments associated with their positions at UHS.  As a part of this scheme, defendants caused UHS to violate the False Claims Act and actively made and/or participated in the making of, or aided and abetted the making of, misrepresentations regarding UHS's financial results.

98.     Defendants' conduct constituted an abuse of their ability to control and influence UHS.

99.     By reason of the foregoing, UHS has been damaged.

## COUNT V

### Gross Mismanagement Against All Defendants

100.     Plaintiff incorporates ¶¶1-99 by reference and realleges each and every allegation set forth above, as though fully set forth herein.

101.     Defendants had a duty to UHS and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of UHS.

102.     Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of UHS in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, defendants breached their fiduciary duties of due care, diligence and candor in the management and administration of UHS's affairs and in the use and preservation of UHS's assets.

103.     During the course of the discharge of their duties, defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet defendants caused UHS to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to UHS, thus breaching their duties to the Company.  As a result, defendants grossly mismanaged UHS.

104.     By reason of the foregoing, UHS has been damaged.

## COUNT VI

### Constructive Fraud Against All Defendants

105.     Plaintiff incorporates ¶¶1-104 by reference and realleges each and every allegation set forth above, as though fully set forth herein.

106.    As corporate fiduciaries, defendants owed to UHS and its shareholders a duty of candor and full and accurate disclosure regarding the true state of UHS's business and assets and their conduct with regard thereto.

107.    As a result of the conduct complained of herein, defendants caused UHS to violate the False Claims Act and to make, or aid and abet the making of, numerous misrepresentations to and/or concealed material facts from UHS's shareholders despite defendants' duties to, *inter alia,* disclose the true facts regarding their stewardship of UHS.  Thus they have committed constructive fraud and violated their duty of candor.

108.    By reason of the foregoing, UHS has been damaged.

## COUNT VII

### Corporate Waste Against All Defendants

109.    Plaintiff incorporates ¶¶1-108 by reference and realleges each and every allegation set forth above, as though fully set forth herein.

110.    By failing to properly consider the interests of the Company and its public shareholders, by failing to conduct proper supervision, by rewarding the Officer Defendants through the payment of outsized incentive compensation for causing UHS to violate the False Claims Act, and by facilitating the insider sales by the Insider Selling Defendants, defendants have caused UHS to waste valuable corporate assets.

111.    As a result of defendants' corporate waste, they are liable to the Company.

## COUNT VIII

### Unjust Enrichment Against the Officer Defendants and Insider Selling Defendants

112.    Plaintiff incorporates ¶¶1-111 by reference and realleges each and every allegation set forth above, as though fully set forth herein.

113.     As a result of the conduct described above, the Officer Defendants and Insider Selling Defendants will be and have been unjustly enriched at the expense of UHS.

114.     The Officer Defendants received tens of millions of dollars in outsized executive compensation that was paid to them only as a result of their having caused UHS to defraud the U.S. government by illicitly over-admitting patients and then billing the U.S. government for their "care." The Insider Selling Defendants sold UHS stock for a profit during the Relevant Period, misusing confidential non-public corporate information. These defendants should be required to disgorge the gains they have obtained, and/or will otherwise unjustly obtain, at the expense of UHS. A constructive trust for the benefit of the Company should be imposed thereon.

115.     All the incentive compensation payments and stock sale proceeds received by these defendants were at the expense of UHS. The Company was inadequately compensated for these payments and stock sales proceeds. UHS was damaged by such payments and stock sale proceeds.

## COUNT IX

### Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

116.     Plaintiff incorporates ¶¶1-115 by reference and realleges each and every allegation set forth above, as though fully set forth herein.

117.     At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above and sold UHS common stock on the basis of such information.

118.     The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold UHS common stock.

119.     At the time of their stock sales, the Insider Selling Defendants knew that the Company was engaged in a scheme to defraud the U.S. government due to their illicit over-

admitting of patients and billing the U.S. government for their purported "care." The Insider Selling Defendants' sales of UHS common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

120.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.    Awarding money damages against all defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, to ensure defendants do not participate therein or benefit thereby;

B.    Directing all defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all payment of incentive compensation (whether in the form of cash bonuses, stock awards or stock option grants) and common stock sale proceeds and imposing a constructive trust thereon;

C.    Directing UHS to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with applicable law, including, but not limited to, putting forward for a shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the adoption of the following Corporate Governance policies:

(i)    increasing the number of directors on the Board by three new members, each of which must be independent pursuant to NYSE listing standards, and placing the Board's

Nominating Committee in charge of selecting and putting before shareholders for approval the three new independent directors;

       (ii)    a proposal prohibiting the Company from repurchasing common stock on the open market or from senior executives pursuant to 10b5-1 trading plans within three months of the sale of UHS common stock by the Company's senior executives;

       (iii)    a proposal requiring that the office of CEO of UHS and Chairman of the UHS Board be permanently held by separate individuals, that the Chairman of the UHS Board meet rigorous "independent" standards, and that all members of the Miller family be prohibited from serving as Chairman of the UHS Board;

       (iv)    a proposal to strengthen the UHS Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

       (v)    appropriately test and then strengthen the internal audit and control function;

       (vi)    rotate independent auditing firms every five years;

       (vii)    control and limit insider stock selling and the terms and timing of stock awards and stock option grants; and

       (viii)    reform executive compensation, including requiring that any stock awards or stock options paid as incentive compensation to any officer or director of UHS be held for at least eight years from the grant/award date;

       D.    Ordering the imposition of a constructive trust over defendants' incentive compensation (whether cash bonus, stock award or stock option grant) and insider sales proceeds;

       E.    Awarding punitive damages;

F.      Awarding costs and disbursements of this action, including reasonable attorneys',

accountants', and experts' fees; and

G.      Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: May 12, 2017

KAUFMAN, COREN & RESS, P.C
DEBORAH R. GROSS

DEBORAH R. GROSS

Two Commerce Square
Suite 3900, 2001 Market Street
Philadelphia, PA  19103
Telephone:  215/735-8700
215/735-5170 (fax)
dgross@kcr-law.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
SAMUEL H. RUDMAN
MARY K. BLASY
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

ROBBINS GELLER RUDMAN
   & DOWD LLP
TRAVIS E. DOWNS III
BENNY C. GOODMAN III
ERIK W. LUEDEKE
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
JOHN C. HERMAN
Monarch Tower, Suite 1650
3424 Peachtree Road, N.E.
Atlanta, GA  30326
Telephone:  404/504-6500
404/504-6501 (fax)

CAVANAGH & O'HARA
JOHN T. LONG
2319 West Jefferson Street
Springfield, IL  62702
Telephone:  217/544-1771
217/544-9894 (fax)

Attorneys for Plaintiff

I:\Admin\CptDraft\Derivative\CPT Universal Health Derivative.docx