**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE UNIVERSAL HEALTH SERVICES, | : | CIVIL ACTION |
| INC., DERIVATIVE LITIGATION | : | NO. 17-02187 |
| | : | |
| | : | HONORABLE JOEL H. SLOMSKY |
| This Document Relates To: | : | |
| | : | **JURY TRIAL DEMANDED** |
| ALL ACTIONS | : | |
| | : | REDACTED VERSION |
| | : | (FOR PUBLIC VIEW) |
| | : | |

**VERIFIED SHAREHOLDER DERIVATIVE CONSOLIDATED
<u>AMENDED COMPLAINT</u>**

## TABLE OF CONTENTS

NATURE OF THE CASE ........................................................................................... 1

JURISDICTION AND VENUE ................................................................................ 6

PARTIES ...................................................................................................................... 7

SUBSTANTIVE ALLEGATIONS ......................................................................... 11

I.   UNIVERSAL IS A CONTROLLED COMPANY AND DIRECTORS ARE
     BEHOLDEN TO THE COMPANY'S CONTROLLERS, DEFENDANTS
     ALAN MILLER AND MARC MILLER, WHO ARE BOTH EXECUTIVES .............. 11

II.  UNIVERSAL HAS RAPIDLY EXPANDED ITS OPERATIONS THIS
     DECADE ........................................................................................................ 13

III. UNIVERSAL'S BUSINESS PLANS FOCUS ON PATIENT ADMISSIONS
     AND LENGTH OF STAY TO INCREASE PROFITABILITY ..................................... 17

     A.   The Business Plans for Universal's Behavioral Health Segment
          Leave No Doubt About Defendants' Goals:   Increase
          Admissions at All Costs .................................................................. 18

     B.   Universal's Business Strategies, in Full View and with the
          Support of the Board, Pay Off Handsomely for Universal's
          Leadership .......................................................................................... 37

IV.  UNIVERSAL'S   ENTERPRISE-WIDE   REPUGNANT   CONDUCT
     SUBJECTS THE COMPANY TO INQUIRIES, *QUI TAM* ACTIONS, AND
     GOVERNMENT INVESTIGATIONS ............................................................... 39

     A.   Localized Inquiries by Federal and State Agencies Reveal
          Quality of Care Issues and Fraud Among a Number of
          Universal Facilities ........................................................................ 40

     B.   The *Escobar Qui Tam* Litigation, Centering on Universal's
          Habitual Use of Unqualified, Untrained, and Unlicensed Staff,
          Exposes Universal to Hundreds of Millions of Dollars of
          Potential Liability ............................................................................ 42

     C.   Federal Inquiries into Universal Facilities Mount, Resulting in
          a Criminal Investigation of Universal, the Corporate Entity,
          and a Widespread Civil Investigation .......................................... 45

V.   IN LATE   2016, *BUZZFEED*'S INVESTIGATIVE EXPOSÉ FULLY
     REVEALS   WHAT   UNDERLIES   FEDERAL   INVESTIGATORS'

INTEREST:  UNIVERSAL'S  WIDESPREAD  FRAUDULENT  PATIENT ADMISSION AND BILLING PRACTICES ................................................. 50

    A.    Universal Illicitly Increases Its Patient Admission Rate by Wildly Mischaracterizing Patient Symptoms ........................................... 50

    B.    The Illicit Admissions and Unreasonable Cost-Cutting Reflects Universal's Corporate Culture and Negatively Impacts Patient Care ........................................................................................................... 55

    C.    Universal Holds Patients for as Long as Their Insurance Is Approved ..................................................................................................... 57

    D.    Additional Reports of Neglect and Abuse at Universal Facilities Continue to Come to Light, Further Damaging Universal's Reputation ............................................................................ 60

VI.    UNIVERSAL'S  BOARD  IS  REPEATEDLY  NOTIFIED  OF  THE MISCONDUCT YET REFUSES TO TAKE CORRECTIVE ACTION ......................... 62

    A.    As Early as 2012, the Behavioral Health Segment's Business Plans Contained Red Flags ........................................................................ 63

    B.    The Board Is Put on Notice of and Frequently Discusses the Various Government Investigations and Litigations Involving an Increasing Number of Universal's Facilities........................................ 64

    C.    Beginning in Late 2013, Stockholder Representatives and Other Groups Began to Ring the Alarm Bells About Universal's Practices in Written Communications to the Board ............. 67

    D.    Universal's Board, Through Its Audit and Compliance Committees, Has Long Been Well Aware of Problems at the Company ................................................................................................... 70

    E.    Stockholder Groups Revive Their Complaints About Universal's Oversight Failures in 2014 .................................................... 74

    F.    Universal's Failure to Address the Concerns Raised by Its Stockholders, and Apparent from Its Own Internal Compliance Procedures, Continues Unabated ............................................................ 82

    G.    Not Even the *BuzzFeed* Exposé Could Spur the Board into Action.................................................................................................... 103

VII.    MARKET PRICE OF UNIVERSAL COMMON STOCK WAS INFLATED BY FALSE UNIVERSAL FINANCIAL REPORTS, PROMPTING THE

FILING OF A SECURITIES FRAUD CLASS ACTION AGAINST THE COMPANY ........................................................................................ 115

VIII.    INSIDERS UNLOAD MILLIONS OF DOLLARS IN STOCK .................................. 117

IX.    UNIVERSAL AWARDS OFFICER DEFENDANTS FOR THEIR MISCONDUCT WITH EXORBITANT COMPENSATION ........................................ 127

DAMAGES TO UNIVERSAL ........................................................................................ 130

INDIVIDUAL DEFENDANTS' DUTIES AND OBLIGATIONS ........................................... 131

I.    INDIVIDUAL DEFENDANTS' DUTIES ................................................... 131

II.    ADDITIONAL DUTIES OF DIRECTOR DEFENDANTS ON THE UNIVERSAL AUDIT COMMITTEE ............................................................. 139

III.    ADDITIONAL DUTIES OF DIRECTOR DEFENDANTS ON THE UNIVERSAL COMPENSATION COMMITTEE ......................................... 142

DERIVATIVE ALLEGATIONS ...................................................................................... 144

DEMAND FUTILITY ALLEGATIONS ................................................................. 144

PRAYER FOR RELIEF .............................................................................................. 158

JURY DEMAND ......................................................................................................... 160

Plaintiffs Amalgamated Bank, trustee of the Longview Broad Market 3000 Index Fund, Longview LargeCap 500 Index Fund, Longview LargeCap 500 Index VEBA Fund, Longview Quant LargeCap Equity VEBA Fund, and Longview Quantitative LargeCap Fund (collectively, "**Amalgamated**"), the City of Cambridge Retirement System ("**Cambridge**"), and the Charter Township of Clinton Police & Fire Pension Fund ("**Clinton**") (collectively, "**Plaintiffs**") bring this consolidated derivative action on behalf of Nominal Defendant Universal Health Services, Inc. ("**Universal**" or the "**Company**"), alleging wrongdoing against certain current and/or now former members of Universal's board of directors (the "**Board**") and executive officers.

Plaintiffs make these allegations upon personal knowledge, as to their own actions, and on information and belief, as to all other matters, based upon an in-depth review of: (i) information publicly disseminated by Universal, including its public filings with the U.S. Securities and Exchange Commission ("**SEC**"), and postings on Universal's website; (ii) news reports, press releases, and other publicly available sources; (iii) court dockets, filings, and decisions related to litigation filed against Universal and/or its directors and officers; and (iv) documents produced by Universal in response to demands for books and records under 8 *Del. C.* §220 (the "**220 Documents**" and "**220 Demands**").

## NATURE OF THE CASE

1.     Universal proclaims that "patients are [its] top priority," and it is "dedicated to the highest standards of quality, talent and ethics."  Yet for years, and in contravention of federal and state law and its own proclamation of values, Universal – a hospital management company – committed unsuspecting patients without their express consent to mental treatment facilities for the sole purpose of maximizing insurance payments for their institutionalization.  Beginning from at least January 16, 2013 to the present (the "Relevant Period"), the Board, at the behest of the Company's Chief Executive Officer ("CEO") and controlling stockholder, pushed forward

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

business practices resulting in violations of law and was repeatedly apprised of red flags that this unsavory practice was systemic and continuously occurring.  The Board, however, did nothing to stop it.

2.      Universal is a controlled company operating as a holding company for hundreds of behavioral health facilities across the nation.  Defendant Alan B. Miller ("**Alan Miller**") and his son, Defendant Marc D. Miller ("**Marc Miller**"), served as CEO and President, respectively, during all relevant times discussed herein.  As a holding company, Universal is responsible for ensuring consistent business practices and operations across its portfolio of behavioral health facilities.  As alleged herein, dozens of Universal behavioral health facilities have engaged in similar misconduct throughout the nation, which is the result of a tone at the top pushing the limits of the law in pursuit of profit.

3.      Since February 2013, the Board has been apprised of long-standing and ever-expanding government investigations of Universal – including by the Office of Inspector General for the U.S. Department of Health and Human Services ("**OIG**") and Department of Justice ("**DOJ**") – for violations of the False Claims Act and improper billing.  The number of subpoenas, investigations, and civil demands is breathtaking.  Indeed, over the past several years, at least 31 of the Company's facilities have received, sometimes multiple, subpoenas, from the DOJ as part of an ever-expanding, coordinated investigation that also entails civil investigative demands.  Perhaps most significantly, in late March 2015, the DOJ investigation expanded to include Universal *as a corporate entity* after years of investigations into the Company's behavioral health facilities.

4.      Beginning in 2014, the Board was told numerous times, via letters from a stockholder, an investment firm, and a major labor union representing Company employees, in

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

exacting terms about the Company's unlawful practices and the need to immediately correct the unlawful conduct.  The investor letters layout in painstaking detail the precise misconduct, but the Board did not take any action in response to these repeated warnings of illegality.  Instead, the Board continued to pursue business strategies that further put the Company at risk of liability.

5.     Then, on December 7, 2016, *BuzzFeed News* ("**BuzzFeed**") issued an investigative report, which shed further light on potential criminal conduct taking place throughout Universal's facilities.   *BuzzFeed*'s yearlong investigation was based on *175* interviews with current and former Universal staff, including *18* executives who ran Universal hospitals, and more than *120* additional interviews with patients, government investigators, and other experts, along with a cache of internal documents.  Despite the credibility of the *BuzzFeed* article, the Board chose not to take any steps to investigate, but rather, put in place a public relations campaign to undermine *BuzzFeed*'s reporting.  Worse yet, on May 23, 2017, *BuzzFeed* revealed that the Company's ever-expanding government investigations had expanded to include the FBI and Department of Defense, information not previously shared with the Company's stockholders.

6.     Internal documents and interviews of former and current Universal employees, as well as the 220 Documents obtained by Plaintiffs, show that Universal had Company-wide business plans and strategies to drive revenue and reduce the bottom line, resulting in widespread illegal and unsafe practices at Universal behavioral health facilities known to the Board and the Company's executives.

7.     By way of example, the most egregious misconduct relates to illicit admission of patients regardless of medical necessity.   Universal lured unsuspecting patients into its behavioral health facilities by offering free wellness examinations.   Once in the facility,

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Universal employees tricked patients into committing themselves, exaggerated patient symptoms, manipulated patients' answers to make them seem suicidal, and held patients against their will until the patients' insurance policy payments ran out in order to increase revenues at those facilities in violation of the False Claims Act, 31 U.S.C. § 3729, *et seq.* (the "**FCA**"). Former admissions workers from three Universal facilities stated that they learned how to turn passing statements that individuals made during assessments into more dangerous evaluations: admissions counselors stated they were instructed to "play up the criteria" so that insurers would approve the hospitalization.

8.     The Board closely monitored and sought to increase a facility's "conversion rate," which measured the percentage of callers who came in for psychiatric assessments and the percentage of those individuals who then became inpatients.  A Universal employee interviewed by reporters described the Company's insistence on tracking patient intake statistics as if the employees were "car salesmen."  Other employees have also stated that at Universal behavioral health facilities, "[t]he goal when you're on the phone with someone is to always get them into the facility within 24 hours. And the reason for getting them into the facility is that once they stepped foot in, they are behind locked doors."

9.     The Board also closely monitored and sought to increase patients' average length of stay, a metric measuring the amount of money insurers would pay to keep a patient housed at a Universal behavioral health facility.  While the Board ignored the growing and ever-expanding government investigations focused on the fallout from this business practice, the average length of stay increased substantially.

10.     Moreover, the Individual Defendants (defined *infra* at ¶¶25-31, 34-38) knew, incentivized, and directed Universal's officers and employees to violate the FCA by rewarding

- 4 -
THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

them through incentive compensation for increasing revenues, without installing the proper internal controls and other corporate governance measures to ensure that the Company was not violating any laws in its effort to increase revenues.

11.     Once informed of the investigations by the DOJ and OIG, and having received multiple letters from stockholders concerning the insufficient compliance controls and corporate governance at the Company, the Individual Defendants failed to reform the Company's practices, but instead chose to profit off the illicit conduct, to the detriment of the Company and its stockholders.  In the face of looming investigations by the DOJ's Criminal Frauds Section, the OIG, and a whistleblower action leading to the uncovering of a pattern of wrongful admissions and quality of care issues at facilities in at least 12 states – or more than one in ten of Universal's behavioral health facilities – the Individual Defendants sat on their hands rather than take meaningful corrective action.  As a result, the Company has set aside *$43 million* to cover future government settlements, without any indication when the reserves would stop increasing.

12.     In addition, while in possession of material, non-public information regarding this illegal activity, the Individual Defendants approved or authored false financial statements inflating the Company's share price, sold their shares of Universal common stock at inflated prices, and concurrently caused the Company to repurchase those shares at the inflated prices. The Company's records, including the minutes of the meetings of the Audit Committee of the Board, document the Individual Defendants' receipt and approval of misleading Company filings with the SEC.  These filings are now the subject of a federal securities class action pending in this District, styled *Heed v. Universal Health Services, Inc.*, No. 2:17-cv-02817 (E.D. Pa.) (the "**Securities Class Action**").

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

13.     By this conduct, the Individual Defendants have breached their fiduciary duties to the Company and its stockholders and caused the Company to violate the FCA and its state analogues, as well as federal securities law.  As a result, the Company faces additional damage relating to the investigations and subpoenas from the DOJ and OIG regarding unlawful practices at dozens of the Company's facilities and at the Company's corporate offices, millions of dollars in potential liability under the FCA and state analogues in each state that the Company has facilities, and the Securities Class Action alleging additional damages related to false and misleading statements made during the Relevant Period, which failed to disclose the Company's unlawful practices.

## <u>JURISDICTION AND VENUE</u>

14.     The claims asserted herein arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("**Exchange Act**") (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5), and under state law for breach of fiduciary duty, constructive fraud, corporate waste, and unjust enrichment.

15.     In connection with the wrongdoing complained of herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of national securities markets.

16.     This Court has subject-matter jurisdiction of this case under §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

17.     This Court also has supplemental jurisdiction over the state law claims asserted herein under 28 U.S.C. §1367.

18.     This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

19.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business and maintains its principal executive offices and operates within this District or is an individual who has sufficient minimum contacts with this District, so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.  Further, the Individual Defendants conducted much of the wrongdoing complained of herein in this District.

20.     Venue is proper in this District under §27 of the Exchange Act (15 U.S.C. §78aa).

21.     Venue is also proper in this District under 28 U.S.C. §1391(b) because: (i) Universal maintains its principal place of business in this District; (ii) one or more of the Individual Defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein in violation of fiduciary duties owed to Universal, occurred in this District; and (iv) the Individual Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## **PARTIES**

22.     Plaintiff Amalgamated is a current stockholder of Universal and has continuously held Universal stock since 2012.

23.     Plaintiff Cambridge is a current stockholder of Universal and has continuously held Universal stock since January 31, 2014.

24.     Plaintiff Clinton is a current stockholder of Universal and has continuously held Universal stock since March 13, 2015.

25.     Nominal Defendant Universal is a Delaware corporation, with its principal place of business at 367 South Gulph Road, King of Prussia, Pennsylvania 19406.  The Company's

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

stock trades on the New York Stock Exchange under the symbol "UHS." As of February 28, 2018, Universal owned or operated 326 inpatient facilities and 32 outpatient and other facilities throughout the United States, United Kingdom, Puerto Rico, and U.S. Virgin Islands.

26.     Defendant Alan Miller has served as Universal's Chairman and CEO since its founding in 1978 and served as the Company's President until May 2009.

27.     Defendant Marc Miller is Alan Miller's son and has served as a Universal director since 2006 and as its President since May 2009.

28.     Defendant Robert H. Hotz ("**Hotz**") has served as a Universal director since 1991.

29.     Defendant Lawrence S. Gibbs ("**Gibbs**") has served as a Universal director since 2011.

30.     Defendant Eileen C. McDonnell ("**McDonnell**") has served as a Universal director since April 2013.

31.     Defendant Anthony Pantaleoni ("**Pantaleoni**") served as a Universal director from 1982 until he resigned as a director, effective as of January 17, 2018. Pantaleoni is also Of Counsel to the law firm Norton Rose Fulbright US LLP ("**Norton Rose**"), Universal's long-term outside counsel. Norton Rose provides personal legal services to Defendant Alan Miller and is the trustee of certain trusts for the benefit of Defendants Alan Miller, Marc Miller, and other Miller family members. Defendant Pantaleoni's compensation at Norton Rose is largely dependent upon the continued engagement by and payments for legal services to Universal and Defendant Alan Miller. Warren Nimetz ("**Nimetz**"), also of Norton Rose, was appointed to Pantaleoni's Board seat.

32.     Defendant John H. Herrell ("**Herrell**") served as Universal's director from 1993 until he retired, effective as of May 16, 2018. Upon his retirement, Elliot J. Sussman, M.D.

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

("**Dr. Sussman**") was appointed to Herrell's Board seat.  Dr. Sussman is also a trustee of the Universal Health Realty Income Trust ("**UHRI**").  Alan Miller is a trustee, director, CEO, and President of UHRI and his son, Marc Miller, is a trustee.

33.     Defendants Alan Miller, Marc Miller, Hotz, Gibbs, McDonnell, Pantaleoni, and Herrell are collectively referred to as the "**Director Defendants**."  Each Director Defendant is named as a defendant only for the period in which each served on Universal's Board.

34.     The Director Defendants served on the following Board committees each year, after the Company's annual meeting for that year, and held the following number of meetings during each year:

| Nominating & Governance Committee | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Member** | **2010** | **2011** | **2012** | **2013** | **2014** | **2015** | **2016** | **2017** |
| **Alan B. Miller** | | | | | | | | |
| **Marc D. Miller** | | | | | | | | |
| **Anthony Pantaleoni** | | | | | | | | |
| **John H. Herrell** | | | | X | X | X | X | X |
| **Robert H. Hotz** | Chair | Chair | Chair | Chair | Chair | Chair | Chair | Chair |
| **Lawrence S. Gibbs** | | X | X | X | X | X | X | X |
| **Eileen C. McDonnell** | | | | | | | | |
| **Number of Meetings Held** | **1** | **1** | **1** | **1** | **2** | **1** | **1** | **1** |

| Audit Committee | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Member** | **2010** | **2011** | **2012** | **2013** | **2014** | **2015** | **2016** | **2017** |
| **Alan B. Miller** | | | | | | | | |
| **Marc D. Miller** | | | | | | | | |
| **Anthony Pantaleoni** | | | | | | | | |
| **John H. Herrell** | Chair | Chair | Chair | Chair | Chair | Chair | Chair | Chair |
| **Robert H. Hotz** | X | X | X | X | X | X | X | X |
| **Lawrence S. Gibbs** | | X | X | X | X | X | X | X |
| **Eileen C. McDonnell** | | | | X | X | X | X | X |
| **Number of Meetings Held** | **13** | **13** | **11** | **13** | **11** | **12** | **12** | **19** |

| Compensation Committee | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Member** | **2010** | **2011** | **2012** | **2013** | **2014** | **2015** | **2016** | **2017** |
| **Alan B. Miller** | | | | | | | | |
| **Marc D. Miller** | | | | | | | | |
| **Anthony Pantaleoni** | | | | | | | | |

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

| Compensation Committee | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Member | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
| John H. Herrell | | | | X | X | X | X | X |
| Robert H. Hotz | Chair | Chair | Chair | Chair | Chair | Chair | Chair | Chair |
| Lawrence S. Gibbs | | X | X | X | X | X | X | X |
| Eileen C. McDonnell | | | | | | | | |
| Number of Meetings Held | 7 | 4 | 2 | 2 | 2 | 2 | 3 | 1 |

| Executive Committee | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Member | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
| Alan B. Miller | X | X | X | X | X | X | X | X |
| Marc D. Miller | | | | X | X | X | X | X |
| Anthony Pantaleoni | X | X | X | X | X | X | X | X |
| John H. Herrell | | | | | | | | |
| Robert H. Hotz | X | X | X | X | X | X | X | X |
| Lawrence S. Gibbs | | | | | | | | |
| Eileen C. McDonnell | | | | | | | | |
| Number of Meetings Held | 1 | 1 | 3 | 2 | 1 | 1 | 2 | 0 |

| Finance Committee | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Member | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
| Alan B. Miller | X | X | X | X | X | X | X | X |
| Marc D. Miller | X | X | X | X | X | X | X | X |
| Anthony Pantaleoni | X | X | X | X | X | X | X | X |
| John H. Herrell | | | | | | | | |
| Robert H. Hotz | X | X | X | X | X | X | X | X |
| Lawrence S. Gibbs | | | | | | | | |
| Eileen C. McDonnell | | | | | | | | |
| Number of Meetings Held | 1 | 1 | 1 | 0 | 1 | 1 | 0 | 0 |

35.     Defendant Steve G. Filton ("**Filton**") has served as Universal's Chief Financial Officer ("**CFO**"), Executive Vice President, and Secretary since February 2003.

36.     Defendant Debra K. Osteen ("**Osteen**") has served as an Executive Vice President and the President of Universal's Behavioral Health Division since December 2005.

37.     Defendant Marvin G. Pember ("**Pember**") has served as a Senior Vice President and the President of Universal's Acute Care Division since August 2011.

38.     Defendant Charles F. "Chick" Boyle ("**Boyle**") has served as the Controller at Universal since 2003 and is also currently a Vice President at the Company.  Boyle has held

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

various executive accounting positions at Universal beginning in 1983, including serving as the Assistant Vice President for Corporate Accounting since 1994.

39.     Defendant James Caponi ("**Caponi**") served as the Chief Compliance Officer for Universal from November 2010 to June 2018.   During that time, Caponi was primarily responsible for legal compliance oversight at Universal, reporting to the Company's Compliance Committee on numerous occasions.

40.     Defendants Alan Miller, Mark Miller, Filton, Osteen, Pember, Boyle, and Caponi are collectively referred to as the "**Officer Defendants**."   Director Defendants and Officer Defendants are collectively referred to as the "**Individual Defendants**."

## SUBSTANTIVE ALLEGATIONS

## I.     UNIVERSAL IS A CONTROLLED COMPANY AND DIRECTORS ARE BEHOLDEN TO THE COMPANY'S CONTROLLERS, DEFENDANTS ALAN MILLER AND MARC MILLER, WHO ARE BOTH EXECUTIVES

41.     Universal has four classes of stock with disparate voting rights: (i) holders of Class A are entitled to one vote per share; (ii) holders of Class B are entitled to one-tenth of a vote per share; (iii) holders of Class C are entitled to 100 votes per share; and (iv) holders of Class D are entitled to ten votes per share.

42.     As disclosed in the April 5, 2018 Definitive Proxy Statement ("**April 5 Proxy**"), as of March 20, 2018, Defendant Alan Miller held 99.7% of the Class C stock in the Company, while his son, Defendant Marc Miller, and he collectively held over 90% of the Class A stock.

43.     Defendants Alan and Marc Miller possessed 83.6% and 2.6%, respectively, of the general voting power of the Company, as of March 20, 2018, per the April 5 Proxy.

44.     Defendants Alan and Marc Miller share their voting power.   Thus, because of their ownership of these two classes of Universal stock, they hold, in any given year, between

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

86-88% of the general voting power of Universal, despite together holding only a 7-8% equity stake.

45.     No other stockholder, including large institutional investors, possesses more than 1.3% of the voting power of Universal.  Thus, there is no means for outside stockholders to effect any change at the Company.  This disparate control has been the subject of institutional criticism, including by Institutional Shareholder Services ("**ISS**"), which has supported proposals to reclassify Universal's stock because the disparate stock has, in ISS's terminology, "entrenched" management.

46.     Because Defendants Alan and Marc Miller hold the top executive positions at the Company – CEO and President, respectively – all other executives ultimately report to either or both of them and, thus, are controlled by them.  The Miller family is the primary catalyst for the Company's illegal and illicit business plans, implementing and monitoring Universal's day-to-day operations, including devising the Company's business strategies and ensuring those strategies are followed at the behavioral health facility level.

47.     Moreover, through their control of Class A and Class C common stock, Defendants Alan and Marc Miller are entitled to elect five of the seven directors on the Board.  Of the five directors Defendants Alan and Marc Miller are entitled to elect, they elect themselves, as well as the remaining three Director Defendants, each of whom maintains his/her directorship only at the pleasure of Defendants Alan and Marc Miller, and thus are not truly independent.  In addition, each of the Director Defendants have substantial professional, social, and personal ties to the Miller family.  For this reason, the Director Defendants are incapable of exercising independent judgment in the oversight of Universal.

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

48.     The purportedly independent oversight committees – the Audit Committee and Nominating & Governance Committee – are staffed by directors who serve almost entirely at Defendants Alan and Marc Miller's pleasure, as the charts in ¶33 demonstrate.  Indeed, the Audit Committee was chaired by one of Defendants Alan and Marc Miller's handpicked directors, Defendant Herrell, until his retirement from the Board on May 16, 2018.  And while Defendants Alan and Marc Miller did not appoint Hotz as the Chair of the Nominating & Goverance Committee, Hotz enjoys a long-standing relationship with Defendants Alan and Marc Miller as a fellow Universal director, having served over 25 years on the Board.  Moreover, by their own admission, Defendants and Universal admit the Nominating & Governance Committee has limited powers, since five out of the seven directors are selected by Class A and C stockholders, where the shares are overwhelmingly owned by Defendants Alan and Marc Miller.  Thus, neither of the oversight committees serves as an effective check on the controlling stockholders' power.

