IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE UNIVERSAL HEALTH SERVICES,
INC., DERIVATIVE LITIGATION

CIVIL ACTION
NO. 17-2187

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................................ 4

II.   BACKGROUND .............................................................................................................. 7

  A. Parties ................................................................................................................................ 8

    1. Plaintiffs ......................................................................................................................... 8

    2. Defendants ..................................................................................................................... 9

      a.  Nominal Defendant UHS ..................................................................................... 11

      b. Defendants Alan Miller and Marc Miller .............................................................. 12

      c.  Defendant Robert Hotz ......................................................................................... 14

      d.  Defendant Lawrence S. Gibbs ............................................................................. 15

      e.  Defendant Eileen C. McDonnell ......................................................................... 15

      f.  Defendant Anthony Pantaleoni ............................................................................ 15

      g.  Defendant John H. Herrell ................................................................................... 16

      h.  Defendant Steve G. Filton ................................................................................... 16

      i.  Defendant Debra K. Osteen ................................................................................. 17

      j.  Defendant Charles F. Boyle .................................................................................. 17

      k. Defendant James Caponi ...................................................................................... 17

B. UHS Expands Behavioral Health Division and Approves Business Plans that Lay Out Aggressive Strategies to Increase Revenue ..................................................... 17

C. UHS Behavioral Health Facilities Face Inquiries, Lawsuits, and Government Investigations ......................................................................................................... 21

    1. State and Federal Agencies Investigate UHS Behavioral Health Facilities ................. 21

    2. The Escobar Qui Tam Lawsuit ..................................................................................... 23

    3. Coordinated Civil and Criminal Federal Investigation ............................................... 25

D. Buzzfeed News Publishes First UHS Article on December 7, 2016 .................................. 27

E. Allegations that Individual Defendants Knew About Misconduct at UHS Behavioral Health Facilities ................................................................................................................. 33

    1. Labor Union Letters to the Board of Directors ............................................................ 33

    2. Board of Director Meetings and Board Committee Meetings ...................................... 39

F. Insider Trading Allegations ............................................................................................... 44

G. Plaintiffs File the Present Action in Federal Court ............................................................ 46

III. STANDARD OF REVIEW ........................................................................................................ 54

IV. ANALYSIS ................................................................................................................................ 56

A. Applicable Test to Plaintiffs' Demand Futility Allegations ............................................... 57

B. Plaintiffs Have Failed to Demonstrate Demand Futility ................................................... 61

    1. Plaintiffs Have Failed to Plead Particularized Facts that Create a Reasonable Doubt That the UHS Board of Directors Was Not Disinterested ............................... 61

        a. Plaintiffs Have Failed to Plead Particularized Allegations that the UHS Board Directed UHS Behavioral Health Facilities to Engage in Fraud……………………..63

b.  Plaintiffs Have Failed to Plead Particularized Facts That the UHS

Board Ignored Significant Red Flags……………………………………………68

i.  Qui Tam Lawsuits and Government Investigations……………………….69

ii. Labor Union Letters……………………………………………………..73

iii. Hotline Compliance Calls……………………………………………….74

iv. Business Plans, Performance Metrics, and Statistics…………………75

v.  Buzzfeed I………………………………………………………………77

c.  Plaintiffs Have Not Demonstrated That the UHS Board Faces a

Substantial Threat of  Personal Liability From the Underlying Claims

in the Amended Complaint………………………………………………………78

i.  Count I – Securities Fraud Under Section 10(b) and Rule 10b-5…………78

ii. Count II – Securities Fraud Under Section 20(A)…………………………84

iii. Count VII – Breach of Fiduciary Duty Based on Insider Trading……………85

iv. Count III – State Law Breach of Fiduciary Duty Claim………………………88

v.  Count IV – State Law Constructive Fraud Claim…………………………89

vi. Count V – State Law Corporate Waste Claim………………………………89

vii. Count VI – State Law Unjust Enrichment Claim……………………………91

2. Plaintiffs Have Failed to Plead Particularized Facts that Create a Reasonable

Doubt That a Majority of the UHS Board Lacked Independence ………… ………….92

V.    CONCLUSION.............................................................................................. 98

## OPINION

**Slomsky, J.**                                                    **August 19, 2019**

## I.     INTRODUCTION

Nominal Defendant[1] Universal Health Services ("UHS") is the largest provider of behavioral health services in the United States.  Beginning in 2017, UHS shareholders began filing shareholder derivative suits on behalf of the company, claiming that alleged misconduct at UHS behavioral health facilities was affecting the price of UHS shares.  Four of those suits[2] were consolidated into the present shareholder derivative action, which alleges that from January 16, 2013 to present, the UHS Board of Directors "pushed forward" aggressive business plans for UHS-owned behavioral health facilities, which ultimately resulted in fraudulent billing practices and other issues.  Plaintiffs, who are various UHS shareholders, allege that UHS Directors and Officers knew about or authorized the misconduct, but did nothing to remedy it, in violation of state and federal law.[3]  Named as Defendants are Alan Miller, Marc Miller, Robert Hotz, Lawrence S. Gibbs,

---

[1]  A nominal defendant is a defendant named in a lawsuit not because it is a responsible party, but because the suit would be deficient if it were not named.  Nominal Defendant, Black's Law Dictionary (11th ed. 2019) (West).  For example, in a shareholder derivative suit, the company on whose behalf the shareholders are suing is named as a nominal defendant.

[2]  The four lawsuits include the following: (1) Heed v. Miller, Civ. No. 17-1476 (E.D. Pa., filed Mar. 31, 2017); Central Laborers' Pension Fund v. Miller, Civ. No. 17-2187 (E.D. Pa., filed May 12, 2017); (3) Waterford Twp. Police & Fire Ret. Sys. v. Miller, Civ. No. 17-2595 (E.D. Pa., filed June 9, 2017); and (4) Amalgamated Bank Longview Funds v. Boyle, No. 17-3404 (E.D. Pa., filed July 28, 2017).  (See Doc. No. 38.)

[3]  In connection with this alleged misconduct, Defendants UHS, Alan Miller, and Steve Filton also have been named as defendants in a securities class action lawsuit pending before this Court.  See Teamsters Local 456 Pension Fund v. Universal Health Service, Civ. No. 17-2817 (E.D. Pa., filed June 21, 2017).  Defendants Marc Miller, Robert Hotz, Lawrence S. Gibbs, Eileen C. McDonnell, Anthony Pantaleoni, John H. Herrell, Debra K. Osteen, Marvin G. Pember, Charles F. Boyle, and James Caponi were not named as defendants in the securities class action lawsuit.  The securities lawsuit will be dismissed in a separate Opinion and Order.

Eileen C. McDonnell, Anthony Pantaleoni, John H. Herrell, Steve G. Filton, Debra K. Osteen, Marvin G. Pember,[4] Charles F. Boyle, James Caponi ("Individual Defendants"), and Nominal Defendant UHS (collectively, "Defendants"). (See Doc. No. 48.)

On March 28, 2018, former Chief Judge Lawrence F. Stengel consolidated the four shareholder derivative suits into the present action and appointed Plaintiff Amalgamated Bank Longview Funds ("Plaintiff Amalgamated") as Lead Plaintiff. (Doc. Nos. 42, 43.) On August 13, 2018, this case was assigned from former Chief Judge Stengel to this Court. (Doc. No. 45.) On November 5, 2018, Plaintiffs filed the Verified Shareholder Derivative Amended Complaint (the "Amended Complaint"), which contains seven claims. (Doc. No. 48.)

First, in Count I, Plaintiffs allege that Individual Defendants knowingly or recklessly made materially false or misleading statements and omissions about UHS's financial position in violation of Section 10(b) of the Securities and Exchange Act of 1934, and Rule 10b-5, which was promulgated pursuant to Section 10(b). (Id. ¶¶ 306-312.) In Count II, Plaintiffs allege that Individual Defendants, by virtue of stock ownership and their positions of control in the company, violated Section 20(A) of the Securities and Exchange Act. (Id. ¶¶ 313-14.) Next, in Count III, Plaintiffs claim that under Delaware law, Individual Defendants breached their fiduciary duty to the company. (Id. ¶¶ 315-318.) In Count IV, Plaintiffs allege that Individual Defendants committed constructive fraud under Delaware law by failing to ensure that the company disclosed true facts about its business. (Id. ¶¶ 319-322.) In Count V, Plaintiffs claim that the alleged improper conduct of Individual Defendants amounts to corporate waste under Delaware law. (Id. ¶¶ 323-325.) In Count VI, Plaintiffs bring a state law claim of unjust enrichment, alleging that

---

[4] On April 18, 2019, Defendant Marvin G. Pember was dismissed from this action pursuant to a Joint Stipulation of Dismissal filed by the parties under Federal Rule of Civil Procedure 41(a)(1). (Doc. No. 96.)

Individual Defendants unjustly enriched themselves at the expense of the company. (Id. ¶¶ 326-330.) Finally, in Count VII, Plaintiffs allege that certain Individual Defendants, referred to as "Insider Trading Defendants," violated the fiduciary duty they owed to the company under state law by engaging in insider trading. (Id. ¶¶ 331-335.)

On January 25, 2019, Plaintiff Amalgamated filed a Motion to Amend the Court's March 28, 2018 Order and Appoint Additional Co-Lead Plaintiffs and Co-Lead Counsel. (Doc. No. 62.) On February 22, 2019, the Court granted the Motion (Doc. No. 62) and appointed Plaintiff Amalgamated, together with Plaintiff City of Cambridge Retirement System ("Plaintiff Cambridge") and Plaintiff Charter Township of Clinton Police & Fire Pension Fund ("Plaintiff Clinton"), as Co-Lead Plaintiffs. (Doc. No. 76.)

On February 11, 2019, Defendants filed the present Motion to Dismiss the Amended Complaint. (Doc. No. 66.) On March 29, 2019, Plaintiffs filed a Response in Opposition to the Motion to Dismiss (Doc. No. 87),[5] and on April 29, 2019, Defendants filed a Reply in Support of the Motion to Dismiss (Doc. No. 99).[6] On May 31, 2019, the Court held a hearing on the Motion. (Doc. No. 102.) Following the hearing, both parties filed supplemental briefs in further support of their positions.[7] (Doc. Nos. 105, 108.)

---

[5] That same day, Plaintiffs filed a Motion to Strike Certain Exhibits Attached to Defendants' Motion to Dismiss. (Doc. No. 86.) In the Motion, Plaintiffs request that the Court strike Exhibits B, H, and I, which were attached to Defendants' Motion to Dismiss. The Motion to Strike will be denied as moot because the Court did not rely on Exhibits B, H, or I in this Opinion.

[6] The parties submitted briefings on the Motion to Dismiss pursuant to a Joint Stipulated Briefing Schedule. (Doc. No. 72.)

[7] Additionally, on July 26, 2019, Defendants filed a Notice Regarding the Government's Investigation into UHS. (Doc. No. 116.) On July 31, 2019, Plaintiffs filed a Response to Defendants' Notice. (Doc. No. 117.) The Court has considered the Notice and the Response here.

Defendants' Motion to Dismiss is now ripe for disposition.  For the reasons discussed below, the Motion to Dismiss (Doc. No. 66) will be granted.

## II.     BACKGROUND[8]

At the heart of this matter is Plaintiffs' claim that starting on January 16, 2013, the UHS Board of Directors "pushed forward" aggressive business plans that incentivized or encouraged UHS behavioral health facilities across the country to engage in fraudulent billing practices and other misconduct in order to meet financial goals.  Plaintiffs allege that Individual Defendants knew about this misconduct, but failed to take steps to remedy it, in violation of the law and in breach of their fiduciary duty to the company.  Moreover, the Amended Complaint states that in connection with this alleged misconduct, Individual Defendants violated federal securities laws by knowingly or recklessly making materially false or misleading statements about UHS's financial position.  Finally, the Amended Complaint contains allegations that a subgroup of Individual Defendants, referred to as Insider Trading Defendants, engaged in insider trading by selling UHS common stock while in possession of material, non-public information about the alleged misconduct at UHS behavioral health facilities.  (See Doc. No. 48.)

To address these allegations, the Court will first list the parties to this action and describe Individual Defendants' positions in the company.  Second, the Court will address the alleged "aggressive" business plans and strategies in place at UHS behavioral health facilities.  Third, the Court will discuss the purported misconduct that Plaintiffs claim resulted from those aggressive strategies, and the negative attention the misconduct attracted, including government

---

[8]    The facts are taken from the Amended Complaint and are accepted as true for purposes of deciding the Motion to Dismiss.  Phillips v. Cnty. of Allegheny, 515 F.3d 224, 228 (3d Cir. 2008).  The Background Section is not organized chronologically; rather, it is organized in accordance with how the allegations are set forth in the Amended Complaint.  A chronological list of relevant events alleged in the Amended Complaint can be found at the conclusion of the Background Section.

investigations, whistleblower lawsuits, and articles published by Buzzfeed News. Fourth, the Court will set forth Plaintiffs' various allegations that Individual Defendants were on notice of the misconduct and received updates about the various investigations and lawsuits, but did nothing to remedy the reported illicit policies and practices. Finally, the Court will describe Plaintiffs' allegations that certain Individual Defendants engaged in securities fraud and insider trading.

### A. Parties

At present, there are three Co-Lead Plaintiffs: Plaintiff Amalgamated, Plaintiff Cambridge, and Plaintiff Clinton. As noted, named as Defendants are Alan Miller, Marc Miller, Robert Hotz, Lawrence S. Gibbs, Eileen C. McDonnell, Anthony Pantaleoni, John H. Herrell, Steve G. Filton, Debra K. Osteen, Charles F. Boyle, James Caponi ("Individual Defendants"), and Nominal Defendant UHS (collectively, "Defendants"). (See Doc. No. 48.)

#### 1. Plaintiffs

On March 29, 2018, after extensive proceedings, former Chief Judge Lawrence F. Stengel appointed Plaintiff Amalgamated as Lead Plaintiff in this consolidated shareholder derivative suit. (Doc. No. 43.) Plaintiff Amalgamated is a current UHS shareholder and has continuously held UHS stock since 2012. (Doc. No. 48 ¶ 22.)

On February 22, 2019, this Court granted Plaintiff Amalgamated's request to add additional Lead Plaintiffs, and entered an Order appointing Plaintiffs Cambridge and Clinton, as well as Plaintiff Amalgamated, as Co-Lead Plaintiffs. (Doc. No. 76.) Plaintiff Cambridge is a current UHS shareholder and has continuously held UHS stock since January 31, 2014. (Doc. No. 48 ¶ 23.) Plaintiff Clinton is a current UHS shareholder and has continuously held UHS stock since March 13, 2015. (Id. ¶ 24.)

### 2. Defendants

Because Plaintiffs filed a shareholder derivative suit on behalf of UHS, the company is named as Nominal Defendant. Also named are eleven Individual Defendants, all of whom are either members of the UHS Board of Directors ("Director Defendants") or UHS Officers ("Officer Defendants"), or both. Defendants Alan Miller, Marc Miller, Robert Hotz, Lawrence Gibbs, Eileen McDonnell, Anthony Pantaleoni, and John Herrell are named as Director Defendants. (Id. ¶ 33.) Named as Officer Defendants are Defendants Alan Miller, Marc Miller, Steve Filton, Debra Osteen, Charles Boyle, and James Caponi. (Id. ¶ 40.) Defendants Alan Miller and Marc Miller are both Director Defendants and Officer Defendants. Counts I through VI of the Amended Complaint apply to all Individual Defendants.

Count VII of the Amended Complaint only applies to a subgroup of Individual Defendants, referred to as "Insider Trading Defendants." Insider Trading Defendants include Defendants Alan Miller, Marc Miller, Anthony Pantaleoni, John Herrell, Robert Hotz, Lawrence Gibbs, Steve Filton, and Debra K. Osteen. (Id. ¶ 252.)

The following chart sets forth whether each Individual Defendant is a Director Defendant, Officer Defendant, or an Insider Trading Defendant:

| Individual Defendant | Director Defendant | Officer Defendant | Insider Trading Defendant |
|---|---|---|---|
| Alan Miller | X | X | X |
| Marc Miller | X | X | X |
| Robert Hotz | X | | X |
| Lawrence Gibbs | X | | X |
| Eileen McDonnell | X | | |
| Anthony Pantaleoni | X | | X |

| | | | |
|---|:---:|:---:|:---:|
| John Herrell | X | | X |
| Steve Filton | | X | X |
| Debra Osteen | | X | X |
| Charles Boyle | | X | |
| James Caponi | | X | |

As Directors and Officers, Individual Defendants owe UHS and its shareholders certain fiduciary duties, including a duty of loyalty and a duty of care. (<u>Id.</u> ¶ 281.) In essence, Individual Defendants are obligated to act "in furtherance of the best interests of [UHS] and not for their own personal interest or benefit." (<u>Id.</u>)

There are seven directors on the UHS Board of Directors. The Directors sit on various Board Committees, including the Audit Committee, the Compensation Committee, the Nominating & Governance Committee, the Executive Committee, the Finance Committee, and the Compliance Committee. (<u>Id.</u> ¶¶ 34, 39.)

Relevant here, the Audit Committee is charged with assisting the Board with its oversight responsibilities. (<u>Id.</u> ¶ 292.) The Audit Committee is also responsible for monitoring the company's internal controls, assessing financial risk exposure, overseeing the company's financial reporting process, managing internal employee complaints, and reporting to the Board on these matters. (<u>Id.</u> ¶ 293.) UHS requires that the Audit Committee be comprised of at least three independent directors appointed by the Board. (<u>Id.</u> ¶ 291.) During the years relevant to this action, Defendants Gibbs, Herrell, Hotz, and McDonnell were members of the Audit Committee. (<u>Id.</u>) Plaintiffs claim that these Defendants were not truly independent. (<u>Id.</u>)

### a. Nominal Defendant UHS

Nominal Defendant UHS was founded by Defendant Alan Miller in 1978. (Id. ¶ 26.) It is a publicly-traded company[9] that owns and operates hospitals throughout the United States, the United Kingdom, Puerto Rico, and the U.S. Virgin Islands. (Id. ¶ 25.) The company, which is incorporated in Delaware and headquartered in King of Prussia, Pennsylvania, is split into two divisions: (1) the Acute Care Division, which operates general hospitals, and (2) the Behavioral Health Division,[10] which operates inpatient and outpatient psychiatric facilities. According to the company's August 8, 2018 Form 10-Q,[11] UHS operates 359 facilities. Twenty-six (26) of those facilities are Acute Care facilities; the rest are managed by the Behavioral Health Division. (Id. ¶ 53.)

Since 2011, the Behavioral Health Division has accounted for between 45% and 50% of UHS's total revenue.[12] (Id. ¶ 55.) About one-third of the Behavioral Health Division's revenue is derived from government health insurance payers, such as Medicare and Medicaid. (Id. ¶ 57.)

---

[9] UHS common stock trades on the New York Stock Exchange under the ticker symbol "UHS." (Doc. No. 48 ¶ 25.)

[10] UHS's Behavioral Health Division offers an array of services to treat behavioral health issues, including depression, anxiety, psychotic disorders, bipolar disorder, post-traumatic stress, substance abuse, autism, eating disorders, and neurorehabilitation. It maintains outpatient, inpatient, partial hospitalization, and residential treatment programs. See Behavioral Health, Universal Health Services, https://www.uhsinc.com/about-uhs/behavioral-health/ (last visited: June 12, 2019).

[11] The SEC mandates that public companies file quarterly reports of financial performance in a filing known as Form 10-Q. Form 10-Q, U.S. Securities and Exchange Commission, https://www.sec.gov/fast-answers/answersform10qhtm.html (last visited: June 17, 2019).

[12] The amended complaint filed in the securities class action lawsuit states that the Behavioral Health Division accounted for 70% of the company's business from 2015 to 2017. No explanation has been offered by any party in either case for the discrepancies between these numbers.

According to the company's 2017 Form 10-K,[13] which was filed on February 28, 2018, UHS admitted nearly half-a-million patients into its behavioral health facilities in 2017.  (Doc. No. 68 at 12; Doc. No. 75-1 at 6.)  On average, these patients remained at UHS facilities for 13.6 days, which resulted in more than six million patient-days that year.  (Doc. No. 75-1 at 6.)

The company's filings with the United States Securities and Exchange Commission ("SEC") disclose that each UHS behavioral health facility operates under its own leadership, including a chief executive officer, chief financial officer, and compliance staff.  Each facility has its own governance board, which includes members of the facility's medical and professional staff and is responsible for the facility's day-to-day medical, clinical, and ethical practices.  (Id. at 12.)

### b.   Defendants Alan Miller and Marc Miller[14]

Defendant Alan Miller, who is named as a Director Defendant, an Officer Defendant, and an Insider Trading Defendant, founded UHS in 1978.  (Doc. No. 48 ¶ 26.)  Since that time, he has served as the company's CEO and Chairman of the Board of Directors.  He also served as UHS's President from 1978 until May 2009.  From 2010 to 2017, he held a seat on the Board's Executive Committee and Finance Committee.[15]  (Id. ¶ 34.)  From 2013 to 2017, the Compensation

---

[13] The United States Securities and Exchange Commission ("SEC") requires publicly-traded companies to file a comprehensive annual report about its financial performance.  This filing is known as a Form 10-K.  Form 10-K, U.S. Securities and Exchange Commission, https://www.sec.gov/fast-answers/answers-form10khtm.html (last visited: Apr. 24, 2019).  UHS's filings with the SEC are publicly available on the company's website.  See Universal Health Services, Inc., Annual Report (Form 10-K), at 3 (Feb. 28, 2018) (available at https://uhsinc.gcs-web.com/node/15281/html) (last visited: June 17, 2019).

[14] As noted supra, Defendant Alan Miller is named as a defendant in the related securities class action pending before this Court.  See Teamsters Local 456 Pension Fund v. Universal Health Service, Civ. No. 17-2817 (E.D. Pa., filed June 21, 2017).  Defendant Marc Miller is not named as a defendant in the securities class action.

[15] In Paragraph 34 of the Amended Complaint, Plaintiffs list the various Board committees that Director Defendants served on from 2010 to 2017.  Plaintiffs do not provide information about committee membership prior to 2010 or after 2017.  (See Doc. No. 48 ¶ 34.)

Committee approved a Total Incentive Compensation of $78,669,420 for Alan Miller, as CEO of the company.  (Id. ¶ 278.)