## II.     UNIVERSAL HAS RAPIDLY EXPANDED ITS OPERATIONS THIS DECADE

49.     Universal admits that it is a holding company.  Universal owns and operates hundreds of behavioral facilities through its subsidiaries.  All healthcare and management operations are conducted by these behavioral health facilities.  Universal is responsible for actively ensuring that the behavioral facilities' business operations are consistent across the nation.  Specifically, according to the Company's Form 10-K, Universal "seek[s] to increase the operating revenues and profitability of owned hospitals by the introduction of new services, improvement of existing services, physician recruitment and the application of financial and operational controls."  In short, the Company is responsible for implementing consistent financial and operational business strategies across all of its behavioral health facilities.

50.     Beginning in May 2010, Universal began aggressively expanding its base of facilities by acquiring Psychiatric Solutions, Inc. ("**PSI**"), then the largest standalone behavioral

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

health operator.  In an acquisition that closed in November 2010, Universal paid $1.96 billion in cash and assumed about $1.08 billion of PSI's debt, for a total cost of $3.04 billion, adding 105 facilities spread across 32 states, Puerto Rice, and the U.S. Virgin Islands to its portfolio (the "**PSI Acquisition**").  The deal doubled the number of behavioral health facilities Universal operated, making it the largest provider of behavioral healthcare services in the nation.  As Defendant CFO Filton told analysts about the deal, "this transaction is transformative for [Universal,] repositioning us as the largest provider of behavioral healthcare services."  Universal also opened its Crescent Pines Hospital behavioral health facility in Georgia, as well as its Palmdale Regional Medical Center in California, in 2010.

51.     Since the transformative acquisition of PSI, Universal has aggressively pursued further rapid growth through acquisitions in the United States and beyond.  Universal continued expansion in 2012 through the acquisition of Ascend Health Corporation, adding nine freestanding inpatient psychiatric facilities to its portfolio.  In 2013, the Company acquired Palo Verde Behavioral Health facilities and 2014 marked Universal's entry into the United Kingdom's behavioral health market with its acquisition of Cygnet Health Care, an operator of 21 mental health centers, for $335 million.  Moreover, 2014 also saw Universal's acquisition of the Psychiatric Institute of Washington ("**Psychiatric Institute**") in Washington, D.C. Foundations Recovery Network, LLC, consisting of four facilities, was acquired by Universal in 2015 for approximately $350 million, and in October 2016, the Company finished construction on Henderson Hospital, a behavioral health facility southeast of Las Vegas, Nevada.  The Company also acquired the adult services division of Cambian Group, PLC for $473 million in December 2016, adding 81 more facilities to the Company's operations in the United Kingdom. In total, Universal spent $614 million during 2016 to acquire new facilities.

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

52.     More recently, Universal acquired the 109-bed Memorial Hospital Behavioral Health facility in Gulfport, Mississippi, for $21 million at the end of 2017, and in July 2018, it announced the acquisition of The Danshell Group in the United Kingdom for $92 million.

53.     As of the filing of Universal's latest Form 10-Q with the SEC on August 8, 2018, Universal "owned and/or operated 327 inpatient facilities and 32 outpatient and other facilities" that are "located in 37 states, Washington, D.C., the United Kingdom, Puerto Rico and the U.S. Virgin Islands[.]"  Universal operates and reports its financial results through its two segments: (1) Acute Care; and (2) Behavioral Health Care.  The Acute Care segment operates 26 inpatient acute care hospitals, four free-standing emergency departments, four outpatient surgery/cancer care centers, and one surgical hospital, all of which are located in the United States.  The Behavioral Health Care segment operates 301 inpatient facilities and 23 outpatient facilities, where patients are diagnosed and treated for behavioral and emotional problems.

54.     The Company's facilities are distributed across the United States, Puerto Rico, and the U.S. Virgin Islands, as follows:

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



55.    The Company's Behavioral Health Care segment accounted for the following percentage of net revenues for Universal for each of the following years:



THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

56.     Universal derives over one-third of its revenues from government programs – Medicare and Medicaid – and an additional 50% from sources that include government programs.

57.     Medicare and Medicaid revenues directly represented 30% of Universal's net patient revenues during 2017, 32% during 2016, 34% during 2015, and 38% during 2014. Revenues from managed care entities, including health maintenance organizations and managed Medicare and Medicaid programs, accounted for another 56% of Universal's net patient revenues during each of 2017 and 2016, 54% during 2015, and 52% during 2014.

58.     The Company's policy, pattern, and practice of improperly admitting and holding patients and providing sub-standard care threatens this revenue stream, as the Company continues to violate the FCA.  Universal's business depends on reimbursement from the federal government, and its destructive practices have put a large portion of the Company's revenues at risk.

## III.   UNIVERSAL'S BUSINESS PLANS FOCUS ON PATIENT ADMISSIONS AND LENGTH OF STAY TO INCREASE PROFITABILITY

59.     Universal behavioral health facilities – in full view and at the behest of the Board – have long used the patient admissions process as a tool to fuel profit, without regard to its patients' needs and, indeed, the lawful provision of health services. ███████████

████████████████████████████████████████████████████████████████

██████     Although Universal's behavioral health ("**BH**") division facilities numbered from 195-294 between 2013-2017, ██████████████████████████████████

██████████████████████████████[1]██████████████████████████

_____

[1] ██████████████████████████████████████████████████████████████████████████████████████████████████

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

**A.**   **The Business Plans for Universal's Behavioral Health Segment Leave No Doubt About Defendants' Goals: Increase Admissions at All Costs**

60.

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████

61.   █████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████

62.   █████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████

63.   █████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████

64.   Even where a Universal facility encountered a predicament that entailed doing less with more – ████████████████████████████████████████████████

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

████████████████████ – the facility nonetheless managed to get the patients in and close

the door, ██████████████████ :

████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████

████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
███████   ████████████████████████
████████████████████████████████
██████████████████

65.   ████████████████████████

████████████████████████████████
████████████████████████████████
██████████████████████   ████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ [2]

66.     While certain strategies appeared to work remarkably well for Universal's bottom line, ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████   ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

─────────────────────────

[2] ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████

67.     Overall though, the panoply of strategies executed by the facilities paid off at the

BH division level. █████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████[3]██████████████████████

████████

68.     █████████████████████████████████████

████████████████████████████████████████████████[4]

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████

_____

[3] █████████████████████████████████████████████████

█████████████████████████

[4] █████████████████████████████████████████████████

████████████████████

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

69. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████   ███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████

70. ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████

71. ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

72. ███████████████████████████████████████

████████████████████████████████████████████████

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

73.

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



\* \* \*

74.

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████

75.  ███████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████



THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

76.   ████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████ ████████[5] ██████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

---

[5] ██████████████████████████████████████████████████
████████████████████

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

[REDACTED]

[REDACTED]   [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] [6] [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

77.   [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

---

[6] [REDACTED]

- 28 -

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

78. █████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████     ███████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████[7] ███

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████

79. █████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

[7] ████████████████████████████████████████████

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



80.

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

81.

82.

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

[10] ████████████████████████████████████████

████████████████████████████████████████

83. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████

84. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[10] ████████████████████████████████████████
████████████████████

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

85. ██████████████████████████████████████████████████

86. ██████████████████████████████████████████████████

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████

87.   ████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████ ██████ [11] ████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████

88.   ████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

[11]
███████████████████████████████████████ ██████████

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

[12]

89.

90.

91.

12

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

92.

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

93. ███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████   ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████

██████████████████████████████████

**B.**    **Universal's Business Strategies, in Full View and with the Support of the Board, Pay Off Handsomely for Universal's Leadership**

94.    The Board generally reviewed and approved the business plans for Universal's various BH and acute care business segments at the beginning of each fiscal year.  Indeed, and only by way of example, ███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████    Although Universal either failed to produce, or produced

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

with heavy redactions, the Board meeting minutes for other years during the Relevant Period,

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████

95.     Sustained BH division margins of 26-28% meant that Defendant Alan Miller also reaped extraordinary financial gains during this time period.  As revealed in the April 5 Proxy, in 2017, Alan Miller earned a base salary of $1,635,063, $2,000,060 in stock awards, $15,978,734 in option awards, $719,428 for non-equity incentive plan compensation, $43,407 in earnings for changes in pension value and nonqualified deferred compensation, and $1,254,169 for all other compensation, for a total of $21,630,861.  The April 5 Proxy also advised that for 2018, Alan Miller's base salary would increase by 1.8% from the prior year to $1,665,000.  As disclosed in the March 22, 2018 SEC Form 8-K, Alan Miller continued to receive handsome bonus compensation in 2018, with his target award remaining 100% of his 2018 base salary, but with the possibility of entitlement to anywhere between 0-250% of that target.  The entitlement criteria consisted solely of financial measures, as follows, with the entire amount determined using the following corporate performance criteria:

> [the] Company's achievement of a combination of: (i) a specified range of target levels of adjusted net income per diluted share attributable to UHS (as set forth in [the] Proxy Statement), and; (ii) a specified range of target levels of return on capital (adjusted net income attributable to UHS divided by quarterly average net capital) for the year ending December 31, 2018.

96.     Public filings disclose Universal's drive to increase admissions, lengths of stay, and occupancy.  Between 2013 and 2018, Universal's annual reports (on Form 10-K) or quarterly reports (on Form 10-Q) filed with the SEC reveal increases in admissions and stays year after year:

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

| Year | Admissions and Patient Days in Behavioral Healthcare Facilities (in narrative form in filings), Same-Facility Basis (emphasis added) |
|---|---|
| 2013 10-K | "Inpatient admissions to these facilities *increased 3.2%* during 2013, as compared to 2012, while patient days *increased 0.7%*. Adjusted admissions *increased 3.5%* and adjusted patient days *increased 1.0%* during 2013, as compared to 2012." |
| 2014 10-K | "Inpatient admissions and adjusted admissions to these facilities each *increased 4.7%* during 2014, as compared to 2013, while patient days and adjusted patient days each *increased 1.7%*." |
| 2015 10-K | "Inpatient admissions to these facilities *increased 3.2%* during 2015, as compared to 2014, while patient days *increased 1.6%*. Adjusted admissions *increased 2.9%* and adjusted patient days *increased 1.2%* during 2015, as compared to 2014." |
| 2016 10-K | "Inpatient admissions to our behavioral health care facilities owned during both years *increased 1.3%* during 2016, as compared to 2015, while patient days *increased 1.2%*. Adjusted admissions *increased 1.0%* and adjusted patient days *increased 0.9%* during 2016, as compared to 2015." |
| 2017 10-K | "Inpatient admissions to our behavioral health care facilities owned during both years *increased 2.5%* during 2017, as compared to 2016, while patient days *increased 0.3%*. Adjusted admissions *increased 2.4%* and adjusted patient days *increased 0.2%* during 2017, as compared to 2016." |
| 2018 10-Q (as of June 30, 2018) | "[A] inpatient admissions and adjusted admissions to our behavioral health facilities *increased 1.8% and 1.4%*, respectively, during the six-month period ended June 30, 2018 as compared to the comparable period of 2017. Patient days and adjusted patient days *increased 0.5% and 0.1%*, respectively, during the six-month period ended June 30, 2018 as compared to the comparable prior year period." |

## IV.   UNIVERSAL'S ENTERPRISE-WIDE REPUGNANT CONDUCT SUBJECTS THE COMPANY TO INQUIRIES, *QUI TAM* ACTIONS, AND GOVERNMENT INVESTIGATIONS

97.     Universal's long pattern and practice of unlawful patient admissions and other fraudulent (and dangerous) practices at its various facilities – encouraged and orchestrated by its directors and senior management – have slowly come into focus over the past 15 years.

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

A.     **Localized Inquiries by Federal and State Agencies Reveal Quality of Care
       Issues and Fraud Among a Number of Universal Facilities**

98.     Universal facilities have been subject to a plethora of localized inquiries over the years.  For example, in or about 2005, and as a result of a whistleblower complaint, Universal's McAllen Hospitals d/b/a South Texas Health System ("**South Texas**") was investigated for violations of the FCA, Anti-Kickback Statute (42 U.S.C. §§1320a-7b), and Stark Law (42 U.S.C. §1395nn) on allegations that the facility had entered into financial relationships with several doctors to induce the referral of patients to Universal facilities, including "payments [] disguised through a series of sham contracts, including medical directorships and lease agreements." Universal agreed to settle the claims with the DOJ for $27.5 million.  The settlement also included a five-year Corporate Integrity Agreement ("CIA") requiring South Texas to establish procedures for tracking and evaluating financial arrangements between its healthcare facilities and their referral sources, conduct additional training for staff, submit to an independent third-party annual review of compliance with its obligations under the agreement, and cooperate with a report to the OIG by the independent third party regarding the review results.

99.     In April of 2011, Two Rivers Psychiatric Hospital ("**Two Rivers**"), a Universal facility in Kansas City, Missouri, was barred from collecting Medicaid payments after CMS agents discovered that employees had failed to monitor a suicidal woman who killed herself at the facility.  The *Kansas City Star* reported that Two Rivers had a history of patient care problems originating in 2008, including patient suicides, the use of a towel over an elderly patient's face to prevent the patient from screaming, and the widespread failure to provide psychotherapy or any other form of medical treatment aside from the provision of medications.

100.     Further, in April of 2011, state authorities in North Carolina announced that they were removing all of their wards from The Pines, yet another Universal residential treatment

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

center, after allegations of sexual abuse at the facility surfaced.  The incident triggered a larger investigation in which North Carolina officials discovered multiple instances of ill-trained staff, inadequate staff-to-patient ratios, and "multiple safety risk incidents," according to an email from North Carolina authorities to Virginia officials concerning The Pines.  Virginia and Washington, D.C. subsequently removed their wards from the facility, and Virginia placed the facility on a provisional license.  Of note, this facility currently operates as Harbor Point Behavioral Health Center ("**Harbor Point**") and is one of the dozens of Universal facilities subject to the ongoing coordinated government investigations.

101.    Likewise, in 2011, the Illinois Department of Children and Family Services and the Department of Psychiatry at the University of Illinois at Chicago reviewed Universal-owned Hartgrove, a mental health institution for children, teens, and adults that is also currently subject to the coordinated government investigations, and ultimately issued a scathing report about the disturbing conditions at the facility (the "**UIC Report**").  The review was conducted by a team of doctors and other licensed professionals and involved random observations, interviews with hospital administrators (including the CEO and senior managers), review of 12,000 pages of documents, and, later, surveys by state and federal agencies obtained through Freedom of Information Act requests, as well as news media reports and federal court documents.

102.    According to the UIC Report, "[t]he cumulative weight of the available data regarding services provided DCFS wards at UHS's Hartgrove Hospital demonstrates a consistent pattern of *unacceptable risks of harm, substandard quality of care, poor clinical treatment and discharge planning, and questionable clinical management practices by hospital and corporate officials at all levels of the organization*."  [Emphasis added].  Indeed, the UIC Report complained about a slew of failures at Hartgrove, including failure to protect patients from harm

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

or risks of harm, ensure adequate staffing for patient care, adequately train and supervise staff, or develop individualized treatment plans.  As noted in the report, CMS had also found parallel quality of care deficiencies during an unannounced 2011 survey at Hartgrove.

103.   The UIC Report also found (as has since become even more clear) that these issues did not appear to be limited to Hartgrove, but that "***troubling reports suggest[] a pattern of quality of care issues, harm to patients or major healthcare fraud charges involving UHS-operated facilities in a dozen other states beyond Illinois***: Virginia, Tennessee, Pennsylvania, North Carolina, California, South Carolina, Massachusetts, Connecticut, Texas, Nevada, Arkansas and Missouri."  [Emphasis added].

### B.   The *Escobar Qui Tam* Litigation, Centering on Universal's Habitual Use of Unqualified, Untrained, and Unlicensed Staff, Exposes Universal to Hundreds of Millions of Dollars of Potential Liability

104.   Poor staffing and oversight failures at a Universal outpatient facility in Massachusetts led to the death of a patient, Yarushka Rivera, and a whistleblower action with potential liability exposure of $282 million, which has traveled all the way to the U.S. Supreme Court.  In July 2011, two relators filed a *qui tam* action in the U.S. District Court for the District of Massachusetts, *United States ex rel. Escobar v. Universal Health Services, Inc.*, No. 1:11-cv-11170 ("*Escobar*"), alleging FCA violations and violations of a Massachusetts state analogue statute arising from the Company's false and fraudulent billing claims submitted to MassHealth, the Massachusetts state Medicaid program.

105.   The *Escobar* matter involves allegations that Yarushka Rivera, a middle school student when she came under Universal's care at its Arbour Counseling Services ("**Arbour Counseling**") facility in Lawrence, was "treated" by individuals who, respectively, fraudulently held themselves out to be licensed social workers, an experienced psychologist holding a Ph.D., and a psychiatrist certified to prescribe potent antipsychotic medication.  Ms. Rivera was referred

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

to these purported healthcare professionals by the facility's clinical director. The two purported social workers provided Ms. Rivera with "therapy" for nearly four years without success. Arbour Counseling's clinical director then referred Ms. Rivera to a purported psychologist who diagnosed her – after a 15 minute assessment – with bipolar disorder. The purported psychologist then referred Ms. Rivera to a purported psychiatrist for another evaluation required by Ms. Rivera's school. Based on the previous diagnosis of bipolar disorder, the purported psychiatrist prescribed Ms. Rivera a medication called Trileptal, an anti-seizure medication not indicated for bipolar disorder. She did not advise Ms. Rivera that, if abruptly stopped, Trileptal carries significant risk of causing seizures. Ms. Rivera took Trileptal as instructed and experienced substantial side effects after just one day. She stopped the medication and after a few days suffered a massive seizure requiring hospitalization. She had never before had a seizure. A few months later, Ms. Rivera suffered a fatal seizure while she was alone in her room. She was 17-years-old.

106.    As *Escobar* alleges, none of the purported healthcare professionals that "treated" Ms. Rivera held the credentials they claimed to possess. Indeed, Arbour Counseling's clinical director described the purported psychiatrist as a very young and inexperienced nurse who was "still trying to get her feet wet." Nor were any of these individuals properly supervised. Care by such unlicensed and unqualified persons without supervision was, naturally, in violation of the various rules and regulations governing the provision of healthcare services in Massachusetts.

107.    Nonetheless, Universal submitted claims for reimbursement for the purported healthcare "services" provided to Ms. Rivera (and many other patients) by unqualified, unlicensed, and unsupervised individuals to MassHealth, Massachusetts's Medicaid program, and the Children's Health Insurance Program, making representations about the specific services

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

provided and the types of professionals it employed, thereby misrepresenting its staffs' qualifications and licensing.  Unaware of Universal's misrepresentations, MassHealth paid those claims.

108.    Based on the foregoing, *Escobar* alleged violations of the FCA and Massachusetts's equivalent statute.  *Escobar* has endured a tortured history in the courts, but following a U.S. Supreme Court ruling sanctioning FCA claims grounded in implied certification theories, such as those set forth in *Escobar*, the U.S. Attorney's Office and Massachusetts Attorney General's Office finally formally intervened in 2017 and filed their own complaint in intervention, giving considerable additional weight to the litigation.

109.    The complaint named Universal and two of its subsidiaries, contained claims to recover payments made by MassHealth from 2005 through at least 2013, and further alleged, among other things, that:

- Universal entities employed unlicensed and unsupervised personnel, in violation of the FCA and its Massachusetts analogue, at various mental health centers throughout the Commonwealth;

- Universal entities submitted, or caused to be submitted, MassHealth claims for services by various centers in violation of the FCA and its Massachusetts analogue;

- the clinical director of a Universal subsidiary claimed that he was unaware of the regular and ongoing supervision requirements of MassHealth and the Massachusetts Department of Public Health and failed to provide the direct and continuous supervision required by these regulations to any of the clinical therapists at the behavioral health facility;

- Universal facilities utilized unlicensed clinicians practicing at the facilities, did not employ a single board-certified psychologist qualified to supervise as required by regulation, misrepresented the qualifications and licensure of employees, and evidenced a "systemic lack of supervision"; and

- Universal facilities failed to correct these deficiencies even after entering into remediation plans with the Massachusetts Department of Public Health and related authorities.

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

110.    Significantly, the complaint also included allegations that staff members from Universal facilities told investigators working with the Massachusetts Attorney General's Office that there was not a single qualified supervisor in one entire facility, making it impossible that any unlicensed staff could have been properly supervised, as required by the FCA and its Massachusetts analogue.  Despite the issuance of repeated statements of deficiencies at Universal facilities, these facilities failed to come into compliance, as Universal continued to use unlicensed and improperly trained staff.

111.    By tracing the billing codes for services improperly billed by Universal's health facilities from 2005 through 2013, Massachusetts found that Universal claimed payments totaling $94,217,691.08 for counseling and medication management "services" that were not administered by certified personnel or otherwise properly supervised, as required by the FCA and its Massachusetts analogue.  ***Massachusetts has asked for treble damages for the reimbursements made to Universal between 2005 and 2013, as well as civil penalties, for a total of over $282 million***.

### C.    Federal Inquiries into Universal Facilities Mount, Resulting in a Criminal Investigation of Universal, the Corporate Entity, and a Widespread Civil Investigation

112.    Universal soon attracted widespread scrutiny by federal investigators.  As chronicled in Universal's Form 10-Ks filed with the SEC, in February 2013, the OIG served the first slew of subpoenas on Universal concerning it and UHS of Delaware, Inc., as well as several Universal-owned facilities.  Those facilities included Keys of Carolina, Old Vineyard Behavioral Health, The Meadows Psychiatric Center (the "**Meadows**"), Streamwood, Hartgrove, Rock River Academy and Residential Treatment Center ("**Rock River**"), Roxbury Treatment Center ("**Roxbury**"), Harbor Point f/k/a The Pines Residential Treatment Center (including the Crawford, Brighton, and Kempsville campuses) ("**Harbor Point**"), Wekiva Springs Center

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

("**Wekiva Springs**"), and River Point.  The subpoena sought documents dating back to January 2008.  Moreover, beginning on April 23, 2013, and throughout the Relevant Period, as discussed *infra* at ¶¶159-66, minutes from a host of Board and subcommittee meetings reveal that the Director and Executive Defendants received continuous updates on the coordinated government investigations, with Universal's General Counsel providing specific information about the items requested in the February 2013 subpoenas at a July 17, 2013 Board meeting.

113.    Indeed, the Director and Officer Defendants had much to keep abreast of as the government investigation ballooned.  In April 2013, the OIG served facility-specific subpoenas on Wekiva Springs and River Point, requesting documents dating even further back to January 2005.  In July 2013, another subpoena was issued to Wekiva Springs and River Point requesting additional records.

114.    In June 2013, the OIG served a subpoena on Coastal Harbor Health System ("**Coastal Harbor**") in Savannah, Georgia, requesting documents from January 2009 to the date of the subpoena.

115.    In October 2013, the DOJ's Criminal Frauds Section advised that they had received a referral from the DOJ's Civil Division and opened investigations into River Point and Wekiva Springs.

116.    In February 2014, Universal learned that the investigation conducted by the DOJ's Criminal Frauds Section had expanded to include the National Deaf Academy.

117.    In April 2014, CMS suspended Medicare payments at River Point in accordance with federal regulations, which implemented provisions of the Affordable Care Act regarding suspension of payments during certain investigations.  The Florida Agency for Health Care Administration ("**AHCA**") subsequently issued a Medicaid payment suspension for the facility.

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

River Point has twice submitted rebuttal statements and other information seeking revocation of the suspension, to no avail.  According to Universal's most recent Form 10-K, filed on February 28, 2018, the CMS Medicare suspension for River Point remains in effect.  AHCA is likewise maintaining the suspension for dual eligible and cross-over Medicare beneficiaries.[13]

118.    In September 2014, Universal learned that the DOJ's Civil Division had expanded its investigation to include four additional facilities and was requesting production of documents from them.  These facilities included Arbour-HRI Hospital, Behavioral Hospital of Bellaire, St. Simons by the Sea, and Turning Point Care Center ("**Turning Point**").

119.    In December 2014, the DOJ's Civil Division further extended its document requests to Salt Lake Behavioral Health ("**Salt Lake**").

120.    In March 2015, the OIG issued subpoenas to Central Florida and University Behavioral Center requesting documents dating back to January 2008.

121.    Finally, in late March 2015, Universal learned that the investigation conducted by the DOJ's Criminal Frauds Section had been expanded to include Universal *as a corporate entity* as a result of the pervasive issues discovered in the coordinated government investigations of the facilities described above and, in particular, Hartgrove.  Indeed, as reported by *Healthcare Finance News*, a healthcare industry publication that covers compliance and legal issues, the DOJ investigation is a "criminal investigation [that] include[s] the company's headquarters in King of Prussia, Pennsylvania[.] . . . The [DOJ's] Criminal Frauds Section investigation of the parent company emerged from ongoing investigations of several [Universal] behavioral health

---

[13]    AHCA's Medicaid payment suspension was lifted, effective June 27, 2017.

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

facilities," and "the [DOJ] said its investigation is focused on billings submitted to government payers in relation to services."[14]

122.    Later that year, the DOJ's Civil Division expanded its civil investigation to include Arbour Hospital, Arbour-Fuller Hospital, Pembroke Hospital, and Westwood Lodge, all located in Massachusetts.

123.    All told, by 2015, the following 25 Universal facilities – and Universal itself – were under active, coordinated investigation by the federal government:

- Central Florida (Florida);
- National Deaf Academy (Florida);
- River Point (Florida);
- University Behavioral Health (Florida);
- Wekiva Springs (Florida);
- Coastal Harbor (Georgia);
- St. Simons by the Sea (Georgia);
- Turning Point (Georgia);
- Hartgrove (Illinois);
- Riveredge Hospital (Illinois);
- Rock River (Illinois);
- Streamwood (Illinois);
- Arbour Hospital (Massachusetts);
- Arbour-Fuller Hospital (Massachusetts);
- Arbour-HRI Hospital (Massachusetts);
- Pembroke Hospital (Massachusetts);

---

[14]    Susan Morse, *Feds widen fraud probe of Universal Health Services to include headquarters*, HEALTHCARE FIN. (Apr. 1, 2015), https://www.healthcarefinancenews.com/news/feds-widen-fraud-probe-universal-health-services-include-headquarters.