Defendant Marc Miller is Defendant Alan Miller's son.  He has served on the UHS Board of Directors since 2006 and replaced his father as the company's President in May 2009.  (Id. ¶ 27.)  From 2013 to 2017, Marc Miller sat on the Board's Executive Committee.  From 2010 to 2017, he served on the Board's Finance Committee.  (Id. ¶ 34.)  Marc Miller is named as a Director Defendant, an Officer Defendant, and an Insider Trading Defendant.  From 2013 to 2017, the Compensation Committee approved a Total Incentive Compensation of $13,150,264 for Marc Miller, as President of the company.  (Id. ¶ 278.)

Despite only maintaining a 7 to 8% equity stake in UHS, Alan and Marc Miller retain enormous control over the company.  (Id. ¶ 44.)  According to the UHS April 5, 2018 Definitive Proxy Statement,[16] Alan and Marc Miller respectively possess 83.6% and 2.6% of company's general voting power.  (Id. ¶ 43.)  As of March 20, 2018, Alan Miller held 99.7% of UHS Class C voting stock, which entitles the holder to 100 votes per share.  And collectively, Alan and Marc Miller hold over 90% of UHS Class A stock, which entitles the holder to one vote per share.  (Id.

---

[16] The SEC requires that shareholders of publicly-traded companies receive a proxy statement prior to a shareholder meeting.  The information contained in the statement must be filed with the SEC before the company solicits a shareholder vote on the election of directors or the approval of other corporate action.  That filing is known as a Schedule 14A Form and must provide shareholders with sufficient information to allow them to make an informed vote at the upcoming meeting or to authorize a proxy to vote on their behalf.  See Proxy Statement, Securities and Exchange Commission, https://www.sec.gov/answers/proxy.htm (last visited: Apr. 17, 2019); 17 C.F.R. § 240.14a-101.  UHS's filings with the SEC are publicly available on the company's website.  See Universal Health Services, Inc., Proxy Statement (Schedule 14A), at 52 (Apr. 5, 2018) (available at: https://uhsinc.gcs-web.com/node/15326/html).

¶¶ 41-42.) No other UHS shareholder possesses more than 1.3% of the company's voting power.[17] (Id. ¶ 45.)

Through their control of the company's Class A and Class C stock, Alan and Marc Miller have the power to elect five of the seven directors on the Board. Since 2006, when Marc Miller joined the Board of Directors, the Millers have occupied two of these five seats. Plaintiffs allege that the remaining three directors "maintain[] his/her directorship only at the pleasure of Defendants Alan and Marc Miller, and thus are not truly independent." (Id. ¶ 47.) Further, Plaintiffs claim that "[b]ecause Defendants Alan and Marc Miller hold the top executive positions at the company – CEO and President, respectively—all other executives ultimately report to either or both of them and, thus, are controlled by them." (Id. ¶ 46.) Additionally, Plaintiffs emphasize that the company's "purportedly independent oversight committees – the Audit Committee and Nominating & Governance Committee – are staffed by directors who serve almost entirely at Defendants Alan and Marc Miller's pleasure . . . ." (Id. ¶ 48.)

### c.    Defendant Robert Hotz

Defendant Robert H. Hotz is a Director Defendant and an Insider Trading Defendant. Mr. Hotz is a Senior Managing Director and Vice Chairman of Houlihan Lokey Howard & Zukin, which is an investment bank. (Doc. No. 69-2 at 6.) He has served on the UHS Board of Directors since 1991. (Doc. No. 48 ¶ 28.) From 2010 to 2017, Mr. Hotz sat on several Board Committees, including the Executive Committee, the Finance Committee, and the Audit Committee. During that time, he also served as the Chair of the Board's Compensation Committee and the Chair of the Board's Nominating & Governance Committee. (Id. ¶ 34.)

---

[17] The parties do not dispute these numbers or the fact that Alan Miller and Marc Miller have considerable voting power as shareholders.

#### d.      Defendant Lawrence S. Gibbs

Defendant Lawrence S. Gibbs is a Director Defendant and an Insider Trading Defendant. Mr. Gibbs is a Portfolio Manager at Ramius, LLC, and previously served as a Chief Investment Officer at JP Morgan Chase Bank.  (Doc. No. 69-2 at 6.)  He has served on the UHS Board of Directors since 2011.  (Doc. No. 48 ¶ 29.)  From 2011 to 2017, Mr. Gibbs served on the Board's Nominating & Governance Committee, Audit Committee, and Compensation Committee.  (Id. ¶ 34.)

#### e.      Defendant Eileen C. McDonnell

Defendant Eileen C. McDonnell is a Director Defendant.  Ms. McDonnell currently serves as the Chairman and Chief Executive Officer of the Penn Life Mutual Life Insurance Company.  (Doc. No. 69-2 at 6.)  She has served on the UHS Board of Directors since April 2013.  (Doc. No. 48 ¶ 30.)  Ms. McDonnell served on the Board's Audit Committee from 2013 to 2017.  (Id. ¶ 34.)

#### f.      Defendant Anthony Pantaleoni

Defendant Anthony Pantaleoni is a Director Defendant and an Insider Trading Defendant. He served on the UHS Board of Directors from 1982 until January 17, 2018, when he resigned. (Id. ¶ 31.)  From 2010 to 2017, Mr. Pantaleoni served on the Board's Executive Committee and Finance Committee.  (Id. ¶ 34.)

Additionally, Mr. Pantaleoni is Of Counsel at Norton Rose Fulbright US LLP ("Norton Rose"), UHS's long-term outside counsel.  According to the Amended Complaint, "Norton Rose provides personal legal services to Defendant Alan Miller and is the trustee of certain trusts for the benefit of Defendants Alan Miller, Marc Miller, and other Miller family members."  (Id. ¶ 31.) Plaintiffs further allege that "Pantaleoni's compensation at Norton Rose is largely dependent upon the continued engagement by and payments for legal services to Universal and Defendant Alan

Miller." (Id.) When Mr. Pantaleoni resigned from his position as Director in 2018, he was replaced by Warren Nimetz, another Norton Rose attorney. (Id.)

### g.  Defendant John H. Herrell

Defendant John H. Herrell is a Director Defendant and an Insider Trading Defendant. From 1984 to 1993, Mr. Herrell served as the Chief Financial Officer of the Mayo Clinic Foundation and from 1993 to 2002, he served as the Mayo Clinic's Chief Administrative Officer. (Doc. No. 69-2 at 6.) In 1993, he was elected to serve on the UHS Board of Directors. He remained as a Director until he retired on May 16, 2018. (Doc. No. 48 ¶ 32.) Upon Mr. Herrell's retirement, Elliott J. Sussman, M.D., was appointed to fill his seat. According to the Amended Complaint, Dr. Sussman is a trustee of the Universal Health Realty Income Trust ("UHRI"). Defendant Alan Miller is the CEO and President of UHRI and serves as a trustee and director. Defendant Marc Miller also serves as a UHRI trustee. (Id.)

Mr. Herrell served on the Board's Nominating & Governance Committee from 2013 to 2017. During those years, he also sat on the Board's Compensation Committee. Additionally, Mr. Herrell served as the Chair of the Board's Audit Committee from 2010 to 2017. (Id. ¶ 34.)

### h.  Defendant Steve G. Filton[18]

Defendant Steve. G. Filton is an Officer Defendant and an Insider Trading Defendant. He has served as the company's Chief Financial Officer ("CFO") and Secretary since February 2003. He has also served as an Executive Vice President since 2003. (Id. ¶ 35.) From 2013 to 2017, the Board's Compensation Committee approved a Total Incentive Compensation of $9,267,631 for Mr. Filton, as CFO of the company. (Id. ¶ 278.)

---

[18]  As noted supra, Mr. Filton is named as a defendant in the related securities case pending in this Court. See Teamsters Local 456 Pension Fund v. Universal Health Service, Civ. No. 17-2817 (E.D. Pa., filed June 21, 2017). Except for Alan Miller, no other Individual Defendant is named as a defendant in that case.

### i.        Defendant Debra K. Osteen

Defendant Debra K. Osteen is an Officer Defendant and an Insider Trading Defendant.  She has served as an Executive Vice President and the President of the Behavioral Health Division since December 2005.  (<u>Id.</u> ¶ 36.)  From 2013 to 2017, the Board's Compensation Committee approved a Total Incentive Compensation of $8,545,195 for Ms. Osteen, as President of the Behavioral Health Division.  (<u>Id.</u> ¶ 278.)

### j.        Defendant Charles F. Boyle

Defendant Charles F. Boyle is an Officer Defendant.  He has served as the Controller of the company since 2003 and currently serves as a Vice President.  Additionally, Mr. Boyle has held various executive accounting positions at UHS since 1983.  He has served as the Assistant Vice President for Corporate Accounting since 1994.  (<u>Id.</u> ¶ 38.)

### k.        Defendant James Caponi

Defendant James Caponi is an Officer Defendant.  He served as the UHS Chief Compliance Officer from November 2010 to June 2018.  During that time, Mr. Caponi was responsible for "legal compliance oversight" at UHS.  In his capacity as Chief Compliance Officer, he reported to the company's Compliance Committee on numerous occasions.  (<u>Id.</u> ¶ 39.)

### B.    UHS Expands Behavioral Health Division and Approves Business Plans that Lay Out Aggressive Strategies to Increase Revenue

The UHS Behavioral Health Division has rapidly expanded in the last decade.  In November 2010, the company acquired Psychiatric Solutions, Inc. ("PSI"), which at that point was the largest stand-alone behavioral health operator in the country.  (<u>Id.</u> ¶ 50.)  The acquisition cost UHS $3.4 billion and added 105 behavioral health facilities across 32 states, Puerto Rico, and the U.S. Virgin Islands, making UHS the largest provider of behavioral health services in this market.  (<u>Id.</u>)  Mr. Filton, the company's CFO, called the deal "transformative."  (<u>Id.</u>)  Additionally, between

2012 and 2018, UHS spent nearly one billion dollars to add more behavioral health facilities to the company. (See id. ¶ 51.)

Apart from the company's efforts to expand the Behavioral Health Division through acquisitions, UHS implemented numerous strategies to increase profitability at its behavioral health facilities. These strategies can be found in the business plans for behavioral health facilities that were reviewed and approved by the UHS Board of Directors between 2013 and 2017.[19] (Id. ¶ 59.) For each of those years, the UHS Board of Directors reviewed and approved business plans from a small sample of its behavioral health facilities. (See Doc. No. 99 at 7.) In 2013, the Board reviewed and approved plans for seven facilities, or 3.5% of all UHS behavioral health facilities. (Doc. No. 75-15.) In 2014, the Board reviewed business plans for 3.6% percent of facilities. (Doc. No. 75-16.) In 2015 and 2016, the Board reviewed plans for 2.3% of UHS behavioral health facilities (Doc. Nos. 75-17, 75-18), and in 2017, the Board reviewed plans from five facilities, or 1.6% of all behavioral health facilities (Doc. No. 75-19). Plaintiffs claim that the strategies set forth in these business plans prove that UHS "ha[s] long used the patient admissions process as a tool to fuel profit, without regard to its patients' needs and, indeed, the lawful provision of health services." (Doc. No. 48 ¶ 59.)

In general, Plaintiffs claim that the business plans reveal that certain UHS behavioral health facilities set goals for patients' average length of stay based on financial concerns, "rather than letting individual patient's needs dictate personalized lengths of stay . . . ." (Id. ¶ 60.) For example,

---

[19] Plaintiffs accessed these business plans through their Section 220 demand on the company. Section 220 of the Delaware General Corporation Law provides that any shareholder of a Delaware corporation "shall, upon written demand under oath stating the purpose thereof, have the right during the usual hours for business to inspect for any proper purpose, and to make copies and extracts from . . . the corporation's stock ledger, a list of its stockholders, and its other books and records." 8 Del. C. § 220. Such a demand is known as a Section 220 Demand.

Plaintiffs point to several facilities where the business plans set numerical goals to increase patient days. According to Plaintiffs, allowing numerical goals rather than medical need dictate how long a patient should remain admitted at a facility impermissibly "put[s] the cart before the horse." (Id. ¶¶ 60-62.) Another strategy involved "[c]onverting residential beds to acute care [beds] to obtain higher reimbursement[.]" (Id. ¶ 60.) Plaintiffs claim that UHS adopted this strategy because acute patient days yield higher insurance reimbursements than residential patient days. (See id. ¶ 73.)

Plaintiffs also assert that facilities devised strategies to increase admissions of patients with Medicare insurance. According to several business plans, the average length of stay of Medicare patients far exceeded the average length of stay of patients with other types of insurance. Therefore, admitting more Medicare patients increased same-facility patient days, which then translated into higher insurance reimbursements. For example, Peachford Hospital in Georgia reported that Medicare patients stay at its facility for an average of 14.45 days. In comparison, patients with Blue Cross insurance stay at the facility for an average of 7.76 days. (Id. ¶ 75.) As a result, in its 2014 business plan, Peachford noted that it sought to "increase our Medicare mix which will help our length of stay." (Id.)

Other facilities engaged in what Plaintiffs call "physician-shaming." That is, certain facilities implemented programs in which "[p]hysicians receive[d] monthly documentation outlining their admissions, length of stay and days denied in a peer comparative format which allows them to identify any procedural issues before it becomes routine." (Id. ¶ 78.) According to Plaintiffs, these programs pressured physicians to admit more patients and to extend patients' stays in order to improve performance metrics and ensure higher insurance reimbursements.

In a business plan section entitled "[o]pportunities for growth," Lakeside Behavioral Health System in Tennessee devised a new online assessment scheduling model. The model

advertised that "[t]reatment begins with a free, confidential assessment to determine each patient's unique needs and the program that will best serve those needs[,]" but included a disclaimer that stated that "[t]his reservation system is for scheduling non-life threatening psychiatric assessments. If you are having feels of harming yourself, another person or are in a life threatening situation, please call 911." (Id. ¶ 79) (emphasis omitted). In its 2016 business plan, Lakeside reported that 27% of the 453 people who scheduled assessments through the online scheduling model were admitted to the facility as inpatients in need of acute care treatment. (Id. ¶ 86.)

Plaintiffs allege that both facility executives and the Board of Directors were aware of these facilities' "aggressive" strategies. In the Amended Complaint, Plaintiffs claim that facility executives "continuously monitor[ed] and review[ed] weekly and monthly reports . . . to track referral and admission patterns from referral sources." (Id. ¶ 84.) On the corporate level, Plaintiffs claim that the Board "generally reviewed and approved the business plans for [UHS's] various . . . business segments at the beginning of each fiscal year" and closely monitored facilities' performance. (Id. ¶ 94.)

It appears that these strategies paid off. In 2013, the Behavioral Health Division reported that its profit margin had increased, that it had exceeded its budgeted net income by $33.5 million, and that inpatient admissions had risen 7.6% on a same-facility basis. (Id. ¶ 67.) The Behavioral Health Division reported similar gains in 2014 and 2015. (Id. ¶¶ 68, 76.) In 2016, the Division operated at a 28% profit margin and exceeded its budgeted net income by $36 million. (Id. ¶ 82.) The Behavioral Health Division also posted increases in its residential and acute average length of stay metrics. (Id.) In 2017, the Division maintained a 28% profit margin and increased net income by $9 million, despite external pressures, discussed infra. (Id. ¶ 88.) Plaintiffs allege that "the

strategies disclosed in the facilities' business plans enabled [UHS] to keep its hallmark margins in tact despite the flurry of legal and public pressure." (Id.)

The Behavioral Health Division's success also paid off for Defendant Alan Miller. According to the company's April 5, 2018 Schedule 14A filing, in 2017, "Alan Miller earned a base salary of $1,635,063, $2,000,060 in stock awards, $15,978,734 in option awards, $719,428 for non-equity incentive plan compensation, $43,407 in earnings for changes in pension value and nonqualified deferred compensation, and $1,655,000 for all other compensation, for a total of $21,630,861." (Id. ¶ 95.)

**C.** **UHS Behavioral Health Facilities Face Inquiries, Lawsuits, and Government Investigations**

Plaintiffs allege that UHS's aggressive strategies pushed behavioral health facilities to engage in fraudulent and unethical conduct to meet financial goals. According to Plaintiffs, this conduct attracted inquiries from state and federal agencies, qui tam whistleblower lawsuits, and a coordinated civil and criminal federal investigation.

**1. State and Federal Agencies Investigate UHS Behavioral Health Facilities**

Plaintiffs claim that as a result of the company's aggressive strategies, UHS behavioral health facilities "have been subject to a plethora of localized inquiries over the years." (Id. ¶ 98.) They cite to four examples of such inquiries. First, in 2005, a former UHS employee filed a whistleblower complaint against McAllen Hospitals d/b/a/ South Texas Health System, a UHS behavioral health facility. The complaint alleged that the facility had entered into financial relationships with several doctors to refer patients to UHS behavioral health facilities. (Id.) As a result of the complaint, government authorities opened an investigation into the facility for violations of the False Claims Act, the federal Anti-Kickback Statute, 42 U.S.C. §§ 1320a-7b, and the Stark Law, 42 U.S.C. § 1395m. (Id.) UHS later settled the matter for $27.5 million. (Id.)

Second, in April 2011, the federal government suspended Medicaid payments to Two Rivers Psychiatric Hospital, a UHS behavioral health facility in Kansas, after the Centers for Medicare & Medicaid Services ("CMS")[20] learned that employees failed to monitor a suicidal woman who ultimately killed herself on their watch. (Id. ¶ 99.) That same month, North Carolina state authorities removed all state wards from The Pines, a UHS facility in Virginia now known as Harbor Point Behavioral Health Center, after discovering allegations of sexual abuse at the facility. (Id. ¶ 100.) Later, North Carolina officials learned of additional patient care issues, prompting Virginia to place The Pines on a provisional license and other states to remove their wards from its care. (Id.)

Finally, in 2011, the Illinois Department of Children and Family Services and the Department of Psychiatry at the University of Illinois at Chicago opened an inquiry into Hartgrove Hospital, a UHS behavioral health facility in Chicago. (Id. ¶ 101.) The Departments ultimately issued a "scathing" report after random observations, interviews with hospital administrators, and a review of over 12,000 internal documents. The report found that "[t]he cumulative weight of the available data regarding services provided [to state] wards at UHS's Hartgrove Hospital demonstrates a consistent pattern of unacceptable risks of harm, substandard quality of care, poor clinical treatment and discharge planning, and questionable clinical management practices by hospital and corporate officials at all levels of the organization." (Id. ¶ 102) (emphasis omitted). The report also found that these issues were not limited to Hartgrove; rather, the report concluded that "troubling reports suggest[] a pattern of quality of care issues, harm to patients or major

---

[20] The Centers for Medicare & Medicaid Services ("CMS") is a federal agency within the United States Department of Health and Human Services that administers the Medicare program and works with state governments to administer Medicaid and the Children's Health Insurance Program.

healthcare fraud charges involving UHS-operated facilities in a dozen other states beyond Illinois . . . [including] Virginia, Tennessee, Pennsylvania, North Carolina, California, South Carolina, Massachusetts, Connecticut, Texas, Nevada, Arkansas and Missouri." (Id. ¶ 103) (emphasis omitted).

### 2. The <u>Escobar Qui Tam</u> Lawsuit

Plaintiffs also cite to a <u>qui tam</u> lawsuit[21] that was filed against UHS in the United States District Court for the District of Massachusetts in July 2011. The lawsuit, <u>United States ex rel. Escobar v. Universal Health Services</u>, arose out of mental health treatment provided to Yarushka Rivera at Arbour Counseling Services ("Arbour"), a UHS behavioral health facility in Lawrence, Massachusetts.

After seeking mental health treatment at Arbour, Yarushka Rivera was diagnosed with bipolar disorder and prescribed anti-seizure medication. Soon thereafter, she suffered a fatal seizure, which her parents claim was caused by Arbour's failure to warn her about the side effects of her medication. (Id. ¶ 105.) Miss Rivera's parents later learned that many Arbour employees, including some that treated their daughter, were unlicensed and unsupervised, in violation of state and federal regulations. (Id. ¶ 106.) They then filed the <u>qui tam</u> action against UHS under the False Claims Act, alleging that Arbour had employed unlicensed and unsupervised personnel and had fraudulently submitted reimbursement claims to MassHealth, Massachusetts's Medicaid

---

[21] In a <u>qui tam</u> lawsuit, a private party, called a "relator," brings an action on the government's behalf. If the relator succeeds, the government and the relator share the monetary award. <u>Qui Tam Action</u>, <u>Black's Law Dictionary</u> (10th ed. 2014). For example, the federal False Claims Act authorizes <u>qui tam</u> whistleblower actions against parties who have defrauded the federal government. 31 U.S.C. § 3279 <u>et seq.</u>

program, knowing that they were in violation of regulations pertaining to behavioral health facilities.[22] (Id. ¶ 107.)

In 2017, the United States Office of the Attorney General and the Massachusetts Office of the Attorney General formally intervened in the suit and filed a complaint against UHS. (Id. ¶ 108); see also United States of America v. Universal Health Services, Inc., Civ. No. 17-11843-DPW (D. Mass, filed Sept. 25, 2017).[23] The government's complaint alleged that "staff members from [UHS] facilities told investigators working with the Massachusetts Attorney General's office that there was not a single qualified supervisor in one entire facility, making it impossible that any unlicensed staff could have been properly supervised, as required by the [False Claims Act] and its Massachusetts analogue." (Id. ¶ 110.) Further, the complaint alleged that "[d]espite the issuance of repeated statements of deficiencies at [UHS] facilities, these facilities failed to come into compliance, as [UHS] continued to use unlicensed and improperly trained staff." (Id.) The government also claimed that between 2005 and 2013, UHS facilities in Massachusetts asked for reimbursements totaling $94,217,691.08 for "counseling and medication management 'services'

---

[22] The United States District Court for the District of Massachusetts dismissed the action for failure to state a claim. U.S. ex rel. Escobar v. Universal Health Services, Inc., 2014 WL 1271757, at *1 (D. Mass. Mar. 26, 2014). The First Circuit Court of Appeals reversed the district court, United States ex rel. Escobar v. Universal Health Services, Inc., 780 F.3d 504, 507 (1st Cir. 2015), prompting UHS to seek review in the United States Supreme Court. There, the Supreme Court found that the relators' theory of liability—the implied false certification theory—could be a basis of liability under the False Claims Act and remanded the case for further consideration. Universal Health Services, Inc. v. United States ex rel. Escobar, 136 S.Ct. 1989, 1995-96 (2016).

[23] This case has been stayed pending developments in the Escobar qui tam lawsuit, captioned United States ex rel. Escobar v. Universal Health Services, Inc., Civ. No. 11-11170-DPW (D. Mass., filed July 1, 2011). See United States v. Universal Health Services, Inc., Civ. No. 17-11843-DPW (D. Mass, filed Sept. 25, 2017).

that were not administered by certified personnel or otherwise properly supervised . . . ." (<u>Id.</u> ¶ 111.)