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

- Westwood Lodge (Massachusetts);

- Keys of Carolina (North Carolina);

- Old Vineyard (North Carolina);

- Friends Hospital (Pennsylvania);

- Roxbury (Pennsylvania);

- The Meadows (Pennsylvania);

- Behavioral Hospital of Bellaire (Texas);

- Salt Lake (Utah); and

- Harbor Point (Virginia).

124.    Universal opaquely disclosed in its Form 10-K for the year ending December 31, 2016 that the federal investigations, at least, in part, were a "False Claims Act investigation focused on billings submitted to government payers in relation to services provided at those facilities."   Otherwise, the Individual Defendants provided no context for the DOJ's close examination of Universal, as an entity, and dozens of its behavioral healthcare facilities, leaving investors to wonder just how risky their investment in Universal was.

125.    In its July 25, 2018 press release accompanying its 2018 second quarter financial results, Universal announced that:

> During the first six months of 2018, we recorded a pre-tax increase of approximately $22 million to the reserve established in connection with the civil aspects of the government's investigation of certain of our behavioral health care facilities, increasing the aggregate pre-tax reserve to approximately $43 million. Changes in the reserve may be required in future periods as discussions with the DOJ continue and additional information becomes available.[15]

---

[15]    Universal Health Servs., Inc., Exhibit 99.1 to Current Report (Form 8-K) (July 25, 2018).

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

## V.   IN LATE 2016, *BUZZFEED*'S INVESTIGATIVE EXPOSÉ FULLY REVEALS WHAT UNDERLIES FEDERAL INVESTIGATORS' INTEREST: UNIVERSAL'S WIDESPREAD FRAUDULENT PATIENT ADMISSION AND BILLING PRACTICES

126.   On December 7, 2016, Rosalind Adams, writing for *BuzzFeed*, published an exposé, entitled "Locked on the Psych Ward," regarding Universal's behavioral health facilities and describing the Company's widespread pattern and practice of manipulating the patient admissions process to over-admit patients to its facilities (the "**Exposé**").[16]

127.   The Exposé focused on a "'repeated and willful failure by [Universal] officials to ensure that their staff were properly trained,'" understaffing, and investigations into civil and criminal fraud at the behavioral health facilities owned by the Company.  *BuzzFeed*'s extended investigation into practices at the Company's behavioral health facilities was comprehensive.  It encompassed 175 interviews with current and former Universal staff, including 18 executives who ran Universal facilities, more than 120 additional interviews with patients, government investigators, and other experts, and a review of certain internal Company documents.  With *BuzzFeed* at long last connecting the dots, the public was presented with the necessary narrative to put into perspective the many federal inquiries with which Universal had been wrestling for years.

### A.   Universal Illicitly Increases Its Patient Admission Rate by Wildly Mischaracterizing Patient Symptoms

128.   The Exposé revealed that "scores" of current and former Universal employees from facilities in nine states stated they were under intense pressure to "fill beds" by unlawful methods – including exaggerating symptoms, manipulating patients' answers to make them seem suicidal, and holding patients against their will until their insurance policy payments ran out.

---

[16]      Rosalind Adams, *Locked on the Psych Ward*, Buzzfeed News (Dec. 6, 2016, 12:29 PM ET), https://www. buzzfeednews.com/article/rosalindadams/intake.

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

129.    Universal employees also revealed that the Company's policy at the facilities was to keep beds filled even at the expense of the safety of their staff or the rights of the patients.  For example, a technician at the Ridge Behavioral Health System in Lexington, Kentucky, was told by supervisors to admit patients even when no more beds were available at the facility. Conditions became so overcrowded that patients would sleep in seclusion rooms – which are required by federal law to contain patients who have become dangerous – but were unavailable for such purposes due to the overcrowding.  Staff at four other Universal facilities interviewed in connection with the Exposé stated that their seclusion rooms were also repurposed as bedrooms when the facilities ran out of regular beds.

130.    An employee interviewed at Salt Lake compared the Company's insistence on tracking performance numbers on patient intake as if the employees were "'car salesmen'" and that while a patient might "'think we're going to diagnose them for anxiety or depression[,]'" the "'goal is to admit them to the hospital.'"  As another employee who worked at admissions in three Texas facilities corroborated, "'[t]he goal when you're on the phone with someone is to always get them into the facility within 24 hours[.] . . . And the reason for getting them into the facility is that once they stepped foot in, they are behind locked doors.'"

131.    Other inpatients interviewed by *BuzzFeed* recalled Universal counselors and phone operators urging them to come into Universal facilities for assessments, regardless of the nature of the initial inquiry.  For instance, a young accountant named Allison called Universal's Centennial Peaks to inquire about support options regarding her bipolar disorder, with which she had been coping for years and for which she was taking medication.  Universal counselors would not discuss options with Allison over the phone and required her to drive to the hospital, where she was told she should enter into a five-week intensive outpatient program.  When Allison told

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

the counselor that she did not need such a structured program, she was instructed to take an evaluation, which included questions about suicidal ideation.   Despite Allison telling the Universal counselor that she had dark episodes and had learned to live with them and that she was doing well despite occasional suicidal ideation, the Universal counselor used her evaluation to hold Allison against her will.   She was given a short opportunity to email her workplace to let them know that she would not be reporting to work, and to call her partner, who was expecting her home for dinner that evening, before being escorted into the facility and held indefinitely. Allison later stated that the evaluation was used as a pretext to hold her – she "'didn't even think that being an inpatient was even on the table,'" and "'[i]f [she] would have known that, [she] wouldn't have gone in there.'"

132.   Allison's experience reflects a broader practice by Universal facilities to increase conversion rates.   Former admissions workers from three Universal facilities interviewed for the Exposé stated that they learned how to turn passing statements that individuals made during assessments into more dangerous evaluations – admissions counselors stated they were told to "'play up the criteria'" to obtain approval for hospitalization from insurers.

133.   Clinical staff interviewed at Salt Lake, for example, confirmed that they were instructed to "'chart to the negative,'" or emphasize "the most troubling behavior to make [an assessed individual] sound less stable."   Another intake worker at Millwood Hospital in Arlington, Texas, confirmed that suicidal ideation became a "'go-to formula'" that Universal used to justify almost any admission "'[b]ecause that's the way to make sure everything gets paid for.'"   And a therapist who performed assessments for University Behavioral Health, a Universal hospital in Denton, Texas, and a former clinician at Salt Lake confirmed that through repeated lines of questioning and prodding about hypothetical suicidal ideation, Universal staff

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

would obtain answers that could be twisted into plans to carry out suicide, so that they could justify patient admissions.

134.    As more fully set forth above, the annual business plans created by various Universal facilities tend to bear out the Exposé's description of Universal's pressure tactics to ensure increased patient admissions and lengths of patient stay. ███████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████ bears a striking resemblance to the practice complained of by a Highlands psychiatrist to the BH divisional Vice President, Sharon Worsham ("**Worsham**"), in a 2014 email obtained by *BuzzFeed*, in which the psychiatrist stated that '"I am, in particular, deeply disturbed about the efforts to extend lengths of stay[.] . . . Doctors are publicly shamed by asking them to justify discharging a patient "early" before the end of their insurance authorization.'"

135.    The Exposé also undertook an analysis to determine the rate at which behavioral health facilities would include "suicidal ideation" codes in their Medicare claims.[17]  The analysis found that, from at least 2009, Universal hospitals steadily increased the frequency with which they described patients as experiencing suicidal ideation, and by 2013, the code for suicidal

---

[17]    The analysis was based on three main independent sources of data: (i) Medicare billing claims obtained by *BuzzFeed* for the years 2009-2013, which CMS prohibits from full publication due to the sensitivity of patient-identifying information; (ii) hospital ownership records from the American Hospital Directory; and (iii) publicly available Universal ownership, acquisition, and sale information to determine the dates and facilities acquired by Universal.

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

ideation appeared in more than half of all Medicare claims submitted by Universal behavioral health facilities. This rate was four and a half times the rate for all non-Universal behavioral health facilities. Additionally, in the first full year after the November 2010 PSI Acquisition, which doubled the number of Universal's behavioral health facilities and made it the largest provider of behavioral healthcare services in the nation, the use of the billing code for suicidal ideation in Medicare claims increased by six times.



136. The Exposé revealed that the gaming of the intake assessment process was a widespread practice that Universal reinforced through all levels of staff at Universal facilities. A manager who worked in billing at one of the facilities Universal acquired stated that the billing department '"had to adjust to their ways[,]'" which entailed '"build[ing] the severity level as much as we could[,]'" including representing mere depression as suicidal ideation, to '"better

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

support admission.'"  A front desk employee at Highlands further reported that '"[i]f someone came in voluntarily, I wasn't allowed to let them out of the door.'"  While every state has its own involuntary commitment law, this practice contradicts all of them, as, at a minimum, an individual voluntarily presenting for an assessment is free to leave absent a safety concern or court order.  Colorado, for instance, only allows a behavioral health facility to hold someone when a threat to themselves or others is "imminent."  C.R.S. §27-65-105.[18]

### B.   The Illicit Admissions and Unreasonable Cost-Cutting Reflects Universal's Corporate Culture and Negatively Impacts Patient Care

137.   As Universal admitted more patients under the pretense of suicidal ideation, management further cut facility staff, regardless of the impact on employee safety or the ability to care for the people being admitted, risking patients' lives in the process.  Two separate behavioral health facility administrators stated that cuts made to facility staff in 2014 compromised quality of care at the Universal facilities, telling *BuzzFeed* that staff and patients '"were not a priority.'"

138.   Patients have died at Universal facilities as a result.  For instance, a 22-year-old opioid addict admitted to Highlands died of acute opioid toxicity while in the care of Universal staff.  A nurse on an overnight shift, who had already been written up for '"blanket charting,' or documenting things that she had not observed or done," had mistakenly written that he was due for an additional opioid dose when he had already been medicated.  A social worker who visited the young man at the facility wrote that he was '"overmedicated' and 'almost falling out of his chair[,]'" while "other staff noted that he was falling asleep and slurring his words and that later

---

[18]      Three leading psychiatric health organizations confirmed that industry standard practice is to allow a person who voluntarily presents for an assessment to leave a behavioral health facility of their own volition: Dr. Steven Hoge, Chair of the American Psychiatric Association's Council on Psychiatry and the Law; Ron Honberg, a senior policy adviser with the National Alliance on Mental Illness; and Carly Moore Sfregola, a spokesperson for the American Hospital Association (all stated that it is impermissible to hold someone absent a reason to be concerned about their own safety or the safety of others).

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

he even vomited up his medication."  Staff members who were supposed to watch him overnight to check for breathing merely glanced into his room from the hallway.  At 9:15 the next morning, he was found dead – and had been dead for hours.  The young man's family settled their wrongful death suit against the Company in November 2016.

139.    During the police's investigation of the death, eight Highlands staff members made statements indicating that the facility was understaffed and that they were inadequately trained.  A nurse who was charged with the care of the deceased young man told police she had just one day of training at the facility; even more disturbing, the nurse who administered the fatal opioid dose revealed to police that she had little experience with fentanyl (the synthetic opioid administered) and had so many medications to distribute in such a short amount of time that it was impossible to check if each dose was being properly administered.  A supervisor at the facility "told police she had gotten the position just a few months after she received her registered nurse's license" and that the facility had a "practice of moving new nurses into management roles," which put patients at "'huge risk[,]'" further remarking that "'pretty much nobody knows what they're doing.'"

140.    Such problems were not limited to Highlands.  Nancy Smith ("**Smith**"), a corporate director of clinical services at Universal until 2012, oversaw a dozen hospitals in four states as part of her duties with the Company.  The Exposé quotes her as stating that the staffing in the hospitals that she supervised was so low as to be "'almost criminal[,]'" yet when she raised those concerns with her superiors, her complaints were ignored.  Instead, Smith's supervisors would remove her concerns from the reports before they were published and tell her that staffing concerns were "'not [her] purview.'"  Smith stated that she was faced with "'an ethical

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

dilemma'" due to the "'focus on minimal, minimal staffing,'" and ultimately decided to retire as a result of this untenable situation.

141.    Four doctors interviewed for the Exposé stated that they juggled such heavy caseloads at Universal behavioral facilities that they could meet with patients for only a few minutes at a time, which was not nearly long enough to properly evaluate challenging psychiatric conditions.  Mental health technicians, who had the least training, frequently spent the most time with patients instead.

### C.    Universal Holds Patients for as Long as Their Insurance Is Approved

142.    *BuzzFeed* interviewed two dozen current and former employees from 14 Universal facilities across the country who reported that Company policy was to keep patients until their insurance ran out to maximize insurance payments.  Three former heads of Universal behavioral health facilities corroborated that the mantra of Worsham was: "'Don't leave days on the table.'"

143.    The head of Austin Lakes Hospital in Texas until 2014 stated that it was "'common practice[,]' . . . openly discussed in regional conferences as well as [during] phone calls with facility executives,'" that "'[i]f an insurance company gave you so many days, you were expected to keep the patient there that many days[.]'"  This message from regional directors and other Universal executives was conveyed down to each individual facility's "staff and doctors through 'flash' meetings, the daily gatherings [whereby] administrators ran through the list of patients in the hospital [to discuss] treatment and discharge."

144.    Twenty Universal executives and managers across 12 states, who were interviewed pursuant to the Exposé and attended those meetings, said that the purpose of the "flash" meetings was to review days available to be paid by insurance, as well as to demand an explanation from facility managers for each and every early discharge proposed by staff and

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

doctors.   The facility managers would, in turn, pressure their doctors to keep patients hospitalized for longer periods, up to the maximum covered by the patients' insurance policies. A former manager at Salt Lake confirmed that Universal also encouraged managers to talk their patients into staying for longer periods, including by manipulating them through threats that the authorities would be called – such as child protective services to remove patients' children from their care.

145.   When a Highlands psychiatrist shared his concerns with Worsham in 2014 about the length of stay extensions achieved through physician shaming, Worsham took two weeks to reply by email that he should speak with his facility's medical director "about his 'perspective'" – once again demonstrating the hallmark apathy evinced by Universal management whenever patient care issues were raised.  This psychiatrist's concerns, however, gave way to the financial goals guiding policy at Highlands.   As the head of the facility told *BuzzFeed*, a draft of Highland's 2014 strategic plan included extending patient stays as a means to meet financial goals.

146.   Additionally, Universal's River Point facility in Jacksonville, Florida, which was acquired in 2010, determined through the direction of its top executive that 10 days would be the "'guideline' for how long to keep patients."  According to a manager at River Point, the "flash" meetings held there were thinly veiled attempts to pressure staff to keep patients longer.  If staff or doctors planned to release a patient earlier, they would be questioned.  As a result, after Universal acquired the facility, the number of Medicare patients who stayed 10 days or more at the facility jumped to 70% from the 37% who stayed for the same duration prior to the 2010 acquisition.

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

147.    River Point also used a Florida statute called the Baker Act (Fla. Stat. §§394.451, *et seq*.), which governs the process for involuntary commitment to behavioral health facilities, to detain patients longer.  According to three former River Point therapists, use of the Baker Act became standard practice at River Point after Universal acquired the facility, as patients with insurance would have petitions under the Baker Act filed for them, while those without insurance would be discharged.  In 2009, the year before Universal bought River Point, 238 petitions for involuntary commitment emanated from River Point.  Four years later, ***following the acquisition by Universal, the number grew to 1,362 petitions per year, an increase of more than 470%***.

148.    Per *BuzzFeed*'s Exposé, doctors gave little justification for holding the patients when filing petitions under the Baker Act – usually "just a few words with almost no context." A public defender in Duval County, Florida, stated that "petitions filed by River Point 'were often legally insufficient and lacking in supporting documentation[.]'"  This was because River Point filed the petitions to increase the length of stay to obtain the maximum amount of insurance reimbursement, not to retain patients for better health outcomes.

149.    As noted above, in April 2014, CMS suspended Medicare payments at River Point with Florida's CMS equivalent, the AHCA, following suit.  Universal's contemporaneous disclosures about these suspensions were tightlipped and vague, stating only that they were instituted "in accordance with federal regulations . . . regarding suspension of payments during certain investigations."[19]  The Exposé finally connected the dots between Universal's illicit admissions practices and the agencies' reimbursement suspensions.

150.    At least five Universal hospitals, including Highlands and River Point, have since been cited by federal regulators for violating a patient's right to be discharged or holding a patient without proper documentation.

---

[19]    *See, e.g.*, Universal Health Servs., Inc., Annual Report (Form 10-K) (Feb. 26, 2015).

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

151.    Universal has since confirmed that the DOJ's investigations center on illicit patient admissions, among other things.  The Company disclosed, as follows, in its Form 10-Q for the period ending June 30, 2018, filed on August 8, 2018:

> The DOJ has advised us that the civil aspect of the coordinated investigation referenced above is a False Claims Act investigation focused on billings submitted to government payors in relation to services provided at those facilities. While there have been various matters raised by DOJ during the pendency of this investigation, DOJ Civil has advised that the focus of their investigation is on *medical necessity issues and billing for services not eligible for payment* due to non-compliance with regulatory requirements relating to, among other things, *admission eligibility, discharge decisions, length of stay and patient care issues*. It is our understanding that the DOJ Criminal Fraud Section is investigating issues similar to those focused on by DOJ Civil and the other related agencies involved in this matter.

[Emphasis added].

152.    The *BuzzFeed* Exposé had an immediate impact on Universal.  The Company's stock price dropped by 12.2% per share, from $126.87 to $111.36, shortly after the article was published.

153.    Further, within two days, Senator Charles E. Grassley ("**Senator Grassley**") called on the U.S. Department of Health and Human Services ("**HHS**") to investigate Universal, in addition to the pending investigations by the DOJ.[20]

### D.    Additional Reports of Neglect and Abuse at Universal Facilities Continue to Come to Light, Further Damaging Universal's Reputation

154.    Despite Universal's purported charm offensive following the release of the Exposé, as part of which Universal has offered self-serving explanations and counter-allegations on various websites,[21] bad news continued to pile up and plague the Company.

---

[20]    Letter from Charles E. Grassley, Chairman, U.S. Senate Comm. on the Judiciary, to Honorable Daniel R. Levinson, Inspector Gen., U.S. Dep't of Health & Human Servs. (Dec. 9, 2016), https://www.judiciary.senate.gov/imo/media/doc/2016-12-09%20CEG%20to%20HHS%20IG%20(Buzzfeed%20UHS%20Investigation).pdf.

[21]    According to reports by *BuzzFeed*, Universal also, among other things, terminated an employee, whom the Company alleges had provided information to reporters, sued a former employee for allegedly leaking damaging and

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

155.    Indeed, on December 30, 2016, *BuzzFeed* reported that a six-year-old boy had been held against his parents' and his own will at River Point for more than three days, during which time he sustained physical injuries, was locked in a seclusion room, deprived of sleep, and had to wait more than 24 hours to see a psychiatrist.[22]  Again, River Point availed itself of proceedings under the Baker Act, seeking to extend even further the boy's forced stay at the facility.  A public defender was finally able to secure the boy's release into his parents' custody.

156.    In another lengthy article published on April 11, 2017, *BuzzFeed* reported on widespread understaffing, patient neglect, and abuse, including illegitimate and potentially dangerous forms of patient restraint, at Universal's Shadow Mountain Youth Psychiatric Facility in Tulsa, Oklahoma.[23]  According to the article, Oklahoma had already found that the facility "had barely a third of the staff it needed[;]" moreover, its clinical director, Mike Kistler, had come under the scrutiny of state authorities for possible abuse and neglect.  Shortly after the publication of this article, Oklahoma Governor Mary Fallin and Oklahoma Senator Jim Inhofe called on the state to further investigate the facility.[24]  The report also triggered another letter by Senator Grassley to the HHS calling for further investigation of the Company, emphasizing that continued news reports "portray a pattern of conduct that is extremely concerning and casts a

---

disturbing internal surveillance videos that form the subject of multiple news reports, held town hall meetings with its employees principally for the purpose of chilling employee participation in investigative news reports concerning Universal's misconduct, and "debriefed" several employees so thoroughly that they retracted certain statements confirming the Company's misconduct.  Rosalind Adams, *How a Giant Psychiatric Hospital Company Tried to Spin Us – And Silence Its Staff*, BUZZFEED NEWS (Dec. 27, 2017, 11:37 AM ET), https://www.buzzfeednews.com/article/rosalindadams/how-a-giant-psychiatric-hospital-company-tried-to-spin-us.

[22]    Rosalind Adams, *How A 6-Year-Old Got Locked On A Psych Ward*, BUZZFEED NEWS (Dec. 30, 2016, 4:26 PM ET), https://www.buzzfeednews.com/article/rosalindadams/how-a-6-year-old-got-locked-on-a-psych-ward.

[23]    Rosalind Adams, *The Trash Can Unit*, BUZZFEED NEWS (Apr. 11, 2017, 5:57 AM ET), https://www.buzzfeednews.com/article/rosalindadams/shadow-mountain.

[24]    Rosalind Adams, *Oklahoma Governor And Senator Want Troubled Youth Psych Facility Investigated*, BUZZFEED NEWS (Apr. 14, 2017, 12:31 PM ET), https://www.buzzfeednews.com/article/rosalindadams/governor-senator-call-for-investigation-of-troubled-youth.

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

dark cloud over UHS's ability to properly care for its patients and whether it is properly billing federal programs."[25]

157.   Later, in 2017, and following another lengthy investigation, *BuzzFeed* reported on yet another Universal facility, Hill Crest Behavioral Health Services in Birmingham, Alabama, reciting evidence of staff violence and abuse against patients, including beatings, application of improper restraints, such as chokeholds, and medically inappropriate use of chemical sedatives.[26] As with other Universal facilities, *BuzzFeed* reported on general understaffing with frequently unqualified personnel, which resulted in a dangerous environment for patients and staff alike.  As a result of this *BuzzFeed* report, Senator Grassley again requested that the HHS more fully investigate Universal because "[t]he most recent allegations cause significant concern about whether UHS has the ability to adequately manage the facilities under its control."[27]

## VI.   UNIVERSAL'S BOARD IS REPEATEDLY NOTIFIED OF THE MISCONDUCT YET REFUSES TO TAKE CORRECTIVE ACTION

158.   As the 220 Documents and certain letters to the Board demonstrate, as early as 2012 and 2013, internal documents put the Individual Defendants on notice of Universal's problematic practices.  By 2014 and 2015, internal documents, external correspondence, media reports, and the expansion of the coordinated government investigation into Universal, as a corporate entity, put the Individual Defendants on notice of red flags indicating widespread illegal practices within the Company.  Yet, despite the presence of these red flags, the Individual Defendants took an "ostrich-like" approach and consciously disregarded the barrage of warnings.

---

[25]   Letter from Charles E. Grassley, Chairman, U.S. Senate Comm. on the Judiciary, to Honorable Daniel R. Levinson, Inspector Gen., U.S. Dep't of Health & Human Servs. (Apr. 14, 2017), https://www.grassley.senate.gov/sites/default/files/constituents/2017-04-14%20CEG%20to%20HHS%20IG%20%28UHS%20follow%20up%29.pdf.

[26]   Rosalind Adams, *A Prescription for Violence*, BUZZFEED NEWS (Nov. 11, 2017, 11:00 AM ET), https://www.buzzfeednews.com/article/rosalindadams/videos-show-uhs-hospital-staff-assaulting-young-patients.

[27]   Letter from Charles E. Grassley, Chairman, U.S. Senate Comm. on the Judiciary, to Honorable Daniel R. Levinson, Inspector Gen., U.S. Dep't of Health & Human Servs. (Dec. 13, 2017), https://www.documentcloud.org/documents/4332058-2017-12-13-CEG-to-HHS-OIG-Hill-Crest-Investigation.html.

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Even as stockholder correspondence and negative publicity grew from a stream to a torrent during 2015 and 2016, the Individual Defendants refused to take any meaningful corrective action.

**A.     As Early as 2012, the Behavioral Health Segment's Business Plans Contained Red Flags**

159.    As early as 2012, the Individual Defendants would have known that Universal's business model came at significant regulatory risk because they would have █████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

160. ████████████████████████████████████████████

████████████████████████████

**B.      The Board Is Put on Notice of and Frequently Discusses the Various Government Investigations and Litigations Involving an Increasing Number of Universal's Facilities**

161.    Minutes from a January 16, 2013 Audit Committee meeting attended by Director Defendants Gibbs, Herrell, and Hotz, as well as Officer Defendants Filton and Boyle, show that Defendant Filton "reviewed the most recent UHS Compliance Committee Agenda focusing on the investigation updates."  By January of 2013, the Company had been sued in the *Escobar qui tam* action, had paid a $27 million settlement to the DOJ in Texas for violations of the FCA, Anti-Kickback Statute, and the Stark Law, had another facility barred from receiving Medicaid

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

payments in Kansas for its failing to provide adequate care to patients, and had all of the government's wards from North Carolina, Virginia, and Washington, D.C., removed from a North Carolina facility, which was placed on a provisional license for failure to provide adequate care.  Thus, as reflected in the minutes, Director Defendants Gibbs, Herrell, and Hotz were aware of these issues.

162.    Minutes from an April 23, 2013 executive-level Compliance Committee meeting attended by Director Defendant Marc Miller and Officer Defendants Boyle and Filton show that a review of "investigation updates" was conducted by those attending.  Of significance, Universal's executive-level Compliance Committee is comprised of just **one director**, the President and son of the CEO.  In these minutes, information regarding the South Texas CIA has inexplicably been redacted; this is the same health system that was so plagued with compliance failures that it entered an earlier five-year CIA in 2005 that was part of the $27.5 million settlement that Universal paid to the DOJ.

163.    At a May 15, 2013 Audit Committee meeting attended by Director Defendants Herrell, Hotz, Gibbs, and McDonnell, Officer Defendants Filton and Boyle, and the Universal Director of Internal Audit, Jessica Shure ("**Shure**"), the attendees participated in a ████████████ ████████████████████████████████████████████████

164.    On July 17, 2013, the full Board met and received an update on the government investigations into the coordinated compliance failures occurring at Universal facilities that had prompted the issuance of subpoenas by the DOJ and OIG.  By this time, the Company had hired outside counsel to represent it with respect to the matter.  Director Defendants Alan Miller, Gibbs, Herrell, Hotz, McDonnell, Marc Miller, and Pantaleoni were present, along with Officer Defendant Filton.  At the meeting, the Company's General Counsel "provided an update on the

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

OIG-DOJ Investigation of ten behavioral facilities.   He described items requested in the subpoena that had been received in February 2013, identified the law firm that the company had hired to represent it and discussed the actions being taken to respond to the subpoena."