At present, the <u>Escobar</u> <u>qui</u> <u>tam</u> lawsuit is still pending in the United States District Court for the District of Massachusetts. There has been no finding of liability or wrongdoing.

### 3. Coordinated Civil and Criminal Federal Investigation

Plaintiffs also claim that UHS's aggressive strategies "attracted widespread scrutiny by federal investigators." (<u>Id.</u> ¶ 112.) In February 2013, UHS disclosed that the Office of Inspector General for the United States Department of Health and Human Services ("OIG") had recently served subpoenas on several UHS behavioral health facilities, seeking documents dating back to January 2008. (<u>Id.</u>)

Throughout 2013, the OIG investigation expanded to several other UHS behavioral health facilities. (<u>See</u> <u>id.</u> ¶¶ 113, 114.) In October 2013, the Department of Justice Criminal Frauds Section[24] advised UHS that it had received a referral from the Department of Justice, Civil Division and had opened a criminal investigation into River Point Behavioral Health and Wekiva Springs Center, two UHS behavioral health facilities in Florida. (<u>Id.</u> ¶ 115.) In 2014, the criminal investigation expanded to include the National Deaf Academy in Florida. (<u>Id.</u> ¶ 116.) In April 2014, the company reported that the federal government had suspended Medicare payments to River Point as a result of the criminal investigation. Later, the Florida Agency for Health Care Administration ("AHCA") suspended Medicaid payment to the facility. The Florida ACHA

---

[24] In Defendants' briefings and the company's filings with the SEC, UHS refers to this agency as "DOJ's Criminal Frauds Section." The correct name of this agency is the United States Department of Justice, Criminal Division, Fraud Section. For consistency, the Court will mirror Defendants' use of the name "DOJ Criminal Frauds Section" in this Opinion.

suspension was lifted on June 27, 2017, but at the time the Amended Complaint was filed, the federal suspension was still in place.  (Id. ¶ 16 n.13.)

The civil investigation expanded to additional facilities throughout 2014 and 2015.  (Id. ¶¶ 118-120.)  And in March 2015, UHS disclosed that the criminal investigation had expanded to include UHS as a corporate entity.  (Id. ¶ 120.)  At the close of 2015, the coordinated federal investigations covered twenty-five (25) behavioral health facilities and the UHS corporation.  (Id. ¶ 123.)  In its Form 10-K for the year ending on December 31, 2016, UHS disclosed that the federal investigation was a "False Claims Act investigation focused on billings submitted to government payers in relation to services provided at those facilities."  (Id. ¶ 124.)  In the company's Form 10-Q for the second quarter of 2018, UHS disclosed the following:

> The DOJ[25] has advised us that the civil aspect of the coordinated investigation referenced above is a False Claims Act investigation focused on billings submitted to government payors in relation to services provided at those facilities.  While there have been various matters raised by DOJ during the pendency of this investigation, DOJ Civil has advised that the focus of their investigation is on medical necessity issues and billing for services not eligible for payment due to non-compliance with regulatory requirements relating to, among other things, admission eligibility, discharge decisions, length of stay and patient care issues.  It is our understanding that the DOJ Criminal Fraud Section is investigating issues similar to those focused on by DOJ Civil and the other related agencies involved in this matter.

(Id. ¶ 151.)

To prepare for any costs related to the coordinated federal investigation, the company set aside a reserve of funds.  In its July 25, 2018 press release that accompanied the company's second quarter financial results, UHS announced the following:

> During the first six months of 2018, we recorded a pre-tax increase of approximately $22 million to the reserve established in connection with the civil aspects of the government's investigation of certain of our behavioral health care facilities, increasing the aggregate pre-tax reserve to approximately $43 million.

---

[25] "DOJ" refers to the United States Department of Justice.

> Changes in the reserve may be required in future periods as discussions with the
> DOJ continue and additional information becomes available.

(Id. ¶ 125.)

Significantly, on July 26, 2019, Defendants submitted a Notice Regarding the Government's Investigation, which informed the Court that the DOJ Criminal Frauds Section had closed its investigation into the company and its behavioral health facilities. (Doc. No. 116.) Defendants also represented that it had reached "an agreement in principle to resolve the related civil investigation led by the Department of Justice's Civil Division for $127 million." (Id.) This information was publicly disclosed in the company's Form 8-K, filed July 26, 2019.[26]

### D. Buzzfeed News Publishes First UHS Article on December 7, 2016

On December 6, 2016, Buzzfeed News[27] ("Buzzfeed") published a lengthy article ("Buzzfeed I")[28] that raised allegations of unlawful and unethical practices at UHS behavioral health facilities across the country.[29] (Id. ¶ 126.) The article, entitled Locked on the Psych Ward, was the result of a year-long investigation, during which Buzzfeed reporters interviewed 175 current and former UHS employees, including 18 facility executives that managed daily operations

---

[26] Universal Health Services, Inc. Current Report (Form 8-K) (July 26, 2019) (available at: https://uhsinc.gcs-web.com/node/16011/html). See also Oran v. Stafford, 226 F.3d 275, 289 (3d Cir. 2000) (finding that securities filings are subject to judicial notice on a motion to dismiss).

[27] Buzzfeed News is the news division of Buzzfeed, Inc., a digital media company that focuses on news, entertainment, and popular culture. At one point, the Buzzfeed News staff included six (6) Pulitzer Prize-winning journalists.

[28] Beginning in December 2016, Buzzfeed News published several articles regarding the UHS Behavioral Health Division. Four of those articles are discussed in this Opinion. The first article, Buzzfeed I, was published on December 7, 2016, The second article, Buzzfeed II, was published on December 30, 2016. The third article, Buzzfeed III, was published on April 11, 2017. The fourth article, Buzzfeed IV, was published on November 17, 2017.

[29] Rosalind Adams, Locked on the Psych Ward, Buzzfeed News (Dec. 7, 2016, 17:29 GMT), https://www.buzzfeednews.com/article/rosalindadams/intake.

at UHS inpatient behavioral health facilities.  Buzzfeed also interviewed more than 120 patients, government investigators, and health care experts, and reviewed a cache of internal UHS documents.  The article includes anecdotal accounts from five former UHS patients.  (Id. ¶ 127.)

According to Buzzfeed I, UHS employees from behavioral health facilities in nine different states reported that they faced pressure to increase admissions by "wildly mischaracterizing patient symptoms."  (Id. ¶ 128.)  More specifically, employees told Buzzfeed that they were instructed to exaggerate symptoms or manipulate patients' answers to make them seem suicidal in order to justify admitting them to UHS facilities.  (Id.)

Buzzfeed also reported that UHS facilities increased inpatient admissions by urging patients to schedule in-person assessments.  An employee at Salt Lake Behavioral in Utah stressed that while a patient might "think we're going to diagnose them for anxiety or depression[,]" the "goal is to admit them to the hospital."  (Id. ¶ 130.)  Another employee working in a Texas facility told Buzzfeed that "[t]he goal when you're on the phone with someone is to always get them into the facility with 24 hours[.] . . . And the reason for getting them into the facility is that once they stepped foot in, they are behind locked doors."  (Id.)  As evidence of this practice, Buzzfeed reported the account of a patient named Allison, which the Amended Complaint summarizes as follows:

> For instance, a young accountant named Allison called Universal's Centennial Peaks to inquire about support options regarding her bipolar disorder, with which she had been coping for years and for which she was taking medication.  Universal counselors would not discuss options with Allison over the phone and required her to drive to the hospital, where she was told she should enter into a five-week intensive outpatient program.  When Allison told the counselor that she did not need such a structured program, she was instructed to take an evaluation, which included questions about suicidal ideation.  Despite Allison telling the Universal counselor that she had dark episodes and had learned to live with them and that she was doing well despite occasional suicidal ideation, the Universal counselor used her evaluation to hold Allison against her will.  She was given a short opportunity to email her workplace to let them know that she would not be reporting to work, and

to call her partner, who was expecting her home for dinner that evening, before being escorted into the facility and held indefinitely. Allison later stated that the evaluation was used as a pretext to hold her – she "'didn't even think that being an inpatient was even on the table,'" and "'[i]f [she] had known that, [she] wouldn't have gone in there.'"

(Id. ¶ 131.)

Several UHS employees corroborated Allison's account, telling Buzzfeed that they were instructed to "play up to criteria" to obtain approval for hospitalization from insurers. (Id. ¶ 132.) Clinical staff from Salt Lake Behavioral Utah stated that they were instructed to "chart to the negative"—that is, they were told to emphasize troubling behavior that would make an individual seem like a candidate for inpatient treatment. (Id. ¶ 133.) An intake counselor at Millwood Hospital told Buzzfeed that suicidal ideation[30] was the "go-to formula" to admit patients "[b]ecause that's the way to make sure everything gets paid for." (Id.) Another employee stated that he was instructed to "build[] the severity level" of patients' symptoms to justify inpatient admissions—essentially, he was told to characterize mere depression or anxiety as suicidal ideation so that the facility had a reason to admit the patient and bill his insurance for several inpatient days, rather than a single assessment. (Id. ¶ 136.) To that end, the article reported that UHS behavioral health facilities coded for suicidal ideation at a significantly higher rate than comparable facilities. (Id. ¶ 135.)

---

[30] Suicidal ideation refers to thinking about, considering, or planning suicide. Suicide, National Institute of Mental Health, https://www.nimh.nih.gov/health/statistics/suicide.shtml (last visited: Apr. 24, 2019). Billing codes are used by health care facilities to bill an insurance company for services rendered. Relevant here, patients admitted to UHS facilities because they exhibit signs of suicidal ideation are assigned the suicidal ideation billing code. Defendants emphasize that such coding does not happen at admission. Rather, a patient is assigned a code after discharge based on his or her medical records.

Buzzfeed I also claims that UHS facilities purposefully understaffed facilities to maximize profits, despite the effect that the understaffing had on patient or employee safety. Four doctors interviewed for the article stated that they were burdened with such heavy caseloads that they rarely spent enough time with patients to properly evaluate psychiatric conditions. (Id. ¶ 141.) As a result, patients suffered. For example, at Highlands Behavioral in Colorado, physicians prescribed fentanyl to a 22-year old patient who had been admitted for treatment related to his opioid addiction. According to Buzzfeed I, a nurse tasked with monitoring the patient mistakenly charted that he was due for another dose of medication, even though he had already received his dose. That night, staff members charged with checking on the patient's breathing merely glanced into his room from the hallway. The next morning, he was found dead. (Id. ¶ 138.) During a police investigation of the event, several UHS employees stated that the incident occurred because the facility was understaffed. (Id. ¶ 139.) Additionally, the nurse who was charged with the care of the deceased patient told authorities that she had just one day of training at the facility. (Id.)

Buzzfeed I also reported that it was company policy "to keep patients until their insurance ran out to maximize insurance payments." (Id. ¶ 142.) A former executive at Austin Lakes Hospital in Texas stated that it was openly discussed that "[i]f an insurance company gave you so many days, you were expected to keep the patient there that many days[.]" (Id. ¶ 143.) Several employees across multiple facilities told Buzzfeed that facilities would have regular "flash meetings," where executives would repeat the same mantra: "Don't leave days on the table." (Id. ¶¶ 142, 144.) At those meetings, facility executives would track performance metrics and question why doctors released patients before their insurance had run out. (Id. ¶ 144.) In essence, Buzzfeed reported that certain UHS facilities saw extending patient stays as a means to meet financial goals.

Although Buzzfeed I states that these policies were handed down from UHS executives,

the article does not link the policies to any of the Individual Defendants.  In fact, the only Individual

Defendant named in the article is Alan Miller, who is mentioned solely to note that he founded the

company and remains CEO and Chairman of the Board.  No other Individual Defendant is

referenced in Buzzfeed I.

UHS immediately denied Buzzfeed I's conclusions.  Further, seven days after the article

was published, the UHS Board of Directors held a special meeting to review and analyze the

article.  (Id. ¶ 236.)  After the meeting, UHS researched the allegations in Buzzfeed I and developed

a 93-page paper refuting its conclusions.  (Doc. No. 101-1.)  The paper, entitled Response to the

Buzzfeed Article About UHS, Myth v. Fact, states the following in its introduction:

> Universal Health Services (UHS) denies and disputes the accusations and
> conclusions drawn by Buzzfeed regarding practices at UHS Behavioral Health
> (BH) Facilities.  The assertions made by Buzzfeed in its recent coverage regarding
> UHS contain numerous inaccuracies and non-contextualized mischaracterizations
> of clinical operations at a select number of UHS BH facilities.  The accounts are
> overwhelmingly anecdotal and rely on a non-representative sampling of former
> employees (many unidentified) and patients to create a false narrative about the
> operations of our facilities.  The reporter's interpretations and conclusions are
> inaccurate.
>
> ***
>
> Buzzfeed has not been immune from criticism and questions regarding its reporting
> as well as low trustworthiness rankings from the public and industry experts.  Jeff
> Zucker, President of CNN, was quoted saying that Buzzfeed . . . was not a
> "legitimate news organization."
>
> ***
>
> Notwithstanding these concerning facts, UHS worked diligently with Buzzfeed in
> an effort to set the record straight including in-person interviews with BH
> executives, providing numerous written answers to questions and other requested
> information.  Based on the feedback of many current and former UHS staff
> contacted during the course of Buzzfeed's "investigation," the reporter seemed
> highly disinterested in viewpoints that differed from the negative portrayal she was
> fixated on developing.  In the addendum, we have included a significant number of
> signed testimonials from current and former UHS staff, facility leadership, patients,

families and community partners all attesting to the high quality of care provided
by our behavioral health facilities.

(Id. at 4-5.)  The remainder of the paper meticulously addresses and refutes the allegations raised

in Buzzfeed I.  The company also created a website to refute the article's conclusions.[31]

By the end of December 7, 2016, the day Buzzfeed I was published, UHS stock fell nearly

12%, wiping out $1.45 billion in market capital.  (Id. ¶ 249.)  Plaintiffs claim that this loss occurred

because "Individual Defendants caused the Company to manipulate the patient admissions process

at its facilities, hold patients beyond lengths medically necessary, critically understaff those

facilities and otherwise cut costs while sacrificing patient care, and submit fraudulent

reimbursements for such 'services' in violation of the [False Claims Act] . . . ."  (Id. ¶ 245.)

Two days after the publication of Buzzfeed I, Senator Charles E. Grassley (R., Iowa)

publicly called on the United States Department of Health and Human Services to investigate UHS.

(Id. ¶ 153.)  Notwithstanding this development, Plaintiffs claim that the conduct profiled in

Buzzfeed I continued unfettered at UHS behavioral health facilities across the country.  For

example, on December 30, 2016, Buzzfeed published an article ("Buzzfeed II") that stated that a

six-year-old boy had been held against his and his parents' will for three days at River Point

Behavioral in Florida.[32]  Notably, the child was involuntarily committed under the Baker Act,

meaning that a court approved the decision to keep him at the facility.  (Id. ¶ 155.)  Then, on April

11, 2017, Buzzfeed published an article ("Buzzfeed III") that zeroed in on Shadow Mountain, a

---

[31]  The website, uhsthefacts.com, is no longer active.

[32]  Rosalind Adams, How A 6-Year-Old Got Locked On A Psych Ward, Buzzfeed (Dec. 30, 2016,
4:26 p.m. ET), https://www.buzzfeednews.com/article/rosalindadams/how-a-6-year-old-got-
locked-on-a-psych-ward.

UHS behavioral health facility in Oklahoma.[33]  Buzzfeed III echoed Buzzfeed I's conclusions—that the facility was understaffed and engaged in improper patient care practices.  (Id. ¶ 156.) Finally, on November 17, 2017, Buzzfeed published an article ("Buzzfeed IV") about Hill Crest Behavioral Health Services in Alabama that reported practices like staff violence, patient abuse, understaffing, and the use of unqualified or unlicensed personnel.[34]  (Id. ¶ 157.)

### E.  Allegations that Individual Defendants Knew About Misconduct at UHS Behavioral Health Facilities

In the Amended Complaint, Plaintiffs allege that Individual Defendants were on notice of the conduct alleged in the qui tam lawsuits, state and federal investigations, and Buzzfeed articles. To support that allegation, Plaintiffs point to a number of labor union letters sent to the Board that raised concerns about corporate oversight and billing fraud.  Plaintiffs also recite a list of Board and Committee meetings during which Individual Defendants received updates about the qui tam suits, the state and federal inquiries, and the coordinated federal investigation.

### 1.  Labor Union Letters to the Board of Directors

First, on November 8, 2013, Local 1199 SEIU Healthcare Workers East, a chapter of the Service Employees International Union ("SEIU"),[35] sent a letter to Mr. Herrell, a Director Defendant and the Chair of the Audit Committee, and the Board of Directors, raising concerns

---

[33] Rosalind Adams, Videos Show the Dark Side of Shadow Mountain Youth Psych Facility (April 11, 2017, 5:57 a.m. ET), https://www.buzzfeednews.com/article/rosalindadams/shadow-mountain.

[34] Rosalind Adams, A Prescription For Violence, Buzzfeed (Nov. 11, 2017, 11:00 a.m. ET), https://www.buzzfeednews.com/article/rosalindadams/videos-show-uhs-hospital-staff-assaulting-young-patients#.fx3Y771eX.

[35] The Service Employees International Union, or the SEIU, is a labor union that represents nearly two million workers in over one hundred professions in the United States and Canada.  The SEIU represents many employees that work at UHS facilities.

about the quality of patient care at Arbour Health Services based on the allegations made in the Escobar qui tam lawsuit. Further, Local 1199 wrote that an independent review of Medicare data revealed that "severe quality of care issues in multiple areas" had led to "breakdowns in care [that] have risen to immediate jeopardy status or condition-level violations, which could compromise the facilities' eligibility to receive Medicare and Medicaid reimbursements." (Id. ¶ 169.) Finally, Local 1199 lamented that UHS lacked a committee to oversee patient safety and quality and that the company's Chief Compliance Officer did not report to the UHS Audit Committee. (Id.)

Next, on March 7, 2014, representatives from the nation-wide chapter of SEIU sent a letter to UHS that emphasized that the "serious nature of the regulatory and quality of care issues emerging at [UHS] facilities" necessitated "a dedicated independent committee to work toward resolving these issues in order to protect shareholders, patients, workers and the company itself." (Id. ¶ 171.) SEIU also noted that the data referenced in Local 1199's letter revealed a significant uptick in the use of the suicidal ideation billing code at independent behavioral health hospitals after they were acquired by UHS. (Id. ¶ 172.) Additionally, SEIU echoed the allegations raised in a qui tam lawsuit filed by Dr. Steven Klotz, a former UHS doctor, who claimed that UHS pressured employees to manipulate case charts to make patients seem suicidal in order to admit them for inpatient treatment. (Id. ¶ 173.) SEIU suggested that UHS address quality of care issues at UHS behavioral health facilities by establishing "a dedicated independent committee . . . equipped and empowered to investigate and resolve these issues." (Id. ¶ 174.)

On April 8, 2014, Change to Win Investment Group ("CtW"), a prominent coalition of unions that works to hold public companies accountable for corporate fraud, sent a letter to the Board, raising questions about the admissions and billing practices of UHS behavioral health

facilities.  (Id. ¶ 182; Doc. No. 69-5.)  The letter, which was signed by CtW's Executive Director, urged UHS to take immediate steps to improve its oversight of regulatory compliance:

> [W]e believe shareholders face considerable risk that regulatory enforcement action and/or settlements with federal regulators will result from the OIG and DoJ investigations, given the divergence in billing practices between UHS-owned and other facilities evinced by an independent analysis of Medicare data.  Furthermore our review of UHS's corporate governance, and in particular of the board's committee structure and membership, strongly suggests that improvements are overdue; unlike most publicly traded hospital companies, UHS's board does not have a separate Compliance Committee—instead housing compliance oversight in the Audit Committee.  However, the members of the Audit Committee do not have the depth or range of heath care and regulatory experience evidence among the members of the Compliance Committees at other publicly traded hospital and health care firms.  We are concerned that inadequate board oversight of regulatory compliance has generated significant risks for shareholders, and believe that without changes in the board's structure and membership, such oversight will not improve sufficiently to mitigate such risks going forward.
>
> Absent a commitment by the board to create a new Compliance Committee comprised of independent directors with extensive relevant medical and regulatory experience, we will be unable to support Lawrence Gibbs, the Audit Committee member who is slated to stand for election at this year's annual meeting.

(Doc. No. 48 ¶ 183) (emphasis omitted).  CtW also claimed that the Audit Committee lacked members with sufficient medical and regulatory experience.  (Id. ¶ 185.)  Relying on SEIU's analysis of Medicare data and the qui tam lawsuits referenced in SEIU's letters, CtW also echoed SEIU's concerns about UHS's use of the suicidal ideation code.  (Id. ¶¶ 183-184.)

On April 22, 2014, Mr. Herrell responded to CtW's concerns via letter.  (Doc. No. 69-3.) To start, Mr. Herrell emphasized that UHS behavioral health facilities provide the highest quality of care and treatment to patients:

> First and foremost, I would like to address any misplaced quality of care concerns you may have as well as illustrate the extensive compliance mechanisms and practices in place at UHS to ensure our facilities are providing the highest quality of care and treatment to our patients under the direction of the Board of Directors. In 2013, The Joint Commission awarded 48 UHS facilities Top Performer Status for Quality and Patient Safety.  44 of the 48 UHS facilities that received this high quality distinction were behavioral health facilities.  This equates to 40% of UHS's

eligible behavioral health facilities achieving this elite quality distinction from The Joint Commission. In fact, 27% of all the behavioral health facilities in the nation which received this designation were UHS facilities. Such a measure of success does not come without a full commitment of resources of the entire company, including its Board of Directors, to providing the highest quality healthcare. UHS's facilities have also received a number of other recognitions, awards and designations for its high quality services too numerous to mention here.

(Id. at 1.) Mr. Herrell also addressed the qui tam lawsuits that were referenced in CtW's letter:

Many of the contentions in the prior letters were based on lawsuits filed against the company or its subsidiaries. The lawsuit in Boston mentioned in the November 8th letter from your local 1199 and covered in the Boston Globe articles last year has since been dismissed by the court. In addition, both the Massachusetts Attorney General's Office and the U.S. Department of Justice had previously declined to intervene. As mentioned in the prior letters, the qui tam case filed related to the Roxbury Treatment Center was also dismissed following the government's investigation of the allegations and decision not to intervene. Such actions and dispositions of those cases should point to their lack of basis. We have only recently become aware of the allegations in the qui tam action at Roxbury. I have been informed that the company is conducting its own internal review. The preliminary investigation to date confirms that the allegations are without merit. Further, settlements of lawsuits do not constitute admissions of liability in any circumstance but instead reflect economic realities of the costs and risks of litigation. Any product company is often faced with the prospect of settling cases it believes it could defend due to the extremely high cost associated with litigation and the always unpredictable nature of our judicial system.