165.   On July 25, 2013, the Company's executive-level Compliance Committee met and discussed "investigation updates."   In addition, Caponi disclosed that Sierra Vista Hospital ("**Sierra Vista**") had "filed the 1st Annual CIA Report to the OIG."   Director Defendant Marc Miller and Officer Defendants Boyle and Filton were present.

166.   On September 18, 2013, the entire Board, including Director Defendants Alan Miller, Gibbs, Herrell, Hotz, McDonnell, Marc Miller, and Pantaleoni, as well as Officer Defendant Filton, held a regular meeting.   Filton "provided an update on the ongoing DOJ investigation of 10 behavioral facilities.   He indicated that the Company continued to collect and produce documents in response to the government's requests."

167.   On October 1, 2013, the executive-level Compliance Committee, including Director Defendant Marc Miller and Officer Defendants Boyle and Filton, were provided with an "Investigation Update."   The contents of this update were redacted from the 220 Documents received by Plaintiffs.

168.   On November 6, 2013, the Audit Committee, including Director Defendants Gibbs, Hotz, and McDonnell, as well as Officer Defendants Filton and Boyle, met and discussed disclosures relating to the OIG investigation.   Specifically, Defendant Filton "reviewed the draft of the third quarter Form 10-Q, which had been previously distributed to the Committee [and] noted one change to the disclosures in the Legal Proceedings section updating the OIG investigation of Wekiva [Springs] and River Point Hospitals."   These minutes reflect that Director Defendants Gibbs, Hotz, and McDonnell reviewed – and, per the responsibilities laid

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

out in the Audit Committee Charter and the lack of any dispute raised in these minutes, it can be

inferred that they also approved – the Company's public filings.

### C. Beginning in Late 2013, Stockholder Representatives and Other Groups Began to Ring the Alarm Bells About Universal's Practices in Written Communications to the Board

169.    On November 8, 2013, representatives of 1199 SEIU United Healthcare Workers

East, a chapter of the Service Employees International Union ("**SEIU**"), wrote to Defendant

Herrell, copying the Board, in which SEIU raised concerns stemming from its review of

investigative reporting by *The Boston Globe*, which raised concerns regarding inadequate

staffing, training, and supervision issues in Universal's Arbour Health System resulting in

problems that "have severely affected patient care."  SEIU pointed out that although Universal

was "the largest behavioral health operator in the country, there are numerous indicators that

[Universal's] oversight of patient safety, quality of care and compliance lags behind its publicly

traded for-profit peers."   One of the areas in which Universal lagged was a Board-level

"committee to oversee patient safety and quality": at the time, Universal's Audit Committee

Charter lacked the scantest mention of compliance functions.  Moreover, Universal's Chief

Compliance Officer, unlike counterparts at Universal's peer companies, did not report to the

Audit Committee.  SEIU, through its independent review of regulatory reports and lawsuit

filings, highlighted how "severe quality of care issues in multiple areas" led to "breakdowns in

care [that] have risen to immediate jeopardy status or condition-level violations, which could

compromise the facilities' eligibility to receive Medicare and Medicaid reimbursements."  And

"[i]n many instances, state health departments have levied fines or placed a ban on a facility's

admissions, which costs [Universal] revenue from reliable government payors [sic]."  Moreover,

Universal had seen private lawsuits "lead to the even costlier involvement of government

authorities."  SEIU also pointed to a systematic problem of "additional false claims allegations in

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

other parts of [Universal's] system," as well as allegations of retaliation against those who raised complaints.

170.    Despite the serious concerns that SEIU raised, SEIU appears not to have received a direct response from Universal or any of its officers or directors.

171.    On March 7, 2014, representatives of SEIU – this time from the national body – wrote a letter following up on the concerns it raised in its November 8, 2013 letter.  It gave Universal credit for having the Board "amend[] its Audit Committee charter to include quality of care under its purview," while emphasizing that "the serious nature of the regulatory and quality of care issues emerging at [Universal] facilities[,] necessitate[ing] a dedicated independent committee to work toward resolving these issues in order to protect shareholders, patients, workers and the company itself."  Issues SEIU highlighted include the fact that state regulators have halted admissions at a Universal's Arbour-HRI Hospital in Massachusetts, additional investigations by the DOJ's Criminal Frauds Section, and "a whistleblower's allegations of improper and fraudulent coding and billing[,]" which SEIU's independent analysis of publicly available Medicare data confirmed in part.

172.    SEIU also stressed its concerns that "[a]t many former PSI free-standing inpatient psychiatric facilities (IPFs), we have observed a significant increase in the use of suicidal ideation as a diagnosis code on Medicare claims immediately after acquisition by [Universal,]" which "has brought the former PSI facilities much more in line with already above average trends observed at [Universal] legacy IPFs."  SEIU then presented a chart illustrating how Universal's suicidal ideation coding had "far outpaced" PSI and non-Universal facilities over the last seven years, with PSI's suicidal-ideation coding noticeably increasing after its acquisition by Universal:

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



173.    Moreover, SEIU recounted the concerns of Klotz, the whistleblower, who alleged that Universal "categorized patients as suicidal when the likelihood was extremely low" to make these patients qualify for inpatient psychiatric care that the federal and state governments would then reimburse.  Moreover, as SEIU recounted, the whistleblower alleged that Universal gamed auditing processes so that auditors, instead of detecting the problem of false billing, "advise[d] the caregivers on how to maximize reimbursement from falsely up-coded patients."  Further, SEIU confirmed some of the whistleblower's allegations by looking into how former PSI facilities have increased occupancy rates by "300 basis points from 2010 to 2011," which "seems to contradict a statement made by" Defendant Filton regarding volume growth at PSI facilities. At the same time, SEIU raised quality-of-care issues, noting the high rates of comorbidity present at PSI facilities following their acquisitions by Universal.

174.    SEIU concluded that Universal's "business strategy exposes the company to a complex set of healthcare laws and regulations that are each unique to the behavioral health and acute care industries in which it operates."  SEIU stressed that owing to Universal's size, it

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

"should not lag its peers in its oversight of quality of care compliance" and that the Board should dedicate resources "that can devote attention solely to addressing the multiple government investigations" by "establish[ing] a dedicated independent committee that is equipped and empowered to investigate and resolve these issues."

### D. Universal's Board, Through Its Audit and Compliance Committees, Has Long Been Well Aware of Problems at the Company

175.    On November 20, 2013, the Audit Committee, including Director Defendants Gibbs, Herrell, Hotz, and McDonnell, as well as Officer Defendants Filton and Boyle, met with the Company's Chief Compliance Officer, Defendant Caponi.  Caponi made a presentation on "the Company's compliance program and compliance hotline procedures . . . [and] there was also a general discussion regarding the Board/Committee process for monitoring compliance with quality of care issues."  Tellingly, "[i]t was agreed to continue the conversation in the near future with the input of outside counsel."  Therefore, as early as November 20, 2013, the Audit Committee knew, and was discussing, that outside counsel was required to advise the Company on problems related to the monitoring of quality of care issues.

176.    On January 10, 2014, the executive-level Compliance Committee, including Director Defendant Marc Miller and Officer Defendants Boyle and Filton, "discussed overall calls for each division and concerns with particular facilities" and also discussed "investigation updates."  Given that the Audit Committee had just discussed the hiring of outside counsel to address quality of care issues, it is reasonable to infer that the Compliance Committee likewise discussed quality of care issues at the unidentified "particular facilities" referenced in the minutes. ████████████████████████████████████████████████[28]████

████████████████████████████████████████████████████████████████

---

[28]   ████████████████████████████████████████████

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

reference to the 195 behavioral health facilities that Universal owned and/or operated at the time,[29] ███████████████ :

    a.   ████████████████████████████████████

████████████████████████████████████

██████████████████████████

    b.   ██████████████████

    c.   ████████████████████[30]█████████

    d.   ███████████████████████████

██████████████████████████████████

    e.   ███████████████████████████

██████████████████████████████████

██████████████████████████████████

████████████████

    f.   ███████████████████████████

██████████████████████████

    g.   ███████████████████████████

██████████████████████████████████

██████████████████████████████████

████████

    h.   ███████████████████████████

██████████████████████████████████

---

[29]    As revealed in the Form 10-Q for the period ending September 30, 2013, filed on November 7, 2013.

[30]    ████████████████████████████████████

██████████████████████████████████

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



177. ██████████████████████████████████████████████████[31]

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

178.    At a March 26, 2014 meeting of the Universal Board, attended by all Director Defendants, as well as Officer Defendant Filton, the Board received a presentation from Karen Johnson ("**Johnson**"), Senior Vice President of Clinical Services and Behavioral Health Compliance Officer at the Company.  The minutes reveal that "Ms. Johnson made a presentation on clinical quality in the behavioral facilities.  She reviewed the corporate clinical organization and described the oversight that they provided to the hospitals.  She identified the various indicators/metrics that were tracked to insure quality care and identify potential problems."

179.    Johnson's presentation raised serious red flags. ███████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████

180.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

181.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

**E.      Stockholder Groups Revive Their Complaints About Universal's Oversight Failures in 2014**

182.    On April 8, 2014, CtW[32] sent a letter to Lead Independent Director Defendant Herrell (and copying the Board) exhorting the Board to take immediate steps to improve its oversight of regulatory compliance.  CtW noted in its letter, in pertinent part:

> [W]e believe shareholders face considerable risk that regulatory enforcement actions and/or settlements with federal regulators will result from the OIG and DoJ investigations, given the divergence in billing practices between UHS-owned and other facilities evinced by an independent analysis of Medicare data. Furthermore, our review of UHS's corporate governance, and in particular of the board's committee structure and membership, strongly suggests that improvements are overdue: unlike most publicly traded hospital companies, UHS's board does not have a separate Compliance Committee – instead housing compliance oversight in the Audit Committee. However, the members of the Audit Committee do not have the depth or range of health care and regulatory experience evident among the members of the Compliance Committees at other publicly traded hospital and health care firms. ***We are concerned that inadequate board oversight of regulatory compliance has generated significant risks for shareholders, and believe that without changes in the board's structure and membership, such oversight will not improve sufficiently to mitigate such risks going forward.***
>
> Absent a commitment by the board to create a new Compliance Committee comprised of independent directors with extensive relevant medical and regulatory experience, we will be unable to support Lawrence Gibbs, the Audit Committee member who is slated to stand for election at this year's annual meeting.

[Emphasis added].

183.    The April 8, 2014 CtW letter brought up specific concerns regarding Universal's billing practices, including the analysis of Medicare data conducted by SEIU showing that Universal's inpatient psychiatric facilities utilized the suicidal ideation code much more frequently than other facilities and that following Universal's acquisition of PSI facilities in 2010, those facilities experienced a dramatic increase in their utilization of the suicidal ideation

---

[32]      CtW is a group organized to advocate for long-term stockholder value on behalf of Change to Win, a federation of unions representing over six million members and investing over $200 billion in global capital markets.

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

code.  CtW noted that, before Universal's acquisition, PSI facilities had been either in line with or below the average of other facilities in terms of their coding patterns for suicidal ideation. CtW included the following charts evincing the Company's fraudulent use of the suicidal ideation code to illicitly admit patients regardless of medical necessity following the PSI Acquisition in 2010:







184.   CtW further noted that such high suicidal ideation rates were consistent with the allegations made in a *qui tam* action filed by Dr. Klotz against a Universal facility in Pennsylvania.  This facility was one of the 14 Universal facilities that received an OIG subpoena in February 2013.  The complaint alleged that Universal falsely and fraudulently coded patients as suicidal when patient charts did not reflect a likelihood of patient suicide, and Universal's internal audit employees advised caregivers on how to maximize reimbursement.  CtW further noted that:

> Despite having a substantial share of its facilities above the 'red flag' 80th percentile[33] for suicidal ideation diagnoses, . . . UHS's board has not disclosed any efforts by itself or the Audit Committee to determine if UHS's unusually high level of suicidal ideation diagnoses, comorbidity rates, or other billing practices, may be generating excessive regulatory and compliance risks for the company and its long-term shareholders.

185.   CtW also noted in its April 8, 2014 letter that Universal's Audit Committee, which was responsible for compliance issues given the absence of a separate Board-level

---

[33]   As explained in this same letter, "in federal fiscal year 2010, only seven of PSI's facilities had suicidal ideation rates above the 80th percentile nationally . . ., the level identified by the OIG as indicating a significant outlier at risk of billing errors. But by federal fiscal year 2012, 71% of former PSI facilities (37 out of 52) had suicidal ideation rates above the national 80th percentile level."

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

committee dedicated to this area, was ill-equipped for the task and had called on the Board to

take action specifically to improve Universal's compliance oversight:

**Audit Committee Lacks Medical and Regulatory Experience**

In contrast to many other publicly-traded hospital and healthcare firms, UHS assigns responsibility for overseeing regulatory compliance to its Audit Committee, rather than to a separate committee focused on that area of responsibility. Moreover, UHS's Audit Committee members do not appear to have medical and regulatory experience comparable to that of directors serving on the Compliance Committees of other hospital firms. For instance, [Herrell's] fellow Audit Committee members include a portfolio manager, an investment banker, and an insurance executive. While [Herrell] [him]self worked for over 30 years for the Mayo Foundation, it does not appear from [his] biographical description that [his] work there involved matters directly pertaining to regulatory compliance or the review of clinical practices. Additionally, as the only financial expert on the Audit Committee, as well as the Lead Independent Director for the board, we are skeptical that [Herrell] alone can provide the experience and expertise to effectively oversee UHS's compliance practices, especially given all the other duties of the Audit Committee.

\* \* \*

Moreover, the other major hospital firms make much more clear the relevant committee's responsibility to oversee regulatory compliance and that committee's role in the reporting relationships among senior compliance executives. At UHS, up until October 2013 the Audit Committee's charter did not state explicitly that the Committee was responsible for overseeing "the Company's compliance with legal and regulatory requirements and quality of care standards." The charter was also amended to include among the Committee's responsibilities reviewing and discussing with management and independent auditors "any correspondence with regulators or governmental agencies and any published reports which raise material issues regarding the Company's financial statements or accounting policies which has been brought to the Committee's attention." While the Committee has access to the Chief Compliance Officer, he is not described as reporting to the Committee.

\* \* \*

**Improved Compliance Oversight Will Protect Shareholders**

*In light of the ongoing federal investigations of UHS's billing practices, the unusually high levels of suicidal ideation diagnoses at UHS facilities – and the very sharp increase in such diagnoses at formerly PSI facilities following their 2010 acquisition by UHS – and the UHS Audit Committee's lack of members with direct medical and regulatory experience, we believe that an overhaul of*

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

*the board's compliance oversight function is necessary. In particular, we urge you and your fellow directors to separate the compliance and audit oversight roles, and create a new committee comprised of independent directors with direct medical and regulatory experience to oversee legal and regulatory compliance.* Absent a commitment to make such changes to the board's structure and membership, we will be unwilling to support the reelection of Lawrence Gibbs at this year's annual meeting.

[Emphasis added in bold and italics].

186. On April 22, 2014, Defendant Herrell, on behalf of the Board, responded to CtW's and SEIU's letters.  His response was more notable for what it failed to address than what it actually said.  For instance, Herrell did not offer any reforms, nor did he indicate that an investigation into the points CtW and SEIU raised was currently underway or even planned for the future.  Rather, he devoted his response to disputing CtW's contentions, such as arguing that the Compliance Committee reported to the Audit Committee, the coding for suicidal ideation had no effect on reimbursement, and he and Defendant McDonnell had the right experience to supervise compliance functions.  Moreover, instead of addressing the substance of CtW's contentions about the high rate of suicidal ideation coding, he simply insisted that various entities had not found the coding to be improper.  Herrell did, however, concede that "while our Board and the Audit Committee oversee these issues, they rely on the company employees tasked with these functions to effectuate the necessary actions to ensure our facilities are complying with all laws, rules, and regulations."  But he insisted that no Board-level compliance committee was necessary, claiming that the Audit Committee already performed such functions. This contention plainly ignored CtW's point that Universal's problem stemmed from its reliance on the Audit Committee to perform functions that Universal's peer companies placed in board-level compliance and quality-of-care committees.

187. On April 28, 2014, the Executive Vice President of the Massachusetts Division of a contingent of the SEIU, consisting of more than 1,000 members who were employees of

- 78 -

Universal facilities in Las Vegas, Nevada, and Brookline, Massachusetts, echoed CtW's concerns and called for compliance reforms in a letter addressed to all members of the Universal Board that stated, in relevant part:

> We are among the more than 1,000 members of the Service Employees International Union (SEIU) who work at Universal Health Services (UHS) facilities in Las Vegas, Nevada and Brookline, Massachusetts. As members of the country's largest union of healthcare workers, with 1.1 million healthcare members nationwide, we advocate for quality and affordable healthcare, decent wages and benefits for healthcare workers, and accountable stewardship of our healthcare resources.
>
> ***We are troubled by the investigations by both the Department of Health and Human Services Office of Inspector General and the Department of Justice as well as high profile breakdowns in patient care at several UHS facilities across the country.*** In addition, our initial examination of hundreds of reports issued by state and federal regulators have revealed repeated issues related to inadequate staffing, patient security and patient abuse. We have examined ***several hundred (354) regulator surveys from 90 different facilities in 13 states, from 2008-2014*** and are in the process of obtaining and analyzing more. We have already found ***repeated citations for violations of federal and state requirements*** to provide care in a safe setting, ensure the security of patients and provide adequate staff to ensure the safety of the facility's patients and staff. We believe these issues ***clearly demonstrate the need for systematic and high-level oversight, which we feel is lacking on UHS's Board of Directors.***
>
> As dedicated caregivers, we have committed our professional lives to delivering high quality healthcare. As UHS workers, we expect the company to share this mission. ***We call on the UHS Board of Directors to match our commitment by creating and empowering a qualified committee to oversee quality of care and compliance.*** Lacking such a committee, UHS significantly lags behind its publicly traded for-profit peers, most of whom have a dedicated board committee specifically charged with overseeing healthcare specific issues such as compliance with industry laws, patient safety, and quality of care. We compared UHS's board structure and responsibilities to those of its publicly traded peers [and Universal's peers all have specifically designated compliance and/or ethics committees].
>
> As the nation's largest provider of inpatient behavioral health as well as major acute care hospital operator, we believe that UHS should be at the forefront in making quality care a top priority. Installing such a committee would broadly demonstrate UHS's commitment to high quality patient care, not just to shareholders, but also to workers, patients and the communities in which UHS operates. It would also better position UHS to adapt to the healthcare landscape as reimbursements begin to reward value over volume.

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

As workers and shareholders, we want UHS to be a leader in the industry and thus, we urge you to consider our request to create this committee. Thank you for your prompt consideration of our proposal. We look forward to a timely response to further discuss these concerns.

[Emphasis added].

188.   On May 6, 2014, the Audit Committee, including Director Defendants Gibbs, Herrell, Hotz, and McDonnell, as well as Officer Defendants Boyle and Filton, held a meeting during which Filton "pointed out the new disclosure [in the Company's latest Form 10-Q] of the CMS payment suspension at River Point Hospital and answered several questions from the Committee regarding this."  Despite the shareholder letters, and the fact that River Point had its payments suspended by CMS, the Director Defendants took no action to reform Universal's compliance practices.  This failure was particularly significant because the Board had just been notified, at length, of the specific problems that required it to act.

189.   On May 19, 2014, the President of SEIU's Pennsylvania segment, the state's largest union of nurses and healthcare workers, wrote another letter addressed to all members of the Board:

We are troubled by the investigations by both the Department of Health and Human Services Office of Inspector General and the Department of Justice as well as high profile breakdowns in patient care at several UHS facilities across the country. In addition, our initial examination of hundreds of reports issued by state and federal regulators have revealed repeated issues relating to inadequate staffing, patient security and patient abuse. We have examined several hundred (354) regulator surveys from 90 different facilities in 13 states, from 2008-2014 and are in the process of obtaining and analyzing more. We have already found *repeated citations for violations of federal and state requirements* to provide care in a safe setting, ensure the security of patients and provide adequate staff to ensure the safety of the facility's patients and staff. *We believe these issues clearly demonstrate the need for systematic and high-level oversight, which we feel is lacking on UHS's Board of Directors.*

As dedicated caregivers, we have committed our professional lives to delivering high quality healthcare across multiple settings in Pennsylvania. As a national company with headquarters and operations in our state, we expect UHS to share this mission. *We call on the UHS Board of Directors to match our commitment*

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

*by creating and empowering a qualified committee to oversee quality of care and compliance.* Lacking such a committee, UHS significantly lags behind its publicly traded for-profit peers, most of whom have a dedicated board committee specifically charged with overseeing healthcare specific issues such as compliance with industry laws, patient safety, and quality of care. We compared UHS's board structure and responsibilities to those of its publicly traded peers [and Universal's peers all have specifically designated compliance and/or ethics committees].

As the country's largest provider of inpatient behavioral health as well as a major acute care hospital operator, we believe that UHS should be at the forefront in making quality care a top priority. *Installing such a committee would broadly demonstrate UHS's commitment to high quality patient care, not just to shareholders, but also to workers, patients and the communities in which UHS operates. It would also better position UHS to adapt to the healthcare landscape as reimbursements begin to reward value over volume.*

[Emphasis added].

190.   On May 21, 2014, SEIU's Executive Vice President of its Nevada division wrote to the Board, again alerting the Board to its insufficient committee oversight, quality of care, and compliance.   The letter was similar to the April 28, 2014 letter authored by SEIU's Massachusetts Division.

191.   Unfortunately, the Board met these letters, which clearly set out the facts of Universal's unlawful and unethical patient care and billing practices, as well as the associated risks from their continued use, with conscious disregard.  A May 26, 2014 *Philadelphia Inquirer* article noted that SEIU members had raised the serious concerns expressed in the organization's letters at the annual meeting and demanded that a compliance committee be implemented at the Company.  Nevertheless, Defendant Alan Miller subsequently responded in an email that "[t]he board of directors has a well-functioning audit committee and, working in conjunction with an extensive quality department, determined that an additional oversight organization is not required."

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

192. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████

193. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

### F. Universal's Failure to Address the Concerns Raised by Its Stockholders, and Apparent from Its Own Internal Compliance Procedures, Continues Unabated

194. On August 7, 2014, the Audit Committee, including Director Defendants Gibbs, Herrell, Hotz, and McDonnell, as well as Officer Defendants Boyle and Filton, reviewed a draft of the Company's Form 10-Q for second quarter of 2014. In a presentation on the matter, Filton "focused primarily on updating the status of certain matters, specifically the continuing investigation of the National Deaf Academy and the Medicare payment suspension at River Point." Of significance, in 2013 the National Deaf Academy, a facility subject to the coordinated government investigations, and later closed by Universal in 2016, was embroiled in at least one whistleblower action – *Gilrain & Savage v. The National Deaf Academy LLC*, No. 2013 CA 001190 (Fla. Cir. Ct., Lake Cty.) – by former therapists who made allegations against the facility's executive management of, among other things, fraudulent billing practices, deplorable patient care, and impermissible extensions of lengths of patient stay. These minutes also reflect that Director Defendants Gibbs, Herrell, Hotz, and McDonnell reviewed – and per the responsibilities laid out in the Audit Committee Charter and the lack of any dispute raised in these minutes, it can be inferred that they also approved – the Company's public filings.

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

195.    On October 3, 2014, the executive-level Compliance Committee, including Director Defendant Marc Miller and Officer Defendants Boyle and Filton, met ███████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████

196.    The minutes further note that the Committee ████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ █████████████████████████████████    ██████████████████ ███████████████████████████████████████████████████████████ ██████████████████████████████████

197.    On November 6, 2014, the Audit Committee was again updated on the status of the ongoing OIG investigation.  Director Defendants Gibbs, Herrell, Hotz, and McDonnell, as well as Officer Defendants Boyle and Filton, were in attendance, and Filton "noted one change to the disclosures [in a draft Form 10-Q for the third quarter of 2014] in the Legal Proceedings section updating the OIG investigation of behavioral facilities, noting that the government had requested information from four additional facilities."

198.    ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



199. ████████████████████████████████████[34] ██

███████████████████████████████ in reference to the 215 behavioral

health facilities that Universal owned and/or operated at that time specifically,[35] that ████████

████████:

    a.  ████████████████████████████████

████████████████████████████████████

████████

    b.  ████████████████████

    c.  ████████████████████████

████████████████████████

    d.  ████████████████████████

████████████████████

    e.  ████████████████████

    f.  ████████████████████████████

████████████████

---

[34]  ████████████████████████████

[35]  As revealed in the Form 10-Q for the period ending September 30, 2014, filed on November 7, 2014.

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

g. █████████████████████████

████████████████████████████████

████████████████████████████████

███████████████

h. █████████████████████████

████████████████████████████████

██████████████████████████████

i. █████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

██████████

j. █████████████████████████

████████████████████████████████

███████████████████████

200. █████████████████████████████

████████████████████████████████████

███████████████████████████████████

- ████████████████

- ██████████████████████

- ███████████████

- ████████████████

- ██████████████████████

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



201.    The Audit Committee was presented with a similar update at a meeting held on November 19, 2014, attended by Director Defendants Gibbs, Herrell, Hotz, and McDonnell, along with Officer Defendants Boyle and Filton.   At this meeting, "the Company's Chief Compliance Officer made a presentation on the Company's compliance program and compliance hotline procedures[]" and then the Company's General Counsel "provided the Committee an update of the various government investigations that are disclosed in the Company's SEC filings."   Of significance, the minutes note that Caponi "described the small number of hotline calls during the past year that involved corporate employees."   Nowhere in the 220 Documents

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

produced to Plaintiffs does Universal disclose more detail about the identity of these "corporate employees."   Nor do these minutes reveal anything related to the "update on internal audit activity" noted.

202.    The executive-level Compliance Committee again met on January 28, 2015 ██

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████

203.    On February 24, 2015, the Audit Committee, including Director Defendants Gibbs, Herrell, Hotz, and McDonnell, as well as Officer Defendants Boyle and Filton, met to review a draft of the Company's Form 10-K for fiscal year 2014.  Pursuant to this review, Filton reviewed "the subpoena received regarding Salt Lake Behavioral."  These minutes also reflect that Director Defendants Gibbs, Herrell, Hotz, and McDonnell reviewed – and per the responsibilities laid out in the Audit Committee Charter, and the lack of any dispute raised in these minutes, it can be inferred that they also approved – the Company's public filings.