(Id. at 2-3.) Mr. Herrell admitted that "a small minority of [UHS] facilities may encounter sporadic regulatory compliance issues," but assured CtW that "those matters are always remedied." (Id. at 3.)

Next, Mr. Herrell turned to CtW's allegations that UHS behavioral health facilities over-utilized the billing code for suicidal ideation. Notwithstanding CtW's statistical analysis, Mr. Herrell strongly defended UHS's billing practices, noting that all UHS coding staff "are required to be certified as a Registered Health Information Administrator, Registered Health Information Technologist or Certified Coding Specialist." (Id.) Additionally, Mr. Herrell informed CtW that UHS's billing and coding practices are frequently audited by outside, independent analysts:

In addition, each of these facilities is subject to regular internal and external coding audits. The purpose of these audits is to ensure all coding and billing at all UHS facilities is accurate and in compliance with all billing requirements for federal and state healthcare programs. On a quarterly basis, an outside, independent coding consultant group reviews sample records at all UHS facilities to ensure compliance with acceptable and applicable coding guidelines as stipulated by CMS.[36]

*\*\**

As mentioned above, UHS engages an independent coding review company to assess our coding for accuracy. According to information provided to me by the company, not once have our independent coding reviewers referenced improper assignment of suicidal ideation as a coding designation. In addition, UHS behavioral health facilities have been subject to a number of RAC[37] audits over the past few years (like all of our competitors). Despite the RAC's pecuniary interest in obtaining recoupment from providers, not one UHS facility has ever been cited by the RACs nor had any recoupment assessed based upon coding for suicidal ideation. This fact alone should refute any contentions you have regarding the propriety of our coding on this matter.

(Id.) (footnotes added). In conclusion, Mr. Herrell stated that the company strongly "disputes the basis of [CtW's] premise that coding of suicidal ideation by UHS facility as compared to [its] competitors is indicative of any impropriety and . . . refute[s] that contention." (Id. at 4.)

Then, on April 28, 2014, another SEIU contingent sent UHS a letter that called for corporate reform (Doc. No. 48 ¶ 187.) In relevant part, the letter stated the following:

We are troubled by the investigations by both the Department of Health and Human Services Office of Inspector General and the Department of Justice as well as high profile breakdowns in patient care at several UHS facilities across the country. In addition, our initial examination of hundreds of reports issued by state and federal regulators have revealed repeated issues related to inadequate staffing, patient security and patient abuse. We have examined several hundred (354) regulator

---

[36] Again, "CMS" stands for Centers for Medicare and Medicaid Services, a federal agency within the United States Department of Health and Human Services.

[37] "RAC" refers to the Recovery Audit Contractor, a program run by the Centers for Medicare and Medicaid Services whose mission is to identify and correct improper payments. Medicare Fee for Service Recovery Audit Program, CMS.gov, https://www.cms.gov/Research-statistics-data-and-systems/monitoring-programs/medicare-FFS-compliance-programs/recovery-audit-program/index.html (last visited: June 13, 2019).

surveys from 90 different facilities in 13 states, from 2008-2014 and are in the
process of obtaining and analyzing more. We have already found repeated citations
for violations of federal and state requirements to provide care in a safe setting,
ensure the security of patients and provide adequate staff to ensure the safety of the
facility's patients and staff. We believe these issues clearly demonstrate the need
for systematic and high-level oversight, which we feel is lacking on UHS's Board
of Directors.

(Id.) (emphasis omitted). The letter also called on UHS to create and empower a "qualified
committee to oversee quality of care and compliance." (Id.)

On May 21, 2014, the Executive Vice President of SEIU's Nevada contingent sent a letter
to the Board, raising similar concerns related to billing and corporate oversight. (Id. ¶ 190.) Then
on May 26, 2014, an article in the Philadelphia Inquirer reported that the SEIU had raised issues
about UHS's compliance procedures. In response, Alan Miller stated that "[t]he board of directors
has a well-functioning audit committee and, working in conjunction with an extensive quality
department, determined that an additional oversight organization is not required." (Id. ¶ 191.)
According to Plaintiffs, Defendants took no actions to reform the practices addressed in the CtW
and SEIU letters. (Id. ¶ 188.)

On May 8, 2015, CtW sent yet another letter to UHS. This letter renewed the group's
concerns, especially in light of the government's decision to investigate UHS as a corporate entity,
and stressed a need for better oversight. (Id. ¶ 209.) In response, Mr. Herrell stated that the letter
"is a part of the SEIU's 'corporate campaign' against [UHS] rather than a good faith effort to
further your stated goal of protecting long-term shareholders." (Id. ¶ 210.) He again denied any
wrong-doing and pointed out that UHS competitors were also subject to numerous investigations
and lawsuits. (Id.) On March 30, 2016, CtW again wrote to UHS, this time raising concerns about
"troubling trends in billing practice," a surge in admittance rates for Medicare patients, and
overpayment from insurance companies. (Id. ¶ 223.)

On March 28, 2017, CtW sent another letter to the Board, again raising concerns about corporate oversight and lamenting that the Board was "entrenched." (Id. ¶ 243.) In the letter, CtW wrote that it would not support the re-election of Mr. Gibbs to the Board of Directors unless the Board publicly committed to changes in its corporate governance structure. (Id.) Finally, on April 21, 2017, CtW wrote a letter to fellow UHS shareholders, asking them to withhold support for the re-election of Mr. Gibbs to the Board of Directors at the company's annual meeting on May 17, 2017. (Id. ¶ 244.)

## 2. Board of Director Meetings and Board Committee Meetings

Plaintiffs also allege that Individual Defendants received regular updates about the lawsuits, inquiries, and investigations during meetings of the Board of Directors and during various Committee meetings. This allegation is based on Board minutes, which Plaintiffs obtained through their Section 220 Demand on the company. Due to the nature of the meeting minutes and the fact that portions of the minutes were redacted, it is unclear how extensively the alleged misconduct was discussed or how much Individual Defendants knew about the nature of the coordinated federal investigation.

The following chart is a chronological list of the Board of Director meetings and Board Committee meetings cited by Plaintiffs in the Amended Complaint:

| Date | UHS Board and Committee Meetings |
|---|---|
| January 16, 2013 | At an Audit Committee meeting, Mr. Gibbs, Mr. Herrell, Mr. Hotz, Mr. Filton, and Mr. Boyle review updates regarding Escobar qui tam lawsuit, the Texas settlement, and compliance issues at The Pines in Virginia. (Id. ¶ 161.) |
| April 23, 2013 | At an executive-level Compliance Committee meeting, Director Defendant Marc Miller and Officer Defendants Boyle and Filton review "investigation updates." (Id. ¶ 162.) |

| | |
|---|---|
| May 15, 2013 | At an Audit Committee Meeting, Mr. Herrell, Mr. Hotz, Mr. Gibbs, Ms. McDonnell, Mr. Filton, and Mr. Boyle discuss how quality of care issues at facilities are addressed in the compliance process. (<u>Id.</u> ¶ 163.) |
| July 17, 2013 | At a full Board meeting, the entire Board and Mr. Filton receive "investigation updates." (<u>Id.</u> ¶ 164.) |
| July 25, 2013 | At a Compliance Committee meeting, Mr. Caponi, Marc Miller, Mr. Boyle, and Mr. Filton receive investigation updates. (<u>Id.</u> ¶ 165.) |
| September 18, 2013 | At a full Board Meeting, Director Defendants and Mr. Filton discuss the federal investigation. (<u>Id.</u> ¶ 166.) |
| October 1, 2013 | At a Compliance Committee meeting, Marc Miller, Mr. Filton, and Mr. Boyle are provided an investigation update. (<u>Id.</u> ¶ 167.) |
| November 6, 2013 | At an Audit Committee meeting, Mr. Gibbs, Mr. Hotz, Ms. McDonnell, Mr. Filton, and Mr. Boyle meet and discuss the federal investigation. (<u>Id.</u> ¶ 168.) |
| November 20, 2013 | At an Audit Committee meeting, Mr. Gibbs, Mr. Hotz, Mr. Herrell, Ms. McDonnell, Mr. Filton, and Mr. Boyle meet with Mr. Caponi, who made a presentation about the company's compliance program and compliance hotline procedures. Defendants discuss hiring outside counsel. (<u>Id.</u> ¶ 175.) |
| January 10, 2014 | At a Compliance Committee meeting, Marc Miller, Mr. Boyle, and Mr. Filton discuss calls to the compliance hotline and the federal investigation. (<u>Id.</u> ¶ 176.) |
| March 26, 2014 | At a full meeting of the Board, the Director Defendants and Mr. Filton receive a presentation from Karen Johnson, Senior Vice President of Clinical Services and the UHS Behavioral Health Compliance Officer. Ms. Johnson tells the Board that 42% of audited events have deficiencies. (<u>Id.</u> ¶¶ 178-79.) |
| April 4, 2014 | At a Compliance Committee meeting, Marc Miller, Mr. Boyle, and Mr. Filton review compliance hotline calls. Mr. Caponi outlines certain hotline call issues. (<u>Id.</u> ¶ 180.) |
| May 6, 2014 | At an Audit Committee meeting, Mr. Gibbs, Mr. Herrell, Mr. Hotz, Ms. McDonnell, Mr. Boyle, and Mr. Filton discuss issues at River Point Behavioral. (<u>Id.</u> ¶ 188.) |
| July 24, 2014 | The Audit Committee meets to discuss the compliance hotline calls. (<u>Id.</u> ¶ 192.) |

| | |
|---|---|
| July 28, 2014 | At a Compliance Committee meeting, Marc Miller, Mr. Boyle, and Mr. Filton discuss calls received by the compliance hotline. (<u>Id.</u> ¶ 193.) |
| August 7, 2014 | At an Audit Committee Meeting, Mr. Gibbs, Mr. Herrell, Mr. Hotz, Ms. McDonnell, Mr. Boyle, and Mr. Filton discuss updates in the federal criminal investigation. (<u>Id.</u> ¶ 194.) |
| October 3, 2014 | At a Compliance Committee meeting, Marc Miller, Mr. Boyle, and Mr. Filton discuss the compliance hotline calls. (<u>Id.</u> ¶¶ 195-96.) |
| November 6, 2014 | The Audit Committee receives updates regarding the coordinated federal investigation. (<u>Id.</u> ¶ 197.) |
| November 12, 2014 | Marc Miller, Mr. Filton, and Mr. Boyle receive a memorandum that states that during 2014 the compliance hotline received 977 calls in reference to the Behavioral Health Division. (<u>Id.</u> ¶ 198.) |
| November 19, 2014 | The Audit Committee and Mr. Caponi discuss compliance issues and hotline calls. (<u>Id.</u> ¶ 201.) |
| January 28, 2015 | At a Compliance Committee meeting, Marc Miller, Mr. Boyle, and Mr. Filton discuss compliance hotline calls. (<u>Id.</u> ¶ 202.) |
| February 24, 2015 | The Audit Committee meets to discuss the company's Form 10-K and investigation updates. (<u>Id.</u> ¶ 203.) |
| March 30, 2015 | The Audit Committee meets to discuss the coordinated federal investigation. The Committee discusses plans to get updates from outside counsel about the investigation. (<u>Id.</u> ¶ 204.) |
| April 2, 2015 | The Board holds a special meeting to receive an update from outside counsel regarding the federal investigation. (<u>Id.</u> ¶ 205.) |
| April 9, 2015 | At a Compliance Committee meeting, Marc Miller, Mr. Filton, and Mr. Boyle review compliance hotline calls. (<u>Id.</u> ¶ 207.) |
| April 27, 2015 | The Audit Committee and the company's General Counsel review investigation updates. (<u>Id.</u> ¶ 208.) |
| August 6, 2015 | The Audit Committee reviews public filings and updates in the federal investigation. (<u>Id.</u> ¶ 211.) |
| September 10, 2015 | The Audit Committee and Mr. Boyle and Mr. Filton discuss the fact that the Medicare Provider Agreement of UHS's Timberlawn facility had been terminated. (<u>Id.</u> ¶ 212.) |
| September 10, 2015 | At a full meeting of the Board, the Director Defendants and Mr. Filton receive update from Mr. Herrell about quality of care issues and the events leading to the termination of Timberlawn's Medicare Provider Agreement. (<u>Id.</u> ¶ 214.) |

| | |
|---|---|
| October 6, 2015 | The Compliance Committee discusses compliance hotline calls. (Id. ¶ 215.) |
| November 5, 2015 | The Audit Committee reviews public filings and investigation updates. (Id. ¶ 217.) |
| November 6, 2015 | Marc Miller, Mr. Filton, and Mr. Boyle receive a memorandum that states the compliance hotline received 950 calls in 2015 in reference to behavioral health facilities. (Id. ¶ 218.) |
| November 18, 2015 | The Audit Committee receives a presentation about compliance from Mr. Caponi. The Committee discusses internal audit activity. (Id. ¶ 220.) |
| November 18, 2015 | At a full Board meeting, the Board, Mr. Filton, and Ms. Osteen receive updates about the federal investigation. (Id. ¶ 221.) |
| March 23, 2016 | At a regular meeting of the Board, the company's General Counsel provides an update on the federal investigation. (Id. ¶ 222.) |
| April 12, 2016 | The Compliance Committee discusses compliance hotline calls. (Id. ¶ 228.) |
| July 12, 2016 | The Compliance Committee discusses compliance hotline calls. (Id. ¶ 232.) |
| December 14, 2016 | Special Meeting of the Board, where the Board and Mr. Filton and Ms. Osteen discuss Buzzfeed I. (Id. ¶ 236.) |
| January 23, 2017 | The Compliance Committee discusses compliance hotline calls. (Id. ¶ 237.) |

Plaintiffs emphasize that the Board of Directors, the Audit Committee, and the Compliance Committee reviewed and analyzed employee complaints submitted through the UHS Compliance Hotline. These complaints reported isolated incidents of misconduct at behavioral health facilities, including billing and coding issues, financial conflicts of interest, falsification of documents, problems with patient care, and unfair employment practices. In 2013, the Hotline received around 479 calls in reference to behavioral health facilities. At that time, UHS operated 195 facilities. (Id. ¶ 176.) In 2014, the Hotline received 977 calls in reference to behavioral health facilities. (Id. ¶ 198.) By the end of 2014, UHS owned 215 behavioral health facilities. (Id. ¶ 199.) In 2015, the Hotline fielded 950 calls about behavioral health facilities. (Id. ¶ 218.) During that time, UHS

maintained 217 behavioral health facilities.  (Id.)  The Amended Complaint does not provide call totals for 2016 or 2017.  Nor does the Amended Complaint state whether the Board took any measures to remedy the issues raised through the Hotline.  What is clear, however, is that the Board discussed and analyzed the issues raised in the calls.

Plaintiffs also stress that on March 26, 2014, during a full meeting of the Board of Directors, Karen Johnson, the Senior Vice President of Clinical Services and the Behavioral Health Division's Compliance Officer, gave the Board a compliance oversight presentation.  During the presentation, Ms. Johnson reviewed the corporate clinical organization of behavioral health facilities and the various indicators used to track quality care and identify potential problems.  (Id. ¶ 178.)  Plaintiffs allege that this presentation raised "serious red flags" for the Board.  More specifically, they highlight the fact that Ms. Johnson told the Board that "42% of audited events [at UHS behavioral health facilities] contained deficiencies."  (Id. ¶ 179.)  It is unclear what those deficiencies were, what facilities experienced deficiencies, or whether those deficiencies were remedied.

In short, Plaintiffs rely upon these meeting minutes to contend that despite the labor union letters, government inquiries and investigations, and the Buzzfeed articles, the Board "obstinately failed to implement any meaningful change."  (Id. ¶ 244.)

F.     Securities Fraud Class Action

Additionally, Plaintiffs allege that Individual Defendants further harmed the company by failing to disclose material information about the UHS's financial position in violation of federal securities laws.  (Id.)  Other UHS shareholders agreed.  In December 2016, shareholders[38] filed a federal securities class action against the company, alleging that:

---

[38]  Plaintiffs in this case are not the UHS shareholders that filed the securities fraud class action.

247. The Securities Class Action alleges that, in the annual Form 10-Ks filed with the SEC on February 26, 2015 and February 25, 2016, as well as the quarterly Form 10-Qs filed with the SEC on May 6, August 5, and November 8, 2016, the Company misrepresented that it:

    a.    had effective internal controls over financial reporting and that its disclosure controls and procedures were effective;

    b.    was focused on "long-term results" for investors, including providing "superior healthcare services" through a commitment to "service excellence," "continuous improvement in measurable ways," "employee development," and "ethical and fair treatment";

    c.    had "a comprehensive ethics and compliance program that is designed to meet or exceed applicable federal guidelines and industry standards[,]" and the Company believed it complied with regulations governing the healthcare industry; and

    d.    had no changes in internal control over financial reporting or in "other factors" over the period of its financial reports that had materially affected, or were reasonably likely to materially affect, its internal control over financial reporting.

(Id. ¶ 247.) The securities class action alleged that these statements were materially false and misleading because the company failed to disclose that:

(1) [UHS] admitted patients based on its own financial considerations and not upon the medical necessity of the patient; (2) [UHS] would keep patients admitted until their insurance payments ran out in order to ensure the maximum payment for its 'services'; (3) as a result, [UHS's] revenues from inpatient care relied on unsustainable practices; (4) in turn, [UHS] lacked effective internal controls concerning its practices and policies of admitting patients; and (5) as a result, [UHS's] public statements were materially false and misleading at the times they were made.

(Id. ¶ 248.)

**G.    Insider Trading Allegations**

Additionally, Plaintiffs allege that from January 16, 2013 to March 8, 2017, Defendants Alan Miller, Marc Miller, Pantaleoni, Herrell, Hotz, Gibbs, Filton, and Osteen ("Insider Trading Defendants") collectively sold $29,686,911.13 of UHS common stock while in possession of material, non-public information in violation of federal securities laws. (Id. ¶ 252.) According

to the Amended Complaint, "these sales placed the Insider Trading Defendants' shares onto the open market at artificially inflated prices at a time when the Board was causing the Company to repurchase those shares" and "[a]s a result, [UHS] overpaid by more than estimated $29.7 million for those shares." (Id.)

At the heart of the insider trading allegations is the claim that Insider Trading Defendants knew about the "illicit scheme" to overadmit and improperly retain patients, failed to disclose the supposed scheme, and still traded UHS stock. Plaintiffs claim that Insider Trading Defendants were prohibited from trading UHS stock until they disclosed this material information to the public. (Id. ¶ 259.)

Plaintiffs also claim that Insider Trading Defendants sought to inflate the market price of UHS stock by filing false and misleading annual financial reports. According to Plaintiffs, UHS's financial disclosures were false and misleading because they stated that UHS believed that its facilities were "in substantial compliance with current applicable federal, state, local and independent review body regulations and standards," but in reality, Individual Defendants knew that the company's internal controls were ineffective. (Id. ¶¶ 256, 258.) Each of the allegedly false and misleading financial reports from 2014 and 2015 were signed by Director Defendants and Defendant Filton. (Id. ¶ 262.) The reports also included certifications by Defendant Alan Miller and Defendant Filton, stating that the management had reviewed the company's internal controls and deemed them effective to ensure that "material information was being recorded, processed, summarized, and reported by management on a timely basis in order to comply with [UHS's] disclosure obligations . . . ." (Id. ¶ 261.) Plaintiffs claim that Insider Trading Defendants' efforts to artificially inflate UHS stock had its intended effect: "[f]rom January 13, 2013 to

December 6, 2016, the Company's stock price rose from $52.63 to $126.16, representing a 240% increase." (Id. ¶ 263.)

Plaintiffs also claim that Insider Trading Defendants sold UHS stock at times that suspiciously coincided with periods during which the Board authorized the company to repurchase UHS stock on the open market. As a result, Plaintiffs claim that UHS overpaid for these shares by $29.7 million. (Id. ¶¶ 264-271.) Alan Miller profited $5,365,603.28 from these sales. (Id. ¶ 264.) Marc Miller profited $2,206,774.06. (Id. ¶ 265.) Anthony Pantaleoni made $2,636,443.71. (Id. ¶ 266.) John Herrell profited $2,170,093.50 from the sales. (Id. ¶ 267.) Robert Hotz made $3,508,555.88. (Id. ¶ 268.) Lawrence Gibbs profited $1,618,441.61. (Id. ¶ 269.) Steve Filton made $3,278,100.00 from the transactions. (Id. ¶ 270.) Finally, Debra Osteen made $6,714,460.59 from selling UHS stock during the relevant time period. (Id. ¶ 271.)

## H.    Plaintiffs File the Present Action in Federal Court

Based on the conduct alleged here, UHS shareholders filed four separate shareholder derivative suits in federal court. The four suits were later consolidated into the present consolidated shareholder derivative suit. (Doc. Nos. 42, 43.) Plaintiffs bring this action derivatively, meaning that are suing on behalf of Nominal Defendant UHS to "address the breaches of fiduciary duty and other violations of law committed by Individual Defendants." (Id. ¶ 296.)

In the seven-count Amended Complaint, which was filed on November 5, 2018, Plaintiffs allege that starting on January 16, 2013, "the Board, at the behest of the Company's Chief Executive Officer ("CEO") and controller stockholder, pushed forward business practices resulting in violations of law and was repeatedly appraised of red flags that this unsavory practice was systemic and continuously occurring[,]" but "did nothing to stop it." (Id. ¶ 1.) They claim that this conduct violated federal securities laws and Delaware state law. Further, they allege that Individual Defendants breached their fiduciary duty to the company by:

(i) causing the Company to defraud federal and state Medicare and Medicaid systems in violation of the [False Claims Act] due to the illicit over-admission and failure to properly care for patients at the Company's facilities; (ii) authorizing the Company's filing of false and misleading financial statements that failed to disclose the true nature of the schemes herein described; and (iii) using Universal stock for their own benefit and to the detriment of shareholders and the Company by causing the Company to repurchase tens of millions of dollars of Universal common stock on the open market at artificially inflated prices at the same time that the Individual Defendants sold tens of millions of dollars of their own personal stake in the Company.