204.    On March 30, 2015, the Audit Committee again met, including Director Defendants Gibbs, Herrell, Hotz, and McDonnell, in addition to Officer Defendants Boyle and Filton, at which time Filton explained:

> [I]n regards to the ongoing OIG investigation of multiple behavioral facilities, the Company was recently notified that the investigation conducted by the Criminal Frauds Section has been expanded to include UHS as a corporate entity arising out of the coordinated investigation of the previously disclosed facilities and, in particular, Hartgrove Hospital. After a discussion, the Committee unanimously agreed the Company would file an 8-K the following morning to disclose this same information. It was further agreed that another meeting would be scheduled

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

shortly to allow the outside counsel representing the Company in the OIG investigation to directly report on its status.

205.    Notably, the last time that the Audit Committee had met and discussed its implementation of outside counsel was on November 20, 2013.  The 220 Documents do not reveal any affirmative action taken by the Board to address any of the outstanding compliance issues it had identified years earlier and of which it was specifically advised by letters from CtW and SEIU, nor do any of the minutes produced reveal the existence of a single presentation from outside counsel in the period from November 20, 2013 to March 30, 2015.

206.    Three days later, on April 2, 2015, the Board held a Special Meeting, attended by Director Defendants Alan Miller, Marc Miller, Pantaleoni, Gibbs, Hotz, and Herrell, as well as Officer Defendants Filton and Osteen.  The Board finally received an update from their outside counsel:

> Mr. Payne, lead attorney from Gibson Dunn for UHS, began by reporting to the Board about the DOJ-OIG investigation of the Behavioral Health Division in light of the recent information that ***the DOJ Criminal Frauds Section was investigating UHS as a corporate entity*** in addition to the specific facilities previously identified. He updated the Board on the progress of the investigation and answered questions from various Board members.

[Emphasis added].

The remainder of the minutes regarding the investigation were redacted in the 220 Documents received by Plaintiffs.  As reflected in these minutes, Director Defendants Alan Miller, Marc Miller, Pantaleoni, Gibbs, Hotz, and Herrell knew that Universal was the subject of a criminal fraud investigation that was so serious and widespread that Universal, as a corporate entity, was a target.  Nothing was done in response.

207.    On April 9, 2015, the executive-level Compliance Committee, including Director Defendant Marc Miller and Officer Defendants Filton and Boyle, again received "Investigation Updates[,]" and Caponi "reviewed the hotline calls for both divisions with the committee."

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

208.    On April 27, 2015, the Audit Committee, including Director Defendants Gibbs, Herrell, Hotz, McDonnell, and Pantaleoni, in addition to Officer Defendants Boyle and Filton, discussed "a demand letter received from a plaintiff's law firm regarding the ongoing OIG investigation of certain behavioral health facilities."   The Company's General Counsel, "Mr. Klein[,] answered several questions[.]"   On information and belief, a "demand letter" is typically an extensive letter sent by a shareholder to a board outlining any wrongdoing at a company and demanding that the board take specific steps to bring the wrongdoing to an end, including initiating litigation against the culpable directors and executives.   In this instance, the demand letter concerned the "OIG investigation of certain behavioral health facilities."   Therefore, these minutes reflect that on April 27, 2015, the Director Defendants were yet again apprised in detail of the wrongdoing occurring at Universal and were asked to correct it.

209.    On May 8, 2015, as a follow-up to its April 8, 2014 letter, CtW wrote another letter to Defendant Herrell, Lead Independent Director and Chairman of the Audit Committee, which stated, in pertinent part:

> Since our letter to you dated April 8, 2014, UHS's River Point Behavioral Health facility in Florida has had payments from the Medicare and Medicaid programs suspended , a suspension that is still in effect. Moreover, the coordinated federal false claims investigation that we raised concerns over in our letter has now expanded its scope to 21 facilities, with subpoenas seeking records as far back as 2006. ***But most troubling of all, on March 31, 2015 UHS disclosed that the corporation as a whole is now subject to a criminal investigation led by the Department of Justice's Criminal Fraud Section.***
>
> ***Additionally, we have noticed that over the past five years, UHS has made substantial reductions to its reserve for general and professional liabilities.*** Due to these reductions, UHS's reserve balances are at an all-time low of 2.1% of total assets, or $192.9 million, while many of the company's peers have increased reserves from 2013 to 2014. Moreover, these reductions boosted UHS's earnings per share and enabled the company to meet or beat analyst consensus expectations in several of the corresponding periods. However, the risk inherent in these reserve reductions manifested in Q3 2014 when UHS recognized a material charge to earnings due to a larger than expected settlement. In the quarter leading

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

up to the settlement, the total amount accrued for UHS's professional and general liability claims was the lowest it had been in the past seven years.

*In light of these developments, it is incumbent upon you and your fellow directors to explain to shareholders what steps the board intends to take in order to minimize the exposure of long-term shareholders to the risks of regulatory enforcement and associated litigation, including risks associated with inadequate general and professional liability reserves.*

\* \* \*

*We are deeply disturbed by the developments at UHS over the past year, and by you and your fellow directors' failure to heed our warning that the risk of enforcement action was unnecessarily high.* We hope that you are now willing to undertake the steps necessary to protect long-term shareholders, and look forward to hearing your explanation of the board and Audit Committee's plan to improve regulatory oversight at the annual meeting.

**Expansion of Federal Investigation to UHS Itself**

In our letter dated April 8, 2014 we urged you and your fellow directors to take immediate steps to improve the UHS board's oversight of regulatory compliance, including the creation of a new, board-level committee charged with overseeing regulatory compliance and quality of care, a step that most of UHS's publicly-traded peers have already taken. We noted that multiple state and federal investigations of UHS facilities, together with the evident divergence of UHS's billing practices from those of its peers – which we illustrated in the case of a suicidal ideation diagnosis – suggested a substantial and unaddressed risk to long-term shareholders. In particular, we suggested that the board's lack of focus on overseeing regulatory compliance could result in significant and costly enforcement actions and settlements.

*In your response, you assured us that the board effectively oversees UHS's compliance program, that this program is robust, that our analysis of UHS billing practices did not imply any significant, unaddressed risks going forward, and that the creation of a separate, dedicated compliance committee was unnecessary. You also noted that "While a small minority of our facilities may encounter sporadic regulatory compliance issues, those matters are always remedied. UHS has never had a facility lose its license or Medicare/Medicaid certification."*

As noted above, shortly after we received your reply, UHS's River Point Behavioral Health facility in Florida had payments suspended by the Medicare and Medicaid programs, the federal false claims investigation was expanded to 21 facilities, and most recently, in March 2015, UHS disclosed that the corporation as a whole is now subject to a criminal investigation led by the Department of Justice's Criminal Fraud Section. Additionally, UHS disclosed that Rock River

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Academy is scheduled to close in Q2 2015 after the Illinois Department of Children and Family Services stopped placing juvenile wards in the facility.

These developments only reinforce the concerns we expressed in our letter last spring, that the Audit Committee of UHS lacks adequate focus on and experience with oversight of regulatory compliance, and that long-term shareholders would be better served if the board followed its peers and created a separate committee charged with overseeing compliance and quality of care. ***Given that it now appears that the Audit Committee has also tolerated questionable and risky changes in accounting practices, we are more convinced than ever that a restructuring of the board and its committees is necessary in order to protect the interests of long-term shareholders.***

\* \* \*

**Board Reform for UHS**

***In the year since our last communication, it has become evident that the risks to long-term UHS shareholders from the lack of effective oversight of regulatory compliance are if anything greater than we feared.*** Moreover, it appears that the Audit Committee has approved reserve accounting practices that led directly to a significant and surprising reduction in reported earnings for 2014 and that appear to have boosted reported earnings in several other reporting periods. As we have repeatedly noted, the tasks of regulatory compliance oversight and oversight of accounting and financial reporting controls and practices are each in themselves complex and if not executed effectively, creates significant risks for long-term shareholders. We urge you to step forward at this year's annual meeting and provide shareholders with a thorough explanation of the board and the Audit Committee's past decisions and current structure as they are relevant to the compliance and accounting concerns we have raised.

[Emphasis added in bold and italics].

210.    On May 19, 2015, Defendant Herrell responded to CtW's letter, opening with the salvo: "We recognize that your letter is a part of the SEIU's 'corporate campaign' against [Universal] rather than a good faith effort to further your stated goal of protecting long-term shareholders."  As with his response in 2014, Herrell again resisted any suggestion that Universal create a separate Board-level Compliance Committee, even though other healthcare companies had such committees.  He justified this distinction between Universal and its competitors by pointing to how the competitors were subjects of government investigations or settlements, while

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

simultaneously disclaiming the possibility that ongoing government investigations or settlements involving Universal implied any wrongdoing or need for reform. Otherwise, like his 2014 response, Defendant Herrell focused on disputing CtW's contentions, rather than affirmatively addressing its concerns or offering solutions to potential problems CtW identified.

211. On August 6, 2015, the Audit Committee, including Director Defendants Gibbs, Herrell, Hotz, and McDonnell, as well as Officer Defendants Boyle and Filton, met and reviewed the Company's Form 10-Q for the second quarter of 2015. Boyle "focused primarily on updating the status of certain matters, specifically the potential termination of Timberlawn's Medicare/Medicaid certification." These minutes also reflect that Director Defendants Herrell, Gibbs, Hotz, and McDonnell reviewed – and, per the responsibilities laid out in the Audit Committee Charter and the lack of any dispute raised in these minutes, it can be inferred that they also approved – the Company's public filings.

212. About one month later, on September 10, 2015, the Audit Committee, including Director Defendants Gibbs, Herrell, Hotz, and McDonnell, as well as Officer Defendants Boyle and Filton, met to discuss the fact that the Medicare Provider Agreement of Universal's Timberlawn facility had been terminated. Specifically, the minutes reveal:

> In response to the recent termination of Timberlawn's Medicare Provider Agreement, Karen Johnson, the Behavioral VP of Clinical Services, made a presentation regarding the circumstances that led to the termination and the corrective actions undertaken by the hospital. More broadly, Ms. Johnson made a presentation on clinical quality in the behavioral facilities. She reviewed the corporate clinical organization and described the oversight that they provided to the hospitals. She identified the various indicators/metrics that were tracked to insure quality care and patient satisfaction. She also described the process by which CMS and JCAHO survey the facilities. Ms. Johnson explained how the facilities prepare for these surveys and how they respond to any findings. She and Mr. Klein [the Company's General Counsel] also discussed the ongoing DOJ investigation of certain behavioral facilities.

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

213.   ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████ Timberlawn

announced its intention to close voluntarily on January 18, 2018, "just a week after state officials

threatened to shut down the century-old treatment center because it was too dangerous for

patients."[36]

214.   That same day, there was a meeting of the full Board, including all seven Director

Defendants, in addition to Officer Defendant Filton.  At the meeting, "Herrell provided an update

on the Audit Committee meeting held earlier that morning, indicating the Committee had

received a quality of care review on the Behavioral Division from Karen Johnson."  The minutes

continue, "[h]e said there was a general discussion of how the Company tracks and measures

quality and patient satisfaction. He also said there was a specific discussion over the events

leading to the termination of Timberlawn's Medicare Provider Agreement.

215.   On October 6, 2015, the executive-level Compliance Committee, including

Director Defendant Marc Miller and Officer Defendants Boyle and Filton, met ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[36]      Sue Ambrose, Sarah Mervosh, and Mile Moffeit, *Timberlawn psychiatric hospital to close Feb. 16 after safety violations*, THE DALLAS MORNING NEWS (Jan. 18, 2018), https://www.dallasnews.com/news/investigations/2018/01/18/dmn-investigates-troubled-timberlawn-psychiatric-hospital-closing-before-state-can-shut.

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

216.

217.     On November 5, 2015, the Audit Committee, including Director Defendants Gibbs, Herrell, Hotz, and McDonnell, as well as Officer Defendants Boyle and Filton, reviewed a draft of the Company's Form 10-Q for the third quarter of 2015. Filton "noted one change to the disclosures in the Legal Proceedings section regarding the receipt of a letter by several of [the Company's] behavioral hospitals in Pennsylvania demanding a recoupment of certain Medicaid



THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

payments."   These minutes also reflect that Director Defendants Gibbs, Herrell, Hotz, and McDonnell reviewed – and, per the responsibilities laid out in the Audit Committee Charter and the lack of any dispute raised in these minutes, it can be inferred that they also approved – the Company's public filings.

218.



[38] the Compliance Committee would have reviewed data specific to the 217 behavioral health facilities that Universal owned and/or operated at that time,[39]                              :

a.

b.

c.

d.

e.

---

[38]

[39]       As revealed in the Form 10-Q for the period ending September 30, 2015, filed on November 6, 2015.

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

f. ██████████████████████████████

████████████████████

g. ██████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████

h. ██████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████

i. ██████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████

j. ██████████████████████████████

████████████████████████████████████

████████████████████████████

219. ██████████████████████████████

██████████████████████████████████████

████████████████████████████████████

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

- ███████████████████████████████████
- ████████████
- █████████████
- ██████████
- ████████████████████████████████████████████████
- ████████████████
- ████████████████
- ████████████████████████████
- ███████████
- ██████████████████████████████████████████████████████
- ██████████
- ████████████████████████
- ████████████████
- ████████████████████████████████
- ████████████████████████████
- ██████████████
- ████████████

220.   On November 18, 2015, the Audit Committee, including Director Defendants Gibbs, Herrell, Hotz, and McDonnell, and Officer Defendants Boyle and Filton, met and received a presentation from Caponi "on the Company's compliance program and compliance hotline procedures. Committee members requested that certain of the compliance reporting data be presented in graphic format at the next meeting." ██████████████████████████

██████████████████████████████████████████████████████████

████████

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

221.    On the same date, there was a meeting of the full Board, including all seven Director Defendants, in addition to Officer Defendant Filton.  At the meeting, Herrell reported on the Audit Committee's meeting and its ████████████████████████████████ ████████████████████████████████████████████

222.    On March 23, 2016, a regular meeting of the Board was held, including Director Defendants Alan Miller, Gibbs, Herrell, Hotz, McDonnell, Marc Miller, and Pantaleoni, in addition to Officer Defendants Filton and Osteen.  The Company's General Counsel "presented an update on the DOJ-OIG investigation of the Behavioral Division. He updated the Board on the progress of the investigation and answered questions from various Board members."  The minutes reflect that the Board did not discuss the Company's compliance procedures and controls at all.

223.    On March 30, 2016, CtW again wrote to Defendant Herrell about their concerns regarding "*troubling trends in [Universal's] billing practices*."  [Emphasis added].  This time, CtW highlighted "surprisingly high rates of Medicare patients being admitted to Inpatient Rehabilitation Facilities ('IRFs') upon acute discharge[.] . . . Our analysis suggests that [Universal] *may have received around $106M in overpayments from Medicare* for potentially unnecessary IRF admissions during Federal Fiscal years ('FFY') 2010 through 2014."  [Emphasis added].  CtW then stressed the need for Universal to be mindful of regulatory and reputational risks since Universal "is already the subject of a corporate-level investigation by the Department of Justice Criminal Frauds Section" and expressed "disappoint[ment]" in the lack of "any meaningful steps" toward creating a "dedicated compliance and quality of care committee" by the Board.

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

224.    CtW, in its March 30, 2016 letter, highlighted the fact that Universal had "double the national average from FFY 2010 through 2014" of IRF post-acute-care admissions rates, and Universal's IRF transfer rate was increasing even as the national average remained flat:



225.    Moreover, CtW pointed out that 12 out of Universal's 20 facilities rank in the top 20% nationwide in terms of IRF transfers, and this "unusual pattern raises concerns related to whether patients are receiving the levels of care that best suit their condition – especially given the intense rehabilitation that the IRF setting is intended to provide."   CtW noted that this practice inured to Universal's financial benefit, since the Company's own IRF units received most of the transfers.   CtW questioned whether Universal's high IRF transfer rate reflected actual medical necessity and further raised concern about the quality of patient care.

226.    Moreover, CtW highlighted the fact that two hospital systems had recently settled with the DOJ[40] regarding alleged FCA violations related to suspect IRF admissions, yet those two systems both had far lower IRF admissions than Universal.

---

[40]    Tenet Healthcare for $42 million and Carondelet Health Network for $35 million.

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

227.    After detailing its concerns, CtW concluded by observing that "the emerging best-practice among publicly traded hospital companies is to delegate oversight of regulatory compliance and quality of patient care to a dedicated committee comprised of clearly qualified and genuinely independent directors."   CtW stressed that its "analysis of [Universal's] IRF-related practices only heightens our concern with the effectiveness of the board's current structure."   CtW explained that "the high level of regulator interest in ensuring that only medically necessary IRF transfers take place" highlighted the need for the Board "to ensure that [Universal's] unusual and surprisingly high levels of IRF utilization are carefully examined[,]" and the Board "act with much greater alacrity to address its increasingly outmoded structure, and create a dedicated compliance and patient care committee."

228.    On April 12, 2016, the executive-level Compliance Committee, including Director Defendant Marc Miller and Officer Defendants Boyle and Filton, met █████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

229.    Appealing to the Board's previous request for graphical depictions of certain compliance data, the minutes from the April 12, 2016 executive-level Compliance Committee meeting also include the following chart showing ████████████████████████

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

The minutes further note that ███████████████████████████████

230. ███████████████████████████████████████

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

231.   In addition, the minutes include a discussion about ███████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

232.   On July 12, 2016, the executive-level Compliance Committee, including Director

Defendant Marc Miller and Officer Defendants Boyle and Filton, met and ███████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████

233.   ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

234.   Likewise, the minutes disclose that ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



235.

**G.    Not Even the *BuzzFeed* Exposé Could Spur the Board into Action**

236.    Following publication of the *BuzzFeed* Exposé, the full Board, including all Director Defendants, met at a Special Meeting on December 14, 2016, attended also by Officer Defendants Filton and Osteen.  At this meeting, the entire Board discussed the publication of the Exposé, which had been "previously provided to the Board."  Further, the heavily redacted minutes reflect that no discussion about compliance reform ensued.

237.    On January 23, 2017, Universal's executive-level Compliance Committee met to review a breakdown of hotline complaint calls Universal received in 2016, as well as to receive an update on the coordinated government investigations.  In attendance were Director Defendant Marc Miller, Officer Defendants Boyle and Filton, Caponi, Johnson, and Klein.

238.    For the fourth quarter of 2016,

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

239. ███████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████ [41] the Compliance

Committee would have reviewed data showing ██████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

240. ██████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

- ████████████████

- ███████████████████████

- ██████████████████

---

[41] ████████████████████████████████████

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

- ▪ ███████████████████
- ▪ █████████████
- ▪ ████████████████████████
- ▪ ████████████████████████
- ▪ ██████████████████████
- ▪ █████████████
- ▪ ██████████████
- ▪ ████████████████
- ▪ ██████████████████████████████
- ▪ ███████████
- ▪ █████████████████████████████████████████
- ▪ ███████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

241.    Moreover, the Compliance Committee would also have reviewed data in reference to the 232 behavioral health facilities that Universal owned and/or operated at that time,[42] ███████████████████████

      a.    ████████████████████████████████████

████████████████████████████████████████████████

██████████████

---

[42]    As revealed in the Form 10-Q for the period ending September 30, 2016, filed on November 8, 2016.

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

b. █████████████████████████████

████████████████████████████████

██████████████████

c. █████████████████████████████

████████████████████████████████

███████████████████████████████

d. █████████████████████████████

████████████████████████████████

███████████████████████

e. ████████████████████████

f. ███████████████

g. ████████████████

h. █████████████████████████████

████████████████████████████████

████████████████████

i. █████████████████████████████

████████████████████████████████

████████████████████████████████

█████████████

j. █████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

███████████████████████████████████████████████████

██████████████

    k.   ███████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

242.   Incredibly, despite facing widespread negative publicity from *BuzzFeed*'s coverage, which spanned from December 2016 through July 2018, the Individual Defendants ignored red flags and caused Universal to actively deny wrongdoing and obstruct the flow of information to stockholders by publishing "alternative facts" on various websites.

243.   Likewise, they failed to appropriately respond to the serious noncompliance issues raised in each of the shareholder letters received to date, prompting yet another letter addressed to Defendant Herrell from CtW on March 28, 2017.  CtW again raised concerns about compliance oversight at the Company.   It also noted the Board's retrenchment and anti-shareholder policies, and stated, in pertinent part:

> ***While we and other shareholders have repeatedly urged you to modernize the entrenched and unaccountable character of UHS's governance practices, while also constructively addressing UHS mounting legal woes, these efforts appear to have fallen on deaf ears.*** Consequently, unless the board publicly commits to the governance changes we and other shareholders have urged upon you, we will not support the re-election of Lawrence Gibbs as a director at UHS's 2017 annual meeting.

* * *

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

**Our Previous Communications and the Burgeoning Federal Investigation**

*We first wrote to you three years ago to express concern over the coordinated federal investigation being undertaken by the Office of the Inspector General for the Department of Health and Human Services and the Department of Justice's Criminal Fraud Section.* This investigation prompted the issuance of [a] series of subpoenas from February 2013 through July 2013, including at least 10 separate UHS facilities, as disclosed by UHS in November 2013. We noted in our April 2014 letter that UHS's admissions practices – in particular the frequency with which patients were admitted with a suicidal ideation diagnosis - diverged from its competitors, and that such admissions rose sharply in former Psychiatric Services ("PSI") facilities following UHS's acquisition of that company in 2010. We urged the board to address the risk of an adverse enforcement action by creating a new board level committee charged with overseeing legal and regulatory compliance.

*The following year, after UHS disclosed that the Federally led criminal investigation was expanded to an additional 11 facilities, that one of its facilities subject to this investigation had Medicare and Medicaid payments suspended, and most importantly that the corporation as a whole is now subject to this criminal investigation, we wrote to you again, this time noting that over the prior two years, UHS's reserve for professional and general liabilities had been falling sharply relative to its overall assets.* We expressed the concern that reducing this reserve seemed imprudent in light of the scrutiny focused on the company, while also noting the implausibility of the company's explanation for the methodological changes through which it explained this reduction. *Moreover, we pointed out that in a then recent settlement, UHS had incurred costs well in excess of its expectations, and had to report a $44 million charge to reflect the lack of adequate provisioning for this liability. We again urged the board to create a new committee charged with overseeing legal and regulatory compliance.*

\* \* \*

*Throughout this engagement, we have urged the board to proactively address what appeared to us to be significant signs of vulnerability to regulatory enforcement actions and related liabilities. Unfortunately, to date the board had taken no action, and now the company is mired in an apparently serious, corporation-wide criminal investigation.* Its admissions practices have been the subject of investigative reports that have drawn additional public scrutiny, and it continues to maintain a level of professional and general liability reserves well below that of its competitors. In the following sections we update the analysis of inpatient psychiatric admissions, inpatient rehabilitation facility transfers from acute care hospitals, and UHS's professional and general liability reserves.

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

**UHS Psychiatric Facilities Inpatient Admissions Diverge Sharply From Competitors**

As we noted in our April 2014 letter, a former UHS psychiatrist alleged that UHS manipulates patient diagnosis and treatment decisions in order to increase admissions and maintain a high occupancy level. This psychiatrist specifically identified excessive use of the suicidal ideation diagnosis, and the prescription of unnecessarily expensive pharmaceuticals – which many patients would be unable to afford, causing them to become non-compliant with discharge instructions and establishing an acceptable basis for future readmission. In your response to this letter, you noted that suicidal ideation diagnosis does not increase payment rates from payers such as Medicare. However, UHS executives have identified maintaining a high occupancy level as beneficial to the company's profitability; for example, CFO Steve Filton told a J.P. Morgan investor conference in 2014 that "We operate this business at fairly high occupancy rates and operating margins. I think those two things are tied together."

Our letter also provided a summary of Medicare data that in fact UHS free-standing inpatient psychiatric facilities do utilize suicidal ideation code much more frequently tha[n] comparable facilities owned and operated by competitors. In addition, we noted that following the acquisition of PSI in 2010, the suicidal ideation utilization rate at PSI facilities increased dramatically, from below the average for non-UHS facilities, to many times that average. We also noted that between 2010 and 2012, the percentage of PSI facilities that utilized the suicidal ideation code at a frequency placing them in the 80th percentile nationally or higher, increased from 13.4% to 71%.

***With three years' worth of additional data available, we can see that the trends we observed in 2014 have continued unabated. As we can see in Figure 1, UHS freestanding psychiatric facilities have continued to admit patients under a suicidal ideation diagnosis much more frequently than its competitors.***



THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

In addition to our concerns about UHS's excessive suicidal ideation rates, we have also identified additional coding and utilization patterns that potentially lead to higher admission and occupancy rates. Figure 2 demonstrates that, especially since 2011, UHS freestanding psychiatric facilities admit patients with a history of past non-compliance with post-discharge instructions at a dramatically higher rate than non-UHS psychiatric facilities. This data appears to be consistent with the allegation that post-discharge instructions from UHS facilities may be objectively more difficult for patients to comply with, resulting in a higher rate of future readmissions.



And Figure 3 shows that, in fact, UHS does exhibit a much higher rate of readmission within 30 days of discharge than other facilities.

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



While Medicare reimbursement penalties are not currently assessed on psychiatric facilities with high readmission rates, we nevertheless believe that such a high readmission rate strongly suggests that there are reasonable grounds to be concerned that quality of care issues could pose risks for the company and for shareholders. ***When combined with the ongoing high utilization of the suicidal ideation diagnosis and the high non-compliance rate, and the associated whistleblower allegations, this data suggests that UHS's high overall occupancy levels may be a source of investor risk, rather than an unambiguous positive for the company.***

Furthermore, CFO Filton has in the past noted that additional days for current stays may be just as good – if not preferable – to a new admission for UHS, saying, "If you can get paid for an increased days [sic], it's easier and cheaper than generating another admission." In fact, the per diem rates paid by Medicare include a multiplicative factor that gradually reduces actual payments below the base rate after 10 days. Figure 4 compares the frequency of different lengths of stay in UHS facilities to other privately operated free-standing psychiatric facilities, and there appears to be a clear clustering of above average frequency at UHS for lengths of stay between 5 and 13 days.