(Id. ¶ 279.) As a result of these alleged breaches of duty, Plaintiffs claim that the company suffered harm. More specifically, they allege UHS incurred significant expenses dealing with the lawsuits and investigations, and will continue to expend large sums, including:

a. the risk of having up to about 40% of the Company's revenues suspended as a result of the FCA violations occurring at the Company's behavioral health facilities, in addition to $282 million in penalties threatened from the Escobar qui tam action concerning wrongdoing in just the Commonwealth of Massachusetts;

b. further penalties and fines Universal will incur to resolve its criminal and civil federal investigations, including, but limited to, public and private FCA and Exchange Act violations, as well as violations of analogous other state laws;

c. the costs incurred to carry out internal investigations, including the costs of legal and other fees paid to outside counsel, auditors, and other experts;

d. executive compensation improperly paid to the Individual Defendants throughout the Relevant Period;

e. the amount the Individual Defendants authorized and further caused Universal to overpay to repurchase its shares on the open market at artificially inflated prices;

f. the almost $29.7 million in damages resulting from Universal's senior officers and directors selling almost $29.7 million of Universal common stock on the open market at artificially inflated prices;

g. resultant loss of business and business opportunities;

h. loss in market value and shareholder equity;

47

i.  legal fees, costs, and amounts payable in settlement or satisfaction of lawsuits brought against the Company related to the foregoing wrongdoing; and

j.  the increased capital costs the Company will incur as a result of loss of market capitalization and the Company's damaged reputation in the investing community as a result of the foregoing.

(Id.)

Significantly, Plaintiffs did not make a pre-suit demand on the Board of Directors. (Id. ¶ 298.) That is, they did not ask the Board to remedy these issues before filing this action in federal court. Plaintiffs claim that they did not make a pre-suit demand, which is typically required before a shareholder derivative suit can proceed, because such a demand would have been futile. In particular, they contend that making a demand on the Board would have been futile because the Directors lack sufficient independence and disinterest to fairly determine whether this claim should have been pursued. (Id.)

## I.    Chronological List of Relevant Events Alleged in the Amended Complaint

Because the allegations in the Amended Complaint are not listed chronologically, and in the interest of clarity, the Court has created the following chronological chart of the relevant events alleged by Plaintiffs in the Amended Complaint:

| Date | Event |
|------|-------|
| 2005 | A former UHS employee files a qui tam lawsuit against UHS regarding McAllen Hospitals in Texas. UHS later settles the matter for $27.5 million. |
| November 2010 | UHS acquires Psychiatric Solutions, Inc., making it the largest behavioral health provider in the United States. |
| April 2011 | The federal government bar Two Rivers Psychiatric Hospital in Kansas from collecting Medicaid payments after learning that the facility failed to monitor a suicidal patient who ultimately killed herself. |

| | |
|---|---|
| April 2011 | North Carolina state authorities remove state wards from The Pines, a UHS facility in Virginia, after discovering patient care issues. Virginia soon follows suit. |
| 2011 | The Illinois Department of Children and Family Services ("DCFS") and the University of Illinois at Chicago Department of Psychiatry issue a report detailing patient care issues at Hartgrove Hospital in Chicago. |
| July 2011 | Relators file the Escobar qui tam lawsuit against UHS regarding Arbour Counseling Services in Massachusetts. |
| January 16, 2013 | From this date until the day the Amended Complaint is filed on November 5, 2018, Plaintiffs allege that Defendants pushed forward business plans that resulted in violations of state and federal law. |
| January 16, 2013 | At an Audit Committee meeting, Mr. Gibbs, Mr. Herrell, Mr. Hotz, Mr. Filton, and Mr. Boyle review updates regarding Escobar qui tam lawsuit, the Texas settlement, and compliance issues at The Pines in Virginia. |
| 2013 | Board of Directors approves 2013 Behavioral Health Business Plan, which includes business plans from seven (7) behavioral health facilities. The business plans outline aggressive strategies to improve growth and financial performance. |
| February 2013 | UHS discloses that the Office of Inspector General for the United States Department of Health and Human Services ("OIG") served subpoenas on several UHS behavioral health facilities, seeking documents dating back to January 2008. |
| April 23, 2013 | At a Compliance Committee meeting, Marc Miller, Mr. Boyle, and Mr. Filton review "investigation updates." |
| May 15, 2013 | At an Audit Committee Meeting, Mr. Herrell, Mr. Hotz, Mr. Gibbs, Ms. McDonnell, Mr. Filton, and Mr. Boyle discuss quality of care issues. |
| July 17, 2013 | At a full Board meeting, the entire Board and Mr. Filton receive "investigation updates." |
| July 25, 2013 | At a Compliance Committee meeting, Mr. Caponi, Marc Miller, Mr. Boyle, and Mr. Filton receive investigation updates. |
| September 18, 2013 | At a full Board Meeting, Director Defendants and Mr. Filton discuss the federal investigation. |
| October 1, 2013 | At a Compliance Committee meeting, Marc Miller, Mr. Filton, and Mr. Boyle are provided an investigation update. |

| | |
|---|---|
| October 2013 | In October 2013, the Department of Justice Criminal Frauds Section advises UHS that it has received a referral from the Department of Justice Civil Division and has opened a criminal investigation into River Point Behavioral Health and Wekiva Springs Center, two UHS behavioral health facilities in Florida. |
| November 6, 2013 | At an Audit Committee meeting, Mr. Gibbs, Mr. Hotz, Ms. McDonnell, Mr. Filton, and Mr. Boyle meet and discuss the federal investigation. |
| November 8, 2013 | Representatives of 1199 SEIU Healthcare Workers East send UHS a letter, raising concerns about patient quality of care after the Escobar qui tam lawsuit. |
| November 20, 2013 | At an Audit Committee meeting, Mr. Gibbs, Mr. Hotz, Mr. Herrell, Ms. McDonnell, Mr. Filton, and Mr. Boyle meet with Mr. Caponi, who makes a presentation about the company's compliance program and compliance hotline procedures. Defendants discuss hiring outside counsel. |
| Year-End 2013 | The 2013 Universal Compliance Hotline Report, covering from November 1, 2012 to October 31, 2013, states that the company received around 479 calls in reference to UHS behavioral health facilities. |
| 2014 | UHS discloses that the criminal investigation has expanded to a third UHS behavioral health facility. |
| 2014 | Board of Directors approves 2014 Behavioral Health Business Plan, which includes business plans from 3.6% of UHS behavioral health facilities. The business plans outline aggressive strategies to improve growth and financial performance. |
| January 10, 2014 | At a Compliance Committee meeting, Marc Miller, Mr. Boyle, and Mr. Filton discuss calls to the compliance hotline and the federal investigation. |
| February 2014 | UHS Form 10-K for 2013 reports growth in the Behavioral Health Division. |
| March 7, 2014 | SEIU sends a letter to UHS, claiming that an independent review of Medicare data demonstrated an uptick in the use of the suicidal ideation billing code. |
| March 26, 2014 | At a full meeting of the Board, the Director Defendants and Mr. Filton receive a presentation from Karen Johnson, Senior Vice President of Clinical Services and the UHS Behavioral Health Compliance Officer. Ms. Johnson tells the Board that 42% of audited events have deficiencies. |
| April 2014 | UHS discloses that Medicare and Medicaid payments are suspended to River Point Behavioral in Florida. |

| | |
|---|---|
| April 4, 2014 | At a Compliance Committee meeting, Marc Miller, Mr. Boyle, and Mr. Filton review compliance hotline calls. Mr. Caponi outlines certain hotline call issues. |
| April 8, 2014 | Change to Win (CtW), an investment group, sends a letter to UHS, raising concerns about billing and admittance practices. |
| April 22, 2014 | Mr. Herrell, Chairman of the Board's Audit Committee, responds to CtW's concerns in a public letter. |
| April 28, 2014 | SEIU sends another letter to UHS, calling for corporate reform. |
| May 6, 2014 | At an Audit Committee meeting, Mr. Gibbs, Mr. Herrell, Mr. Hotz, Ms. McDonnell, Mr. Boyle, and Mr. Filton discuss issues at River Point Behavioral. |
| May 19, 2014 | The President of SEIU's Pennsylvania contingent sends a letter to UHS, noting that SEIU is concerned about the coordinated federal investigation. |
| May 21, 2014 | SEIU sends another letter to the Board, repeating concerns about the company's corporate oversight. |
| July 24, 2014 | The Audit Committee meets to discuss the compliance hotline calls. |
| July 28, 2014 | At a Compliance Committee meeting, Marc Miller, Mr. Boyle, and Mr. Filton discuss calls received by the compliance hotline. |
| August 7, 2014 | At an Audit Committee Meeting, Mr. Gibbs, Mr. Herrell, Mr. Hotz, Ms. McDonnell, Mr. Boyle, and Mr. Filton discuss the federal criminal investigation. |
| October 3, 2014 | At a Compliance Committee meeting, Marc Miller, Mr. Boyle, and Mr. Filton discuss the compliance hotline calls. |
| November 6, 2014 | The Audit Committee receives updates regarding the coordinated federal investigation. |
| November 12, 2014 | Marc Miller, Mr. Filton, and Mr. Boyle receive a memorandum that states that during 2014 the compliance hotline received 977 calls in reference to the Behavioral Health Division. |
| November 19, 2014 | The Audit Committee and Mr. Caponi discuss compliance issues and hotline calls. |
| 2015 | Board of Directors approves 2015 Behavioral Health Business Plan, which includes business plans from 2.3% of behavioral health facilities. The business plans outline aggressive strategies to improve growth and financial performance. |
| January 28, 2015 | At a Compliance Committee meeting, Marc Miller, Mr. Boyle, and Mr. Filton discuss compliance hotline calls. |
| February 24, 2015 | The Audit Committee meets to discuss the company's Form 10-K and investigation updates. |

| | |
|---|---|
| February 2015 | UHS Form 10-K for 2014 reports growth in the Behavioral Health Division. |
| March 2015 | UHS discloses that the criminal investigation has expanded to include the UHS corporate entity. |
| March 30, 2015 | The Audit Committee meets to discuss, <u>inter</u> <u>alia</u>, the coordinated federal investigation. The Committee discusses plans to get updates from outside counsel about the investigation. |
| April 2, 2015 | The Board holds a special meeting to receive an update from outside counsel regarding the federal investigation. |
| April 9, 2015 | At a Compliance Committee meeting, Marc Miller, Mr. Filton, and Mr. Boyle review compliance hotline calls. |
| April 27, 2015 | The Audit Committee and the company's General Counsel review investigation updates. |
| May 8, 2015 | CtW sends UHS another letter, renewing the group's concerns about lack of proper corporate oversight. |
| May 19, 2015 | Mr. Herrell responds to the CtW letter, stating that the letter was part of a "corporate campaign" against UHS, and not a good faith effort to protect shareholders. |
| August 6, 2015 | The Audit Committee reviews public filings and updates in the federal investigation. |
| September 10, 2015 | The Audit Committee and Mr. Boyle and Mr. Filton discuss the fact that the Medicare Provider Agreement of UHS's Timberlawn facility had been terminated. |
| September 10, 2015 | At a full meeting of the Board, the Director Defendants and Mr. Filton receive update from Mr. Herrell about quality of care issues and the events leading to the termination of Timberlawn's Medicare Provider Agreement. |
| October 6, 2015 | The Compliance Committee discusses compliance hotline calls. |
| November 5, 2015 | The Audit Committee reviews public filings. |
| November 6, 2015 | Marc Miller, Mr. Filton, and Mr. Boyle receive a memorandum that states the compliance hotline received 950 calls in 2015 in reference to behavioral health facilities. |
| November 18, 2015 | The Audit Committee receives a presentation about compliance from Mr. Caponi. The Committee discusses internal audit activity. |
| November 18, 2015 | At a full Board meeting, the Board, Mr. Filton, and Ms. Osteen receive updates about the federal investigation. |

| | |
|---|---|
| 2016 | Board of Directors approves 2016 Behavioral Health Business Plan, which includes business plans from 2.3% of behavioral health facilities. The business plans outline aggressive strategies to improve growth and financial performance. |
| February 24, 2016 | The Audit Committee meets to discuss the UHS Form 10-K for 2015. |
| February 2016 | UHS Form 10-K for 2015 reports growth in Behavioral Health Division. |
| March 23, 2016 | At a regular meeting of the Board, the company's General Counsel provides an update on the federal investigation. |
| March 30, 2016 | CtW sends UHS another letter, raising the same concerns about "troubling trends in billing practice." |
| April 12, 2016 | The Compliance Committee discusses compliance hotline calls. |
| July 12, 2016 | The Compliance Committee discusses compliance hotline calls. |
| December 7, 2016 | Buzzfeed News publishes Buzzfeed I, an article that alleges misconduct at UHS behavioral health facilities across the country. |
| December 14, 2016 | Special Meeting of the Board, where the Board and Mr. Filton and Ms. Osteen discuss Buzzfeed I. |
| December 30, 2016 | Buzzfeed publishes Buzzfeed II, which states that a six-year-old boy was held against his will and his parents' will at River Point Behavioral. |
| December 2016 | UHS investors file related securities class action lawsuit, alleging that the company made materially false and misleading statements about the company's financial condition. |
| December 2016 | UHS investigates Buzzfeed I's conclusions and develops a 93-page paper to refute those conclusions. The company also creates a public website to rebut Buzzfeed I. |
| 2017 | Board of Directors approves 2017 Behavioral Health Business Plan, which includes business plans from 1.6% of behavioral health facilities. The business plans outline aggressive strategies to improve growth and financial performance. |
| January 23, 2017 | The Compliance Committee discusses compliance hotline calls. |
| February 2017 | UHS Form 10-K for 2016 reports growth in the Behavioral Health Division. UHS also discloses that the federal investigation is a False Claims Act investigation focused on billings submitted to government payers. |
| March 28, 2017 | CtW sends another letter to UHS, raising the same concerns regarding corporate oversight. |

| April 11, 2017 | Buzzfeed publishes Buzzfeed III, which reports misconduct at Shadow Mountain Youth Psychiatric Facility in Tulsa, Oklahoma. |
|---|---|
| April 21, 2017 | CtW sends another letter to UHS shareholders, raising concerns about corporate oversight and asking the shareholders to withdraw support for the re-election of Mr. Gibbs to the Board. |
| November 17, 2017 | Buzzfeed publishes Buzzfeed IV, which reports misconduct at a UHS behavioral health facility in Alabama. |
| February 2018 | UHS Form 10-K for 2017 reports growth in the Behavioral Health Division. |
| July 25, 2018 | UHS discloses that it has increased the reserve of funds set aside to settle or litigate the federal investigation. |
| August 8, 2018 | In Form 10-Q, pertaining to 2018 second quarter results, UHS discloses that the federal investigation involves "medical necessity issues and billing for services not eligible for payment" and "admission eligibility, discharge decisions, length of stay and patient care issues." |
| November 5, 2018 | Amended Complaint filed in this Court. |
| July 26, 2019 | UHS discloses in Form 8-K that it has been advised by DOJ Criminal Frauds Section that the criminal investigation into UHS and its behavioral health facilities has been closed. Additionally, UHS discloses that "it has reached an agreement in principle to resolve the related civil investigation led by the Department of Justice's Civil Division for $137 million." |

## III.     STANDARD OF REVIEW

A motion filed under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a

complaint's factual allegations.  Zomolosky v. Kullman, 70 F. Supp. 3d 595, 603 (D. Del. 2014).

The motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) is set forth in

Ashcroft v. Iqbal, 556 U.S. 662 (2009).  After Iqbal, it is clear that "[t]hreadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice" to defeat

a Rule 12(b)(6) motion to dismiss.  Id. at 678; see also Bell Atl. Corp. v. Twombly, 550 U.S. 544

(2007).  "To survive dismissal, 'a complaint must contain sufficient factual matter, accepted as

true, to state a claim to relief that is plausible on its face.'" Tatis v. Allied Interstate, LLC, 882 F.3d

422, 426 (3d Cir. 2018) (quoting <u>Iqbal</u>, 556 U.S. at 678). Facial plausibility is "more than a sheer possibility that a defendant has acted unlawfully." <u>Id.</u> (quoting <u>Iqbal</u>, 556 U.S. at 678). Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> (quoting <u>Iqbal</u>, 556 U.S. at 678).

Applying the principles of <u>Iqbal</u> and <u>Twombly</u>, the Third Circuit in <u>Santiago v. Warminster Township</u>, 629 F.3d 121 (3d Cir. 2010), set forth a three-part analysis that a district court in this Circuit must conduct in evaluating whether allegations in a complaint survive a Rule 12(b)(6) motion to dismiss:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

<u>Id.</u> at 130 (quoting <u>Iqbal</u>, 556 U.S. at 675, 679). The inquiry is normally broken into three parts: "(1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." <u>Malleus v. George</u>, 641 F.3d 560, 563 (3d Cir. 2011).

A complaint must do more than allege a plaintiff's entitlement to relief, it must "show" such an entitlement with its facts. <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210-11 (3d Cir. 2009) (citing <u>Phillips v. County of Allegheny</u>, 515 F.3d 224, 234-35 (3d Cir. 2008)). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" <u>Iqbal</u>, 556 U.S. at 679 (alteration in original) (citation omitted). The "plausibility" determination is a

"context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.

IV.    ANALYSIS

Before the Court is Defendants' Motion to Dismiss the Amended Complaint. (Doc. No. 66.) As noted above, the Amended Complaint contains seven claims. First, in Count I, Plaintiffs allege that Individual Defendants knowingly or recklessly made materially false or misleading statements and omissions about UHS's financial position in violation of Section 10(b) of the Securities and Exchange Act, and Rule 10b-5, which was promulgated pursuant to Section 10(b). (Id. ¶¶ 306-312.) In Count II, Plaintiffs allege that Individual Defendants, by virtue of stock ownership and their positions of control in the company, violated Section 20(A) of the Securities and Exchange Act. (Id. ¶¶ 313-14.) Next, in Count III, Plaintiffs claim that under Delaware law, Individual Defendants breached their fiduciary duty to the company. (Id. ¶¶ 315-318.) In Count IV, Plaintiffs allege that Individual Defendants committed constructive fraud under Delaware law by failing to ensure that the company disclosed true facts about its business. (Id. ¶¶ 319-322.) In Count V, Plaintiffs claim that Individual Defendants' alleged improper conduct amounts to corporate waste under Delaware law. (Id. ¶¶ 323-325.) In Count VI, Plaintiffs bring a state law claim of unjust enrichment, alleging that Individual Defendants' conduct unjustly enriched them at the expense of the company. (Id. ¶¶ 326-330.) Finally, in Count VII, Plaintiffs allege that certain Individual Defendants, referred to as "Insider Trading Defendants," violated their state law fiduciary duty to the company by engaging in insider trading. (Id. ¶¶ 331-335.)

Significantly, Plaintiffs admit that they did not make a pre-suit demand on the UHS Board of Directors to bring the claims asserted in this litigation. They claim that making such a demand would have been futile. Conversely, in the Motion to Dismiss, Defendants submit that Plaintiffs have not pled sufficiently particularized allegations to demonstrate demand futility, and that as a

result, the Amended Complaint should be dismissed in its entirety. (Doc. No. 68.) The Court will analyze Defendants' argument below.

### A. Test Applicable to Plaintiffs' Demand Futility Allegations

A shareholder derivative suit is a lawsuit brought by a corporation's shareholders on behalf of the corporation to "enforce a corporate cause of action against officers, directors, and third parties." Ross v. Bernhard, 396 U.S. 531, 534 (1970). The purpose of a shareholder derivative suit is "to place in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of 'faithless directors and managers.'" Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 95 (1991) (quoting Cohen v. Beneficial Loan Corp., 337 U.S. 541, 548 (1949)). As a precondition of a shareholder derivative suit, most jurisdictions require that "the shareholder [must] demonstrate 'that the corporation itself had refused to proceed after suitable demand, unless excused by extraordinary conditions.'" Id. at 96 (citing Ross, 396 U.S. at 534). That is, before bringing a shareholder derivative suit, a shareholder must make a pre-suit demand on the corporation's board to give the board the opportunity to bring the suit on the corporation's behalf, unless such a demand would be futile. See Freedman v. Redstone, 753 F.3d 416, 423-24 (3d Cir. 2014) (citing In re Merck & Co., Sec., Deriv. & ERISA Litig., 493 F.3d 393, 399 (3d Cir. 2007)).

While Federal Rule of Civil Procedure 8 (General Rules of Pleading) governs pleadings in a typical complaint, Federal Rule of Civil Procedure 23.1 (Derivative Actions) governs the particularity with which demand futility allegations must be pled in a shareholder derivative suit.[39]

---

[39] Defendants claim that in addition to satisfying the heightened pleading requirements of Rule 23.1, Plaintiffs' allegations must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), which states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Defendants argue that Rule 9(b) not only applies to Plaintiffs' fraud causes of action, but that it also applies

More specifically, Rule 23.1 requires that a derivative complaint "state with particularity . . . any effort by the plaintiff to obtain the desired action from the directors or comparable authority, and, if necessary, from the shareholders or members . . . and . . . the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3)(A)-(B). But Rule 23.1 does not generate substantive demand requirements; rather, the substantive requirements of a pre-suit demand are formulated by state law. Blasband v. Rales, 971 F.2d 1034, 1046 (3d Cir. 1992) (citing Kamen, 500 U.S. at 96). Because UHS is a Delaware corporation, Delaware law governs the substantive requirements of Plaintiffs' claims, including the demand requirement. See Freedman, 753 F.3d at 425; In re Cendant Corp. Deriv. Action Litig., 189 F.R.D. 117, 129 (D.N.J. 1999).

Under Delaware law, which applies in this case, the decision of whether to bring a lawsuit is "a decision concerning the management of the corporation and consequently is the responsibility of the directors." Blasband, 971 F.2d at 1048 (quoting Levine v. Smith, 591 A.2d 194, 200 (Del. 1991)). By its very nature, a shareholder derivative suit encroaches upon that responsibility. Thus, the pre-suit demand requirement balances the interest of directors in managing the corporation and the interest of the shareholders in pursuing claims on behalf of the corporation. Pre-suit demand

---

to all of Plaintiffs' claims because the entire Amended Complaint "sounds in fraud." (Doc. No. 68.)