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



*This picture seems much too close for comfort to what we would expect to see if health care decisions were being made at UHS psychiatric facilities based on the desire to maintain high occupancy and high margins, rather than ensuring either the best possible care or fulsome compliance with law and regulation.*

*Three years after we raised concerns with you over the clear and increasing divergence between admissions practices at UHS and its competitors, this divergence and the risks it indicates for shareholders have not abated.* Instead, these large differentials have persisted and may have grown. Given the Federally-led investigation of UHS, allowing these divergent practices – and even encouraging them, as CFO Filton appears to have done – generates unacceptable risks of adverse enforcement actions against the company.

* * *

**Shrinking Reserves While Liabilities Grow**

*As we pointed out in our March 2015 letter, the combination of an ongoing, multi-agency Federal criminal investigation of the company with clear empirical indicators of compliance risk affecting both the psychiatric and acute care segments should at the very least result in a stable allocation of resources toward reserves against adverse enforcement actions, settlements, or litigation outcomes.* But far from increasing its reserves for professional and general liability, since 2010 UHS has been sharply reducing this reserve even as its self-insured claims have grown and its settlement payments have increased. This has resulted in a 28% drop in the balance of UHS's professional and general liability reserve. *Since 2014, UHS's professional and general liability reserve has fallen*

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

*to 2% of total assets, by far the lowest relative reserve level of all the publicly traded hospital companies.*

Figure 10 illustrates the simultaneous decline in professional and general liabilities, even as the settlements paid by the company out of this reserve have grown.



**Figure 10: UHS Professional and General Self-Insurance Liability Reserves**

\* \* \*

**Governance Reform and New Directors Needed to Protect Shareholders' Investment**

Since UHS disclosed on March 31, 2015 that the corporation as a whole was subject to a criminal investigation led by the Department of Justice's Criminal Fraud Section, its share price has moved sideways even as the broad market has steadily risen. ***We believe that shareholders such as ourselves have justified concerns that this investigation will generate adverse consequences for UHS***, whether in the form of regulatory enforcement actions, financial settlements, or private litigation. We are convinced that the looming risks facing UHS could have been ameliorated or even avoided if the company had been willing to adopt the governance changes enacted by its competitors over the past decade, including the creation of a separate board committee charged with overseeing regulatory compliance and quality of patient care. The board's unwillingness to adopt such a change –despite Chairman and CEO Miller's statement at the 2015 annual meeting that the board would consider it – seems sadly consistent with UHS's general approach to corporate governance and shareholder accountability.

***UHS has what is in our experience a uniquely entrenched governance structure. In addition to having a classified board – an increasingly endangered species in US markets – UHS divides its shares into four classes, of which only***

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

***one (the class B or public shares) provides voting power proportional to economic exposure.*** The other three classes all provide their holders, when voting on matters other than director elections, with voting power equal to 10, 100, or 1000 times that of the public shareholders, and these classes of shares are overwhelmingly held by company insiders, including Chairman and CEO Miller. But even beyond these entrenchments, UHS also divides its already classified directors so that only two of the seven board members are even subject to elections in which the outside, public shareholders have a vote. Consequently, public shareholders have an effective opportunity to oppose an incumbent director only twice every three years.

It is long past time for UHS to modernize its board of directors by eliminating these entrenching mechanisms and ensuring that all directors are accountable to all shareholders on an annual basis, while also establishing that voting power among shareholders must be proportional to economic exposure. While we appreciate Mr. Millers' past contributions as founder of the company, the fact remains that he chose to sell the vast majority of his economic stake in the company to the investing public. UHS has for many years now been included in many popular equity indexes, and so many of its shareholders – including the funds we work with – will obtain stakes in the company through passively-managed index funds. ***As a consequence, UHS cannot defend its governance practices by claiming that shareholders accepted its peculiar institutions when they chose to purchase shares: first, because many if not most shareholders have obtained that exposure through a mechanical (index) rather than discretionary mechanism, and second because even if a shareholder had consented to this dog's breakfast of a governance structure in the past, subsequent events – including those described in this letter – have demonstrated just how inadequate it is as a defense against excessive and unnecessary risk.***

We have repeatedly engaged you in an effort to convince the UHS board to undertake this much needed modernization proactively. We have hoped that you and your fellow directors would recognize the benefits that an open and democratic governance structure would provide both for outside shareholders but also for the corporation itself. Unfortunately, and despite occasional contrary indicators, the board has failed to act and the problems fester. If the board does not publicly commit to modernizing its structure prior to issuing its proxy statement for this years' annual meeting, we will publicly oppose Mr. Gibbs['s] candidacy for re-election.

[Emphasis added in bold and italics].

244.   Despite these repeated exhortations for reform at Universal, the Board has obstinately failed to implement any meaningful change.  On April 21, 2017, CtW wrote a letter to fellow Universal shareholders asking them to withhold support for the re-election of

- 114 -
THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Defendant Gibbs at the Company's annual meeting on May 17, 2017.   Unfortunately for stockholders, the Company had already incurred significant damages as a result of the continuing and obdurate mismanagement and disloyal oversight of the Director Defendants.

## VII.   MARKET PRICE OF UNIVERSAL COMMON STOCK WAS INFLATED BY FALSE UNIVERSAL FINANCIAL REPORTS, PROMPTING THE FILING OF A SECURITIES FRAUD CLASS ACTION AGAINST THE COMPANY

245.   While the Individual Defendants caused the Company to manipulate the patient admissions process at its facilities, hold patients beyond lengths medically necessary, critically understaff those facilities and otherwise cut costs while sacrificing patient care, and submit fraudulent reimbursements for such "services" in violation of the FCA, they also failed to disclose any such material information to the Company's shareholders.   As such, the Individual Defendants were, and are, responsible to the Company for failing to accurately portray the Company's financial position, in violation of §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder, and have exposed the Company to additional costs incurred as a result of such misrepresentations.

246.   In December 2016, the Securities Class Action was filed against the Company. Through the Securities Class Action, another Universal shareholder seeks to recover from damages suffered due to a "precipitous decline in the market value of the Company's Class B common stock" on behalf of a class of Company shareholders for misrepresentations made by the Company between February 26, 2015 and December 7, 2016 in public filings the Company made with the SEC.

247.   The Securities Class Action alleges that, in the annual Form 10-Ks filed with the SEC on February 26, 2015 and February 25, 2016, as well as the quarterly Form 10-Qs filed with the SEC on May 6, August 5, and November 8, 2016, the Company misrepresented that it:

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

a.      had effective internal controls over financial reporting and that its disclosure controls and procedures were effective;

b.      was focused on "long-term results" for investors, including providing "superior healthcare services" through a commitment to "service excellence," "continuous improvement in measurable ways," "employee development," and "ethical and fair treatment";

c.      had "a comprehensive ethics and compliance program that is designed to meet or exceed applicable federal guidelines and industry standards[,]" and the Company believed it complied with regulations governing the healthcare industry; and

d.      had no changes in internal control over financial reporting or in "other factors" over the period of its financial reports that had materially affected, or were reasonably likely to materially affect, its internal control over financial reporting.

248.   The Securities Class Action alleges that the foregoing statements were materially false and misleading because they misrepresented and failed to disclose known adverse facts pertaining to the Company's business operations and financial results, including the failure to disclose that: (1) Universal admitted patients based on its own financial considerations and not upon the medical necessity of the patient; (2) Universal would keep patients admitted until their insurance payments ran out in order to ensure the maximum payment for its "services"; (3) as a result, Universal's revenues from inpatient care relied on unsustainable practices; (4) in turn, Universal lacked effective internal controls concerning its practices and policies of admitting patients; and (5) as a result, Universal's public statements were materially false and misleading at the times they were made.

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

249.    When the Exposé was published and made these falsities clear, the Company's inflated stock price fell nearly 12%, losing $1.45 billion in market cap in a single day. Unfortunately, the Individual Defendants caused the Company to repurchase its own shares before the truth came to light and also sold a large portion of their own shares into the open market, all while knowing that the Company's financial statements were false.

250.    During the February 24, 2015 Audit Committee Meeting, Director Defendants Gibbs, Herrell, Hotz, and McDonnell, as well as Officer Defendants Boyle and Filton, reviewed and approved the false and misleading Form 10-K, which was filed with the SEC on February 26, 2015.  All Director Defendants, as well as Officer Defendant Filton, signed the February 26, 2015 Form 10-K.

251.    During the February 24, 2016 Audit Committee meeting, Director Defendants Gibbs, Herrell, Hotz, and McDonnell, and Officer Defendants Boyle and Filton, reviewed and approved the false and misleading Form 10-K, which was filed with the SEC on February 25, 2016.  All Director Defendants, as well as Officer Defendant Filton, signed the February 25, 2016 Form 10-K.

## VIII.    INSIDERS UNLOAD MILLIONS OF DOLLARS IN STOCK

252.    From January 16, 2013 to March 8, 2017, in further breach of their fiduciary duties, having placed their own financial interests ahead of Universal and Universal's stockholders, Individual Defendants Alan Miller, Marc Miller, Pantaleoni, Herrell, Hotz, Gibbs, Filton, Osteen, and Pember (hereinafter, the "**Insider Trading Defendants**") collectively sold $29,683,911.13 of Universal common stock while in possession of material non-public information.  These sales placed the Insider Trading Defendants' shares onto the open market at artificially inflated prices at a time when the Board was causing the Company to repurchase

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

those shares.  As a result, Universal overpaid by more than an estimated $29.7 million for those shares.

253.    Furthermore, in July 2014, and again in February 2016, the Director Defendants twice authorized the repurchase of up to $400 million worth of publicly traded Universal common stock on the open market for a total of up to $800 million worth of shares.  The Company repurchased more than 4.3 million Universal shares, resulting in an estimated overpayment of around $29.7 million.

254.    The Insider Trading Defendants knew about the Company's systemic practice of inappropriate patient admissions, improper staffing, and false claims submissions. Consequently, they were aware that the Company was defrauding the U.S. and individual state health care systems due to their illicit over-admitting of patients and fraudulent billing of Medicare and Medicaid for the purported services rendered.  The Insider Trading Defendants knew that they were thereby creating substantial litigation risk for the Company, but did not disclose this risk, nor their underlying wrongdoing, to the public.  It was not until December 7, 2016, when the Exposé was published detailing the extent of the Company's illicit schemes, that the Company's overarching pattern of FCA violations were made visible to the public markets.

255.    As knowing participants in the illicit scheme to over-admit patients, retain patients for specific periods coextensive with insurance payouts without regard for actual treatment needs, provide substandard care, and make false representations regarding that care for Medicare and Medicaid reimbursement in violation of the FCA and state analogues, the Insider Trading Defendants were in possession of material non-public information and were prohibited from trading Company stock until such information was revealed to the public.  The Insider Trading Defendants were, therefore, prohibited from trading Company stock on the basis of non-

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

public adverse information about the illicit scheme that exposed the Company to extraordinary financial risk.

256.    In addition to the criminal scheme generally, the Insider Trading Defendants were also aware of specific material facts that were not disclosed to the public, including the fact that Universal was improperly recognizing millions of dollars of net patient revenues derived through the practice of illicitly over-admitting patients, providing substandard care through employees not licensed to provide such care, and billing the U.S. government in violation of the FCA. Furthermore, the Insider Trading Defendants knew that the Company's controls were ineffective to identify these problems and enforce compliance with the law, rendering the Company's financial statements – including revenues derived from Medicare and Medicaid and the profits reported on those revenues – materially false and misleading.

257.    In the face of subpoenas from the OIG and DOJ, as well as shareholder letters demanding corporate governance reform, including the establishment of a seperate Board-level Compliance Committee and the elimination of the protective measures designed to entrench the Board, the Company did nothing substantive to rectify or disclose these issues.

258.    Given their knowledge of the Company's extensive noncompliance with Medicare and Medicaid billing laws and guidelines, and the active, ever-expanding coordinated government investigation, the Company's annual reports to shareholders from 2013 to 2016 were false in stating that Universal "believe[d] [that its] facilities [we]re in substantial compliance with current applicable federal, state, local and independent review body regulations and standards." Each of the Company's quarterly financial reports during the Relevant Period also incorporated these statements by reference.

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

259.    The Insider Trading Defendants were thus in possession of material non-public information and, therefore, were prohibited from trading Company stock until such information was revealed to the public.

260.    Director Defendants Gibbs, Herrell, Hotz, and McDonnel, as well as Officer Defendants Boyle and Filton, reviewed and approved the Company's false and misleading Form 10-Ks, filed with the SEC on February 26, 2015 and February 25, 2016, in addition to the Form 10-Qs filed with the SEC on May 6 and August 5, 2016.

261.    Each of the false and misleading quarterly financial reports issued during the Relevant Period was signed by Defendants Alan Miller and Filton and included certifications pursuant to the Sarbanes Oxley Act of 2002, stating that management had reviewed the Company's internal controls and that they were effective to ensure that material information was being recorded, processed, summarized, and reported by management on a timely basis in order to comply with Universal's disclosure obligations under the Exchange Act, as amended, and the SEC rules promulgated thereunder.

262.    Each of the false and misleading annual financial reports issued during the Relevant Period (for fiscal years 2014 and 2015) were signed by all Director Defendants, as well as Officer Defendant Filton.

263.    The Insider Trading Defendants' efforts to artificially inflate the market price of Universal common stock through a pattern and practice of illicit over-admissions and provision of care below regulatory minimums in violation of the FCA, not to mention their false and misleading financial reporting, had its intended effect.  From January 16, 2013 to December 6, 2016, the Company's stock price rose from $52.63 to $126.16, representing a 240% increase.

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

264.    The following chart summarizes the dates upon which Defendant Alan Miller divested, as well as the total proceeds from such trades:

| Defendant Alan B. Miller | | | |
|---|---|---|---|
| Date | Shares | Price | Proceeds |
| 12/12/13 | 5,000 | $80.75 | $403,750.00 |
| 12/13/13 | 5,000 | $80.7632 | $403,816.00 |
| 9/12/14 | 2,000 | $113.4475 | $226,895.00 |
| 12/5/14 | 33,228 | $107.51 | $3,572,342.28 |
| 12/11/14 | 7,000 | $108.40 | $758,800.00 |
| **Total Proceeds** | | | **$5,365,603.28** |

Alan Miller's sales were inconsistent with past trading patterns and suspicious in their timing and amount.  Alan Miller sold his shares, placing them into the open market, at artificially inflated prices and at a time when the Board was causing the Company to repurchase those same shares. As a result, it is estimated that the Company overpaid for these and other shares by more than more than $29.7 million.  In placing his own financial interest ahead of the interests of both Universal and its shareholders, Alan Miller wrongfully and illicitly profited from his knowledge of the Individual Defendants' and the Company's wrongdoing to the detriment of both Universal and its shareholders.

265.    The following chart summarizes the dates upon which Defendant Marc Miller divested, as well as the total proceeds from such trades:

| Defendant Marc D. Miller | | | |
|---|---|---|---|
| Date | Shares | Price | Proceeds |
| 12/13/13 | 863 | $80.8565 | $69,779.16 |
| 12/13/13 | 863 | $80.8565 | $69,779.16 |
| 12/13/13 | 4,137 | $80.8855 | $334,623.31 |
| 12/13/13 | 4,137 | $80.8855 | $334,623.31 |
| 5/14/14 | 8,477 | $85.8837 | $728,036.12 |
| 9/12/14 | 2,000 | $111.6543 | $223,308.60 |
| 9/12/14 | 2,000 | $111.664 | $223,328 |
| 9/12/14 | 2,000 | $111.6485 | $223,297 |
| **Total Proceeds** | | | **$2,206,774.06** |

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Marc Miller's sales were inconsistent with past trading patterns and suspicious in their timing and amount.  Marc Miller sold his shares, placing them into the open market, at artificially inflated prices and at a time when the Board was causing the Company to repurchase those same shares.  As a result, it is estimated that the Company overpaid for these and other shares by more than $29.7 million.  In placing his own financial interest ahead of the interests of both Universal and its shareholders, Marc Miller wrongfully and illicitly profited from his knowledge of the Individual Defendants' and the Company's wrongdoing to the detriment of both Universal and its shareholders.

266.    The following chart summarizes the dates upon which Defendant Pantaleoni divested, as well as the total proceeds from such trades:

| Defendant Anthony Pantaleoni | | | |
|---|---|---|---|
| *Date* | *Shares* | *Price* | *Proceeds* |
| 3/5/14 | 19,942 | $80.819 | $1,611,692.50 |
| 5/6/15 | 862 | $116.184 | $100,150.61 |
| 5/8/15 | 7,700 | $120.078 | $924,600.60 |
| 5/5/16 | 6,995 | $133.51 | $933,902.45 |
| **Total Proceeds** | | | **$2,636,443.71** |

Pantaleoni's sales were inconsistent with past trading patterns and suspicious in their timing and amount.  Pantaleoni sold his shares, placing them into the open market, at artificially inflated prices and at a time when the Board was causing the Company to repurchase those same shares.  As a result, it is estimated that the Company overpaid for these and other shares by more than $29.7 million.  In placing his own financial interest ahead of the interests of both Universal and its shareholders, Pantaleoni wrongfully and illicitly profited from his knowledge of the Individual Defendants' and the Company's wrongdoing to the detriment of both Universal and its shareholders.

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

267.     The following chart summarizes the dates upon which Defendant Herrell divested, as well as the total proceeds from such trades:

| Defendant John H. Herrell | | | |
|---|---|---|---|
| *Date* | *Shares* | *Price* | *Proceeds* |
| 3/6/14 | 6,500 | $80.2626 | $521,706.90 |
| 3/4/15 | 6,000 | $115.1651 | $690,990.60 |
| 12/14/15 | 1,200 | $117.38 | $140,856.00 |
| 5/11/16 | 6,000 | $136.09 | $816,540.00 |
| **Total Proceeds** | | | **$2,170,093.50** |

Herrell's sales were inconsistent with past trading patterns and suspicious in their timing and amount.  Herrell sold his shares, placing them into the open market, at artificially inflated prices and at a time when the Board was causing the Company to repurchase those same shares.  As a result, it is estimated that the Company overpaid for these and other shares by more than $29.7 million.  In placing his own financial interest ahead of the interests of both Universal and its shareholders, Herrell wrongfully and illicitly profited from his knowledge of the Individual Defendants' and the Company's wrongdoing to the detriment of both Universal and its shareholders.

268.     The following chart summarizes the dates upon which Defendant Hotz divested, as well as the total proceeds from such trades:

| Defendant Robert H. Hotz | | | |
|---|---|---|---|
| *Date* | *Shares* | *Price* | *Proceeds* |
| 6/6/14 | 4,000 | $94.7501 | $379,000.40 |
| 7/31/14 | 5,000 | $106.85 | $534,250.00 |
| 7/31/14 | 100 | $106.9701 | $10,697.01 |
| 7/31/14 | 700 | $106.97 | $74,879.00 |
| 7/31/14 | 200 | $106.985 | $21,397.00 |
| 7/31/14 | 6,000 | $106.98 | $641,880.00 |
| 8/1/14 | 6,804 | $107.00 | $728,028.00 |
| 5/28/15 | 100 | $129.5356 | $12,953.56 |
| 5/28/15 | 904 | $129.506 | $117,073.42 |
| 5/28/15 | 1,454 | $129.466 | $188,243.56 |
| 3/8/16 | 7,077 | $113.064 | $800,153.93 |
| **Total Proceeds** | | | **$3,508,555.88** |

- 123 -
THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Hotz's sales were inconsistent with past trading patterns and suspicious in their timing and amount. Hotz sold his shares, placing them into the open market, at artificially inflated prices and at a time when the Board was causing the Company to repurchase those same shares. As a result, it is estimated that the Company overpaid for these and other shares by more than $29.7 million. In placing his own financial interest ahead of the interests of both Universal and its shareholders, Hotz wrongfully and illicitly profited from his knowledge of the Individual Defendants' and the Company's wrongdoing to the detriment of both Universal and its shareholders.

269.    The following chart summarizes the dates upon which Defendant Gibbs divested, as well as the total proceeds from such trades:

| Defendant Lawrence S. Gibbs | | | |
|---|---|---|---|
| Date | Shares | Price | Proceeds |
| 3/7/14 | 1,672 | $80.3268 | $134,306.41 |
| 7/31/14 | 1,000 | $107.1167 | $107,116.70 |
| 3/4/15 | 4,541 | $115.3167 | $523,653.13 |
| 5/28/15 | 1,393 | $129.6162 | $180,555.37 |
| 3/8/16 | 6,000 | $112.135 | $672,810.00 |
| **Total Proceeds** | | | **$1,618,441.61** |

Gibbs' sales were inconsistent with past trading patterns and suspicious in their timing and amount. Gibbs sold his shares, placing them into the open market, at artificially inflated prices and at a time when the Board was causing the Company to repurchase those same shares. As a result, it is estimated that the Company overpaid for these and other shares by more than $29.7 million. In placing his own financial interest ahead of the interests of both Universal and its shareholders, Gibbs wrongfully and illicitly profited from his knowledge of the Individual Defendants' and the Company's wrongdoing to the detriment of both Universal and its shareholders.

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

270.    The following chart summarizes the dates upon which Defendant Filton divested, as well as the total proceeds from such trades:

**Defendant Steve Filton**

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| 6/2/16 | 15,000 | $136.01 | $2,040,150.00 |
| 3/8/17 | 10,000 | $123.795 | $1,237,950.00 |
| **Total Proceeds** | | | **$3,278,100.00** |

Filton's sales were inconsistent with past trading patterns and suspicious in their timing and amount.  Filton sold his shares, placing them into the open market, at artificially inflated prices and at a time when the Board was causing the Company to repurchase those same shares.  As a result, it is estimated that the Company overpaid for these and other shares by more than $29.7 million.  In placing his own financial interest ahead of the interests of both Universal and its shareholders, Filton wrongfully and illicitly profited from his knowledge of the Individual Defendants' and the Company's wrongdoing to the detriment of both Universal and its shareholders.

271.    The following chart summarizes the dates upon which Defendant Osteen divested, as well as the total proceeds from such trades:

**Defendant Debra K. Osteen**

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| 5/21/14 | 1,500 | $88.4247 | $132,637.05 |
| 5/21/14 | 1,500 | $88.3601 | $132,540.15 |
| 5/21/14 | 1,500 | $88.3148 | $132,472.20 |
| 5/21/14 | 1,500 | $88.3532 | $132,529.80 |
| 5/21/14 | 1,121 | $88.3963 | $99,092.25 |
| 5/27/15 | 3,300 | $130.59 | $430,947.00 |
| 5/27/15 | 4,016 | $130.71 | $524,931.36 |
| 5/27/15 | 461 | $130.59 | $60,201.99 |
| 5/27/15 | 100 | $130.63 | $13,063.00 |
| 5/27/15 | 700 | $130.59 | $91,413.00 |
| 6/10/15 | 1,305 | $131.3797 | $171,450.51 |
| 6/10/15 | 360 | $131.375 | $47,295.00 |
| 6/10/15 | 200 | $131.36 | $26,272.00 |
| 6/10/15 | 199 | $131.353 | $26,139.25 |

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

**Defendant Debra K. Osteen**

| | | | |
|---|---|---|---|
| 6/10/15 | 4,000 | $131.203 | $524,812.00 |
| 6/10/15 | 800 | $131.202 | $104,961.60 |
| 6/10/15 | 300 | $131.347 | $39,404.10 |
| 6/10/15 | 3,641 | $131.337 | $478,198.02 |
| 6/10/15 | 300 | $131.315 | $39,394.50 |
| 6/10/15 | 200 | $131.21 | $26,242.00 |
| 6/1/16 | 18,749 | $135.81 | $2,546,301.69 |
| 6/9/16 | 6,756 | $138.27 | $934,152.12 |
| **Total Proceeds** | | | **$6,714,450.59** |

Osteen's sales were inconsistent with past trading patterns and suspicious in their timing and amount. Osteen sold her shares, placing them into the open market, at artificially inflated prices and at a time when the Board was causing the Company to repurchase those same shares. As a result, it is estimated that the Company overpaid for these and other shares by more than $29.7 million. In placing her own financial interest ahead of the interests of both Universal and its shareholders, Osteen wrongfully and illicitly profited from her knowledge of the Individual Defendants' and the Company's wrongdoing to the detriment of both Universal and its shareholders.

272.    The following chart summarizes the dates upon which Defendant Pember divested, as well as the total proceeds from such trades:

**Defendant Marvin G. Pember**

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| 6/3/16 | 16,105 | $135.70 | $2,185,448.50 |
| **Total Proceeds** | | | **$2,185,448.50** |

Pember's sales were inconsistent with past trading patterns and suspicious in their timing and amount. Pember old his shares, placing them into the open market, at artificially inflated prices and at a time when the Board was causing the Company to repurchase those same shares. As a result, it is estimated that the Company overpaid for these and other shares by more than $29.7 million. In placing his own financial interest ahead of the interests of both Universal and its shareholders, Pember wrongfully and illicitly profited from his knowledge of the Individual

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Defendants' and the Company's wrongdoing to the detriment of both Universal and its shareholders.

## IX. UNIVERSAL AWARDS OFFICER DEFENDANTS FOR THEIR MISCONDUCT WITH EXORBITANT COMPENSATION

273. The Officer Defendants were unjustly enriched as they exposed Universal to massive liability in allowing the Company to over-admit patients, over-retain patients, and provide substandard care, often by employing individuals without the requisite training or licensure, falsely billing for those "services" in violation of the FCA, and failing to disclose that the Company was generating illicit revenues to shareholders and regulators in violation of the federal securities laws.

274. Moreover, because Universal awards the Officer Defendants bonuses based purely on financial performance, rather than quality of care measures, unlike many other healthcare companies, the Officer Defendants have a perverse incentive to push for increased patient admissions and lengths of stay while simultaneously cutting the budgets for actual patient care. Indeed, by way of example, the "**Compensation Discussion and Analysis**" section of the Company's Proxy Statement filed with the SEC on April 6, 2017 ("2016 Proxy Statement"), illustrates as much, seeking to justify the incentive compensation awards granted to the Officer Defendants by emphasizing the following highlights:

- During 2016, our adjusted net income . . . increased to $720.2 million, or $7.32 per diluted share, as compared to $692.0 million, or $6.87 per diluted share, during 2015.

- Our net revenues increased 8.0% to $9.77 billion during 2016 as compared to $9.04 billion during 2015.

\* \* \*

- Net revenues at our behavioral health care facilities owned during both years increased 2.6% during 2016 as compared to 2015. During 2016 at these facilities, adjusted admissions increased 1.0% and adjusted patient days increased 0.9% as compared to 2015.