The Court disagrees for two reasons. First, to support their position, Defendants only cite to securities fraud cases, where the entire claim stems from fraudulent misstatements and representations. See California Public Emp. Ret. Sys. v. Chubb Corp., 394 F.3d 126, 144 (3d Cir. 2004). Second, courts applying Delaware law have generally held that Rule 9(b) does not apply to state law claims of breach of fiduciary duty, mismanagement, corporate waste, and unjust enrichment, which are alleged here. See In re NutriSystem, Inc. Deriv. Litig., 666 F. Supp. 2d 501, 524 (E.D. Pa. 2009) (only applying Rule 9(b) to claims of securities fraud, and not state law claims for breach of fiduciary duty); In re Fruehauf Trailer Corp., 250 B.R. 168, 197-98 (D. Del. 2000) (collecting cases); In re Walnut Leasing Co., No. 99-526, 1999 WL 729267, at *6 n.13 (E.D. Pa. Sept. 8, 1999).

is excused where making the demand would be futile.  A pre-suit demand is futile where the directors upon whom demand would be made "are incapable of making an impartial decision regarding such litigation."  Rales, 634 A.2d at 932.

Delaware courts have developed two tests to evaluate whether a plaintiff has properly pled demand futility.  See Zomolosky v. Kullman, 640 Fed. App'x 212, 216 (3d Cir. 2016).  First, in Aronson v. Lewis, the Delaware Supreme Court held that courts determining demand futility should consider "whether, under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment."  473 A.2d 805, 814 (Del. 1984), overruled on other grounds by Brehm v. Eisner, 746 A.2d 244 (Del. 2000).  The Aronson test is used when shareholders challenge a specific decision of a corporation's board of directors.  Further, the test is disjunctive, meaning that "if either prong is satisfied, demand is excused."  In re DaVita Inc. Stockholder Deriv. Litig., No. 17-152-MPT, 2019 WL 1855445, at *6 (D. Del. April 25, 2019) (quoting Brehm, 746 A.2d at 256).

In Rales v. Blasband, the Delaware Supreme Court explained that the Aronson test does not apply where "the board that would be considering the demand did not make the business decision which is being challenged in the derivative suit."  634 A.2d 927, 933-34 (Del. 1993).  Instead, where the subject of the derivative suit is not a business decision, but rather a violation of a board's oversight duties, the Rales test applies.  Wood v. Baum, 953 A.2d 136, 140 (Del. 2008) (citing Rales, 634 A.2d at 937).  The Rales test provides the following:

> [A] court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand.  If the derivative plaintiff satisfied this burden, then demand will be excused as futile.

<u>Rales</u>, 634 A.2d at 934.

Here, Plaintiffs did not make a pre-suit demand. They claim that making such a demand would have been futile because (1) a majority of the Board of Directors was interested, and (2) a majority of the Board lacked independence. To analyze Plaintiffs' demand futility allegations, the Court must determine whether <u>Aronson</u> or <u>Rales</u> applies to the Board's conduct. In the Amended Complaint, Plaintiffs seem to allege both action and inaction. On the one hand, they contend that the Board "push[ed] forward" aggressive business strategies that incentivized behavioral health facilities to engage in fraudulent practices to meet financial goals. On the other hand, Plaintiffs claim that Individual Defendants, including a majority of the Board, knew or should have known about the alleged misconduct, but failed to take steps to remedy it, in violation of their fiduciary duty to the company.

Having reviewed the allegations in the Amended Complaint, the Court will apply the <u>Rales</u> test to Plaintiffs' demand futility allegations. Although Plaintiffs frame the Board's conduct as "push[ing] forward" aggressive strategies, the allegations in the Amended Complaint only state that the Board reviewed and approved business plans that had already been written. Further, there are no allegations that the Board faced an explicit choice of action or inaction. Instead, at its core, the Amended Complaint charges the Board with general inaction, lack of oversight, and acquiescence. <u>See</u> <u>Zomolosky</u>, 640 Fed. App'x at 217 (finding that <u>Rales</u> applied to a case where the board of directors failed to act). Accordingly, the Court will apply the <u>Rales</u> test to Plaintiffs' demand futility allegations.[40]

---

[40] As Defendants note, many courts have held that, in cases that allege board inaction, "the <u>Rales</u> test encompasses all relevant aspects of the <u>Aronson</u> test." <u>In re Wal-Mart Stores, Inc. Del. Deriv. Litig.</u>, No. 7455-CB, 2016 WL 2908344, at *11 (Del. Ch. May 13, 2016). "[T]he <u>Rales</u> test functionally covers the same ground as the <u>Aronson</u> test in determining the impartiality of

In sum, to prevail, Plaintiffs must demonstrate that particularized factual allegations in the Amended Complaint create a reasonable doubt that the Board of Directors could not have exercised its independent and disinterested business judgment in responding to a pre-suit demand. Below, the Court will analyze whether Plaintiffs have pled sufficiently particularized facts under Rule 23.1 to create a reasonable doubt that a majority of the Board was not disinterested or that a majority of the Board was not independent, such that a pre-suit demand would have been futile.

**B.      Plaintiffs Have Failed to Demonstrate Demand Futility**

In the Motion to Dismiss, Defendants first argue that the Amended Complaint lacks sufficiently particularized facts under Rule 23.1 to create a reasonable doubt that a majority of the Board was not disinterested. Second, Defendants submit that Plaintiffs have not pled particularized facts that raise a reasonable doubt that a majority of the Board lacked independence. For these reasons, Defendants submit that the Amended Complaint should be dismissed in its entirety.

**1.      Plaintiffs Have Failed to Plead Particularized Facts that Create a Reasonable Doubt that the UHS Board of Directors Was Not Disinterested**

At the crux of the demand futility analysis is the question of whether a director, faced with a pre-suit demand, can make an impartial decision. An "interested" director cannot be impartial. "A director is considered interested when he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders." <u>Rales</u>, 634 A.2d at 936. Where, as here, the pre-suit demand involves determining whether litigation should be brought against directors on behalf of the company, a director is interested "if the proposed litigation would expose

---

directors." <u>Id.</u> (quoting <u>Sandys v. Pincus</u>, No. 9512-CB, 2016 WL 769999, at *12-13 & n.59 (Del. Ch. Feb. 29, 2016) (collecting cases and authorities)).

him to a 'substantial threat' of personal liability." Steinberg on behalf of Hortonworks, Inc. v. Bearden, No. 2017-0286, 2018 WL 2434558, at *6 (Del. Ch. May 30, 2018) (quoting Kohls v. Duthie, 791 A.2d 772, 782 (Del. Ch. 2000)). Thus, in this section, the Court must consider whether Plaintiffs have pled particularized allegations that a majority of the Board face a substantial threat of personal liability from this litigation, such that they would not have been able to make an impartial decision when faced with a pre-suit demand from Plaintiffs.

In the Amended Complaint, Plaintiffs claim that the Board faces a substantial threat of personal liability from this litigation, and are therefore "interested" because (1) the Board directed or incentivized UHS behavioral health facilities to engage in fraudulent misconduct by approving aggressive business plans, (2) the Board consciously ignored significant red flags that alerted it to the misconduct, and (3) they have stated claims against Individual Defendants in Counts I to VII. (Doc. No. 48.)

To combat those claims, Defendants first submit that the Amended Complaint lacks particularized facts to raise a reasonable doubt that the Board directed facilities to commit fraud. (Doc. No. 68 at 22.) Second, they assert that the alleged red flags cited by Plaintiffs do not expose them to a significant threat of personal liability. (Id. at 25.) Third, Defendants argue that Plaintiffs have failed to state a claim against any Individual Defendant, and therefore have failed to show that any Individual Defendant faces a substantial threat of personal liability from this litigation. (Id. at 29.) The Court will address Defendants' arguments in turn.

### a. Plaintiffs Have Failed to Plead Particularized Allegations that the UHS Board Directed UHS Behavioral Health Facilities to Engage in Fraud

Defendants first submit that the Amended Complaint lacks sufficiently particularized allegations to demonstrate that the Board directed UHS behavioral health facilities to engage in fraudulent misconduct. As a result, they argue that the Board does not face a substantial threat of personal liability from this litigation. The Court agrees with this argument.

As an initial matter, the UHS corporate charter exculpates the UHS Board of Directors from personal liability unless they have been disloyal to the company, acted in bad faith, committed intentional misconduct, or engaged in knowing violations of law.[41] (Doc. No. 69-12 at 11.) It is well-established under Delaware law that "[w]here directors are contractually or otherwise exculpated from liability for certain conduct, 'then a serious threat of liability may only be found to exist if the plaintiff pleads a non-exculpated claim against the directors based on particularized facts.'" Wood, 953 A.2d at 141 (citing Guttman v. Huang, 823 A.2d 492, 501 (Del. Ch. 2003)) (emphasis omitted).[42]

Thus, here, Plaintiffs will not meet their burden by showing that the Board faces a substantial threat of personal liability from this litigation by merely alleging breaches of fiduciary duty or negligent oversight of corporate affairs. Instead, Plaintiffs can only establish that the Board

---

[41] The Court may take judicial notice of the UHS Corporate Charter. See In re Merck & Co., Inc. Deriv. & "ERISA" Litig., MDL No. 1658(SRC), 2006 WL 1228595, at *14 n.6 (D.N.J. May 5, 2006), rev'd on other grounds by In re Merck & Co. Sec., Deriv., & ERISA Litig., 493 F.3d 393 (3d Cir. 2007) (citing In re Baxter Int'l, Inc. Shareholder Litig., 654 A.2d 1268, 1269 (Del. Ch. 1995)).

[42] Additionally, Title 8 Section 102(b)(7) of the Delaware Code states that a company's certificate of incorporation may contain "[a] provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director . . . ." 8 Del. C. § 102(b)(7).

faced a substantial threat of personal liability by making particularized allegations of disloyalty, bad faith, or intentional misconduct. Additionally, Plaintiffs must sufficiently allege that the Board had "actual or constructive knowledge" that their conduct was legally improper. Id.

Here, Plaintiffs first allege that a majority of the Board faces a substantial threat of personal liability from this litigation because Director Defendants breached their duty of loyalty to the company. Under Delaware law, the duty of loyalty is violated "[w]here directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities [and] failing to discharge [the non-exculpable duty of loyalty] in good faith." Stone ex rel. AmSouth Bancorporation v. Ritter, 911 A.2d 362, 370 (Del. 2006). In the Amended Complaint, Plaintiffs claim that Director Defendants breached their duty of loyalty to the company by "approv[ing] business plans, policies, and strategies that incentivized illegal activity by pressuring [UHS] employees to fill beds through unlawful methods, increasing conversion rates, emphasizing the most troubling behavior in order to code a patient as suicidal, keeping patients until their insurance was exhausted, manipulating patients through threats to get them to stay longer, and otherwise gaming the intake assessment process." (Doc. No. 87 at 31.) Through these business plans and strategies, Plaintiffs claim that Director Defendants, at Defendant Alan Miller's direction, "pushed forward business practices that result[ed] in violations of law" and "encouraged and orchestrated" facilities' unlawful admissions and billing practices. (Doc. No. 48 ¶¶ 1, 97.)

As noted above, each year, management from the Behavioral Health Division provides the Board with a "UHS Behavioral Health Division Business Plan." Each plan contains an overview of the Division's operations and individual business plans from a sample of behavioral health facilities. The Board then reviews and, if appropriate, approves the plans. According to the Amended Complaint, these business plans laid out aggressive strategies that promoted growth and

expansion at UHS facilities. For example, certain plans set forth strategies to attract new clientele, including adolescent, geriatric, and military patients; other plans sought to replace residential services with acute services, which yield higher insurance reimbursements. (Id. ¶¶ 60, 73, 74, 80.) Some plans set goals to attract more Medicare patients in order to improve facilities' average length of stay metric. (Id. ¶ 75.) And as emphasized by Plaintiffs, most of the business plans set numerical goals to increase patient days and patient admissions. (See id. ¶¶ 60-62.)

What these plans do not contain are directives from the Board to fraudulently admit patients or improperly lengthen patient stays. Nor do the plans reveal a company-wide edict handed down by the Board that pressured or incentivized facilities to commit fraud. In fact, the business plans actually cut against Plaintiffs' argument that the Board directed or pressured all UHS behavioral health facilities to commit fraud. As noted above, the Board only reviewed and approved a small sample of business plans. In 2013, the Board reviewed and approved plans for seven facilities, or 3.5% of all UHS behavioral health facilities. (Doc. No. 75-15.) In 2014, the Board reviewed business plans for 3.6% percent of facilities. (Doc. No. 75-16.) In 2015 and 2016, the Board reviewed plans for 2.3% of UHS behavioral health facilities (Doc. Nos. 75-17, 75-18), and in 2017, the Board reviewed plans from five facilities, or 1.6% of all behavioral health facilities (Doc. No. 75-19). Based on these statistics, it is not plausible that the UHS Board of Directors masterminded a company-wide scheme to commit fraud by its yearly review of business plans from less than 4% of all of the facilities in the Behavioral Health Division.

More to the point, the business plans cited by Plaintiffs are devoid of any indication that the Board directed or pressured facilities to engage in misconduct to improve financial performance. To the contrary, the business plans set forth appropriate, lawful means of improving

financial performance, which is a legitimate business goal.  In short, the business plans do exactly what business plans are meant to do—lay out strategies to generate more business.

To support their position of interest by the Board, Plaintiffs cite to a case in which the Ninth Circuit Court of Appeals, applying Delaware law, found that a shareholder derivative complaint adequately pled demand futility by showing that the company's board was not disinterested.  In Rosenblum v. Pyott, shareholders brought a derivative suit on behalf of Allergen, the pharmaceutical company that makes Botox, for damages in connection with the illegal promotion of off-label uses of drugs not yet approved by the FDA.  765 F.3d 1137, 1140 (9th Cir. 2014). There, the shareholders claimed that pre-suit demand was futile because the Board faced a substantial threat of personal liability from the litigation because they created programs to illegally promote unapproved, off-label uses for Botox.  In support of that claim, the shareholders pled particularized allegations that Allergen's Board created and approved business plans to (1) intentionally target specialists practicing in off-label fields, (2) encourage doctors to prescribe Botox for unapproved, off-label uses, and (3) instruct sales representatives to tell doctors that Botox works for unapproved, off-label uses, even when such uses had not been proven in clinical trials.  Id. at 1142-1145.

The district court dismissed the suit, finding that the allegations did not establish that a majority of the Board faced a substantial threat of personal liability.  Id. at 1141.  On appeal, the Ninth Circuit Court of Appeals reversed, finding that the shareholders had successfully pled demand futility.  In so concluding, the court quoted language from a virtually identical shareholder derivative suit filed on behalf of Allergen in Delaware state court, in which the court held that a pre-suit demand would be futile because a majority of the Board was interested:

> The plaintiffs in this case have alleged a direct connection between the Board and a business plan premised on illegal activity.  The Complaint pleads that from 1997

onward, the Board discussed and approved a series of annual strategic plans that contemplated expanding Botox sales dramatically within geographic areas that encompassed the United States. The plans contemplated new markets for Botox that involved applications that were off-label uses in the United States. So significant was the scope of the expansion that it necessarily contemplated marketing and promoting off-label uses within the United States. The Board then closely monitored Allergen's dramatic success in increasing its sales of Botox at rates far exceeding what the market for existing on-label uses could support or that could be generated by physicians serendipitously learning about and trying new off-label applications. The Board kept Allergen's business plan in place even after [investigations and lawsuits] illustrated the extent of Allergen's regulatory exposure.

Id. at 1154-55 (quoting La. Mun. Police Emps.' Ret. Sys. v. Pyott, 46 A.3d 313, 352-53 (Del. Ch. 2012)).

The allegations found to be sufficient in Rosenblum are far stronger than those pled here. In Rosenblum, the shareholders alleged that the board of Allergen approved business plans that explicitly promoted illegal practices. Here, however, Plaintiffs allege that the UHS Board of Directors approved business plans that promoted legitimate, lawful strategies to promote growth at UHS behavioral health facilities. Relying on Rosenblum, Plaintiffs ask the Court to examine the business plans and conclude that the Board knew that the behavioral health facilities could not reach set goals without committing fraud, and that the Board approved the plans with the intention of committing fraud. But the link between the business plans and the fraud is too attenuated to support that conclusion. Nor does the Amended Complaint contain allegations to support it. Just because a company sets aggressive goals to improve financial performance does not mean that the company employs fraudulent means to achieve those goals. Without more particularized allegations, connecting the business plans to an alleged directive or incentive to commit fraud requires a mental leap prohibited by Rule 23.1.

In sum, Plaintiffs have failed to allege particularized allegations sufficient to raise a reasonable doubt that a majority of the Board faced a substantial threat of personal liability because

they directed behavioral health facilities to engage in fraud, which would constitute a breach of their duty of loyalty to the company.

        **b.**        **Plaintiffs Have Failed to Plead Particularized Facts That Show That the UHS Board Ignored Significant Red Flags**

Second, Defendants submit that Plaintiffs have failed to show that the Board acted in bad faith by ignoring a series of red flags that should have put them on notice of alleged misconduct at UHS behavioral health facilities. For the reasons that follow, the Court agrees.

As noted above, Plaintiffs claim, inter alia, that a majority of the Board faced a substantial threat of personal liability from this litigation because Director Defendants knew about significant red flags of misconduct, but acted in bad faith by consciously disregarding their duty to remedy that misconduct. This is a theory of liability known as Caremark liability. See In re Caremark Int'l Inc. Deriv. Litig., 698 A.2d 959 (Del. Ch. 1996). Courts have emphasized that Caremark liability is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." King ex rel. Cephalon Inc. v. Baldino, 409 Fed. App'x 535, 537 (3d Cir. 2010) (quoting Caremark, 698 A.2d at 967).

In Stone v. Ritter, the Delaware Supreme Court restated the bases on which directors may be found liable under Caremark:

> We hold that Caremark articulates the necessary conditions predicate for director oversight liability: (a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention. In either case, imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations. Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith.

Stone v. Ritter, 911 A.2d 362, 370 (Del. 2006) (footnotes omitted).

Here, Plaintiffs' claims are based on the second of Stone's two means to plead a Caremark claim. Under this formulation, a plaintiff can show Caremark liability by establishing: "(1) that the directors knew or should have known that the corporation was violating the law, (2) that the directors acted in bad faith by failing to prevent or remedy those violations, and (3) that such failure resulted in damage to the corporation." Melbourne Municipal Firefighters' Pension Trust Fund on Behalf of Qualcomm, Inc. v. Jacobs, No. 10872-VCMR, 2016 WL 4076369, at *8 (Del. Ch. Aug. 1, 2016) (citing Caremark, 698 A.2d at 971). In short, a plaintiff can prevail on a Caremark claim by "pleading that the board had knowledge of certain 'red flags' indicating corporate misconduct and acted in bad faith by consciously disregarding its duty to address that misconduct." Id. For the purposes of a Caremark claim, red flags are "facts showing that the board ever was aware that [the corporation's] internal controls were inadequate." King ex rel. Cephalon Inc. v. Baldino, 409 Fed. App'x 535, 538 (3d Cir. 2010) (quoting Stone, 911 A.2d at 370). Ignoring such red flags would amount to bad faith, which, as noted earlier, is a non-exculpable charge under the UHS Corporate Charter.

Plaintiffs cite to five categories of red flags: (1) the qui tam lawsuits and government investigations; (2) labor union letters; (3) compliance hotline calls and presentations; (4) the business plans from behavioral health facilities and facilities' performance metrics; and (5) Buzzfeed I. (See Doc. No. 48.) The Court will address each category in turn.

### i.  Qui Tam Lawsuits and Government Investigations

The Court will first turn to the claim that the qui tam lawsuits and government investigations were significant red flags that should have alerted the Board to alleged misconduct at UHS behavioral health facilities. As noted earlier, Plaintiffs claim that UHS's aggressive strategies resulted in a "plethora" of inquiries and lawsuits. (Doc. No. 48 ¶ 98.) For example, in

2005, a former UHS employee filed a <u>qui tam</u> lawsuit against the company in relation to alleged misconduct at McAllen Hospitals in Texas, which UHS ultimately settled for $27.5 million.  (<u>Id.</u>)  In April 2011, the federal government suspended Medicaid payments to Two Rivers Psychiatric Hospital in Kansas after the government discovered that employees failed to monitor a suicidal patient.  (<u>Id.</u> ¶ 99.)  That same month, several states pulled their wards from The Pines, a facility in Virginia, after learning of patient abuse.  (<u>Id.</u> ¶ 100.)  Later that year, the Illinois Department of Children and Family Services reported serious health and safety issues at Hartgrove Hospital in Chicago.  (<u>Id.</u> ¶¶ 101-03.)  Finally, in July 2011, relators filed the <u>Escobar qui tam</u> lawsuit in Massachusetts, alleging that Arbour Counseling Services employed unqualified staff and submitted false claims to the government for reimbursement.  (<u>Id.</u> ¶¶ 105-11.)

Additionally, in February 2013, UHS disclosed that the federal government had opened a civil investigation into several UHS behavioral health facilities.  (<u>Id.</u> ¶ 112.)  In October 2013, the DOJ Criminal Frauds Section advised the company that it had opened a criminal investigation into several facilities.  (<u>Id.</u> ¶¶ 114-15.)  In March 2015, UHS disclosed that the federal investigation had expanded to include UHS as a corporate entity.  (<u>Id.</u> ¶ 120.)  In its 2015 Form 10-K, UHS told investors that the federal investigation was a "False Claims Act investigation focused on billings submitted to government payers in relation to services provided at those facilities."  (<u>Id.</u> ¶ 124.)  But significantly, on July 26, 2019, UHS filed a Form 8-K that disclosed that the DOJ Criminal Frauds Section had closed its investigation into the company and its behavioral health facilities without filing any charges.  (Doc. No. 116.)  Defendants also stated that it had reached "an agreement in principle to resolve the related civil investigation led by the Department of Justice's Civil Division for $127 million."  (<u>Id.</u>)

Contrary to Plaintiffs' contention, the filing of the qui tam lawsuits are not significant red flags because "knowledge of unsubstantiated qui tam allegations, on their own, do not suggest that the Board of was aware of . . . corporate misconduct." In re Johnson & Johnson Deriv. Litig., 865 F. Supp. 545, 567 (D.N.J. 2011). In a securities class action relying on the filing of a single qui tam lawsuit to impute knowledge of misconduct to a board of directors, the court in Bartesch v. Cook explained the following:

> The qui tam complaint is also an unreliable source. It is devoid of any information concerning the qui tam plaintiff's relationship to [the defendant company] or whether the plaintiff has firsthand knowledge of his allegations against [the defendant company. As other courts in the Third Circuit have held, "it [is] not appropriate for the Court to give weight to the allegations in [a] qui tam case," Gaer v. Educ. Mgmt. Corp., 2011 WL 7277578, at *2 (W.D. Pa. Sept. 29, 2011), because such allegations "are unproven and contested [and] do not amount to 'facts' sufficient to establish a strong inference of scienter." In re Apollo Grp., Inc. Secs. Litig., 2011 WL 5101787, at *10 n.5 (D. Ariz. Oct. 27, 2011).