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Further, in discussing the process used to set compensation, the 2016 Proxy Statement also disclosed that: "The Compensation Committee has traditionally taken into account the input and recommendations of our Chairman and Chief Executive Officer, Mr. Alan Miller, with respect to our compensation programs, including the compensation arrangements with our named executive officers other than himself."

275.    Thus, Defendant Alan Miller, in addition to the disproportionate voting power he wields by virtue of his ownership of Class A and Class C stock, also has significant power in setting the compensation of the Company's executive officers.   While the Compensation Committee charter describes a committee of non-executive directors charged with designing and approving compensation for Universal's executive officers, in practice, Alan Miller makes executive pay decisions for all other officers at the Company, and the Universal Compensation Committee rubber stamps those decisions.

276.    The Compensation Committee also acquiesced in setting Alan Miller's requested bonuses, stock grants, and salary increases during the purported contract negotiations. Defendant Alan Miller's salary is currently $1.635 million, an increase of 2.2% over his 2016 salary, and he is eligible for an annual bonus targeted at 100% of his salary.  Defendant Alan Miller was also granted restricted stock awards valued at $1.5 million each in March 2015 and 2016, and over $2 million in 2017.  According to a report by the news publication *Axios*, in 2016, Alan Miller was the most highly compensated CEO in the hospital industry, with compensation to the tune of more than $51 million.

277.    The Compensation Committee, by virtue of setting revenue and profit targets based upon increases in patient admission rates and number of patient days, caused Universal executives to illicitly over-admit and hold patients, so that the Company could bill federal and

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

state governments billions of dollars for inpatient behavioral health care "services" from 2013 to the present.

278.    While the Company was violating the FCA and failing to provide even a semblance of adequate care, Universal's Compensation Committee, in addition to approving millions of dollars in salaries, health benefits, deferred compensation, retirement contributions, and other perquisites for Universal executives, also approved payment of more than $74 million in stock, option, and cash incentive awards to the Officer Defendants for fiscal years 2013 through 2017:

| Defendant | Year | Stock Awards | Option Awards | Non-Equity Incentive Award | Total Incentive Compensation |
|---|---|---|---|---|---|
| Alan Miller | 2013 | $0 | $7,846,233 | $2,310,089 | $78,669,420 |
|  | 2014 | $1,500,004 | $10,098,440 | $3,843,900 |  |
|  | 2015 | $1,500,022 | $12,553,430 | $3,434,599 |  |
|  | 2016 | $1,500,069 | $14,024,359 | $1,360,053 |  |
|  | 2017 | $2,000,060 | $15,978,734 | $719,428 |  |
| Marc Miller | 2013 | N/A | $1,196,883 | $645,337 | $13,150,264 |
|  | 2014 |  | $1,540,440 | $1,083,375 |  |
|  | 2015 |  | $1,914,930 | $989,371 |  |
|  | 2016 |  | $2,377,010 | $398,276 |  |
|  | 2017 |  | $2,789,508 | $215,134 |  |
| Filton | 2013 | N/A | $930,909 | $404,496 | $9,267,631 |
|  | 2014 |  | $1,198,120 | $682,901 |  |
|  | 2015 |  | $1,489,390 | $619,794 |  |
|  | 2016 |  | $1,663,907 | $248,458 |  |
|  | 2017 |  | $1,895,782 | $133,874 |  |
| Osteen | 2013 | N/A | $930,909 | $331,146 | $8,545,195 |
|  | 2014 |  | $1,198,120 | $413,203 |  |
|  | 2015 |  | $1,489,390 | $518,495 |  |
|  | 2016 |  | $1,663,907 | $67,790 |  |
|  | 2017 |  | $1,895,782 | $36,453 |  |
| Pember | 2013 | N/A | $664,935 | $1,110,692[43] | $8,544,846 |
|  | 2014 |  | $855,800 | $618,187 |  |
|  | 2015 |  | $1,063,850 | $613,441 |  |
|  | 2016 |  | $1,307,356 | $529,592 |  |
|  | 2017 |  | $1,624,956 | $156,037 |  |

[43]    In addition to earning $110,692 in non-equity incentive compensation, Pember also earned a $1,000,000 cash bonus.

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

## DAMAGES TO UNIVERSAL

279.     The Individual Defendants breached their duties of loyalty and good faith by: (i) causing the Company to defraud federal and state Medicare and Medicaid systems in violation of the FCA due to the illicit over-admission and failure to properly care for patients at the Company's facilities; (ii) authorizing the Company's filing of false and misleading financial statements that failed to disclose the true nature of the schemes herein described; and (iii) using Universal stock for their own benefit and to the detriment of shareholders and the Company by causing the Company to repurchase tens of millions of dollars of Universal common stock on the open market at artificially inflated prices at the same time that the Individual Defendants sold tens of millions of dollars of their own personal stake in the Company.  As a result of these breaches, Universal has incurred significant expenses, and will continue to expend significant sums, including:

   a.  the risk of having up to about 40% of the Company's revenues suspended as a result of the FCA violations occurring at the Company's behavioral health facilities, in addition to $282 million in penalties threatened from the *Escobar qui tam* action concerning wrongdoing in just the Commonwealth of Massachusetts;

   b.  further penalties and fines Universal will incur to resolve its criminal and civil federal investigations, including, but not limited to, public and private FCA and Exchange Act violations, as well as violations of analogous other state laws;

   c.  the costs incurred to carry out internal investigations, including the costs of legal and other fees paid to outside counsel, auditors, and other experts;

   d.  executive compensation improperly paid to the Individual Defendants throughout the Relevant Period;

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

e.     the amount the Individual Defendants authorized and further caused Universal to overpay to repurchase its shares on the open market at artificially inflated prices;

f.     the almost $29.7 million in damages resulting from Universal's senior officers and directors selling almost $29.7 million worth of Universal common stock on the open market at artificially inflated prices;

g.     resultant loss of business and business opportunities;

h.     loss in market value and shareholder equity;

i.     legal fees, costs, and amounts payable in settlement or satisfaction of lawsuits brought against the Company related to the foregoing wrongdoing; and

j.     the increased capital costs the Company will incur as a result of loss of market capitalization and the Company's damaged reputation in the investing community as a result of the foregoing.

280.    Universal has been directly and substantially injured by reason of the Individual Defendants' intentional breach and/or reckless disregard of their fiduciary duty of loyalty to the Company.  Plaintiffs, as shareholders and representatives of Universal, seek damages and other relief for the Company, in an amount to be proven at trial.

## INDIVIDUAL DEFENDANTS' DUTIES AND OBLIGATIONS

### I.    INDIVIDUAL DEFENDANTS' DUTIES

281.    By reason of their positions as officers and/or directors of Universal, and due to their ability to control the business and corporate affairs of Universal, the Individual Defendants owed Universal and its shareholders the fiduciary obligations of loyalty and due care.  The Individual Defendants were obligated to use their utmost abilities to control and manage Universal in an honest, lawful manner and to promptly disseminate accurate and truthful

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

information with respect to the Company's operations, earnings, and compensation practices.  In addition, the Individual Defendants had a duty to refrain from utilizing their control over Universal to cause the Company to spend millions of dollars repurchasing its own stock at artificially inflated prices as a result of their own improper and unlawful practices.  In sum, the Individual Defendants were, and are, required to act in furtherance of the best interests of Universal and its shareholders and not for their own personal interest or benefit.

282.    Because of their positions of control and authority as directors and/or officers of Universal, in addition to their attendance and votes at meetings of the Board and its subcommittees, the Individual Defendants were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  As to the Director Defendants, these acts include: the oversight and approval of fraudulent admissions of patients at mental health facilities; the simultaneous understaffing and undertraining of facility personnel below regulatory requirements; the oversight and approval of attendant FCA billing violations; the oversight and approval of the filing of false financial statements with the SEC that contained false information regarding the true state of affairs at the Company; the repeated and willful refusal to correct the Company's operations through the implementation of adequate internal controls; the authorization of a stock repurchase program causing Universal to repurchase tens of millions of dollars' worth of Universal common stock at artificially inflated prices; and the concurrent sale of their own personally held Universal shares on to the same market at those artificially inflated prices.

283.    The Individual Defendants' conduct complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Universal, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

shareholders, which the Individual Defendants were, or should have been, aware posed a risk of serious harm to the Company.

284.    Universal's Code of Business Conduct and Corporate Standards (the "**Code of Conduct**") expressly requires, in pertinent part, that "[a]ll employees, officers and directors of the company and its subsidiaries":

- "Shall not buy or sell UHS or any other stock based upon 'insider' information about or involving UHS, not [sic] pass on any such information to others, including, but not limited to, friends and family members.";

- "Shall notify either the UHS general counsel, the facility's compliance officer, or the chief executive officer of the UHS facility in which he or she works, who will in turn notify the UHS general counsel, immediately upon the receipt (at work or at home) of an inquiry, subpoena or other agency or government request for information regarding UHS or any of its subsidiaries or facilities (other than for medical records or other routine licensing matters).";

- "Shall not participate in any false billing of patients, government entities, or any other party."; and

- "Shall promptly report all suspected violations of this Code of Business Conduct and Corporate Standards by other employees, officers or directors to (1) the UHS compliance hotline (1-800-852-3449), or (2) the compliance post office box (Universal Health Services, Inc., P.O. Box 61823, King of Prussia, PA, 19406-8823), or (3) his or her immediate supervisor or the facility's compliance officer."

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

285.    Universal's Code of Conduct and Ethics (the "**Code of Ethics**") provides further principles to "guide all employees, officers and directors of the Company[,]" holds the Universal Board and its Nominating & Governance Committee expressly "responsible for the enforcement" of the Code of Ethics, and mandates that every employee, officer and director comply with the following pertinent provisions:

**Compliance with Laws, Rules and Regulations**

You must respect and abide by all applicable laws, rules and regulations. Although you are not expected to know the details of all applicable laws, rules and regulations, you are expected to seek advice in accordance with guidelines described in Section 13 of this Code [Compliance Procedures].

In the event of litigation or government investigation, please consult with one or more of the persons, and in accordance with the guidelines, described in Section 13 below so that the Company may comply in full with all applicable laws, rules and regulations, including those relating to the retention of records.

**Insider Trading**

Federal law and the policies of the Company prohibit you, either directly or indirectly through your family members or others, from purchasing or selling Universal Health Services, Inc. Shares [sic] while in the possession of material, non-public information concerning the Company. This same prohibition applies to trading in the stock of other publicly-held companies on the basis of material, non-public information.

Material, non-public information is any information which could reasonably be expected to affect either the price of, or a decision to buy or sell, the stock of any company.  If you are considering buying or selling Universal Health Services, Inc. shares because of inside information you possess, you should assume that such information is material.

Federal law and Company policy also prohibit you from "tipping" family, friends or others regarding material, non-public information that you learn about the Company or any other publicly traded company in the course of your employment or other position with the Company.  The same penalties apply, regardless of whether you derive any benefit from the trade.

* * *

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

**Integrity of Financial Statements and Disclosures**

The integrity of the Company's financial statements and the disclosures contained in the filings with government agencies and in its press releases and other public statements is essential. All financial books, records and accounts must timely and accurately reflect transactions and events. You must comply with the Company's policies and practices that comprise its system of internal controls and disclosure controls and procedures and must provide full, fair, accurate, timely and understandable responses to all requests from any of the Company's senior management, independent or internal auditors or legal counsel for information in accordance therewith.

**Reporting of Illegal or Unethical Behavior**

You should report all actual or potential violations of laws, rules, regulations or of this Code in accordance with the guidelines described in Section 13 of this Code [Compliance Procedures]. You may submit your report confidentially and, if you wish, anonymously in accordance with the guidelines described in Section 13 of this Code.

\* \* \*

**Compliance Procedures**

The Company endeavors to promote a business environment in which its officers, directors, employees or agents feel comfortable addressing concerns and questions regarding compliance matters without fear of retaliation. Accordingly, the Company has established the following procedural guidelines. You should follow these guidelines when you have any questions about appropriate course of action in any situation which many [sic] be subject to this Code:

- **Discuss the situation with your supervisor or a member of the Company's legal staff.** This is the basic guidance for all situations. Remember that it is the responsibility of your supervisor or a member of the Company's legal staff to help you address any situation.

- **Alternatives.** In a situation where you do not feel comfortable discussing the situation with your supervisor or a member of the Company's legal staff you may contact the Chairperson of the Nominating and Governance Committee of the Board.

- **Reporting Code Violations.** You may report violations of this Code, including applicable laws, rules and regulations, in confidence and without fear of retaliation. If you request that your identity be kept secret, the Company is committed to protecting your anonymity (subject to applicable laws, rules, regulations and the requirements relating to legal

- 135 -

proceedings). Company policy prohibits retaliation against you for reasonable good faith reports of violations of this Code.

**Violations of Code of Business Conduct**

Failure to comply with this Code could result in disciplinary action, up to and including termination of employment, and may subject you to civil liability and/or criminal prosecution under applicable law.

Any director, officer or employee of the Company who authorizes or permits another person to violate this code may also be subject to disciplinary action, dismissal, and/or other penalties.

286.    The Code of Ethics also contains a preliminary direction that any employee, officer or director "*in a situation which [s/he] believe[s] may violate or lead to a violation*" of the Code of Ethics should refer to the Compliance Procedures guidelines of the Code of Ethics.

287.    Universal also has a separate Code of Ethics for Senior Financial Officers (the "**SFO Code of Ethics**").  The SFO Code of Ethics applies to the Company's CEO, CFO, Treasurer, Controller, Vice President of Finance – Acute Care/Behavioral Health, and "any other employee of the Company performing similar functions."  The SFO Code of Ethics provides supplemental guidance requiring the Company's senior officers to comply with the following pertinent provisions:

**Disclosure in SEC Filings and Other Public Communications**

The Senior Financial Officers should conduct themselves and their activities on behalf of the Company, its Subsidiaries and affiliated entries in a manner which promotes the full, fair, accurate, timely and understandable disclosure, in accordance with applicable law, rules or regulations, of all material information required to be included in (i) each report or other document required to be filed or submitted by the Company with the SEC and (ii) in all other public communications made by the Company. To this end, the Senior Financial Officers should oversee the establishment and management of the Company's internal controls and disclosure controls and procedures to enable:

- The Company's consolidated financial statements and the notes thereto to present fairly, in all material respects, the financial position, the results of operations and the cash flows of the Company as of and for the period(s)

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

indicated in conformity with accounting principles generally accepted in the United States; and

- The Senior Financial Officers to bring to the attention of the Audit Committee any information, of which they are aware, concerning (i) significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial data or (ii) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls.

### Compliance with Applicable Governmental Laws, Rules and Regulations

The Senior Financial Officers are expected to comply, and should encourage and promote compliance by all employees of the Company, its subsidiaries and affiliated entities, with the governmental laws, rules and regulations applicable to their business and operations, including the retention and disposal of business documents and records.

### Reporting Code Violations

Senior Financial Officers should report any known or suspected violation of this Code by any Senior Financial Officer to the Company's chief executive officer, chief compliance officer and the Audit Committee (and any other appropriate committee) of the Board.

288. Universal also had in place a separate Inside Information and Trading of Company Stock policy (the "**Inside Trading Policy**"),[44] prohibiting all Company directors, officers, and other employees from transacting in Universal stock while in possession of material non-public information, stating, in pertinent part:

Under the Federal Securities Law, a person is prohibited from exercising stock options and/or purchasing or selling securities on the basis of "material (inside) information", which includes any information that would influence a reasonable investor to buy or sell stock of the Company. Non-public information is material if it is reasonably certain to have a substantial effect on the market price of the security, if publicly disclosed. The news of such activity must be widely disseminated in the press before stock options can be exercised and/or purchases or sales of stock can be made. Communications on behalf of the Company with

---

[44] This version of the Inside Trading Policy was in place at the time of the alleged misconduct. Effective January 18, 2018, the Board updated the Inside Trading Policy. The current version is available on the Company's website at https://ir.uhsinc.com/inside-information-and-trading-company-stock.

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

the media, security analysts and investors must be made only by specifically designated representatives of the Company.

Examples of material (inside) information include, but are not limited to, earnings, mergers, acquisitions, divestitures, joint ventures, acquisition or loss of a significant contract, stock or cash dividends, stock splits, significant financing developments, major personnel changes, and major litigation developments. No individual, regardless of position within the Company, should exercise stock options and/or purchase or sell the Company's stock while in the possession of material (inside) information which is not yet publicly disseminated. At such times, such individuals (referred to as "Insiders") may not exercise stock options and/or purchase or sell Company stock.

The Company has designated its Directors and Executive Officers as Insiders for both [SEC] and internal purposes and as such, they are required to comply at all times with the requirements and restrictions outlined in III and IV below.  [sic]

289.    Parts I and II of the Inside Trading Policy, presumably providing the requirements and restrictions referred to above, require all Insiders, including "the Company's Directors, Executive Officers, and [certain] non-executive officers," to refrain from exercising stock options and trading in the Company's stock during certain financial "quiet periods":

- 1st Quarter: March 15th through April 30th.
- 2nd Quarter: June 15th through July 31st.
- 3rd Quarter: September 15th through October 31st.
- 4th Quarter/full year: December 15th through March 3rd.

Additionally, the Inside Trading Policy provides that other "quiet periods" outside of the foregoing dates may require the suspension of insider trading:

Since there may be other "quiet periods" when trading should be suspended including, but not limited to, the pending release of material (inside) information to the public or recent stock repurchases by the Company pursuant to its repurchase program, all designated insiders must notify the Company's Senior Vice President and Chief Financial Officer (Steve Filton), or the Vice President and Controller (Chick Boyle), before executing purchases or sales of Company stock, at any time. The Company's Senior Vice President and Chief Financial Officer shall notify the President and Chief Executive Officer before executing purchases or sales of Company stock, at any time. Notification for the exercise of stock options should be made to the Corporate Accounting Department to the Controller and/or the Director of Corporate Accounting. If any development of major importance is expected to be announced in the near future, Insiders should also refrain from trading. Whenever doubt exists, the presumption should be made

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

against exercising stock options or trading in the Company's stock until advice has been sought in advance.

290.    Senior Vice President and CFO Defendant Filton was the "Originator" of the Inside Trading Policy.   President and CEO Defendant Alan Miller "Authorized" the Inside Trading Policy.   Defendants Filton and Alan Miller both signed the Inside Trading Policy available at Universal's website.

## II.    ADDITIONAL DUTIES OF DIRECTOR DEFENDANTS ON THE UNIVERSAL AUDIT COMMITTEE

291.    The Universal Board has delegated additional responsibilities to its Audit Committee (made up of Director Defendants Gibbs, Herrell (until his retirement), Hotz, and McDonnell) through the Company's Audit Committee Charter.   The Audit Committee Charter requires that its members be comprised of at least three independent directors appointed by the Board.   For the reasons described *infra* at ¶299(e), the Director Defendants on the Audit Committee are not independent.

292.    The Audit Committee Charter[45] provides that the Audit Committee's purpose is to "take appropriate actions to set the overall 'tone' for quality financial reporting, sound business risk practice and ethical behavior," and the Audit Committee:

> shall provide assistance to the Board of Directors in fulfilling its oversight responsibility to the stockholders, potential stockholders, the investment community and others relating to: the integrity of the Company's financial statements; the financial reporting process; the systems of internal accounting and financial controls; the performance of the Company's internal audit function and independent auditors; the independent auditors' qualifications and independence; and the Company's compliance with legal and regulatory requirements and quality of care standards. In doing so, it is the responsibility of the Committee to maintain free and open communication among the Committee, independent auditors and management of the Company. In discharging its oversight role, the Committee is empowered to investigate any matter brought to its attention with

---

[45]    This version of the Audit Committee Charter was in place at the time of the alleged misconduct.  Upon information and belief, the Board amended the Audit Committee Charter after December 13, 2017.  The current version is available on the Company's website at https://ir.uhsinc.com/index.php/uhs-audit-committee-charter.

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

full access to all books, records, facilities and personnel of the Company and to engage independent counsel and other advisors as it determines necessary to carry out its duties.

293.    The Audit Committee Charter also lays out the following principal duties and responsibilities of the Audit Committee, in pertinent part, as guidelines:

### Discussion of the Audit and Internal Controls; Risk Assessment

The Committee shall discuss with the independent auditors the overall scope and plans for the audit, including the adequacy of staffing and compensation. Also, the Committee shall discuss with management and the independent auditors the adequacy and effectiveness of the accounting and financial controls, including the Company's policies and procedures to assess, monitor and manage business risks, and legal and ethical compliance programs. In connection with its review of the Company's risk assessment and risk management policies, the Committee shall discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures. The Committee shall also discuss with the independent auditors the matters required to be discussed by auditing standards relating to the conduct of the audit, including any difficulties encountered in the course of the audit work, any restrictions on the scope of activities or access to requested information, and any significant disagreements with management.

### Oversight of Management's Conduct of the Company's Financial Reporting Process

*Financial Information Disclosure*. The Committee shall review and discuss earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies. In connection with the foregoing, the Committee shall review the type and presentation of information to be included in the earnings press releases (paying particular attention to any use of "pro forma," or "adjusted" non-GAAP, information).

*Interim Financial Statements*. The Committee shall meet to review and discuss with management and the independent auditors the interim financial statements and disclosures under Management's Discussion and Analysis of Financial Condition and Results of Operations with management and the independent auditors prior to the filing of the Company's Quarterly Report on Form 10-Q. Also, the Committee shall discuss the results of the quarterly review and any other matters required to be communicated to the Committee by the independent auditors under generally accepted auditing standards. Any such matters reported to the Chairman of the Committee shall be communicated by the Chairman to the other members of the Committee.

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

*Audited Financial Statements.* The Committee shall meet to review and discuss with management and the independent auditors the annual audited financial statements and disclosures under Management's Discussion and Analysis of the Financial Condition and Results of Operations to be included in the Company's Annual Report on Form 10-K (or the annual report to shareholders if distributed prior to the filing of the Annual Report on Form 10-K), including the independent auditors' judgment about the quality, not just the acceptability, of accounting principles, the reasonableness of significant judgments and the clarity of the disclosures in the financial statements. Also, the Committee shall discuss the results of the annual audit and any other matters required to be communicated to the Committee by the independent auditors under generally accepted auditing standards.

*Financial Statement Issues.* The Committee shall also review and discuss with management and the independent auditors: (i) major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; (ii) analyses prepared by management and/or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements; (iii) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company and (iv) any correspondence with regulators or governmental agencies and any published reports which raise material issues regarding the Company's financial statements or accounting policies which has been brought to the Committee's attention.

## Assist the Board in Oversight of the Company's Financial Reporting and Compliance Matters; Reporting to the Board

The Committee shall establish and oversee procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal controls or auditing matters, and the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

The Committee shall receive periodic reports from and meet with the Company's divisional officers responsible for overseeing the quality of patient care at the Company's facilities.

***The Committee shall receive corporate attorneys' reports of evidence of a material violation of securities laws or breaches of fiduciary duty or any other matter brought to the attention of the Company's general counsel and/or the chief compliance and privacy officer. Further, the Committee shall discuss with the Company's general counsel and/or the chief compliance and privacy***

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

*officer, legal matters that may have a material impact on the financial statements or the Company's compliance policies*.

*The Committee shall report regularly to the full Board of Directors. The Committee shall review with the full Board of Directors any issues that arise with respect to the quality or integrity of the Company's financial statements*, the performance and independence of the independent auditors, or *the performance of the internal audit function and the Company's compliance with legal or regulatory requirements, and quality control matters with respect to patient care*.

The Committee shall consider any requests for waivers from the Company's Code of Business Conduct & Ethics or from the Company's Code of Ethics for Senior Financial Officers and assure that the Company discloses any such waivers as may be required by the NYSE or the regulations of SEC.

The Committee shall perform an evaluation of its performance at least annually to determine whether it is functioning effectively.

[Emphasis added in bold and italics].

## III. ADDITIONAL DUTIES OF DIRECTOR DEFENDANTS ON THE UNIVERSAL COMPENSATION COMMITTEE

294.    The Universal Board has delegated additional responsibilities to its Compensation Committee (made up of Director Defendants Gibbs, Herrell (until his retirement), and Hotz) through the Company's Compensation Committee Charter.   The Compensation Committee Charter requires that its membership be comprised of at least three independent directors appointed by the Board.   For the reasons described *infra* at ¶¶299(f)-(g), the Director Defendants on the Compensation Committee are not independent.

295.    The Compensation Committee is responsible for the following duties and responsibilities, as enumerated in the Compensation Committee Charter, in pertinent part:

Review and approve the Company's goals and objectives relevant to the compensation of the Chief Executive Officer and the Company's other executive officers;

Evaluate the performance of the CEO and of the Company's other executive officers in accordance with policies and principles established by the Committee

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

from time to time, including the Company's goals and objectives relevant to the compensation of the CEO and the other executive officers;

Determine and approve, either as a Committee or (as directed by the Board) together with other Board members that satisfy the applicable independence requirements under the listing standards of the New York Stock Exchange, the compensation level of the [CEO] and of the Company's other executive officers based on the Committee's evaluation of the performance of the CEO and of the other executive officers, using those criteria deemed appropriate by the Committee from time to time, including, with respect to the long-term incentive component of the CEO's compensation, the Company's performance and relative shareholder return, the value of incentive awards granted to principal executive officers of comparable companies and awards granted to the CEO of the Company in past years;

Review and determine the form and amount of compensation of the non-management members of the Board, including cash, equity-based awards and other compensation, including benefits, in accordance with guidelines and general principles established by the Committee from time to time;

Administer, and make recommendations to the Board with respect to, incentive-compensation plans and equity-based plans, including the Executive Incentive Plan, establish and verify annual performance targets and criteria for the granting of options to the Company's officers and other employees, review and approve the granting of options in accordance with such criteria and determine potential bonus amounts;

Approve compensation awards (with or without ratification of the Board) as may be required to comply with applicable tax laws;

Produce an annual report on executive compensation, as required by the [SEC] for inclusion in the Company's annual proxy statement filed with the SEC;

Report periodically to the Board on the actions and deliberations of the Committee; [and]

\* \* \*

Conduct an annual performance evaluation of the Committee's performance and report the results of such evaluation to the Board or the Governance Committee thereof[.]