941 F. Supp. 2d 501, 507 (D. Del. 2013). Similarly, in Gaer v. Education Management Corp., which was cited in Bartesch, the court afforded no weight to allegations of a single qui tam lawsuit, finding that the mere existence of a lawsuit, without any finding of liability or wrongdoing, has little significance. No. 10-1061, 2011 WL 7277447, at *2 (W.D. Pa. Sept. 29, 2011).

Indeed, the allegations raised in the qui tam lawsuits cited here are just that—allegations. None of the qui tam lawsuits resulted in findings of liability against UHS. Liability was not admitted, and thus, the allegations made in those suits remain unsubstantiated. Thus, the fact that the Board did not "reform the Company's practices" after the qui tam lawsuits were filed is not enough to demonstrate that the Board ignored red flags in violation of their duty of good faith to UHS. Regardless of whether there was one or, as alleged here, three[43] qui tam suits, they still only

---

[43] Throughout the Amended Complaint, Plaintiffs reference three qui tam lawsuits: (1) the qui tam lawsuit in connection with McAllen Hospitals in Texas; (2) the Escobar qui tam lawsuit; and

involve allegations.  And as courts in this Circuit have noted, "it [is] not appropriate for the Court to give weight to the allegations in [a] <u>qui tam</u> case . . . .'"  <u>Bartesch</u>, 941 F. Supp. 2d at 507 (quoting <u>Gaer</u>, 2011 WL 7277578, at *2).

Similarly, a government investigation "is not evidence of fraud, or even negligence or mistake."  <u>Southeastern Pennsylvania Transportation Authority v. Orrstown Financial Serv., Inc.</u>, No. 12-00993, 2016 WL 7117455, at *11 (M.D. Pa. Dec. 7, 2016) (citing <u>Meyer v. Greene</u>, 710 F.3d 1189, 1201 (11th Cir. 2013) ("The announcement of an investigation reveals just that—an investigation—and nothing more.")).  Nor does the amount of ongoing investigations into a company demonstrate that the board recognized but ignored red flags.  <u>In re Intel Corp. Deriv. Litig.</u>, 621 F. Supp. 2d 165, 175 (D. Del. 2009) (dismissing the action where "Plaintiff's approach is little more than to catalog the ongoing investigations into Intel's alleged wrongdoing, and then assert that the thickness of the catalog demonstrates that Intel's conduct was so egregious and widespread that the Directors certainly must now face at least a 'substantial likelihood' of personal liability for having ignored the 'red flags'").

Courts applying Delaware law have found that pending government investigations are not red flags that a corporation engaged in misconduct.  "[S]uch red flags do not suggest that a board was aware of corporate misconduct—they only suggest that the board was aware that the company was under investigation."  <u>Johnson & Johnson</u>, 865 F. Supp. 2d at 566 (citing <u>Intel</u>, 621 F. Supp. 2d at 175).  Thus, in this case, the fact that the government opened an investigation into UHS for potential violations of the False Claims Act does not mean that the company actually violated the False Claims Act or that the Board knew that any violations occurred.  For this reason, the Board's

_____

(3) the <u>qui tam</u> lawsuit filed by Dr. Steven Klotz in 2010, which is only referenced in the first CtW letter.

failure to remedy these alleged violations only reflects its position that UHS did not violate the law. And notably, on July 26, 2019, UHS disclosed that the government had closed its criminal investigation into UHS and its behavioral health facilities. That same day, UHS disclosed that it had entered into an agreement in principle to settle the civil investigation.

### ii. Labor Union Letters

Next, Plaintiffs assert that the SEIU and CtW letters were red flags that alerted the Board to the alleged misconduct at UHS behavioral health facilities, which the Board then ignored. As noted above, from 2013 through 2017, UHS received several letters from SEIU and CtW, which raised concerns about billing, admittance, and quality of care practices at UHS behavioral health facilities. Additionally, the unions told the Board that an independent review of Medicare data revealed that UHS facilities utilized the suicidal ideation code at a higher rate than comparable facilities. Finally, the unions urged UHS to take steps to improve its corporate oversight of regulatory compliance issues. In the Amended Complaint, Plaintiffs contend that the Board ignored these issues.

First, these letters do not constitute red flags. Instead, they raise the same inference as that raised by the qui tam lawsuits and the government investigations—that the Board knew that outside sources had raised concerns about practices at UHS facilities. As with the lawsuits and the investigations, the letters do not support the inference that the Board knew that the allegations of misconduct were true.

And even if these letters were red flags, the UHS Board of Directors did not ignore them. To the contrary, the Board acknowledged the unions' concerns, but based on the results of internal and external audits, determined that the concerns were unfounded. As noted earlier, after receiving the labor union letters, Mr. Herrell, the Chairman of the Audit Committee, responded to the unions

in a letter.  In the letter, he admitted that a small number of behavioral health facilities had encountered sporadic regulatory compliances issues, but assured SEIU and CtW that the company always remedied those matters.  On the subject of the suicidal ideation code, Mr. Herrell first informed the labor unions that all UHS coding staff are required to be certified as a Registered Health Information Administrator, Registered Health Information Technologist or Certified Coding Specialist.  Additionally, Mr. Herrell reported that the company employed both internal auditors and external government auditors to analyze its billing and coding practices.  According to Mr. Herrell, not a single auditor reported improper usage of the suicidal ideation code.

Again, to demonstrate demand futility under Caremark, a plaintiff must show that a corporation's board consciously disregarded red flags.  The labor union letters do not show that this happened.  Contrary to Plaintiffs' contentions, the letters, and Mr. Herrell's response to the letters, demonstrate that the Board acknowledged the unions' concerns, considered them, but decided that the concerns lacked merit.  Such a response is not an example of a board acting in bad faith.

### iii.    Hotline Compliance Calls

Next, Plaintiffs argue that the hotline compliance calls were red flags that were ignored by the Board.  As explained in a preceding section, UHS operated a compliance hotline that allowed UHS employees to call in and submit anonymous complaints to the company.  According to the Amended Complaint, the Board's Compliance Committee routinely reviewed each of these calls to determine whether the complaint was substantiated and whether the complaint required an investigation.  Plaintiffs admit that in response to certain complaints, the company replaced or retrained staff, reimbursed insurance payors, and took steps to investigate misconduct.  (See Doc. No. 48 ¶¶ 196, 215-16, 231, 235.)

Similar to the letters, the compliance hotline calls do not demonstrate that the Board acted in bad faith by consciously disregarding red flags. To the contrary, it appears that the Board reviewed the calls and took appropriate action when necessary. Caremark liability only attaches when no steps were taken by a board. In Oklahoma Firefighters Pension & Retirement System v. Corbat, the court explained as follows:

> As our Supreme Court has recognized, "directors' good faith exercise of oversight responsibility may not invariably prevent employees from violating criminal laws, or from causing the corporation to incur significant financial liability, or both." That is one reason why a Caremark claim requires a showing of "intentional dereliction of duty, [or] a conscious disregard for one's responsibilities," a standard that entails a greater degree of culpability than "simple inattention or failure to be informed of all facts material to the decision." At issue is the duty of loyalty; a board's efforts can be ineffective, its actions obtuse, its results harmful to the corporate weal, without implicating bad faith. Bad faith may be inferred where the directors knew or should have known that illegal conduct was taking place, yet "took no steps in a good faith effort to prevent or remedy that situation."

No. 12151-VCG, 2017 WL 6452240, at *17 (Del. Ch. Dec. 18, 2017). As explained above, the Board routinely reviewed the compliance hotline calls and took steps to remedy the conduct alleged if necessary. For this reason, the hotline compliance calls do not support Plaintiffs' theory that the Board consciously disregarded red flags in violation of its duties to the company.

### iv. Business Plans, Performance Metrics, and Statistics

Plaintiffs also claim that the Behavioral Health Division's business plans were red flags that should have alerted the Board to the fact that misconduct was occurring at UHS behavioral health facilities. More specifically, Plaintiffs allege that the Board knew or should have known that the facilities could not effectuate the business plans' aggressive strategies or reach the financial goals without committing fraud. Further, Plaintiffs allege that the Board should have looked at the Behavioral Health Division's strong financial performance from 2013 through 2017 and realized

that such a performance was not possible without the misconduct alleged in the Amended Complaint.

Plaintiffs' argument lacks merit. As explained in the preceding section, the business plans cited by Plaintiffs do not contain directives to fraudulently admit patients or improperly lengthen patient stays. Nor do they set forth a company-wide edict that incentivizes fraud. Instead, the business plans set forth appropriate, lawful means of increasing business and improving financial performance. In short, the business plans serve their intended purpose—to lay out strategies to generate more business.

Likewise, strong performance metrics are not red flags. Rather, they only show that the Behavioral Health Division was successful. To assume that the Board knew about alleged misconduct simply because the facilities were successful requires a logical leap well beyond the particularity requirements of Rule 23.1.

Plaintiffs also argue that statistics at certain facilities should have alerted the Board to the alleged misconduct. For example, Plaintiffs point to the fact that after UHS acquired outside behavioral health facilities, the use of the suicidal ideation code at those facilities tended to increase. Indeed, after UHS acquired Psychiatric Solutions, Inc. ("PSI") in November 2010, the use of the suicidal ideation billing code increased by six-times. According to Plaintiffs, this statistic should have put the Board on notice that UHS facilities were improperly admitting patients by coding them as suicidal. But that argument misses a key point: most PSI facilities never used the suicidal ideation code until UHS acquired the facilities in November 2010 and updated their coding practices to include use of that code. Thus, it should have been neither alarming nor unusual to the Board that the use of the suicidal ideation billing code increased six-fold at PSI facilities after the UHS acquisition—after never using a particular code, any sudden usage would result in

a dramatic increase. For this reason, there was no reason for the Board to view this statistic as a red flag.

### v. Buzzfeed I

Finally, Plaintiffs contend that Buzzfeed I was a red flag that was ignored by the Board. But contrary to Plaintiffs' contention, the Amended Complaint lacks particularized allegations that the Board ignored Buzzfeed I. In fact, the Amended Complaint concedes that seven days after the article was published, the Board gathered for a special meeting to review and discuss its conclusions. And soon thereafter, the Board thoroughly investigated the allegations and developed a 93-page paper that carefully addressed and refuted them. Additionally, UHS created a website to rebut Buzzfeed I's conclusions.

Again, to show demand futility under Caremark, a plaintiff must demonstrate that a board acted in bad faith by consciously disregarding its duties to the corporation. Here, the Board's response to Buzzfeed I does not demonstrate bad faith. Instead, the Board's actions demonstrate good faith: it reviewed the allegations, thoroughly investigated them, and concluded that conduct at UHS behavioral health facilities did not violate the law. Further, as admitted in the Amended Complaint, the Board continuously expressed its view that Buzzfeed I, the article published on December 6, 2017, was overly anecdotal and that the company's conduct did not violate the law. Accordingly, the Amended Complaint is devoid of any plausible allegation that the Board acted in bad faith by consciously disregarding the allegations raised in Buzzfeed I. For this reason, the Court is not convinced that the Board's response to the article supports liability under Caremark. See Qualcomm, 2016 WL 4076369, at *10-12 (finding that a plaintiff had not pled bad faith where the board acknowledged the alleged misconduct, reviewed it, and consistently expressed its view that its actions did not violate the law).

For all these reasons, the Court is not persuaded that Plaintiffs have pled particularized facts that demonstrate that the Board acted in bad faith by consciously disregarding red flags that should have put them on notice of alleged misconduct at UHS behavioral health facilities. As a result, Plaintiffs have failed to establish that the Board faces a substantial threat of personal liability from this litigation under the <u>Caremark</u> theory.

> **c.** **Plaintiffs Have Not Demonstrated That the UHS Board Faced a Substantial Threat of Personal Liability From the Underlying Claims in the Amended Complaint**

Defendants also claim that Plaintiffs have failed to establish that the Board faced a substantial threat of personal liability from this litigation because they have failed to state a claim against any Director Defendant. As noted above, Plaintiffs bring six claims against all Individual Defendants: (1) securities fraud under Section 10(b) of the Securities and Exchange Act; (2) securities fraud under Section 20(A) of the Act; (3) breach of fiduciary duty under state law; (4) constructive fraud under state law; (5) unjust enrichment under state law; and (6) corporate waste under state law. (<u>See</u> Doc. No. 48.) In addition, Plaintiffs bring a state law claim of breach of fiduciary duty against the Insider Trading Defendants based on the insider trading allegations.

Below, the Court will first analyze Counts I and II, which contain claims under federal securities law. Second, the Court will consider Count VII, the breach of fiduciary duty claim based on the insider trading allegations. Third, the Court will address Counts III, IV, V, and VI, the state law claims.

> **i.** **Count I – Securities Fraud Under Section 10(b) and Rule 10b-5**

In Count I of the Amended Complaint, Plaintiffs allege that Individual Defendants knowingly or recklessly made materially false or misleading statements or omissions about the

company in violation of Section 10(b) of the Securities and Exchange Act, and Rule 10b-5, which was promulgated pursuant to Section 10(b).  (Doc. No. 48 ¶¶ 306-312.)

Section 10(b) makes it unlawful to "use or employ, in connection with the purchase or sale of any security" a "manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b).  The Act broadly defines a "security" to include, among other things, stocks, bonds, debentures, a variety of other instruments, or, "in general, any instrument commonly known as a 'security.'" 15 U.S.C. § 78c(a)(10).

Rule 10b-5, which was promulgated by the SEC pursuant to the authority granted in Section 10(b), provides the following:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> In connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  Plaintiffs only proceed under Rule 10b-5(b), which creates a private right of action for plaintiffs to recover damages for "false or misleading statements or omissions of material fact that affect trading on the secondary market."  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1417 (3d Cir. 1997).

To prevail on a claim that a defendant made material misrepresentations or omissions in violation of Section 10(b) and Rule 10b-5, a plaintiff must prove "(1) a material misrepresentation

or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." <u>Matrixx Initiatives, Inc. v. Siracusano</u>, 563 U.S. 27, 37-38 (2011) (quoting <u>Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.</u>, 552 U.S. 148, 157 (2008)).  In this case, Defendants submit that Plaintiffs have failed to plead a material misrepresentation, scienter, reliance, and loss causation.  (Doc. No. 68 at 29-30.)

Because this is a securities fraud claim, the Court must analyze the allegations in the Amended Complaint under the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), and the specific requirements of 15 U.S.C. § 78u-4(b), which is a section of the Private Securities Litigation Reform Act ("PSLRA").   The PSLRA "imposes two exacting and distinct pleading requirements."  <u>In re Aetna, Inc. Sec. Litig.</u>, 617 F.3d 272, 277 (3d Cir. 2010). First, with respect to false and misleading statements, a complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation . . . is made on information and belief . . . state with particularity all facts on which that belief is formed." <u>Id.</u> (citing 15 U.S.C. § 78u-4(b)(1)).

Second, the PSLRA enhances the requirements of Federal Rule of Civil Procedure 9(b) which provides that "[i]n alleging fraud or mistake a party must state with particularity the circumstances constituting fraud or mistake" and requires the plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." <u>Id.</u> at 277 (citing 15 U.S.C. § 78u-4(b)(2)).  A strong inference of scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." <u>Tellabs</u>, 551 U.S. at 309.  A court must consider "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual

allegation, scrutinized in isolation, meets that standard." Institutional Investors Grp. v. Avaya, 564

F.3d 242, 267-68 (3d Cir. 2009) (quoting Tellabs, 551 U.S. at 321).

In this case, Plaintiffs claim that the following statements, found in each of UHS's Form

10-K filings from 2013 to 2016, are actionable:

(a)   Universal was focused on "long-term results" for investors, including
      providing "superior healthcare services" through a commitment to "service
      excellence," "continuous improvement in measurable ways," "employee
      development," and "ethical and fair treatment."

(b)   The Company has "a comprehensive ethics and compliance program that is
      designed to meet or exceed applicable federal guidelines and industry
      standards"; and

(c)   "We believe our facilities are in substantial compliance with current
      applicable federal, state, local and independence review body regulations
      and standards."

(Doc. No. 87 at 58.)  The Form 10-Ks were each signed by Director Defendants—Alan Miller,

Marc Miller, Gibbs, Hotz, Herrell, McDonnell, Pantaleoni—and  Steve Filton, the company's

CFO.  Plaintiffs claim that these statements are materially false and misleading because Defendants

failed to disclose to investors that UHS "caused the Company to manipulate the patient admissions

process at its facilities, hold patients beyond lengths medically necessary, critically understaff

those facilities and otherwise cut costs while sacrificing patient care, and submit fraudulent

reimbursements for such 'services' in violation of the [False Claims Act] . . . ."  (Doc. No. 48 ¶

245.)

Considering first whether these statements constitute material misstatements or omissions,

a statement or omission is materially false or misleading if there is "a substantial likelihood that

the disclosure of the omitted fact would have been viewed by the reasonable investor as having

significantly altered the 'total mix' of information available" to that investor.  Matrixx Initiatives,

563 U.S. at 38 (quoting Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988)).  But significantly,

Section 10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any and all material information. Disclosure is required under these provisions only when necessary to make . . . statements made, in light of the circumstances under which they were made, not misleading." Williams v. Globus Medical, Inc., 869 F.3d 235, 241 (3d Cir. 2017) (quoting Matrixx Initiatives, 563 U.S. at 44). "Silence, absent a duty to disclose, is not misleading under Rule 10b-5." Basic, 485 U.S. at 239 n.17. Thus, "[e]ven non-disclosure of material information will not give rise to liability under Rule 10b-5 unless the defendant had an affirmative duty to disclose that information." Oran v. Stafford, 226 F.3d 275, 285 (3d Cir. 2000).

The first set of statements, those representing that UHS believed that it was focused on a commitment to "service excellence," are not actionable. Such statements are too vague and immaterial to truly mislead any investor. General statements about a company's dedication to excellence do not meaningfully alter the total mix of information available to the investor and thus are "immaterial as a matter of law." In re Aetna, Inc., Sec. Litig., 617 F.3d 272, 284 (3d Cir. 2010) (finding that statements like "dedication to disciplined pricing" and "personal commitment to maintain discipline and rigor" were too vague and immaterial to be actionable); Aviva Partners LLC v. Exide Technologies, No. 05-3098, 2007 WL 789083, at *17 (D.N.J. Mar. 13, 2007) (explaining that a statement that the company is "focused on strengthening [its] position as an industry leader and creating long-term value for [its] shareholders" was a vague expression of hope and confidence that was not actionable); In re ATI Technologies, Inc. Sec. Litig., 216 F. Supp. 2d 418, 433 (E.D. Pa. 2002) (concluding that the statement that "everything is under control" is "too vague and nonspecific to be of import to any reasonable investor").

The second set of statements, those representing that UHS has a comprehensive ethics and compliance program, are not actionable because they are not false or misleading. As noted above,

UHS had both an Audit and a Compliance Committee. Indeed, the Amended Complaint concedes that the Audit Committee and the Compliance Committee met regularly during the relevant time period and that the Committees routinely reviewed and analyzed various compliance issues. Further, the Amended Complaint notes that UHS maintained a Compliance Hotline and that the Compliance Committee reviewed the Compliance Hotline complaints on a quarterly basis, making changes and starting investigations where necessary. Finally, in Mr. Herrell's response letter to the labor union letter, he details the significant compliance controls that the company utilizes, including both internal and external audit systems. Thus, contrary to Plaintiffs' contention, statements that UHS has a comprehensive ethics and compliance program are not false, and therefore, are not actionable.

The third set of statements, those representing that the company was in substantial compliance with state and federal guidelines, also are not actionable. For one, such statements are opinion statements. "Opinions are only actionable under the securities laws if they are not honestly believed and lack a reasonable basis." City of Edinburgh Council v. Pfizer, Inc., 754 F.3d 159, 170 (3d Cir. 2014) (citing In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig., 543 F.3d 150, 166 (3d Cir. 2008)).

Here, Plaintiffs have not pled particularized facts under the PSLRA and Rule 9(b) that demonstrate that Defendants did not honestly believe that UHS was in substantial compliance with state and federal standards. Although a small number of UHS facilities experienced compliance issues, it does not appear that these issues pervaded the entire company. At the height of the federal investigation, it appears that at least twenty-five behavioral health facilities were under investigation. But this number represents only a small percentage of the total number of UHS behavioral health facilities. Indeed, by the time the Amended Complaint was filed, UHS operated

over 300 such facilities. (See Doc. No. 48 ¶ 53.) Further, according to Mr. Herrell, in 2013, 40% of UHS behavioral health facilities were awarded "Top Performer Status for Quality and Safety." (Doc. No. 69-5.) Based on these facts, Defendants had a reasonable basis for believing that the company was in substantial compliance with state and federal regulations. Thus, the third set of statements are not actionable.

Because these three sets of statements are not actionable, the Court need not determine whether Plaintiffs have pleaded scienter, reliance, or loss causation. Significantly, due to the fact that Plaintiffs have not stated a claim for securities fraud under Section 10(b) and Rule 10b-5, they have not demonstrated that the Board faced a substantial threat of personal liability from this claim.

### ii. Count II – Securities Fraud Under Section 20(A)

In Count II, Plaintiffs allege that Individual Defendants, by virtue of their position of control over the company, violated Section 20(A) of the Securities and Exchange Act. (Doc. No. 48 ¶¶ 313, 314.) Section 20(a) of the Act imposes joint and several liability upon individuals who control violators of Section 10(b). 15 U.S.C. § 78t(a). To prevail under this provision of the Act, a plaintiff must establish that (1) the defendant was in control of another person or entity, and (2) that person or entity violated Section 10(b). See In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 284 (3d Cir. 2006). "[L]iability under Section 20(a) is derivative of an underlying violation of Section 10(b) by the controlled person." Williams v. Globus Medical, Inc., 869 F.3d 235, 246 (3d Cir. 2017) (quoting Avaya, 564 F.3d at 252).

Because Plaintiffs have failed to plead that Individual Defendants violated Section 10(b), they have likewise failed to state a claim under Section 20(A). See id. (affirming the dismissal of a plaintiff's Section 20(A) claims because dismissal of the plaintiff's Section 10(b) claims was

appropriate). As a result, Plaintiffs have not established that the Board faced a substantial threat of personal liability from the claim in Count II.