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

## DERIVATIVE ALLEGATIONS

296.    Plaintiffs bring this action derivatively in the right, and for the benefit, of Universal to redress the breaches of fiduciary duty and other violations of law committed by the Individual Defendants, as alleged herein.

297.    Plaintiffs will adequately and fairly represent the interests of Universal and its shareholders in enforcing and prosecuting the Company's rights, and Plaintiffs have retained counsel experienced in prosecuting this type of derivative action.  Plaintiffs have continuously held Universal stock throughout the Relevant Period and will continue to hold Universal stock through the resolution of this action.

298.    Plaintiffs have not made a pre-suit demand on the Board to assert the claims set forth herein against the Individual Defendants because such a demand would have been futile, and is thereby excused, since the allegations herein permit, at a minimum, the inference that the Defendant Directors lack the requisite disinterest to determine fairly whether these claims should be pursued.

## DEMAND FUTILITY ALLEGATIONS

299.    The Universal Board has instituted several measures that entrench their positions and are antithetical to their accountability to shareholders, including: imposing a staggered Board and "classes" of directors, so that only two directors are answerable to public stockholders; denying shareholder proxy access; dividing Universal common stock into "tiers" consisting of Classes A, B, C, and D; and assigning disproportionate voting rights to Defendants Alan Miller and Marc Miller by virtue of their ownership of ***99.9% of the voting power*** of the Company's Class A and Class C Common Stock, which ***consists of only 7.5% of total outstanding Universal common stock, but grants them 87% of general voting power*** at the Company.  To put this vast discrepancy in context, Defendants Alan Miller and Marc Miller own $872 million

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

of the $11 billion of the Company's outstanding market cap (*7.5% of the Company*), yet they would have to own over $10 billion of Company common stock to enjoy that same voting power if the Company employed representational voting power.

300.    The Comptroller of the City of New York, Scott M. Stringer, as the custodian and a trustee of the New York City Employees' Retirement System, the New York City Fire Department Pension Fund, the New York City Teachers' Retirement System, and the New York City Police Pension Fund (collectively, the "**New York Shareholders**"), beneficially owning hundreds of thousands of shares of Universal common stock, set forth a "one vote per share" shareholder proposal for proxy access in each of the Company's annual proxy statements filed with the SEC since April 9, 2015.  The one vote per share proposal urged the Company to adopt a recapitalization plan that would eliminate Universal's multiple-class capital structure and provide for true representational voting power, in that each outstanding share of common stock would have one vote on all matters.

301.    While the Company has a one vote per share policy for votes on director elections, as mentioned *supra* at ¶40, the tiered ownership of differing classes of common stock ensures that Defendants Alan Miller and Marc Miller retain vastly disproportionate control over the composition of the Universal Board relative to their holdings in the Company.  For all other voting matters not the subject of director election, Class B shares, which make up the vast majority of shares offered to Universal shareholders, each receive only one-tenth of one vote per share.  Meanwhile, the Class C shares owned by Defendants Alan Miller and Marc Miller each receive 100 votes per share (subject to certain restrictions), while their Class A shares receive one vote per share.  Class D shares receive 10 votes per share.

302.    The Company opposed the shareholder proposal.

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

303.   The New York Shareholders also set forth a shareholder proposal for proxy access in each of the Company's annual proxy statements filed with the SEC on April 7, 2016 and April 6, 2017.   If approved, the proposal would have required that the Universal Board amend its bylaws to include a proxy access bylaw allowing for shareholders to nominate Class B and D directors for election, as well as to permit the shareholders to vote on such nominees on Universal's proxy card.

304.   The Company opposed the shareholder proposal in both years.

305.   It is clear that a pre-suit demand on the Universal Board would be a futile and useless act for the following reasons:

a.      The Universal Board is controlled by Defendant Alan Miller, who has the voting power to elect five of the seven directors on the Board.   As stated in the 2016 Proxy Statement, Universal is "eligible to be treated as a controlled company under New York Stock Exchange Rule 303A due to the fact that the family of Alan B. Miller holds more than 95% of the shares of Class A and Class C Common Stock, which is entitled to elect 80% of the entire Board of Directors and constitutes more than 50% of [Universal's] aggregate voting power."   Moreover, Universal "determin[ed] that [its] Nominating & Governance Committee is not responsible for identifying and recommending qualified candidates for Board positions that, in accordance with [its] Restated Certificate of Incorporation, are to be elected by the holders of Class A and Class C Common Stock of the Company."   Universal also stated the following in its Form 10-K for fiscal year 2016, filed with the SEC on February 28, 2017:

> Since a substantial majority of the Class A shares and Class C shares are controlled by Mr. Alan B. Miller and members of his family, one of whom (Marc D. Miller) is also a director and officer of our company, and they can elect a majority of our company's directors and effect or reject most

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

actions requiring approval by stockholders without the vote of any other stockholders, ***there are potential conflicts of interest in overseeing the management of our company***.

[Emphasis added].

All Universal Board members therefore serve at the discretion of Defendant Alan Miller, who directed the misconduct alleged herein, failed to institute any meaningful corrective action to address such wrongdoing, and whose son was the sole director who oversaw the woefully insufficient and anemic activity of the Compliance Committee.  Because of these facts, and because the Company itself recognizes that the ownership structure of the Company subjects it to "***potential conflicts of interest***" in oversight, none of the Universal Board members are independent from Alan Miller, and thus, none are disinterested for the purposes of demand futility.

b.      Universal's Proxy Statement filed with the SEC on April 6, 2017 expressly states that Director Defendants Alan Miller, Marc Miller, and Pantaleoni are not independent due to Alan and Marc Miller's stock ownership and roles with the Company, Pantaleoni's role as outside counsel to the Company, and their relationships with, and dependence upon, the other members of the Board for their livelihoods.

c.      All of the following factors disqualify the Director Defendants from considering demand, as these activities constitute personal participation by the Director Defendants in the misconduct alleged herein: the severity and long duration of the Company's illicit over-admissions; failure to comply with care standards; FCA violations; internal reporting and control deficiencies at the Company; the fact that the Director Defendants were repeatedly warned about the risks that such wrongdoing posed to the Company through shareholder letters, SEIU letters, and at regularly held meetings, yet actively supported the Company's continuous wrongdoing and failed to reform any of

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

its corporate governance policies or practices; the artificial inflation of the price of Universal common stock; the authorization of the share repurchase program, causing the Company to repurchase its own shares at artificially inflated prices; the insider trading conducted by the Insider Trading Defendants using non-public information owned by the Company; the approval of excessive incentive compensation to the Officer Defendants, unjustly enriching them by millions of dollars; and the authorization of the filing of false and misleading public statements.

d.      Director Defendants Hotz, as Chairman, and Gibbs and Herrell, as current or former members of the Nominating & Governance Committee, are also disqualified from considering demand due to their complicity in the misconduct described herein and their failure to uphold their fiduciary duties, as described in the Nominating and Governance Committee Charter, to "develop and recommend to the Board a set of corporate governance guidelines applicable to the Company, and shall review and reassess the adequacy of such guidelines annually and recommend to the Board any changes deemed appropriate."   Additionally, because five out of seven Director Defendants are nominated by Defendant Alan Miller, the Nominating & Governance Committee can do little more than rubber stamp his decision and is therefore not independent and cannot consider demand in a disinterested manner.

e.      Director Defendants Herrell, as former Chairman, and McDonnell, Gibbs, and Hotz, as members of the Audit Committee, are also disqualified from considering demand due to their complicity in the misconduct described herein and their failure to uphold their fiduciary duties, as described in the Audit Committee Charter, to:

> provide assistance to the Board of Directors in fulfilling its oversight
> responsibility to the stockholders, potential stockholders, the investment

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

community and others relating to: the integrity of the Company's financial statements; the financial reporting process; the systems of internal accounting and financial controls; the performance of the Company's internal audit function and independent auditors; the independent auditor's qualifications and independence; and the Company's compliance with legal and regulatory requirements and quality of care standards.

f.      Director Defendants Hotz, as Chairman, and Gibbs and Herrell, as current or former members of the Compensation Committee during the Relevant Period, are also disqualified from considering demand due to their complicity in the misconduct described herein.  Specifically, these Director Defendants failed to act in the interests of the Company and its shareholders to satisfy their fiduciary duties to:

Evaluate the performance of the CEO and of the Company's other executive officers in accordance with policies and principles established by the Committee from time to time, including the Company's goals and objectives relevant to the compensation of the CEO and the other executive officers;

Determine and approve, either as a Committee or (as directed by the Board) together with other Board members that satisfy the applicable independence requirements under the listing standards of the New York Stock Exchange, the compensation level of the [CEO] and of the Company's other executive officers based on the Committee's evaluation of the performance of the CEO and of the other executive officers, using those criteria deemed appropriate by the Committee from time to time, including, with respect to the long-term incentive component of the CEO's compensation, the Company's performance and relative shareholder return, the value of incentive awards granted to principal executive officers of comparable companies and award granted to the CEO of the Company in past years; [and]

Review and determine the form and amount of compensation of the non-management members of the Board, including cash, equity-based awards and other compensation, including benefits, in accordance with guidelines and general principles established by the Committee from time to time[.]

g.      The Compensation Committee improperly awarded the Officer Defendants for defrauding the government through the illicit over-admission and over-retention of patients to its behavioral health facilities, and the use of under-trained and

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

unlicensed employees to perform services proscribed by their lack of requisite accreditations, as well as by misleading the Company's shareholders as to its revenues, all while authorizing the Company's repurchase of stock at inflated price, to the detriment of Universal and its shareholders.  Defendants Hotz, Gibbs, and Herrell are directly complicit in these activities and therefore are incapable of considering demand in a disinterested matter.

        h.      The Director Defendants have also each violated Universal's Code of Conduct, Code of Ethics, SFO Code of Ethics, and Inside Trading Policy by: (i) failing to cause Universal to comply with all applicable laws and regulations, including the FCA and federal securities laws; (ii) failing to maintain internal controls, corporate governance, and compliance procedures, which could have caused the discontinuance, or at least abatement, of the illicit scheme; (iii) failing to cause Universal to appropriately maintain the Company's financial statements and accurately report its financial performance on filings made with the SEC; (iv) engaging in and/or allowing other Defendants to engage in insider trading, including using proprietary Universal information for their own personal gain; (v) wasting Universal assets by paying excessive compensation to the Officer Defendants that rewarded them for defrauding the government in violation of the FCA and its state analogues; and (vi) failing to respond to the repeated and consistent reports received regarding investigations and subpoenas from the OIG and the DOJ's Criminal Frauds Division, as well as calls from Universal stockholders and employees for reform of wrongful practices and the institution of corporate governance reforms, including substantial improvements to the Company's compliance procedures.

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

i.       The Director Defendants have demonstrated a longstanding unwillingness or inability to act to uphold their fiduciary obligations to correct the Company's wrongdoing, and thus, they will not sue themselves and/or their fellow directors and allies in the top ranks of the corporation for the violations of law complained of herein, of which there is a substantial likelihood of liability.  The Director Defendants have developed professional relationships with each other, maintained long-standing friendships and familial relationships, or have entangling financial interests and dependencies among themselves and therefore are not able to, and will not, vigorously prosecute any such action.

j.       The Director Defendants participated in and approved the wrongdoing described herein and participated in efforts to conceal or disguise those wrongs from Universal's stockholders and are therefore not disinterested parties.  As a result of their attendance at Board and subcommittee meetings, as recorded in the minutes, each of the Defendants knew the adverse non-public information regarding the potential FCA violations, false financial reporting, and the payment of excessive incentive compensation to the Officer Defendants as a reward for having caused the Company to violate the law. Pursuant to their specific duties as Board members, the Director Defendants are charged with oversight of the Company and its compliance with the law.   The Director Defendants breached the fiduciary duty of loyalty they owe to Universal and its shareholders in that they failed to prevent and correct the FCA violations, false financial reporting, and wasteful share repurchases, and they further acquiesced to Defendant Alan Miller in awarding the Officer Defendants excessive incentive compensation for causing Universal to violate the FCA, thereby incentivizing continued noncompliance.  Certain

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Director Defendants are also dominated and controlled by other Director Defendants and cannot act independently of them. Thus, each Director Defendant is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action.

k.     The Director Defendants have benefitted, and will continue to benefit, from the wrongdoing alleged herein and have engaged in such conduct to preserve their positions of control and the perquisites derived thereof, and they have refused to institute reforms that would allow shareholders a voice in the management of the Company equal to their ownership. The Director Defendants are thus incapable of exercising independent judgment in deciding whether to commence and vigorously prosecute this action.

l.     Universal has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the current Board has not filed any lawsuits against itself or others who were responsible for that wrongful conduct to attempt to recover for Universal any part of the damages Universal suffered and will suffer thereby.

m.     Defendants Alan Miller and Filton are already defending claims in the Securities Class Action. The participation of Alan Miller in the alleged securities fraud disqualifies the Director Defendants from independently considering demand, as all Director Defendants are beholden to Defendant Alan Miller.

n.     In order to bring this action for breaching their fiduciary duties, the Director Defendants would have been required to sue themselves and/or their fellow directors and executives in the top ranks of the Company, who are their personal friends

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

or family members and with whom they have entangling financial alliances, interests, and dependencies, which they would not do.

**COUNT I**
**VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND**
**RULE 10B-5 PROMULGATED THEREUNDER**
**(AGAINST ALL INDIVIDUAL DEFENDANTS)**

306.    Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

307.    Throughout the Relevant Period, the Individual Defendants individually, and in concert, engaged and participated in a continuous course of conduct designed to cause Universal to falsify its financial reporting, causing its stock to trade at artificially inflated prices. Meanwhile, the Individual Defendants caused Universal to repurchase its own shares on the open market at artificially inflated prices, rendering Universal a victim of the fraud of its faithless fiduciaries.

308.    The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of material, adverse non-public information and engaged in acts, practices, and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Universal not misleading.

309.    The Individual Defendants, as top executive officers and directors of the Company, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as officers and directors of the Company, each of the Individual Defendants was able to, and did, control the conduct complained of herein and the content of the public statements disseminated by Universal.

310.    The Individual Defendants acted with scienter throughout the Relevant Period, in that they either had actual knowledge of the misrepresentations and/or omissions of material

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.  The Individual Defendants were among the senior management and directors of the Company and therefore directly responsible for the false and misleading statements and/or omissions disseminated to the public through press releases, news reports, and filings with the SEC.  The Individual Defendants also each sold millions of dollars of their personally held Universal common stock while in possession of material non-public information as alleged herein.

311.    Each of the Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Universal by causing it to purchase shares at artificially inflated prices.

312.    By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II
## VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT
## (AGAINST ALL INDIVIDUAL DEFENDANTS)

313.    Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

314.    The Individual Defendants, by virtue of their stock ownership and positions with Universal and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Universal within the meaning of §20(a) of the Exchange Act.  They had the power and influence and exercised the same to cause Universal to engage in the illegal conduct and practices complained of herein.

## COUNT III
## BREACH OF FIDUCIARY DUTY
## (AGAINST ALL INDIVIDUAL DEFENDANTS)

315.    Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

316.     Each of the Individual Defendants owed, and owe, Universal and its shareholders the highest fiduciary obligations of loyalty in managing the Company's affairs.

317.     As detailed above, the Individual Defendants breached their fiduciary duty of loyalty, including acting without good faith, by knowingly failing to supervise Universal and causing the Company to violate the FCA and the federal securities laws.   The Individual Defendants have also engaged in unlawful self-dealing and have acted to put their personal interests ahead of the interests of Universal and its shareholders.   Specifically, the Individual Defendants breached their fiduciary duties by willfully and/or recklessly engaging in a scheme to cause the Company to defraud the U.S. and individual state health care systems due to their illicit over-admitting of patients and billing such government entities for their purported services.   The Individual Defendants were repeatedly informed through litigation updates, investigation updates, and letters from concerned shareholders and an employee union that the Company's practices violated positive law and lacked sufficient internal controls to properly enforce compliance with the law.

318.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary duties, Universal has suffered damages, not only monetarily, but also to its corporate image and goodwill.

## COUNT IV
## CONSTRUCTIVE FRAUD
## (AGAINST ALL INDIVIDUAL DEFENDANTS)

319.     Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

320.     As corporate fiduciaries, the Individual Defendants owed to Universal and its shareholders a duty of candor and full and accurate disclosure regarding the true state of Universal's business, assets, and their conduct with regard thereto.

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

321.     As a result of the conduct complained of herein, the Individual Defendants caused Universal to violate the FCA and to make numerous misrepresentations to and/or conceal material facts from Universal's shareholders, despite the Individual Defendants' duties to ensure the Company disclosed the true facts regarding the Company's business and their control of the Company.  The Individual Defendants have thus committed constructive fraud and violated their duty of candor.

322.     As a direct and proximate result of the Individual Defendants' constructive fraud, Universal has suffered damages, not only monetarily, but also to its corporate image and goodwill.

## COUNT V
## CORPORATE WASTE
## (AGAINST ALL INDIVIDUAL DEFENDANTS)

323.     Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

324.     By rewarding themselves through the payment of outsized incentive compensation while causing Universal to violate the FCA, and by facilitating the insider sales by the Insider Trading Defendants, the Individual Defendants have caused Universal to waste valuable corporate assets.

325.     As a direct and proximate result of the Individual Defendants' corporate waste, Universal has suffered damages, not only monetarily, but also to its corporate image and goodwill.

## COUNT VI
## UNJUST ENRICHMENT
## (AGAINST ALL INDIVIDUAL DEFENDANTS)

326.     Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

327.     As a result of the conduct described herein, the Individual Defendants will be, and have been, unjustly enriched at the expense of the Company and its shareholders.

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

328.    The Individual Defendants granted, authorized, approved, and/or received tens of millions of dollars in outsized executive compensation that was paid to them only as a result of their having caused Universal to defraud the U.S. and individual state healthcare systems by illicitly over-admitting patients and then billing the U.S. government for their so-called services. The Insider Trading Defendants also sold Universal stock for a profit during the Relevant Period, misusing confidential, non-public corporate information.  The Individual Defendants should be required to disgorge the ill-gotten gains they have obtained, and/or will otherwise unjustly obtain, at the expense of Universal and its shareholders.  A constructive trust for the benefit of the Company should be imposed thereon.

329.    All incentive compensation payments and stock sale proceeds granted, authorized, approved, and/or received by the Individual Defendants were at the expense of Universal.  The Company was inadequately compensated for these payments and stock sale proceeds.

330.    As a direct and proximate result of the Individual Defendants' unjust enrichment, Universal has suffered damages, not only monetarily, but also to its corporate image and goodwill.

### COUNT VII
### BREACH OF FIDUCIARY DUTY FOR INSIDER TRADING AND MISAPPROPRIATION OF INFORMATION
### (AGAINST THE INSIDER TRADING DEFENDANTS)

331.    Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

332.    At the time of the stock sales set forth herein, the Insider Trading Defendants knew the material non-public information described above and sold Universal common stock on the basis of such information.

333.    The information described above was proprietary non-public information concerning the Company's operation, financial condition, and future business prospects.  It was a

- 157 -

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

proprietary asset belonging to the Company, which the Insider Trading Defendants used for their own benefit when they sold Universal common stock.

334.    At the time of their stock sales, the Insider Trading Defendants knew of and/or were engaging in a scheme to cause the Company to defraud the U.S. and individual state health care systems due to their illicit over-admission of patients and billing such government entities for their purported services.  The Insider Trading Defendants' sales of Universal common stock while in possession and control of this material, adverse non-public information was a breach of their fiduciary duties of loyalty and good faith, and the material non-public information caused the Insider Trading Defendants to knowingly sell their shares at inflated prices.

335.    As a direct and proximate result of the Individual Defendants' insider sales and breach of fiduciary duties, Universal has suffered damages, not only monetarily, but also to its corporate image and goodwill.  Because the Individual Defendants used the Company's proprietary information for their own gain, the Company is entitled to the imposition of a constructive trust on any profits the Insider Trading Defendants obtained thereby.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following relief and judgment:

A.    Declaring that Plaintiffs may maintain this derivative action on behalf of Universal and that Plaintiffs are proper and adequate representatives of the Company;

B.    Declaring that the Individual Defendants breached their fiduciary duty of loyalty to Universal;

C.    Determining and awarding to Universal the damages sustained by it as a result of the breaches of fiduciary duty and other claims set forth above from each of the Individual Defendants, jointly and severally;

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

D.      Awarding to Universal restitution from the Individual Defendants and ordering disgorgement of all profits, benefits, and other compensation obtained by them, including all profits, special benefits, and unjust enrichment they have obtained as a result of their unlawful conduct, payment of incentive compensation (whether in the form of cash bonuses, stock awards, or stock option grants), and common stock sale proceeds, and imposing a constructive trust thereon;

E.      Directing Universal to take all necessary actions to reform and improve its corporate governance and internal procedures to enable the Company to comply with the Company's existing governance obligations and all applicable laws, and to protect the Company and its stockholders from a recurrence of the damaging events described herein, including, but not limited to, the following specific relief:

(i)      requiring the Company to put forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation, allowing for shareholder proxy access, eliminating the Company's staggered Board structure, and increasing the number of Board members and allowing for voting power to represent actual ownership in the Company according to one vote per share;

(ii)      prohibiting the Company from repurchasing common stock on the open market or from senior executives pursuant to 10b5-1 trading plans within three months of the sale of Universal common stock by the Company's senior executives;

(iii)      requiring the Company to implement additional audit, compliance, and internal control procedures, including, but not limited to, a Board-level Compliance Committee made up of a majority of truly independent directors and excluding either Defendant Alan Miller or Marc Miller;

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

(iv)    requiring independent approval of the terms and timing of insider stock selling and stock option grants, rather than allowing insiders to perform trades with the mere approval of the Company's Senior Vice President and CFO or Vice President and Controller; and

(v)    reforming executive compensation, including requiring that any stock awards or stock options paid as incentive compensation to any director or officer of Universal be held for at least 10 years from the grant/award date;

F.    Awarding Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

G.    Ordering the imposition of a constructive trust over the Individual Defendants' incentive compensation (whether cash bonus, stock award, or stock option grant) and insider sales proceeds;

H.    Awarding punitive damages;

I.    Awarding pre- and post-judgment interest; and

J.    Granting such other and further relief as the Court deems just and equitable.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

Dated: November 5, 2018

THE AXELROD FIRM LLC

Sheryl L. Axelrod (PA I.D. 70959)
The Beasley Building
1125 Walnut Street
Philadelphia, PA 19107
Telephone: (215) 461-1768
Facsimile:  (215) 238-1779
saxelrod@theaxelrodfirm.com

*Liaison Counsel for Plaintiffs*

THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Judith S. Scolnick
Donald A. Broggi (P.A. I.D. 85514)
Thomas L. Laughlin
Jonathan M. Zimmerman (P.A. I.D. 322668)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334
jscolnick@scott-scott.com
tlaughlin@scott-scott.com
dbroggi@scott-scott.com
jzimmerman@scott-scott.com

*Lead Counsel for Plaintiffs*

Michael J. Barry (PA I.D. 69122)
Viola Vetter (PA I.D. 206277)
**GRANT & EISENHOFER P.A.**
123 Justison Street
Wilmington, DE 19801
Telephone: (302) 622-7000
Facsimile:  (302) 622-7100
mbarry@gelaw.com
vvetter@gelaw.com

*Counsel for Plaintiff the Charter Township of
Clinton Police & Fire Pension Fund and
[Proposed] Co-Lead Counsel for Plaintiffs*

Mark Lebovitch
David Wales
David MacIsaac
**BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP**
1251 Avenue of the Americas, 44th Floor
New York, NY 10020
Telephone: (212) 554-1400
Facsimile:  (212) 554-1444
markl@blbglaw.com
DWales@blbglaw.com
david.macisaac@blbglaw.com

*Counsel for Plaintiff the City of Cambridge
Retirement System and [Proposed] Co-Lead
Counsel for Plaintiffs*

- 161 -
THIS DOCUMENT IS A CONFIDENTIAL FILING
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

## VERIFICATION OF ROBERT ZEIDMAN ON BEHALF OF AMALGAMATED BANK AS TRUSTEE OF THE LONGVIEW FUNDS

I, Robert Zeidman, Senior Vice President, Investment Management Division for Amalgamated Bank ("Amalgamated"), Trustee of the Longview Broad Market 3000 Index Fund, Longview LargeCap 500 Index Fund, Longview LargeCap 500 Index VEBA Fund, Longview Quant LargeCap Equity VEBA Fund, and Longview Quantitative LargeCap Fund (the "Longview Funds"), state:

I have read the foregoing Verified Shareholder Derivative Consolidated Amended Complaint and know the contents thereof. I certify that its filing has been authorized by the Trust Committee of Amalgamated and that the foregoing is true to the best of my knowledge, information, and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Date:  October 18, 2018

_____
Robert Zeidman

Sworn to and subscribed before me this 18th day of October, 2018.

_____
NOTARY PUBLIC

KAREN S. MACALUSO
Notary Public, State of New York
No. 01MA6099172
Qualified in Queens County
Commission Expires 09/22/2019

My commission expires:

09/22/2019

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE UNIVERSAL HEALTH SERVICES, :    CIVIL ACTION
INC., DERIVATIVE LITIGATION :    NO. 17-02187
                                       :

This Document Relates To:             :

## **VERIFICATION**

I, Charles Champagne, Chairman, acting on behalf of and with the consent of the Board of Trustees of the Charter Township of Clinton Fire and Police Retirement System, hereby verify that I am familiar with the allegations in the Verified Shareholder Derivative Consolidated Amended Complaint for Violation of the Federal Securities Laws and State Law Claims for Breaches of Fiduciary Duty, Constructive Fraud, Corporate Waste, and Unjust Enrichment and that the allegations contained therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: October 29, 2018

Charles Champagne, Chairman

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE UNIVERSAL HEALTH SERVICES, INC., DERIVATIVE LITIGATION | : : : | CIVIL ACTION NO. 17-02187 |
| This Document Relates To: | : : | |

## **VERIFICATION**

I, Ellen K. Philbin, Executive Director, acting on behalf of and with the consent of the Board of the City of Cambridge Retirement System, hereby verify that I am familiar with the allegations in the Verified Shareholder Derivative Consolidated Amended Complaint for Violation of the Federal Securities Laws and State Law Claims for Breaches of Fiduciary Duty, Constructive Fraud, Corporate Waste, and Unjust Enrichment and that the allegations contained therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

DATED:  November 2, 2018