### iii. Count VII – Breach of Fiduciary Duty Based on Insider Trading

In Count VII of the Amended Complaint, Plaintiffs allege that from January 16, 2013 to March 8, 2017, Defendants Alan Miller, Marc Miller, Pantaleoni, Herrell, Hotz, Gibbs, Filton, and Osteen, the Insider Trading Defendants, collectively sold $29,686,911.13 of UHS common stock while in possession of material, non-public information in violation of federal securities laws. (Doc. No. 48 ¶ 252.) According to the Amended Complaint, "these sales placed the Insider Trading Defendants' shares onto the open market at artificially inflated prices at a time when the Board was causing the Company to repurchase those shares" and "[a]s a result, [UHS] overpaid by more than estimated $29.7 million for those shares." (Id.) More specifically, Count VII states the following:

334.   At the time of their stock sales, the Insider Trading Defendants knew of and/or were engaging in a scheme to cause the Company to defraud the U.S. and individual state health care systems due to their illicit over-admission of patients and billing such government entities for their purported services. The Insider Trading Defendants' sales of Universal common stock while in possession and control of this material, adverse non-public information was a breach of their fiduciary duties of loyalty and good faith, and the material non-public information caused the Insider Trading Defendants to knowingly sell their shares at inflated prices.

335.   As a direct and proximate result of the Individual Defendants' insider sales and breach of fiduciary duties, Universal has suffered damages, not only monetarily, but also to its corporate image and goodwill. Because the Individual Defendants used the Company's proprietary information for their own gain, the Company is entitled to the imposition of a constructive trust on any profits the Insider Trading Defendants obtained thereby.

(Id. ¶¶ 334, 335.) In short, Plaintiffs claim that Insider Trading Defendants breached their duties of loyalty and good faith to the company by selling UHS common stock while in possession of material, non-public information—the alleged misconduct at UHS behavioral health facilities.

Delaware law recognizes a cause of action for breach of fiduciary duty when a director engages in insider trading by trading shares of the company, motivated in whole or in part by material, nonpublic information about the company in his possession. In re Oracle Corp., Deriv. Litig., 867 A.2d 904, 934 (Del. Ch. 2004) (citing Brophy v. Cities Service Co., 70 A.2d 5 (Del. Ch. 1949)), aff'd, 872 A.2d 960 (Del. 2005). "For allegations of insider trading to create a reasonable doubt as to whether a director is disinterested, there must be more than merely cursory allegations of sales made at a time when the director alleged[ly] possessed material, non-public information." In re NutriSystem, Inc. Deriv. Litig., 666 F. Supp. 2d 501, 502 (E.D. Pa. 2009) (citing Guttman v. Huang, 823 A.2d 492, 500 (Del. Ch. 2003)). Indeed, "[a] plaintiff must allege facts that show a substantial likelihood that a director will be liable for engaging in 'material trading activity at a time when one can infer from particularized pled facts that [he or she] knew material, non-public information about the company's financial condition.'" Id. (quoting Guttman, 823 A.2d at 500).

Here, Plaintiffs have failed to meet their burden of showing a substantial likelihood of liability for insider trading on the part of Insider Trading Defendants for several reasons. First, Plaintiffs have not demonstrated that the Board knew of or directed the material, non-public information that forms the bedrock of this claim. As emphasized repeatedly throughout this Opinion, Plaintiffs have not pled particularized facts that demonstrate that any of the Individual Defendants, including the Insider Trading Defendants, "knew of and/or were engaging in a scheme to cause the Company to defraud the U.S. and individual state health care systems due to their illicit over-admission of patients and billing such government entities for their purported services." (See Doc. No. 48 ¶ 334.)

Further, even if Plaintiffs had successfully established that Individual Defendants knew about or engaged in the alleged misconduct, much of this misconduct was publicly disclosed in

the company's filings.  As noted above, UHS disclosed the qui tam lawsuits and the state and federal investigations in its SEC filings.  The letters, Mr. Herrell's response to the letters, and the Buzzfeed articles were also public.

Finally, Plaintiffs' insider trading allegations are not sufficiently particularized to show a substantial likelihood of liability against Insider Trading Defendants.  For example, the Amended Complaint states that Insider Trading Defendants' trades "were inconsistent with past trading patterns and suspicious in their timing and amount."  (See id. ¶¶ 264-72.)  But fatally, they fail to demonstrate this point by citing to examples of past trades for comparison.  Without such allegations, it is wholly unclear where the inconsistencies lie and how they support an insider trading claim.

Additionally, the Amended Complaint alleges that Insider Trading Defendants "sold [their] shares, placing them into the open market, at artificially inflated prices and at a time when the Board was causing the Company to repurchase those same shares."  (Id. ¶ 264.)  According to Plaintiffs, this timing was "suspicious."  But Plaintiffs provide no particularized information about the Board's decisions—it is unclear when these decisions were made, when the repurchases occurred, or how much stock the company was authorized to repurchase.  Instead, Plaintiffs merely offer a boilerplate allegation that the timing was suspicious and expect the Court to fill in the blanks.

For these reasons, Plaintiffs have failed to plausibly allege a breach of fiduciary duty claim based on insider trading, and therefore have not demonstrated that this claim exposes the Board to a substantial threat of personal liability.

### iv.     Count III – State Law Breach of Fiduciary Duty Claim

In Count III, Plaintiffs allege that "the Individual Defendants breached their fiduciary duty of loyalty, including acting without good faith, by knowingly failing to supervise Universal and causing the company to violate the [False Claims Act] and the federal securities laws." (Doc. No. 48 ¶ 317.) They further allege that "the Individual Defendants breached their fiduciary duties by willfully and/or recklessly engaging in a scheme to cause the Company to defraud the U.S. and individual state health care systems due to their illicit over-admitting of patients and billing such government entities for their purported services." (Id.)

Count III is entirely premised on the allegation that Individual Defendants ignored red flags that should have alerted them to the alleged misconduct occurring at UHS behavioral health facilities. In other words, Plaintiffs' theory of liability in Count III mirrors Plaintiffs' Caremark claims, discussed supra. Indeed, in Paragraph 317 of the Amended Complaint, Plaintiffs allege that Individual Defendants "were repeatedly informed through litigation updates, investigation updates, and letters from concerned shareholders and an employee union that the Company's practices violated positive law and lacked sufficient internal controls to properly enforce compliance with the law[,]" but failed to remedy the alleged misconduct. (Id. ¶ 317.)

As noted in the Caremark section, Plaintiffs have failed to plead that the Board acted in bad faith by ignoring red flags that should have put them on notice of alleged misconduct at UHS behavioral health facilities. For this reason, Plaintiffs have also failed to state a claim in Count III and have failed to establish that the conduct alleged in this claim exposes the Board to a substantial threat of personal liability.

### v.     Count IV – State Law Constructive Fraud Claim

In Count IV, Plaintiffs bring a state law claim of constructive fraud, alleging that Individual Defendants "caused Universal to violate the [False Claims Act] and to make numerous misrepresentations to and/or conceal material facts from Universal's shareholders, despite the Individual Defendants' duties to ensure the Company disclosed true facts regarding the Company's business and their control of the Company."  (Id. ¶ 321.)

Delaware courts have held that the term "constructive fraud" is used "to describe a breach of fiduciary duty and not . . . a separate tort."  Parfi Holding AB v. Mirror Image Internet, Inc., 794 A.2d 1211, 1236-37 (Del. Ch. 2001), rev'd on other grounds, 817 A.2d 149 (Del. 2002).  Thus, courts have dismissed claims for constructive fraud where the conduct alleged in support of the claim simply repeats the allegations pled in support of a breach of fiduciary duty claim.  See Carsanaro v. Bloodhound Technologies, Inc., 65 A.3d 618, 643 (Del. Ch. 2013) (applying Parfi and dismissing a constructive fraud claim that merely "reframe[d]" the breach of fiduciary duty claim).

Here, the conduct alleged to support the constructive fraud claim in Count IV is identical to the conduct pled to support the breach of fiduciary claim in Count III.  Thus, because the Court has found that Count III fails to state a claim, Count IV also fails to state a claim.  For this reason, the conduct alleged in Count IV does not expose the Board to a substantial threat of personal liability.

### vi.     Count V – State Law Corporate Waste Claim

In Count V, Plaintiffs bring a state law corporate waste claim against Individual Defendants, alleging that "[b]y rewarding themselves through the payment of outsized incentive compensation while causing Universal to violate the [False Claims Act], and by facilitating the

insider sales by Insider Trading Defendants, the Individual Defendants have caused Universal to waste valuable corporate assets." (Doc. No. 48 ¶ 324.)

"The essence of a claim of waste of corporate assets is the diversion of corporate assets for improper or unnecessary purposes." Taylor v. Kissner, 893 F. Supp. 2d 659, 673 (D. Del. 2012) (quoting Michelson v. Duncan, 407 A.2d 211, 217 (Del. 1979)). To excuse demand on the ground of corporate waste, "the Complaint must allege particularized facts that lead to a reasonable inference that the director defendants authorized 'an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate compensation.'" In re Citigroup Inc. Shareholder Deriv. Litig., 964 A.2d 106, 136 (Del. Ch. 2009) (quoting Brehm, 746 A.2d at 263). The test for corporate waste is stringent; indeed, "[t]o prevail on a waste claim . . . the plaintiff must overcome the general presumption of good faith by showing that the board's decision was so egregious or irrational that it could not have been based on a valid assessment of the corporation's best interests." Id. (quoting White v. Panic, 783 A.2d 543, 554 n.36 (Del. 2001)).

Here, Plaintiffs have failed to state a claim of corporate waste because the claim is entirely premised on their claims that Individual Defendants' breached their fiduciary duties. Indeed, Plaintiffs claim that Individual Defendants committed waste (1) by paying salaries to directors and officers who committed breaches of fiduciary duties by knowing about or engaging in the alleged misconduct, and (2) by paying salaries to directors and officers who allegedly committed breaches of fiduciary duties by engaging in insider trading. Having determined that Plaintiffs have failed to allege sufficient facts which would allow the Court to draw the reasonable inference that the Board faces a substantial likelihood of liability on the breach of fiduciary duty claims, the Court similarly finds that Plaintiffs have failed to allege a claim of corporate waste.

### vii.    Count VI – State Law Unjust Enrichment Claim

Finally, in Count VI, Plaintiffs allege a state law unjust enrichment claim, claiming that "[a]s a result of the conduct described [in the Amended Complaint], the Individual Defendants will be, and have been, unjustly enriched at the expense of the Company and its shareholders."  (Id. ¶ 327.)  More specifically, they allege that "Individual Defendants granted, authorized, approved, and/or received tens of millions of dollars in outsized executive compensation that was paid to them only as a result of their having caused Universal to defraud the U.S. and individual state health care systems by illicitly over-admitting patients and then billing the U.S. government for their so-called services."  (Id. ¶ 328.)  Finally, Plaintiffs argue that "[a]ll incentive compensation payments and stock sale proceeds granted, authorized, approved, and/or received by the Individual Defendants were at the expense of Universal" and that the company "was inadequately compensated for these payments and stock sale proceeds."  (Id. ¶ 329.)

In general, unjust enrichment refers to "the unjust retention of a benefit to the loss of another."  Calma on Behalf of Citrix Systems, Inc. v. Templeton, 114 A.3d 563, 591 (Del. Ch. 2015) (quoting Fleer Corp. v. Topps Chewing Gum, Inc., 539 A.2d 1060, 1062 (Del. 1988)).  Under Delaware law, a claim for unjust enrichment has five elements: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) absence of justification, and (5) the absence of a remedy."  Nemec v. Shrader, 991 A.2d 1120, 1130 (Del. 2010).  "At the pleadings stage, an unjust enrichment claim that is entirely duplicative of a breach of fiduciary duty claim—i.e., where both claims are premised on the same purported breach of fiduciary duty—is frequently treated 'in the same manner when resolving a motion to dismiss.'"  Templeton, 114 A.3d at 591 (quoting Frank v. Elgamal, No. 6120-VCN, 2014 WL 957550, at *31 (Del. Ch. Mar. 10, 2014)); see also Monroe Cnty. Emps.' Ret. Sys. v. Carlson, No. 4587-CC, 2010

WL 2376890, at *1 (Del. Ch. June 7, 2010) (granting a motion to dismiss a fiduciary duty claim and a duplicative unjust enrichment claim).

Here, Plaintiffs' unjust enrichment claim is based on the same allegations as their breach of fiduciary duty claim. That is, they claim that as a result of the alleged breaches of fiduciary duties, Individual Defendants were unjustly enriched. Without a successful a fiduciary duty claim, the unjust enrichment claim cannot survive. For that reason, Count VI fails to state a claim against any Individual Defendant. Therefore, Count VI does not expose any member of the Board to a substantial threat of personal liability.

In sum, Plaintiffs have not shown that a majority of the Board of Directors was disinterested. First, Plaintiffs have not established that the Board faces a substantial threat of personal liability because they directed or incentivized the behavioral health facilities to engage in misconduct through the business plans. Second, Plaintiffs have not demonstrated that the Board faces a substantial threat of personal liability under <u>Caremark</u>. Third, Plaintiffs have failed to state a claim against any Individual Defendant, and therefore, the Amended Complaint does not expose any members of the Board to a substantial threat of personal liability. For these reasons, the Court is not persuaded that Plaintiffs have pled particularized facts under Rule 23.1 that raise a reasonable doubt that the Board was not disinterested, such that making a pre-suit demand would have been futile.

2.    **Plaintiffs Have Failed to Plead Particularized Facts that Create a Reasonable Doubt that a Majority of the UHS Board Lacked Independence**

As explained above, Defendants argue that Plaintiffs have failed to demonstrate demand futility because the Amended Complaint lacks particularized facts that create a reasonable doubt that a majority of the Board was not disinterested or that a majority Board was not independent.

Having concluded that Plaintiffs failed to show that a majority of the Board was not disinterested, the Court now turns to the question of whether Plaintiffs have pled particularized facts that raise a reasonable doubt that a majority of the Board was not independent.

As with disinterestedness, the independence inquiry focuses on whether a director, when faced with a pre-suit demand, can be impartial. See Kanter v. Barella, 489 F.3d 170, 178 (3d Cir. 2007). To be independent, "'a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences.'" Rales, 634 A.2d at 936 (quoting Aronson, 473 A.2d at 816). "Directorial interest exists whenever divided loyalties are present, or where the director stands to receive a personal financial benefit from the transaction not equally shared by the shareholders." Blasband, 971 F.2d at 1048 (citing Aronson, 473 A.2d at 812). If a director is beholden to an interested director or "so under [another's] influence that [his] discretion would be sterilized," he lacks independence. Kanter, 489 F.3d at 178 (quoting Rales, 634 A.2d at 936).

Significantly, directors are entitled to a presumption that they are independent and would faithfully adhere to their fiduciary duties. Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart, 845 A.2d 1040, 1048 (Del. 2004) (citing Aronson, 473 A.2d at 812) ("It is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."). "In the context of a pre-suit demand, the burden is upon the plaintiff in a derivative action to overcome that presumption." Id. at 1048-49. At the pleading stage, a court must evaluate whether a plaintiff has alleged particularized facts that create a reasonable doubt of a director's independence in order to rebut the presumption. Id. at 1049 (citing Rales, 634 A.2d at 934). If the plaintiff successfully rebuts the presumption, demand will be excused as futile. Id.

In this case, Plaintiffs argue that Defendant Alan Miller, the company's CEO and Chairman of the Board, is an interested director, and that the remaining members of the Board are beholden to Alan Miller, such that they are not independent. As noted earlier, there are seven members of the UHS Board of Directors. During the time period relevant to the misconduct alleged in this case, the following Individual Defendants sat on the Board: Alan Miller, Marc Miller, Lawrence Gibbs, Robert Hotz, Anthony Pantaleoni, Eileen McDonnell, and John Herrell.[44] Again, these Individual Defendants are referred to as Director Defendants.

Plaintiffs primarily contend that Director Defendants were beholden to Alan Miller because Alan Miller and his son, Defendant Marc Miller, retain a controlling share of the company's voting power. According to UHS's public filings, despite maintaining a 7-8% equity stake in UHS, Alan and Marc Miller respectively possess 83.6% and 2.6% of company's general voting power. (Doc. No. 48 ¶¶ 43, 44.) As of March 20, 2018, Alan Miller held 99.7% of UHS Class C voting stock, which entitles the holder to 100 votes per share. Collectively, Alan and Marc Miller hold over 90% of UHS Class A stock, which entitles the holder to one vote per share. (Id. ¶¶ 41-42.)

Through their control of the company's Class A and Class C stock, Alan and Marc Miller have enough voting power to elect five of the seven directors on the Board. Since 2006, when Marc Miller joined the Board of Directors, the Millers have occupied two of those five seats. Plaintiffs allege that the remaining three directors "maintain[] his/her directorship only at the pleasure of Defendants Alan and Marc Miller, and thus are not truly independent." (Id. ¶ 47.) Thus, Plaintiffs contend that at least five out of seven, or a majority, of Directors are beholden to

---

[44] Mr. Herrell and Mr. Pantaleoni have since retired as members of the UHS Board of Directors. At the time the Amended Complaint was filed on November 5, 2018, the following individuals were members of the Board: Alan Miller, Marc Miller, Lawrence Gibbs, Robert Holz, Eileen McDonnell, Warren Nimetz, and Elliott Sussman. (See Doc. No. 48.)

Alan Miller and therefore lack the requisite independence to consider a pre-suit demand impartially.

As an initial matter, Plaintiffs' independence argument fails because, as explained <u>supra</u>, the Amended Complaint lacks particularized facts that demonstrate that Alan Miller, or any member of the Board, is an interested director. For that reason alone, the contention that the majority of the Board lacks independence because they are beholden to Alan Miller fails.

But even assuming Alan Miller was an interested Director, Plaintiffs' argument is inconsistent with controlling Delaware law on the subject. In <u>Aronson</u>,[45] the Delaware Supreme Court firmly rejected the notion that a controlling interest in a corporation, by itself, is enough to overcome a director's presumption of independence. There, the plaintiff challenged certain agreements entered into between the company and a director who had a 47% ownership stake in the company. The plaintiff alleged that pre-suit demand was futile because the director with the 47% ownership interest personally selected nine members of the company's board. The court disagreed:

> [I]n the demand context even proof of majority ownership of a company does not strip the directors of the presumptions of independence, and that their acts have been taken in good faith and in the best interests of the corporation. There must be coupled with the allegation of control such facts as would demonstrate that through personal or other relationships the directors are beholden to the controlling person.

<u>Id.</u> at 815. The court then found that the complaint failed to plead demand futility under Rule 23.1. <u>Id.</u>

---

[45] The fact that <u>Rales</u>, and not <u>Aronson</u>, governs demand futility allegations in this case is of no concern on this issue "because—regardless of the applicable test—the demand futility analysis focuses on whether there is a reason to doubt the impartiality of the directors, who hold the authority under 8 Del. C. § 141(a) to decide 'whether to initiate, or refrain from entering, litigation.'" <u>Teamsters Union 25 Health Services & Insurance Plan v. Baiera</u>, 119 A.3d 44, 67 (Del. Ch. 2015).

Twenty years later, in Martha Stewart Living, the Delaware Supreme Court again discussed the effect of a controlling shareholder on the independence analysis. 845 A.2d at 1040. There, investors sued Martha Stewart, the company's founder, and other directors and officers, alleging damages resulting from corporate mismanagement and insider trading. Id. As justification for not making a pre-suit demand, the investors stated that a majority of the directors were not independent from Stewart because they maintained personal and business relationships with her and because she controlled 94% of the company. Citing to Aronson, the court rejected this argument:

> Beam attempts to bolster her allegations regarding the relationships between Stewart and Seligman and Moore by emphasizing Stewart's overwhelming voting control of [the company]. That attempt also fails to create a reasonable doubt of independence. A stockholder's control of a corporation does not excuse presuit demand on the board without particularized allegations of relationships between the directors and the controlling stockholder demonstrating that the directors are beholden to the stockholder. As noted earlier, the relationships alleged by Beam do not lead to the inference that the directors were beholden to Stewart, and, thus, unable independently to consider demand. Coupling those relationships with Stewart's overwhelming voting control of [the company] does not close that gap.

Id. at 1054. The court also explained that to create a reasonable doubt about a director's independence, "a plaintiff must plead facts that would support the inference that because of the nature of the relationship or additional circumstances other than the interested director's stock ownership or voting power, the non-interested director would be more willing to risk his or her reputation than risk the relationship with the interested director." Id. at 1052.

Aronson and Martha Stewart Living make it clear that the presence of a controlling shareholder, standing alone and without more particularized allegations, does not overcome the presumption that directors act independently. Here, Plaintiffs independence argument is almost entirely premised on the fact that Alan Miller's controlling share of the company allows him to elect five out of the seven directors. Beyond that allegation, Plaintiffs only allege additional facts for two Director Defendants. First, they claim that Marc Miller is beholden to his father through

their familial ties. Second, they note that Mr. Pantaleoni's position as Of Counsel at Norton Rose, UHS's long-term outside counsel, made him beholden to Alan Miller because "Pantaleoni's compensation at Norton Rose is largely dependent upon the continued engagement by and payments for legal services to Universal and Defendant Alan Miller." (Doc. No. 48 ¶ 31.)

Even if Marc Miller and Mr. Pantaleoni were beholden to Alan Miller, and even assuming that Alan Miller was an interested director, only three out of the seven directors would have been incapable of making an impartial decision regarding a pre-suit demand. Beyond allegations related to those three Directors, Plaintiffs' independence allegations relating to the other four Director Defendants—Mr. Herrell, Mr. Hotz, Mr. Gibbs, and Ms. McDonnell—are based solely on Alan Miller's control over the company. As explained in Aronson and Martha Stewart Living, and pursuant to the particularity requirements of Rule 23.1, such limited allegations do not raise a reasonable doubt that a majority of the Board lacked the requisite independence to impartially consider a pre-suit demand in this case.

For these reasons, Plaintiffs have failed to plead particularized facts that raise a reasonable doubt that a majority of the Board lacked independence. Nor does the Amended Complaint contain particularized facts that raise a reasonable doubt that the Board was not disinterested. As a result, Plaintiffs have not established demand futility under Rule 23.1 and Delaware law. Accordingly, Defendants' Motion to Dismiss will be granted and the Amended Complaint will be dismissed in its entirety.[46]

---

[46] Defendants also argue that the Amended Complaint should be dismissed against Mr. Caponi pursuant to Federal Rule of Civil Procedure 12(b)(5) for lack of service. (Doc. No. 68 at 37.) Because Plaintiffs have not pled demand futility, leading to the dismissal of the Amended Complaint in its entirety, the Court need not address Defendants' service arguments.

## V.     CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss will be granted.  An appropriate

Order follows.